UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

ROBERT FEILBOGEN,              :    Docket No. 303 CV 1624 (CFD)

              Plaintiff,    :

                    :

           v.            :

AIG TRADING GROUP INC. and   :
AIG FINANCIAL PRODUCTS CORP.,  :

          Defendants.    :    August 9, 2004

                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Theodore O. Rogers, Jr. (ct00904)
Michael Gifford (ct26061)
Nicole A. Barrett (*admission pending)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

David Kulle (ct00333)
Stephen W. Aronson (ct02216)
Christopher T. Wethje (ct24466)
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
(860) 275-8200

*Counsel for Defendants*

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF UNDISPUTED FACTS ................................................................4
    1.    Background ..............................................................................................4
    2.    Compensation and Bonuses ....................................................................5
    3.    Records of Compensation ........................................................................7
    4.    Integration of Trading into AIGFP ........................................................8
    5.    Severance Policy ...................................................................................11
    6.    The Alleged Oral Promise ....................................................................11
    7.    Employment at Sempra Energy Trading Corp......................................12
    8.    Allegations of the Complaint ................................................................13

STANDARD OF REVIEW FOR SUMMARY JUDGMENT ..................................13

ARGUMENT ...........................................................................................................14

I.      DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT  ON
      FEILBOGEN'S CONTRACT CLAIM (COUNT I)...........................................14
      A.    The Alleged Oral Contract Is Void under the Statute of Frauds...............14
      B.    Finigan Did Not Have Requisite Authority to Bind Trading or
            AIGFP to an Oral Contract of the Sort Alleged........................................18
      C.    Feilbogen's Allegations Provide No Basis for a Claim of Breach
            of Contract Against Either Trading or AIGFP............................................19

II.     FEILBOGEN IS NOT ENTITLED TO RECOVERY UNDER THE
      CONNECTICUT WAGE STATUTE (COUNT III) ...........................................21
      A.    The Wage Statute Claim Fails Along with the Contract Claim.................21
      B.    The Alleged Payments Are Not "Wages" in Any Event ...........................21

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
      FEILBOGEN'S CLAIM FOR SEVERANCE (COUNT VI)...............................24
      A.    Severance Was Paid Only to Those Employees Who Released
            Claims ....................................................................................................24
      B.    An Offer of Severance to Others Does Not Establish a Contract
            Right for Feilbogen to Be Offered the Same .............................................24
      C.    Feilbogen Was Not Constructively Discharged in Any Event .................25

IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
      FEILBOGEN'S PROMISSORY ESTOPPEL CLAIM (COUNT II)....................27

V.    FEILBOGEN'S ALTERNATIVE QUASI-CONTRACT CLAIMS OF
      QUANTUM MERUIT (COUNT IV) AND UNJUST ENRICHMENT (COUNT
      V) FAIL ..................................................................................................................30
      A.    Plaintiff's Express Written Agreement to the Terms of His
            Employment Precludes His Claims of Quasi-contract...............................30

CONCLUSION................................................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ABC Office Equip,* v. *Royal Consumer Bus. Prods.,*
    721 F. Supp. 1557 (D. Conn. 1989)................................................................23

*Allen* v. *Bridgestone Firestone, Inc.,*
    81 F.3d 793 (8th Cir. 1996) .......................................................................27

*Am. Fed. Group, Ltd.* v. *Rothenberg,*
    136 F.3d 897, 909 (2d Cir. 1998)............................................................14

*Anderson* v. *Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)................................................................................14

*Butler* v. *Cadbury Beverages, Inc.,*
    1999 U.S. Dist. LEXIS 16098 (D. Conn. June 29, 1999).....................21

*Celi* v. *Canadian Occidental,*
    804 Fed. Supp. 465 (E.D.N.Y. 1992)....................................................18

*Chertkova* v. *Conn. Gen. Life Ins. Co.,*
    92 F.3d 81 (2d Cir. 1996).......................................................................25

*Croslan* v. *Hous. Auth. for New Britain,*
    974 F. Supp. 161 (D. Conn 1997)................................................28, 30

*Engstrom* v. *John Nuveen & Co., Inc.,*
    668 F. Supp. 953 (E.D. Pa. 1987) ......................................................28

*Fenne* v. *TLB Kent Co.,*
    865 F.2d 498 (2d Cir. 1989).................................................................19

*Konigsberg* v. *Sec. Nat'l Bank,*
    66 F.R.D. 439, 443 (S.D.N.Y 1975) ...................................................18

*Lee* v. *Jenkins Bros.,*
    156 F. Supp. 858 (D. Conn. 1957).......................................15, 19, 20

*Lesson* v. *ARI of Conn., Inc.,*
    51 F. Supp. 2d 135 (D. Conn. 1999)...................................................26

*Linker* v. *Koch Investments, Inc.,*
    62 F. Supp. 2d 611 (D. Conn. 1999).................................................29

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,*
    475 U.S. 574 (1986)...............................................................................14

*Owens* v. *Am. Nat'l. Red Cross,*
    673 F. Supp. 1156 (D. Conn. 1987)....................................................25

*Panzino* v. *Scott Paper Co.,*
    685 F. Supp. 458 (D.N.J. 1988)...........................................................28

*Raskin* v. *Wyatt Co.,*
    1996 U.S. Dist. LEXIS 4647 (S.D.N.Y., April 15, 1996) .....................26

*Sedotto* v. *Borg-Warren Protector Servs. Corp.,*
    94 F. Supp. 2d 251 (D. Conn. 2000)..................................................26

*Spence* v. *Md. Casualty Co.,*
    995 F.2d 1147 (2d Cir. 1993)................................................................26

*Stetson* v. *NYNEX Serv. Co.*,
    223 F.2d 355 (2d Cir. 1993)..................................................................27
*Weisse* v. *Engelhard Minerals & Chems. Corp.*,
    571 F.2d 117 (2d Cir. 1978)..................................................................15
*Zaitsev* v. *Salomon Bros. Inc.*,
    60 F.3d 1001 (2d Cir. 1995)....................................................15, 21, 32

## STATE CASES

*Bombard* v. *Indus. Riggers, Inc.*,
    1997 Conn. Super. LEXIS 3524 (Conn. Super. Ct. 1998)................17, 29
*Brittell* v. *Dep't of Corr.*,
    247 Conn. 148 (1998)..........................................................................25
*Burkle* v. *Superflow Mfg. Co.*,
    137 Conn. 488 (Conn. 1951).................................................................14
*Christensen* v. *Bic Corp.*,
    18 Conn. App. 451 (1989) ....................................................................24
*Conn. Nat'l. Bank* v. *Voog*,
    233 Conn. 352 (Conn. 1995)....................................................27, 28, 29
*Cook* v. *Alexander & Alexander of Conn. Inc.*,
    40 Conn. Supp. 246 (Conn. 1985) .......................................................22
*Cunnison* v. *Richardson Greenshields Sec.*,
    107 A.D.2d 50, 54 (N.Y. App. Div. 1985) ..........................................18
*DeLuca* v. *C.W. Blakeslee & Sons, Inc.*,
    174 Conn. 535 (Conn. 1978).................................................................28
*Hall* v. *Pullins*,
    1992 Conn. Super. LEXIS 1086 at *8-*9 (1992) .................................17
*Health Delivery Systems* v. *Scheinman*,
    344 N.Y.S.2d 190 (N.Y. App. Div. 1973) ...........................................18
*Kaplan* v. *Capital Company of America*,
    747 N.Y.S.2d 504 (N.Y. App. Div. 2002) ...........................................31
*Killion* v. *Davis*,
    69 Conn. App. 366, 372 (Conn. App. Ct. 2002) ..................................15
*McGowan* v. *Admin'r*,
    153 Conn. 691 (Conn. 1966).................................................................23
*O'Sullivan* v. *Bergenty*,
    214 Conn. 641 (Conn. 1990).................................................................28
*Reynolds* v. *Chrysler First Commercial Corp.*,
    40 Conn. App. 725, *appeal denied*, 237 Conn. 913 (1996) ...................24
*Rosick* v. *Equip. Maint, & Serv., Inc.*,
    33 Conn. App. 25, 27 (1993) ...............................................................31
*Rutt* v. *Roche*,
    138 Conn. 605, 608 (1952) ..................................................................17
*Scandura* v. *City of Middletown*,
    2003 Conn. Super. LEXIS 545 *17 (2003)...........................................31

*Somerville* v. *Epps*,
    419 A.2d 909, 911 (Conn. Super. 1980) ...................................................................32

*Tierney* v. *Capricorn Investors LP*,
    189 A.D.2d 629 (N.Y.A.D. 1993)...........................................................................21

*Tomlinson* v. *Bd. of Educ. of the City of Bristol*,
    226 Conn. 704 (Conn. 1993)..........................................................................18, 19

*Vachon* v. *Tomacak*,
    155 Conn. 52 (Conn. 1967).................................................................................16

*Verzier* v. *Convard*,
    52 A. 255 (Conn. 1902) ......................................................................................17

*Virgulak* v. *Facsimile Marketing*,
    1994 Conn. Super. LEXIS 248 (Oct. 7, 1993)..............................................17, 29

*Ziotas* v. *Reardon Law Firm, P.C.*,
    No. 550776, 2000 Conn. Super. LEXIS 2842 (Oct. 23, 2000)........................22, 23

## DOCKETED CASES

*Gold* v. *AIG, et. al.*,
    Docket No. 3:97CV2486 (D. Conn. June 30, 2000) (JBA) ..................................25

## STATUTES

Conn. Gen. Stat. §31-71(c) ............................................................................................21
Conn. Gen. Stat. §31-71(a)(3)........................................................................................21
Conn. Gen. Stat. §52-550(a) ..........................................................................................14
Fed. R. Civ. P. 56(c) ......................................................................................................13
Fed. R. Civ. P. 56(e) ......................................................................................................13

## MISCELLANEOUS

*Restatement (Second) of Agency* § 8 .............................................................................19

## PRELIMINARY STATEMENT

Plaintiff Robert Feilbogen ("Feilbogen") was the Chief Operating Officer of AIG Trading Group Inc. ("Trading") from 1999 until early 2003, when he became co-head of the firm's new energy group. In early 2003, Trading's parent, American International Group, Inc. ("AIG"), announced its decision to integrate the operations of Trading, which was based in Greenwich, Connecticut, into the operations of another wholly-owned financial services subsidiary of AIG, AIG Financial Products Corp. ("AIGFP").

In the course of the integration process, AIGFP enlisted Feilbogen's help in compiling compensation commitments made by Trading to employees for the year 2003 or later, so that it could incorporate them into its employment offers to those Trading employees who would be leaving Trading and transferring to AIGFP. Feilbogen admittedly provided the requested information to AIGFP without claiming that any bonus commitment had been made to him.

The transfer of Trading's energy group to AIGFP was scheduled to take place July 1, 2003. A few days before, and after discussions concerning the role he would play at AIGFP, Feilbogen asserted for the first time that the Chief Executive Officer of Trading, John Finigan ("Finigan"), had long before orally promised him a $1.3 million guaranteed bonus for 2003. AIGFP, after inquiring into the matter – including learning from Finigan that he gave no such guarantee – told Feilbogen that he was welcome to join AIGFP, but on the basis of a discretionary bonus for 2003. Instead, Feilbogen decided to resign to join his uncle's firm, Sempra Energy Trading Corp.

("Sempra"), which had been speaking with him about employment for years, and which paid him a $400,000 bonus for four months' work in 2003.

It is undisputed that Feilbogen was a senior executive with intimate knowledge of Trading's operations, including the fact that any bonus commitments made by Trading to employees were subject to approval by AIG, and that the written records of all authorized commitments to employees were kept by human resources personnel at Trading. For example, in late 2000, bonus guarantees were provided to Feilbogen and other Trading executives in connection with the departure of the senior management of the firm. Feilbogen was given a copy of AIG's written authorization of those guarantees, and all such bonuses were recorded in writing by Trading's human resources personnel. Moreover, Trading's Policy Manual for employees – which Feilbogen admittedly received and agreed to in writing – states that all bonuses are discretionary unless guaranteed in writing.

Notwithstanding Feilbogen's admitted knowledge of the company's processes and policies, this action is based on the assertion that he received and relied on a supposed statement by Finigan to Feilbogen in 2002 that "he was going to pay me" $1.3 million for the year 2003, admittedly without any further detail, without any documentation and without the knowledge or approval of AIG.

Feilbogen's claims are defective and should be dismissed for numerous reasons.

First, as to Feilbogen's contract claim, he asserts that the alleged oral promise for a 2003 bonus took place in August 2002, yet it is undisputed that bonuses for 2003 were not to be paid until December 2003 at the earliest, more than one year from

-2-

the alleged oral promise.  Feilbogen's own allegations thus clearly render his contract claim invalid under the Statute of Frauds.  It also is undisputed that Finigan did not have authority to give bonus guarantees without AIG approval, and Feilbogen's admitted knowledge of needed authority for compensation commitments vitiates any claim of apparent authority.

Second, Feilbogen's claim under Connecticut's wage statute fails as a result of Feilbogen's own admissions.  He claims that he was given an oral promise of a bonus for 2003 in order to encourage him to work in the new energy group, which was not expected to generate sufficient income in 2003 to justify such a large bonus.  As a matter of law, retention payments of that sort do not constitute wages for purposes of the Connecticut wage statute.

Third, Feilbogen seeks severance, notwithstanding that severance payments were not automatic but, instead, paid out only to terminated employees who were agreeable to a release of claims, which Feilbogen admittedly refused to do.  Feilbogen's admitted disavowal of any intention to release his claim thus clearly disentitled him to severance under any circumstance.

Fourth, Feilbogen's promissory estoppel claim fails because he did not change his position as a result of Finigan's alleged promise.

Last, Feilbogen's assertions of quasi-contract (*quantum meruit* and unjust enrichment) fail.  It is axiomatic that quasi-contract claims of this sort can only survive in the absence of an express agreement on the subject and here Feilbogen explicitly agreed, in writing, to the Trading Policy Manual, which provides that there is no right to a bonus in the absence of a written bonus contract.

## STATEMENT OF UNDISPUTED FACTS

### 1.    Background

Feilbogen began working at Trading in 1990. He was a member of the

foreign exchange forwards trading desk until late 1997 or early 1998, when he became

Trading's Chief of Staff to the Chief Executive Officer of the firm. His responsibilities

as Chief of Staff included risk management and accounting. (Deposition of Robert

Feilbogen dated March 16, 2004 ("Feilbogen Dep.") 15).[1]  In 1999, he became the

company's Chief Operating Officer, at which time his responsibilities expanded to

include systems and operations. (Feilbogen Dep. 20-21.) In December 2000, Feilbogen

became an Executive Vice-President and was appointed to Trading's Executive

Management Committee. (Complaint ("Compl.") ¶ 8; Feilbogen Dep. 21.)

Beginning in mid-2002, Feilbogen began working on efforts to start an

energy group within Trading. An executive named Tony Gordon ("Gordon") was

recruited and hired to lead the effort. Gordon, like other new hires into the energy group,

had a written employment contract, with a compensation guarantee for 2003. (Feilbogen

Dep. 122.) Feilbogen retained his duties as Chief Operating Officer until March 26,

2003, at which time it was announced internally that he would assume responsibility for

trading and risk management in the energy group. (Def. Dep. Ex. 11.)

---

[1]    The deposition pages and exhibits cited herein are appended to the accompanying Affidavit of Michael
Gifford, dated August 6, 2004. Defendants' deposition exhibits are referred to as "Def. Dep. Ex.;"
deposition exhibits marked by plaintiff are referred to by the name of the deponent at whose deposition
the exhibit was marked, *e.g.*, Dooley Dep. Ex.

2.     **Compensation and Bonuses**

Proposed salaries for employees at Trading had to be sent to the parent AIG for approval. Either Edward Matthews ("Matthews") or William Dooley ("Dooley"), senior executives of AIG with oversight responsibility for Trading had to approve any salary increases for employees at Trading. (Deposition of John Finigan, dated June 10, 2004 ("Finigan Dep.") 50, 228; Deposition of William Dooley, dated June 28, 2004 ("Dooley Dep.") 26). Feilbogen was aware of this fact. (Feilbogen Dep. 40-41.)

In 2000, Feilbogen's annual salary was $200,000. (Feilbogen Dep. 40.) Feilbogen received a discretionary bonus of $720,000 in 2000. Feilbogen understood that Matthews approved this bonus figure. (Feilbogen Dep. 43-44.)

At the end of 2000, three senior executives of Trading left the company. In December 2000, AIG approved bonus guarantees for certain remaining Trading employees, including Feilbogen, for the years 2001 and 2002, as a means of encouraging the employees to stay with the firm during the time of management turnover. (Deposition of Dennis Zampella dated April 8, 2004 ("Zampella Dep.") 81.) In 2001, Feilbogen's annual salary was $200,000; his guaranteed bonus for 2001 was $800,000. (Feilbogen Dep. 54.) Matthews approved this guaranteed bonus figure in a memorandum dated December 6, 2000. (Def. Dep. Ex. 4.) Feilbogen was given a copy of that memorandum. (Feilbogen Dep. 46-47.) At the beginning of 2002, Feilbogen's salary was $200,000; his guaranteed bonus, as set in Matthews' December 6, 2000 memorandum, was $600,000. (Def. Dep. Ex. 4.)

In late 2001 or early 2002, Feilbogen spoke with Finigan about his 2002 compensation. Feilbogen sought an increase. He has testified that he told Finigan that he could find a job outside of Trading that would compensate him in the $1,500,000 range. (Feilbogen Dep. 67.) Finigan consulted with Dennis Zampella ("Zampella"), head of human resources for Trading, about Feilbogen's request for an increase in his 2002 guaranteed bonus. (Zampella Dep. 32.) Zampella, with Finigan's approval, wrote to Dooley to seek approval for the increase of Feilbogen's 2002 guaranteed bonus from $600,000 to $1,300,000. (Zampella Dep. 83; Zampella Dep. Ex. 3; Zampella Dep. Ex. 4.) Dooley approved the increase, and the increase was entered in human resources' records. (Zampella Dep. 84; Affidavit of Allesandra Marr, dated August 4, 2004 ("Marr Aff.") ¶ 6.) Feilbogen knew that Dooley was aware of and approved the increase. (Feilbogen Dep. 117.) In fact, after Finigan told Feilbogen of the compensation increase for 2002, Feilbogen asked Zampella if he should call Dooley and thank him for approving it. (Feilbogen Dep. 71.)

On April 2, 1997, Trading published a Policy Manual that sets forth certain policies of Trading. (Def. Dep. Ex. 31.) The Policy Manual confirmed that, in the absence of a written contract, "each employee is an employee 'at will.'" *Id.* at 28. The Trading policy regarding bonuses, as set forth on page 28 of the Policy Manual, is as follows:

> The Company may, but is not required to, pay employees a bonus based upon their performance and that of the Company. However, the determination as to whether and in what amount to pay such bonus shall be made by the Company in its sole discretion and, absent a written contract to the contrary, no employee has any entitlement to a bonus until it is actually received.

*Id.*

On April 28, 1997, Feilbogen signed an Acknowledgement of Compliance

with Policy Manual, which reads:

> I have read the Policy Manual of the Trading Group
> Companies dated April 2, 1997, which, among other things,
> defines the employment relationship . . . I understand the
> policies set forth in the Policy Manual, agree to be bound
> by such policies and, to the best of my knowledge, have
> adhered to such policies and have not knowingly violated
> my responsibilities as set forth therein.

*Id.* at 29.

### 3.    Records of Compensation

Compensation records, including records of any compensation

commitments, were kept by Trading's human resources personnel.  (Dooley Dep. 68;

Finigan Dep. 50; Marr Aff. ¶ 4.)

On September 11, 2002, Feilbogen wrote to Zampella asking him to create

a letter "confirming my gty [guarantee] payment," to assist Feilbogen in obtaining home

financing.  (Feilbogen Dep. 77; Def. Dep. Ex. 6.)  The letter Zampella created in response

states that Feilbogen had a guaranteed bonus for 2002 set at $1,300,000.  (Def. Dep.

Ex. 7.)  Although Feilbogen now asserts that some time between June and August 2002

he was orally promised a guaranteed bonus of $1.3 million for 2003, this September 2002

letter does not identify any guaranteed bonus for 2003.

Human resources maintained spreadsheets documenting Trading's current

compensation commitments.  The 2002 spreadsheet records Feilbogen's $1.3 million

guarantee for that year, but does not show a 2003 guarantee for Feilbogen.  (Marr Aff.

¶ 6, Ex. A.)  Likewise, the 2003 spreadsheet, as well as other spreadsheets compiling

commitment information for that year group by group, show no guarantee for Feilbogen

for 2003.  (Marr Aff. ¶¶ 7-9, Exs. B-D.)

On March 20, 2003, Feilbogen emailed to himself a spreadsheet that he

put together in the process of developing a business plan for Trading's energy group.

(Feilbogen Dep. 128; Def. Dep. Ex. 14.)  The spreadsheet contains human resources

information on compensation.  It reflects the fact that Gordon was given a 2003

guarantee, yet, like the Zampella letter and human resources spreadsheets, shows no 2003

guarantee for Feilbogen.  (Feilbogen Dep. 132; Def. Ex. 14.)

### 4.    Integration of Trading into AIGFP

AIG decided in early 2003 that it would integrate the operations of

Trading into AIGFP.  (Dooley Dep. 58.)  The decision was announced to employees in

April 2003.  (Finigan Dep. 294.)

Joseph Cassano ("Cassano"), the Chief Executive Officer of AIGFP,

remained the head of AIGFP.  (Dooley Dep. 59.)  By November 14, 2003, before year

end, Finigan's active employment with Trading had ended.  (Feilbogen Dep. 8.)

As part of the integration efforts in early 2003, Cassano asked Feilbogen

to compile and send to him information concerning commitments by Trading to energy

group employees.  (Feilbogen Dep. 131-33.)  Feilbogen testified that "I think he wanted

to understand what obligations AIG had in writing to the AIG Energy employees."  Id.

Feilbogen responded by sending a chart listing the compensation commitments to energy

group personnel, and a May 8, 2003 cover memorandum referring to the fact that

Feilbogen's co-head of the energy group, Gordon, had a bonus guarantee for 2003.

(Feilbogen Dep. 133, Def. Dep. Ex. 17.)  Like the Zampella letter, the human resources

spreadsheets and Feilbogen's own March 20, 2003 spreadsheet, Feilbogen's

memorandum and chart – too – show <u>no</u> <u>2003</u> guarantee for Feilbogen.

In March or April of 2003, Feilbogen traveled to London to meet with

Cassano to discuss the proposed integration of Trading into AIGFP.  (Feilbogen

Dep. 135.)  Feilbogen testified that the meeting was very encouraging and upbeat.

(Feilbogen Dep. 141.)

However, at a subsequent meeting at AIGFP's Wilton headquarters

concerning the integration process, Feilbogen was informed by AIGFP that its energy

activities would be headed by another executive, Martin Wayne ("Wayne").  (Feilbogen

Dep. 155.)  Further, Feilbogen testified that as time went on during the integration

discussions, he did not receive information satisfactory to him as to what role he would

fulfill at AIGFP.  (Feilbogen Dep. 156.)

Feilbogen and the other Trading energy personnel selected to join AIGFP

in Wilton were scheduled to begin employment on July 1, 2004.  AIGFP, <u>based</u> <u>on</u>

<u>compensation</u> <u>information</u> <u>provided</u> <u>by</u> <u>Trading</u>, created a chart titled AIGTG Employee

Transfers, dated June 16, 2003, which contained columns of information concerning the

energy personnel transferring from Trading, including base salary and whether the

employee had a bonus guarantee.  (Marr Aff. ¶ 11; Marr Aff. Ex. E.)  The "bonus

guarantee" box for Feilbogen stated "N/A."  *Id.*  On the afternoon of June 25, 2003,

Feilbogen sent an email to Finigan stating the following:

> Marty Wayne called me today and told me that they will be
> presenting the energy group with contracts or letters on
> Friday indicating that we will become FP employees.
> These letters will apparently reflect any guarantees or deals
> in place. Have you spoken to Joe Cassano about my verbal
> guarantee? I asked Dennis, and he said he knew we had

agreed on my comp for 2003, but wasnt (sic) sure if you
had mentioned anything.  I just don't want to find myself in
the awkward position of asking about it or informing them
for the first time about it on Friday.  If you havent (sic)
mentioned anything, let me know how you would like to
handle it.

(Feilbogen Dep. 189; Def. Dep. Ex. 26.)

As of June 25, 2003, Feilbogen had not spoken to anyone at AIGFP about

his employment terms with Trading, and had never claimed to AIGFP that he had a

guaranteed bonus for 2003.  (Feilbogen Dep. 107, 189.)

Finigan responded to Feilbogen's email with a telephone call confirming

to Feilbogen that he had not given him a guaranteed bonus for 2003.  (Feilbogen

Dep. 189-190.)

On June 27, 2003, Feilbogen was given a letter describing AIGFP's offer

of employment to him.  (Feilbogen Dep. 193; Def. Dep. Ex. 27.)  Consistent with the

information given to AIGFP, which was that Feilbogen had no guarantee, the letter stated

that any bonus compensation for 2003 would be discretionary.  *Id.*

On July 1, 2003, Feilbogen spoke by videoconference with Cassano, who

was in London.  (Feilbogen Dep. 208.)  Feilbogen testified that Cassano told Feilbogen

that he wanted him on the team, but that employees at AIGFP work on a discretionary

bonus basis, and that the current terms of the employment letter were the terms under

which Feilbogen could be an employee of AIGFP.  (Feilbogen Dep. 205.)

On July 3, Feilbogen wrote to Cassano stating that it was "impossible" for

him to be put in a position of "forfeiting my current guarantee."  (Def. Dep. Ex. 29.)

On July 9, 2004, Cassano responded to Feilbogen's letter stating:

-10-

As we have previously advised you, we have discussed your position with John Finigan, among others, and it is clear that, contrary to the assertions in your e-mail, you were not given a 2003 guarantee. This conclusion is of course consistent with Trading Group's Policy Manual, by which you agreed in writing to be bound. The Policy Manual clearly states that, absent a written contract to the contrary, no employee has any entitlement to a bonus until it is actually received.

(Def. Dep. Ex. 29.)

Feilbogen quickly sent an email to Cassano that day in response stating that his employment had ended, and claiming that he had been terminated. (Def. Dep. Ex. 29.)

### 5.   Severance Policy

Feilbogen knew Trading did not have a written severance policy. (Feilbogen Dep. 216.) Trading did, however, offer severance of one month's salary per year of service to those individuals whose employment was terminated as part of the integration of Trading into AIGFP, contingent on their <u>signing</u> a <u>release</u> of <u>claims</u>. (Feilbogen Dep. 216; Zampella Dep. 188.) Severance was paid only to persons who signed a release. (Zampella Dep. 188.)

### 6.   The Alleged Oral Promise

Feilbogen has testified that the conversation in which he claims Finigan made an oral promise to him about his 2003 compensation took place some time between June and August of 2002. (Feilbogen Dep. 109.) The Complaint dates the supposed conversation in <u>August</u> <u>2002</u>. (Compl. ¶14.) Feilbogen testified that he discussed with Finigan his concerns that the energy business would not be seeing revenue for some time, and that he also was moving his residence and would have an increased cost of living.

-11-

He said he told Finigan that he wanted to be clear how he would be compensated, and that Finigan responded by saying "I will pay you the same amount of money – the same bonus for 2003 as 2002." (Feilbogen Dep. 97-98.)

According to Feilbogen's account, Finigan said nothing about what would happen if Feilbogen's employment ended prior to the time bonuses for 2003 were paid.[2]

### 7.       Employment at Sempra Energy Trading Corp.

Feilbogen had been discussing the possibility of leaving Trading and joining Sempra Energy Trading Corp. ("Sempra") since December of 2000. (Feilbogen Dep. 222-23; Messer Dep. 29, 31.) The Chairman and Chief Executive Officer of Sempra, Steven Prince, is Feilbogen's uncle. (Feilbogen Dep. 220; Prince Dep. 12.) Feilbogen began work at Sempra as a Vice-President in early September 2003, shortly after Labor Day. (Feilbogen Dep. 219.) Feilbogen started with a base salary of $240,000, a minimum guaranteed bonus for the remaining four months of 2003 of $250,000, and a minimum guaranteed bonus for 2004 of $500,000. (Feilbogen Dep. 225.) Sempra paid Feilbogen a bonus of $400,000 for the four months he worked in 2003. (Messer Dep. 41.)

Feilbogen is currently the Chief Operating Officer of Sempra. The President of the firm, David Messer, has testified that he suspects Feilbogen could be "one of the top three guys one day" at Sempra. (Messer Dep. 52.) It was envisioned that he would be one of a small group of people who could take a leading role in running the

---

[2]       Although for purposes of this summary judgment motion Feilbogen's testimony about the alleged conversation will not be disputed, it should be noted that Finigan vigorously denies ever giving Feilbogen a 2003 bonus guarantee. (Finigan Dep. 42.)

company one day (Prince Dep. 30.); that he would become "a very senior person here over time . . . one of the core guys helping to run the company." (Messer Dep. 48.)

### 8.   Allegations of the Complaint

Feilbogen filed his Complaint against Trading and AIGFP on September 24, 2003, asserting six claims:  breach of contract (Count I), promissory estoppel against Trading only (Count II), violation of the Connecticut wage statute (Count III), *quantum meruit* against Trading only (Count IV), unjust enrichment (Count V) and a claim for severance (Count VI).

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In opposing summary judgment, plaintiff "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

# ARGUMENT

## I.

## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FEILBOGEN'S CONTRACT CLAIM (COUNT I)

### A.    The Alleged Oral Contract Is Void under the Statute of Frauds

The Connecticut Statute of Frauds provides that, unless a writing is made and signed by the party to be charged, no civil action may be maintained "upon any agreement that is not to be performed within one year from the making thereof." Conn. Gen. Stat. §52-550(a). "Where the time for performance is definitely fixed at more than one year, the contract is, of course, within the statute." *Burkle* v. *Superflow Mfg. Co.*, 137 Conn. 488, 492-93 (Conn. 1951); *Am. Fed. Group, Ltd.* v. *Rothenberg*, 136 F.3d 897, 909 (2d Cir. 1998) (thirteen month non-compete covenant void under Statute of Frauds because it exceeded requisite one-year period).

Feilbogen's Complaint alleges that the supposed oral contract for a guaranteed bonus for his work for the year 2003 was made at an <u>August</u> <u>2002</u> meeting between Finigan and Feilbogen. (Compl. ¶ 14.) In his deposition, Feilbogen reiterated that the formation of the alleged oral contract "was during the period from the end of June through August of 2002." (Feilbogen Dep. 109.) Bonuses at Trading for a particular year were paid out no earlier than December of each calendar year. (Marr Aff. ¶ 2.) For example, the bonuses for 2001 were paid in January 2002 and the bonuses for 2002 were paid in February 2003. (*Id.*) Hence, the 2003 bonuses were to be paid out no earlier than December 2003. An oral contract in August 2002 to be performed in December 2003 (at the earliest) is invalid under the Statute of Frauds because the contract

-14-

could not be performed until no earlier than one year and three months from the date of contracting, rather than within the required one-year period.

For example, in *Lee* v. *Jenkins Bros.*, 156 F. Supp. 858 (D. Conn. 1957), the plaintiff asserted, as Feilbogen does here, that a senior executive of his employer had orally promised him payments to be received more than a year after his start date. The court granted defendant's motion to dismiss under the Connecticut Statute of Frauds.

Likewise, the Second Circuit, applying an analogous provision of the New York Statute of Frauds, held that an alleged oral contract for the payment of a bonus more than one year from the making of the contract was void under the Statute of Frauds:

> According to the terms of the contract [defendant] was to make the second cash bonus payment in 1977, more than one year from the making of the contract. The contract is thus incapable of complete performance within one year of its making and is therefore unenforceable under the statute.

*Weisse* v. *Engelhard Minerals & Chems. Corp.*, 571 F.2d 117, 119 (2d Cir. 1978) (affirming grant of summary judgment) (citations omitted). Further, in *Zaitsev* v. *Salomon Bros. Inc.*, 60 F.3d 1001, 1004 (2d Cir. 1995), the Second Circuit affirmed summary judgment dismissing the claim of an alleged promise to pay bonuses more than one year later (applying New York's Statute of Frauds).

The application of the Statute of Frauds to Feilbogen's contract allegations is thus straightforward. Indeed, it is precisely to discourage the concoction of claims of oral undocumented promises of this magnitude that the Statute of Frauds was adopted. *Killion* v. *Davis*, 69 Conn. App. 366, 372 (Conn. App. Ct. 2002) ("The primary purpose of the Statute of Frauds is to provide reasonable evidence of the existence and terms of the contract.") Zampella's September 2002 letter, the human resources spreadsheets

documenting Trading's guarantees, Feilbogen's own March 20, 2003 spreadsheet, and Feilbogen's own May 8, 2003 memorandum all show <u>no 2003</u> bonus guarantee for Feilbogen (Def. Dep. Ex. 7; Marr Aff. Exs. A-D; Def. Dep. Ex. 14; Def. Dep. Ex. 17). It was only after Feilbogen's discussions concerning the role he would play at AIGFP that he first claimed a guaranteed bonus for 2003.

Feilbogen has questioned deposition witnesses at length about accounting schedules relating to his energy group that were prepared by an accountant for Feilbogen's own use and that have entries concerning <u>accruals</u> for what the accountant called "guarantees." Any attempt to portray those schedules as memoranda sufficient to take the alleged oral contract outside the Statute of Frauds clearly would be unavailing. A written memorandum can only remove an alleged oral agreement from the Statute of Frauds if it is signed by the party to be charged,[3] and if it states the contract between the parties with such certainty that the essentials can be determined without the aid of parol evidence. *Vachon* v. *Tomacak*, 155 Conn. 52, 56-7 (Conn. 1967). The accounting documents fail on all counts: they are not memoranda of any sort, they are unsigned, and they were not seen by Finigan. (Finigan Dep. 378, 380; Gentile Dep. 101.) The evidence is uncontroverted that the accountant who created the documents had no knowledge of whether Feilbogen had a guarantee (Gentile Dep. 56) and that the accrual amount for Feilbogen – $1.3 million – represented his prior year's bonus. (Morrissey Dep. 62.) Human resources, not the accounting department, is the repository of records for employee compensation and bonuses at Trading, and the human resources department

---

[3]   The Statute of Frauds states, in relevant part, "no civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged..." Conn. Gen. Stat. §52-550(a).

records confirm that Feilbogen did not have a guaranteed bonus for 2003. (Marr Aff. ¶¶ 4-9.)

Nor can Feilbogen circumvent the Statute of Frauds by asserting that his mere <u>continued employment</u> with Trading constituted part performance of an alleged oral contract. To qualify as part performance sufficient to avoid the Statute of Frauds, the acts must be of such a character that they can "be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute." *Rutt* v. *Roche*, 138 Conn. 605, 608 (1952); *see also Verzier* v. *Convard*, 52 A. 255, 257 (Conn. 1902), cited with approval in *Hall* v. *Pullins*, 1992 Conn. Super. LEXIS 1086 at *8-*9 (1992). Here, Feilbogen's continued work for Trading is no more referable to the supposed oral contract than it is to his actual at-will employment status.

The decision in *Bombard* v. *Indus. Riggers*, 1997 Conn. Super. LEXIS 3524 at *10 (1998), is directly on point. There, the court granted a motion to strike an oral contract claim by a former employee based on the Statute of Frauds, rejecting plaintiff's argument that his <u>continued employment</u> constituted part performance:

> The court does not feel that 'continued employment' or 'remaining a dedicated employee' is part performance that would be sufficient to overcome the provisions of the statute of frauds. The plaintiff has failed to allege conduct that "cannot 'in the ordinary course of human conduct, be accounted for in any other manner as having been done in pursuance of a contract.'" *Hall,* [1992 Conn. Super. LEXIS 1086 at *9 (quoting *Lester* v. *Kinne*, 37 Conn. 9, 14 (1870))].

*See also Virgulak* v. *Facsimile Mktg.*, 1994 Conn. Super. LEXIS 248, *9-10 (Oct. 7, 1993) (rejecting part performance claim based on continued employment); *Lee*, 156

F. Supp. at 861-862 (granting motion to dismiss and rejecting <u>continued</u> <u>employment</u> as part performance).

These Connecticut decisions are consistent with the many cases under the analogous New York Statute of Frauds holding that <u>continued</u> <u>employment</u> does not constitute part performance to evade the Statute. *See, e.g.*, *Celi* v. *Canadian Occidental*, 804 F. Supp. 465 (E.D.N.Y. 1992) (granting summary judgment and holding partial performance of oral employment contract will not remove contract from Statute of Frauds); *Konigsberg* v. *Sec. Nat'l Bank*, 66 F.R.D. 439, 443 (S.D.N.Y 1975) (same); *Cunnison* v. *Richardson Greenshields Sec.*, 107 A.D.2d 50, 54 (N.Y. App. Div. 1985) (same); *Health Delivery Sys.* v. *Scheinman*, 344 N.Y.S.2d 190 (N.Y. App. Div. 1973) (granting motion to dismiss).

**B.   Finigan Did Not Have Requisite Authority to Bind Trading or AIGFP to an Oral Contract of the Sort Alleged**

In addition to the Statute of Frauds – which vitiates Feilbogen's oral contract claim – it is hornbook law that to hold a corporation liable for an alleged contractual promise made by a corporate agent, a plaintiff must show that the agent had the <u>authority</u> to act on behalf of the corporation. *See Tomlinson* v. *Bd. of Educ. of the City of Bristol*, 226 Conn. 704, 734-35 (Conn. 1993).

Feilbogen admits <u>knowing</u> that Finigan did not have the authority to make contractual bonus commitments. Rather, as Feilbogen admitted, changes in compensation for employees at Trading needed <u>AIG's</u> approval. Either Matthews or Dooley of AIG needed to approve increases. (Feilbogen Dep. 40-41.)

Moreover, the Trading Group Policy Manual – which Feilbogen admittedly received and to which he agreed in writing – deprives Trading's executives of

-18-

the ability to bind Trading orally. The Policy Manual clearly places all Trading employees on notice that unless they have a <u>written</u> guarantee, oral assurances are inadequate to bind the firm to any oral promise of a bonus. (Dep. Ex. 31.)

Although Feilbogen may try to assert that Finigan had "apparent" authority to promise him a bonus, it is elementary that to sustain a claim of apparent authority the plaintiff must have reasonably believed that the agent had the authority to bind the principal. *See Tomlinson*, 272 Conn. at 734-35. Feilbogen's acknowledgement that he <u>knew</u> that Finigan did <u>not</u> have the authority orally to guarantee a bonus vitiates any claim of apparent authority. Moreover, to establish apparent authority it also must be shown that the principal knowingly held the agent out as possessing the necessary authority. *Lee*, 156 F. Supp. at 862-63 (complaint dismissed; plaintiff failed to show that company president making alleged promise had apparent authority). There is no evidence that Trading held out Finigan as having the authority to make valid bonus guarantees. Indeed, to the contrary, the company's Policy Manual – which requires that a bonus guarantee must be in writing – <u>contradicts</u> any intent to grant such authority.[4]

**C.    Feilbogen's Allegations Provide No Basis for a Claim of Breach of Contract Against Either Trading or AIGFP**

Feilbogen agreed, in writing, that the Policy Manual, "defines the employment relationship" and explicitly "agree[d] to be bound by the policies therein."

---

[4]    The *Restatement (Second) of Agency* § 8 defines apparent authority as "the power to affect the legal relations of another person by transactions with third persons, professedly as an agent for the other, arising from and in accordance with the other's manifestations to such third persons." (Cited with approval in *Fenne* v. *TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989).) The principal must manifest to the third party that he consents to have the act done on his behalf; an agent cannot create apparent authority by his/her own actions. *Id.*

(Def. Dep. Ex. 31 at 28.).  The Policy Manual provides that his employment was "at will" and that there is no "entitlement to a bonus until it is actually received."

Feilbogen does not assert that Finigan made any promises to alter Trading's right to terminate his at will employment prior to the end of the year, nor that Finigan committed to vary the year-end time for bonus payments or the policy that bonuses would not be payable in the event employment ended before year end.

In short, even under Feilbogen's version of what Finigan said, there simply was no breach of any obligation by Trading to pay a bonus, because his at will employment with Trading ended before any 2003 bonus would be payable under Trading policy.  Accordingly, under the terms of the Policy Manual, the breach of contract claim against Trading clearly fails.

Likewise, Feilbogen's attempt to charge AIGFP with a contractual obligation based on Finigan's alleged statement is also meritless.  Finigan was not an AIGFP employee, and even Feilbogen does not contend that AIGFP had a role in any alleged promise by Finigan in August 2002.  AIGFP simply offered Feilbogen the opportunity to commence employment on the terms set forth in its offer letter, including eligibility for a discretionary bonus.  (Def. Dep. Ex. 27.)  Feilbogen does not allege that AIGFP undertook to pay him a guaranteed bonus for 2003; indeed, to the contrary, he admitted that he never even told AIGFP of his claim that Finigan had promised him a bonus for 2003 until after AIGFP's offer letters had been formalized and that AIGFP never thereafter offered to pay him a definite bonus amount.  (Feilbogen Dep. 189; Feilbogen Dep. Ex. 27.)

In short, AIGFP never agreed to pay Feilbogen based on an undocumented and disputed claim of an oral promise by a Trading executive.  Based on Feilbogen's own allegations, no breach of contract claim can lie against AIGFP.

## II.

### FEILBOGEN IS NOT ENTITLED TO RECOVERY UNDER THE CONNECTICUT WAGE STATUTE (COUNT III)

#### A.    The Wage Statute Claim Fails Along with the Contract Claim

A plaintiff cannot establish a statutory claim to payments under Connecticut's wage statute, Conn. Gen. Stat. §31-71(c), if he has no enforceable contractual right to payments in the first place.  *See, e.g., Butler* v. *Cadbury Beverages., Inc.*, 1999 U.S. Dist. LEXIS 16098 at *5 (D. Conn. June 29, 1999) ("the employee must be entitled to moneys that were withheld wrongfully by the employer."); *cf. Zaitsev* v. *Salomon Bros. Inc.*, 60 F.3d 1001, 1004 (2d Cir. 1995) (affirming summary judgment dismissal of claim under analogous New York wage law because there was no contractual right to payment); *Tierney* v. *Capricorn Investors LP*, 189 A.D.2d 629, 632 (N.Y. App. Div. 1993) (holding dismissal of claim under analogous New York wage law was required because of lack of contract right).  Accordingly, for the reasons that the contract claim is defective as discussed in Section I above, Feilbogen's claim under the wage statute also fails.  *Id.*

#### B.    The Alleged Payments Are Not "Wages" in Any Event

Feilbogen's attempt to recover under Connecticut's wage statute also fails because, based on his own admissions, the amounts he seeks do not constitute "wages" under the statute.  Conn. Gen. Stat. § 31-71(a)(3) defines "wages" as "compensation for

labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation."

First, a bonus must be tied directly to <u>individual production</u> to be considered wages. *Cook* v. *Alexander & Alexander of Conn. Inc.*, 40 Conn. Supp. 246 (Conn. Super. Ct. 1985); *Ziotas* v. *Reardon Law Firm, P.C.*, 2000 Conn. Super. LEXIS 2842, *4-*8 (Oct. 23, 2000) (granting motion to strike claim that contested bonus was a wage, as bonus payment was not based on individual production).  According to the Complaint, the $1.3 million bonus for 2003 that Feilbogen asserts was promised to him was <u>not</u> calculated by reference to the individual production he expected in Trading's energy group that year, but rather represented an arbitrary "match" of his prior year's bonus. (Compl. ¶14.) Likewise, in his deposition, Feilbogen testified that he sought a bonus promise for 2003 precisely because he did <u>not</u> think his work in the new energy group in 2003 would result in profits justifying a bonus payment:

> I expressed my concern that if we built this business as we had been discussing, that we would not see revenue for some time.  It was unclear when we would see a net profit... given those sets of circumstances, I had big concerns about how I would get paid.

(Feilbogen Dep. 96.)

In *Ziotas,* 2000 Conn. Super. LEXIS 2842, the court granted a motion to dismiss a wage claim based on an alleged promise of a bonus, holding that a bonus determined by the <u>collective</u> success of the members of a law firm is not a wage for purposes of the statute.  The court explained that a bonus is not a "wage" under the statute when it is based on general firm revenues instead of individual performances:

> This does not describe a bonus that accrued as a result of the plaintiff's personal efforts alone; in simplest terms it

-22-

> was not as the statute requires 'compensation for labor or
> services rendered' by this plaintiff employee of the firm . . .
> What is involved here is a payment above and beyond the
> regular salary, an arbitrary figure in other words with no
> relation to any actual services performed by the plaintiff.
> The motion to strike the second count is granted.

*Id.* at 7-8.

Second, Feilbogen's own pleadings and testimony confirm that the amount he claims he was promised did not represent "wages" subject to § 31-71, but rather by his account was an additional payment to induce him to work for Trading in the money-losing energy group. Payments intended to induce a plaintiff to stay with a company do not fall under the Connecticut wage statute. In *ABC Office Equip.* v. *Royal Consumer Bus. Prods.*, 721 F. Supp. 1557, 1559 (D. Conn. 1989), the employee was offered a bonus as an inducement to stay during a transition period, rather than leaving immediately. The court dismissed the plaintiff's claim under the wage statute, holding that:

> The statute, which provides an extraordinary statutory
> remedy, is concerned with timely payment of wages and
> was enacted to discourage the unilateral withholding of
> wages by an employer. The 'severance allowance' in issue
> was a bonus above and beyond the regular salary drawn by
> Crimmins until his termination on May 31, 1987.

*Id.* at 1559 (D. Conn. 1989).

Finally, Feilbogen's additional claim for "severance" payments also clearly falls outside the wage statute. *McGowan* v. *Admin.*, 153 Conn. 691, 693 (Conn. 1966) (because wages cease when employment does, severance pay cannot be considered wages).

-23-

## III.

## DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FEILBOGEN'S CLAIM FOR SEVERANCE (COUNT VI)

**A.     Severance Was Paid Only to Those Employees Who Released Claims**

It is undisputed that defendants paid severance only to those terminated employees who agreed to a release of all claims—which Feilbogen admittedly refused to do. (Zampella Dep. 188; Feilbogen Dep. 200; Def. Dep. Ex. 29.) Feilbogen's admitted disavowal of any intention to release his claim thus clearly disentitled him to severance under any circumstance. For this reason alone, summary judgment should be granted on this claim.

**B.     An Offer of Severance to Others Does Not Establish a Contract Right for Feilbogen to Be Offered the Same**

In *Christensen* v. *Bic Corp.*, 18 Conn. App. 451, 452-55 (1989), the Connecticut Appellate Court held that a routine pattern or customary practice of paying bonuses is insufficient to establish a promise or contractual obligation to do so generally. In *Christensen*, the plaintiff contended that because the defendant had paid him a bonus at the same time each year based upon corporate and individual performance during the preceding year, he was contractually entitled to a bonus for 1983. The Appellate Court squarely rejected the plaintiff's argument that a contract could be created by custom and practice, and reversed the trial court precisely on the point. *Id.* at 456 (citation omitted).

The Appellate Court re-affirmed this holding in *Reynolds* v. *Chrysler First Commercial. Corp.*, 40 Conn. App. 725 (Conn. App. Ct. 1996), *appeal denied*, 237 Conn. 913, (1996) (affirming grant of summary judgment). Further, this Court later followed the holding in *Christensen*, ruling that a pattern and course of conduct of paying bonuses

is insufficient to establish an enforceable contract. *Gold* v. *AIG,* Docket No.

3:97CV2486 (D. Conn. June 30, 2000) (JBA) at 11-13 (granting Motion for Summary

Judgment).

Moreover, this is not a case where a statement regarding severance in a

written policy manual could be construed as a potential contractual commitment, because

Trading's Policy Manual does not provide for severance. *Owens* v. *Am. Nat'l Red Cross,*

673 F. Supp. 1156, 1165 (D. Conn. 1987) (language that cannot be construed as a

contract does not require jury trial).

Thus, even if Feilbogen had been discharged – and he was not – the mere

fact that defendants offered severance to certain individuals does not create a contractual

right for Feilbogen to be offered severance.

## C.      Feilbogen Was Not Constructively Discharged in Any Event

It is undisputed that, in the instances in which Trading chose to pay

severance to individuals, the employees had been underlined terminated; it was not paid to

employees who had resigned. To try to circumvent this, Feilbogen asserts that he was

"constructively discharged." (Complaint ¶53.)

A "constructive discharge" occurs only when an employer, rather than

directly discharging an individual, intentionally creates an intolerable work atmosphere

that forces an employee to quit involuntarily. *Brittell* v. *Dept. of Corr.,* 247 Conn. 148,

178 (1998).

Intolerable working conditions are those that are "so difficult or

unpleasant that a reasonable person in the employee's shoes would have felt compelled to

resign." *Chertkova* v. *Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir. 1996).

Intolerability is determined using an objective reasonable person standard and does not depend on the employee's subjective feelings. *Lesson* v. *ARI of Conn., Inc.*, 51 F. Supp. 2d 135, 143 (D. Conn. 1999) (granting summary judgment). It is not sufficient that an employee feels that he or she did not receive a raise or that the employee preferred not to continue working for the employer. *Spence* v. *Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (affirming grant of summary judgment).

Courts have held that an employee's speculation that working conditions may become intolerable does not meet the requirement. For example, in *Raskin* v. *Wyatt Co.*, 1996 U.S. Dist. LEXIS 4647 at *15 (S.D.N.Y., Apr. 15, 1996), the court granted summary judgment where the plaintiff employee merely feared that his compensation and job responsibilities might be reduced.

Feilbogen's assertion that AIGFP's June 27 letter outlining the terms of employment created an intolerable work environment is meaningless. At the time Feilbogen resigned, he retained his job title and responsibilities. Had Feilbogen continued his employment at AIGFP he would have received a salary of $250,000 and would have been eligible for a discretionary bonus. It is not sufficient that Feilbogen speculated that his compensation might be reduced. For a finding of constructive discharge, a significant reduction must actually have occurred. *Id.*

Furthermore, there is no evidence that Trading or AIGFP intended to force Feilbogen to quit. Courts have consistently dismissed cases where there is no evidence of this intent or where defendants have shown that they did not want the plaintiff to leave. *Sedotto* v. *Borg-Warren Protector Servs. Corp.* 94 F. Supp. 2d 251, 262 (D. Conn. 2000) (summary judgment granted where evidence such as a raise and offer to manage another

district showed lack of intent to induce a resignation); *Stetson* v. *NYNEX Serv. Co.*, 223 F.2d 355, 361 (2d Cir. 1993) (constructive discharge claim must be dismissed absent proof that employer deliberately created a working environment so difficult or unpleasant as to compel a reasonable person to resign). Indeed, the record establishes that AIGFP wished to retain Feilbogen. [5] (Cassano Dep. 68.)

Likewise, letters similar to AIGFP's June 27 letter to Feilbogen were sent to all employees as part of the reorganization. (Feilbogen Dep. 105.) When similar actions are taken with respect to other employees, no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign. *Allen* v. *Bridgestone Firestone, Inc.*, 81 F.3d 793, 797 (8th Cir. 1996). Indeed, the purpose of the letter, by its own terms, was not to force Feilbogen to leave but to confirm his ongoing employment.

## IV.

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON FEILBOGEN'S PROMISSORY ESTOPPEL CLAIM (COUNT II)

Feilbogen also claims that he should be awarded a bonus for 2003 under a promissory estoppel theory. (Compl. at ¶¶ 36-42.)

To sustain a claim of promissory estoppel, the plaintiff must establish that he changed his position in reliance on a promise. *Conn. Nat'l Bank* v. *Voog*, 233 Conn.

---

[5]   Cassano testified that he hoped Feilbogen would stay at AIGFP. Cassano stated that he thought Feilbogen was bright and enthusiastic, understood how to make money, was eager to build the energy business, and had a good understanding of the Trading platform. That Cassano referred to Feilbogen as "a bit of a luxury" in an email sent to Dooley the day after Feilbogen stated that he would not join AIGFP on the terms it offered (Def. Dep. Ex. 29) further demonstrates that Feilbogen was valued by the management of AIGFP. Despite the fact that Cassano thought Feilbogen's new position in energy was not required for developing new business, it is uncontroverted that Cassano and others wanted him to stay. (Cassano Dep. 68; Cassano Dep. Ex. 16).

352, 366 (1995); *O'Sullivan* v. *Bergenty*, 214 Conn. 641, 648 (Conn. 1990). The

plaintiff's acts must be of a such a character that they can be accounted for in no other

way than by the existence of the alleged contract. *De Luca* v. *C.W. Blakeslee & Sons,*

*Inc.* 174 Conn. 535, 544 (Conn. 1978). Additionally, the detrimental reliance must be

reasonable. A person claiming estoppel must show due diligence to know the truth and

that he or she not only did not know the true state of things, but also lacked any

reasonably available means of acquiring such knowledge. *Voog*, 233 Conn. at 367 (citing

*Spear-Newman Inc.* v. *Modern Floors Corp.*, 149 Conn. 88, 91-92 (Conn. 1961).

First, it is undisputed that Feilbogen did not change his position as a result

of Finigan's alleged promise. Indeed, while he may assert that he would have looked for

other jobs, forbearance from seeking other jobs is not a change in position. The decision

in *Croslan* v. *Hous. Auth. for New Britain*, 974 F. Supp. 161 (D. Conn 1997), is directly

on point. There, the plaintiff argued that his mere continued employment and failure to

seek other job opportunities constituted detrimental reliance sufficient for a promissory

estoppel claim. The court soundly rejected that claim – because there clearly needs to be

an actual change in position – and granted the defendant's motion for summary judgment.

*See also Panzino* v. *Scott Paper Co.*, 685 F. Supp. 458, 462 (D.N.J. 1988) (granting

summary judgment where there was no evidence that applications to other employers

would have yielded jobs, and thus jury would be reduced to speculation, an inadequate

basis for finding detrimental reliance); *Engstrom* v. *John Nuveen & Co., Inc.*, 668

F. Supp. 953, 962-63 (E.D. Pa. 1987) (failure to seek other employment is not detrimental

reliance as a matter of law).

In *Linker* v. *Koch Invs., Inc.*, 62 F. Supp. 2d 611 (D. Conn. 1999), the court <u>denied</u> summary judgment because the plaintiff had been actively <u>interviewing for jobs</u> and stopped doing so after an alleged promise to pay a bonus. The court explicitly distinguished the situation from *Croslan*, in which the employee continued employment without <u>definite</u> alternative opportunities. Feilbogen admits that he had no other job offer. (Feilbogen Dep. 75.) Nor is there any evidence that Feilbogen was engaged in or ceased any job search in August 2002.

Feilbogen's continued employment is insufficient as a matter of law to constitute reliance sufficient to establish promissory estoppel. *See, e.g., Bombard*, 1997 Conn. Super. LEXIS 3524 (granting defendant's motion to strike plaintiff's promissory estoppel claim, holding that plaintiff's allegation that "he remained an employee of the defendants" in reliance on the alleged promise was insufficient to allege facts "of a character that could only be accounted for by the existence of a contract"); *Virgulak*, 1994 Conn. Super LEXIS at *9 (continued employment not sufficient to establish reliance for purposes of estoppel). Just as Feilbogen's continued employment cannot constitute part performance under the Statute of Frauds, it cannot establish reliance for purposes of promissory estoppel. *See* page 17, *supra.*

Finally, it is no surprise that Feilbogen did not change his position in response to Finigan's alleged promises because any such change would have been <u>unreasonable</u>. Feilbogen admittedly knew that Finigan did not have the authority to commit to a guaranteed bonus and admittedly never bothered to check with Dooley – or anyone else at AIG or Trading – to see whether AIG had approved the alleged oral guarantee. *Voog*, 233 Conn, at 367. Moreover, the Policy Manual to which he agreed

-29-

confirmed that in the absence of a written contract bonuses were discretionary and there was no entitlement to a bonus until it actually was paid.

## V.

## FEILBOGEN'S ALTERNATIVE QUASI-CONTRACT CLAIMS OF *QUANTUM MERUIT* (COUNT IV) AND UNJUST ENRICHMENT (COUNT V) FAIL

### A.    Plaintiff's Express Written Agreement to the Terms of His Employment Precludes His Claims of Quasi-contract

Feilbogen's alternative claims of *quantum meruit* and unjust enrichment fail because Feilbogen previously agreed, in writing, to what his rights to a bonus would be, and that <u>express</u> agreement precludes a claim for a contrary quasi-contractual remedy.

The Trading Policy Manual, under the heading "Employment Relationship," provides for payment to employees of an annual salary, as well as overtime to the extent required by local law. The Policy Manual further provides that discretionary bonuses may be paid and that "absent a written contract to the contrary, no employee has any entitlement to a bonus until it is actually received." (Feilbogen Dep. Ex. 31 at 28.) Feilbogen signed his agreement to those terms, confirming in writing that he had read the Policy Manual, that it "defines the employment relationship," that he understood the policies set forth therein and that he "<u>agree[d] to be bound by such policies</u>." (Def. Dep. Ex. 31 at 29) (emphasis added).

Feilbogen thus explicitly agreed to what his employment relationship and compensation would be in the absence of a written bonus contract: *i.e.*, that his employment was at will, that any bonuses would be discretionary and that no employee has any entitlement to a bonus until received. That agreement nullifies any attempt to claim *quantum meruit* or unjust enrichment.

-30-

When an express contract exists between the parties, no claim of *quantum meruit* or unjust enrichment can lie. *Rosick* v. *Equipment Maintenance & Service, Inc.*, 33 Conn. App. 25, 27 (1993) (summary judgment dismissing *quantum meruit* claim – "[p]arties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations"); *Scandura* v. *City of Middletown*, 2003 Conn. Super. LEXIS 545 *17 (2003) (summary judgment dismissing unjust enrichment claim – "plaintiff cannot prevail on her claim of unjust enrichment because there is an enforceable express contract between the parties").

In short, for purposes of his quasi-contract claims Feilbogen is no different from any employee who has agreed to work on a salary plus discretionary bonus basis. Such an employee will not be held to have quasi-contract rights different from the agreed terms of employment. *Rosick*, 33 Conn. App. at 38 (holding that "where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law"); *Scandura*, 2003 Conn. Super. LEXIS 545 at *9; *see also Kaplan* v. *Capital Company of America*, 747 N.Y.S.2d 504 (N.Y. App. Div. 2002) (applying analogous New York law and affirming summary judgment dismissing quasi-contract claims, based on employee's signature acknowledging an employee handbook that stated that bonuses were discretionary in the absence of a written contract).

Feilbogen's *quantum meruit* claim fails for an additional reason: Feilbogen testified in his deposition that the basis for his $650,000 *quantum meruit* demand is that it is simply "half the $1.3 million guarantee that Finigan gave me." (Feilbogen Dep. 231.) A plaintiff cannot use the amount of an alleged oral agreement

-31-

that is void under the Statute of Frauds as proof of the value of his services in a *quantum meruit* claim, because to do so would allow the plaintiff indirectly to enforce the invalid alleged oral agreement. *See Somerville v. Epps*, 419 A.2d 909, 911 (Conn. Super. 1980). *See also Zaitsev*, 60 F.3d at 1004.

Finally, an unjust enrichment claim is only available upon proving that a benefit was conferred upon defendant and that, as between the two parties, the "enrichment" was unjust. Feilbogen admits that the energy group sustained losses in 2003, yet he nevertheless claims that his $250,000 salary was insufficient. In *Zaitsev*, a district court faced with a similar allegation granted summary judgment dismissing unjust enrichment claims, holding that plaintiff "provides no evidence from which a reasonable jury could conclude that his $100,000 salary did not constitute the reasonable value of his services." *Zaitsev v. Salomon Brothers, Inc.*, 1994 WL 351463 at *4 (S.D.N.Y. July 8, 1994), *aff'd*, 60 F.3d 1001, 1004 (2d Cir. 1995) (applying New York law). Similarly, plaintiff can point to no evidence of purported unjust benefit to defendants.[6]

---

[6]   In depositions on July 1, 2004, plaintiff questioned two employees of AIGFP about a transaction that AIGFP negotiated with El Paso in late 2003 and 2004 concerning power generating plants and that had not yet closed as of the July 1 deposition date. Plaintiff may try to take credit for that transaction; however, the testimony of the witnesses was that the transaction—a loan to a special-purpose joint venture called Northern Star Generation formed by El Paso and another party—was not even conceived until after plaintiff's departure. (Deposition of Steven Pike, dated July 1, 2004 ("Pike Dep.") at 58, 37-38; Deposition of Timothy Sullivan, dated July 1, 2004 at 28-29, 50-51.) The form of potential transaction with El Paso that was considered prior to plaintiff's departure was a different one, which was rejected by El Paso. (Pike Dep. 27-30.)

## CONCLUSION

For the foregoing reasons, summary judgment should be granted dismissing each of Feilbogen's claims.

Dated: Hartford, Connecticut
          August 9, 2004

DEFENDANTS,
AIG TRADING GROUP INC. AND
AIG FINANCIAL PRODUCTS CORP.,

By: _____
Theodore O. Rogers, Jr. (ct00904)
  rogerst@sullcrom.com
Michael Gifford (ct26061)
  giffordm@sullcrom.com
Nicole A. Barrett (*admission pending)
  barrettn@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel. No. (212) 558-4000
Fax. No. (212) 558-3588

David Kulle (ct00333)
  dkulle@rc.com
Stephen W. Aronson (ct02216)
  saronson@rc.com
Christopher T. Wethje (ct24466)
  cwethje@rc.com
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No. (860) 275-8200
Fax. No. (860) 275-8299

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of August, 2004, I caused to be served a true and correct copy of the foregoing on:

By Hand

Anne C. Vladeck, Esq.
Vladeck, Waldman, Elias & Englehard, P.C.
1501 Broadway
New York, NY  10036

By Federal Express

Daniel M. Young, Esq.
Wofsey, Rosen, Sweskin & Kuriansky, LLP
500 Summer Street
Stamford, CT  06901


_____
Michael Gifford