1

```
 1

 2                UNITED STATES DISTRICT COURT

 3             FOR THE DISTRICT OF CONNECTICUT

 4
      ROBERT FEILBOGEN,            )
 5                                 )Case No.
                    Plaintiff,     )303 CV 1624
 6                                 )
             vs.                   )
 7                                 )
      AIG TRADING GROUP, INC. and  )
 8    AIG FINANCIAL PRODUCTS CORP.,)
                                   )
 9               Defendants.       )
      ----------------------------)
10

11
                         Tuesday, March 16, 2004
12                       10:04 a.m.

13

14
                 Videotaped Deposition of ROBERT
15        FEILBOGEN, held at the offices of
          Sullivan & Cromwell, LLP, 125 Broad
16        Street, New York, New York 10004,
          pursuant to Notice, before Otis Davis, a
17        Notary Public of the State of New York.

18

19

20

21

22
                DAVID FELDMAN WORLDWIDE, INC
23                   805 Third Avenue
                 New York, New York 10022
24           (212) 705-8585  Fax (212) 705-8552

25
```

2

```
 1
 2      A P P E A R A N C E S:
 3           VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.
 4           Counsel for Plaintiff
 5               1501 Broadway
 6               New York, New York 10036
 7      BY:   ANNE C. VLADECK, ESQ.
 8      AND:  KAREN CACACE, ESQ.
 9
10
11
12           SULLIVAN & CROMWELL, LLP
13           Counsel for Defendants
14               125 Broad Street
15               New York, New York 10004
16      BY:   THEODORE O. ROGERS, JR., ESQ.
17      AND:  BRENT J. McINTOSH, ESQ.
18      AND:  MICHAEL GIFFORD, ESQ.
19
20
21
22      ALSO PRESENT:
23               FERNANDO ALVAREZ, Videographer
24
25
```

3

1

2

3

4

5          IT IS HEREBY STIPULATED AND AGREED,

6     by and between counsel for the respective

7     parties hereto, that the filing, sealing

8     and certification of the within deposition

9     shall be and the same are hereby waived;

10          IT IS FURTHER STIPULATED AND AGREED

11     that all objections, except as to the form

12     of the question, shall be reserved to the

13     time of the trial;

14          IT IS FURTHER STIPULATED AND AGREED

15     that the within deposition may be signed

16     before any Notary Public with the same

17     force and effect as if signed and sworn to

18     before the Court.

19

20

21

22

23

24

25

```
 1
 2              THE VIDEOGRAPHER:  This is tape
 3      number 1 of the videotaped deposition of
 4      Mr. Robert Feilbogen, in the matter Robert
 5      Feilbogen versus AIG Trading Group,
 6      Incorporated and AIG Financial Products
 7      Corporation, in the United States District
 8      Court, for the District of Connecticut.
 9          This deposition is being held at
10      Sullivan & Cromwell, 125 Broad Street, New
11      York, New York, on March 16, 2004 at
12      approximately 10:05 a.m.
13          My name is Fernando Alvarez from the
14      firm of David Feldman Worldwide, and I am
15      the legal video specialist.  The court
16      reporter is Otis Davis in association with
17      David Feldman Worldwide.
18          Will counsel please introduce
19      themselves.
20          MS. VLADECK:  Anne Vladeck of
21      Vladeck, Waldman, Elias & Engelhard for the
22      plaintiff.
23          MS. CACACE:  Karen Cacace also for
24      plaintiff.
25          MR. ROGERS:  Theodore Rogers,
```

```
 1                    R. Feilbogen
 2          Sullivan & Cromwell for defendants.
 3              MR. McINTOSH:  Brent McIntosh,
 4          Sullivan & Cromwell for defendants.
 5              MR. GIFFORD:  Mike Gifford, Sullivan
 6          & Cromwell for the defendants.
 7              THE VIDEOGRAPHER:  Will the court
 8          reporter please swear in the witness.
 9     R O B E R T    F E I L B O G E N,  called
10          as a  witness, having been duly sworn by
11          a Notary Public, was examined and
12          testified as follows:
13     EXAMINATION BY
14     MR. ROGERS:
15          Q.   Mr. Feilbogen, could you state your
16     name just for the record.
17          A.   Robert Feilbogen.
18          Q.   My name is Theodore Rogers, as I
19     noted.  I represent the defendants and I will be
20     asking you some questions today.  If at any time
21     during the deposition you don't understand one
22     of my questions, please feel free to ask me to
23     rephrase it, and I will try to do so.
24              Mr. Feilbogen, are you under any
25     medication or do you have any condition today
```

```
 1                    R. Feilbogen
 2      that would affect your ability to testify
 3      truthfully and accurately?
 4           A.    No.
 5           Q.    Where do you live, where do you
 6      reside?
 7           A.    Currently, I am living at 15 Cushman
 8      Road in White Plains, New York.
 9           Q.    Where do you currently work?
10           A.    I currently work at Sempra Energy
11      Trading in Stamford, Connecticut.
12           Q.    Could you state your educational
13      background beginning after the high school
14      level.
15           A.    I went to NYU, graduated in December
16      of 1986 -- sorry, 1989.
17           Q.    What degree did you get at NYU when
18      you graduated in 1989?
19           A.    Bachelor of science in finance and
20      international business.
21           Q.    Can you generally describe the
22      category of courses that you had to take to get
23      that degree?
24           A.    Well, aside from the typical
25      prerequisites of math, economics, I took some
```

```
 1                    R. Feilbogen
 2     statistics, some marketing.  I don't know how
 3     much detail you want, but --
 4          Q.    Did you take accounting at NYU?
 5          A.    Yes.
 6          Q.    After getting your BS degree in 1989
 7     from NYU, did you begin work, or did you --
 8          A.    Yes.
 9          Q.    -- take further schooling?
10          MS. VLADECK:  Objection to form.  You
11     may answer.
12          A.    I started at Drexel as a full-time
13     employee, I don't remember what my exact start
14     date was, if it was in December or January.  I
15     pretty much finished school in December of '89,
16     I started work pretty much thereafter sometime
17     in either December of 1989 or January 1990.
18          Q.    Was the first employer that you had
19     Drexel Burnham Lambert?
20          A.    Yes.
21          Q.    What was your job at Drexel?
22          A.    For the first two months that I was a
23     full-time employee -- I had spent a lot of
24     summers there and I did a lot of part-time work
25     while I was going to school, so it's a little
```

```
 1                    R. Feilbogen

 2      bit unclear.

 3               So exactly what I was doing at that

 4      point in time, I believe I was on the metals

 5      desk as a clerk or fulfilling some type of back

 6      office or clerical type of role.

 7          Q.    How long were you employed at Drexel?

 8          A.    Until I believe the date was February

 9      14th or whatever the date was when Drexel ceased

10      to exist.

11          Q.    So you were employed there only a

12      matter of few months?

13          A.    As a full-time employee, only as a

14      matter of two months or whatever it was.

15          Q.    What was your next employment?

16          A.    I went to AIG, AIG Trading.  I

17      believe it was called AIG Trading Corporation at

18      the time.

19          Q.    Where was AIG Trading Corporation

20      located?  Let me withdraw that.

21               Where did you go to work for AIG

22      Trading?

23          A.    The physical location?

24          Q.    Yes.

25          A.    That was in Fort Lee, New Jersey.
```

```
 1                    R. Feilbogen

 2        Q.    What was your first role at AIG

 3   Trading?

 4        A.    My initial role was in something they

 5   called MIS, which was sort of a risk management

 6   type of position, aggregating the market risk in

 7   some kind of format and passing that on to the

 8   parent company and to the trading desk.

 9        Q.    From the time that you joined AIG

10   Trading to the present, have you taken any

11   courses at any educational institutions, whether

12   part time, at night or the like?

13        A.    No.

14        Q.    Have you received any certifications

15   or professional registrations since graduating

16   from college?

17        A.    No.

18        Q.    Could you briefly describe beginning

19   with your employment at AIG Trading how your

20   responsibilities at AIG Trading changed over

21   time?

22        A.    Sometime towards the end of 1990, I

23   moved to the foreign exchange desk, where I

24   spent a brief period of time trading Canadian

25   dollars, I can't recall exactly how long I did
```

```
 1                    R. Feilbogen
 2       that job for, it was not for very long, couple
 3       of months maybe; at some point -- I guess maybe
 4       sometime at the end of 1991, if I had to guess,
 5       I moved on to -- maybe it was early '92 when I
 6       went to the foreign exchange forwards desk,
 7       which was sort of a new group.
 8            Q.   Did you remain in foreign exchange
 9       forwards for some period of time?
10            A.   Yes.
11            Q.   How long did you remain in foreign
12       exchange forwards?
13            A.   Probably until 1997.
14            Q.   Then as of 1997 or so when your
15       responsibilities changed, what was your next
16       work at AIG Trading?
17            A.   At the end of 1997, early 1998, I
18       moved off the trading desk and became the chief
19       of staff for Gary Davis, who was the CEO.
20            Q.   Who hired you to join AIG Trading
21       back in 1990?
22                 MS. VLADECK:   Objection to form.
23            Q.   You may answer.
24            A.   Gary Davis.
25            Q.   Did Mr. Davis -- let me withdraw
```

```
 1                    R. Feilbogen
 2     that.
 3                    Was Mr. Davis the head of AIG Trading
 4     when you were hired?
 5          A.    I don't remember his exact title.
 6     Actually, I guess when I was hired, I was really
 7     hired at Drexel, meaning I guess there were a
 8     series of offers made to go to AIG Trading from
 9     Drexel.  So I don't really remember exactly who
10     the person was that was responsible.
11          Q.    Let me ask it this way:  Did you work
12     for Mr. Davis while you were at Drexel?
13          A.    Not directly, but yes.
14          Q.    And then when you moved to AIG
15     Trading, did Mr. Davis and others also move from
16     Drexel to AIG Trading?
17          A.    Yes.
18          Q.    If you could look at the complaint, a
19     copy of which we gave you, and turn to paragraph
20     6.
21               MS. VLADECK:  Do you have extra
22          copies?
23               MR. McINTOSH:  We do.
24               MS. VLADECK:  Are you marking this as
25          an exhibit?
```

```
 1                    R. Feilbogen
 2              MR. ROGERS:  I don't think there is a
 3         need to mark the complaint as an exhibit.
 4         If you would like, we could.  I will mark
 5         other things.  It just seems a waste of
 6         paper to do that, since this is a matter of
 7         record.
 8              MS. VLADECK:  Okay.
 9         Q.   Mr. Feilbogen, I would like to direct
10    your attention to paragraph 6 of your complaint.
11    Paragraph 6 has a sentence describing your
12    responsibilities.
13              Is that a fair statement of your
14    responsibilities as a trader at AIG Trading from
15    the time you joined it until the time you became
16    chief of staff?
17         A.   As I mentioned earlier, I worked at
18    Drexel for a period of time, where my job had --
19    I played a number of different roles.  The
20    sentence says that I began working at AIG
21    Trading in 1990 as a trader.  When I began at
22    AIG Trading, a lot of the roles weren't clear,
23    since it was a new startup.
24              So I believe it's more or less
25    accurate, meaning that I was playing a junior
```

```
 1                     R. Feilbogen

 2      role on the trading desk.

 3           Q.     Directing your attention to the

 4      second sentence of paragraph 6 of the complaint,

 5      which states that your responsibilities included

 6      a number of things.

 7                  In addition to those

 8      responsibilities, are there other

 9      responsibilities that sitting here today you can

10      recall you had as a trader at AIG Trading?

11           A.     In the trading role, this describes

12      pretty accurately what it was that I was doing.

13      As I mentioned, there were some other roles I

14      was playing during that interim period just as

15      the group was starting.

16           Q.     After the group got underway, were

17      your responsibilities solely as a trader until

18      you became chief of staff?

19           A.     Yes.

20           Q.     When would you estimate the time came

21      that your functions were solely as a trader; was

22      it within a few months of AIG Trading beginning

23      or longer --

24                  MS. VLADECK:   Objection to form.

25           Q.     -- or some other time?
```

```
 1                    R. Feilbogen

 2          A.    I would like to clarify what it means

 3     to be a trader.

 4          Q.    That would be helpful.  I'll ask you:

 5     What does it mean to be a trader?

 6          A.    What I meant by saying that I was a

 7     trader in this first sentence here was that I

 8     was a member of the trading desk.  Obviously,

 9     being a person fresh out of school, the level of

10     responsibility would increase over time.

11              So the responsibilities as described

12     here, including quoting foreign exchange

13     forwards, floating rate agreements, interest

14     rate swaps and options to AIG Trading customer

15     base, those responsibilities were my primary

16     responsibilities sometime around 1992.

17          Q.    The reference you just made to text

18     in the complaint was to the sentence in

19     paragraph 6, wasn't it, just for the record?

20          A.    Yes.

21          Q.    Paragraph 7 of your complaint states

22     that in 1998 you became the chief of staff of

23     AIG Trading, working with the chief executive

24     officer and president on all matters relating to

25     AIG Trading.
```

1                    R. Feilbogen

2                    Is that an accurate statement?

3          A.    Yes.

4          Q.    Was the chief executive officer and

5     president in 1998 Mr. Davis?

6          A.    Yes.

7          Q.    The second sentence of paragraph 7

8     states that, "In addition, he -- meaning you --

9     was responsible for risk management and

10    accounting."  Is that accurate?

11         A.    Yes.

12         Q.    How did you prepare for your role in

13    becoming responsible for risk management and

14    accounting?

15              MS. VLADECK:  Objection to form.

16         A.    I suppose my experience on the

17    trading desk prepared me for risk management,

18    and I'm not sure I did anything in particular to

19    prepare myself to be responsible for accounting.

20         Q.    As a trader, did you develop

21    experience in matters that you felt qualified

22    you to be responsible for accounting matters

23    once you became chief of staff?

24         A.    I think that experience may have

25    helped.

```
 1                    R. Feilbogen
 2          Q.    Can you describe what your
 3     responsibilities were -- let me withdraw that.
 4               Can you describe what you did in the
 5     risk management and accounting areas when you
 6     became chief of staff?
 7          A.    With respect to risk management, I
 8     was responsible for making sure that the risk
 9     reports that were being produced by the risk
10     management staff were accurate; that the
11     day-to-day process that this group performed was
12     running smoothly; that the risk management group
13     was aware of whatever new transactions might be
14     contemplated; that I coordinated our efforts
15     with the parent company.  Chuck Lucas was the
16     risk manager for AIG.  I think that more or less
17     describes it.
18               With respect to accounting, I was
19     responsible for, again, making sure that the
20     accountants were fully aware of new transactions
21     being contemplated; that the risk management
22     group and the accounting group had a check and
23     balance, meaning that the risk management group
24     was responsible for producing an estimated P and
25     L, profit and loss, on a daily basis; and at the
```

1                    R. Feilbogen

2    end of the month, they were responsible for

3    tying those numbers out with accounting.  That

4    was part of the responsibility.

5              It was to ensure that certain

6    transactions were being handled appropriately

7    and accounted for appropriately by the

8    accounting group, which I was in some ways maybe

9    the spokesperson or would carry out the kinds of

10   things that maybe Gary Davis or some of the

11   other senior partners in the company asked for

12   or wanted to make sure that it was being

13   accounted for in the right way.

14        Q.    Did you communicate with the parent

15   company on accounting matters when you became

16   chief of staff?

17        A.    Yes.  I would communicate with the

18   CFO, with Ron Latz.

19        Q.    Who is Mr. Latz?

20        A.    Mr. Latz, I'm not sure of his exact

21   title, but I believe functionally, he plays the

22   CFO role for the division in which AIG Trading

23   Group was a part of.

24        Q.    Let me just ask for clarification of

25   your answer.  Before the answer you just gave,

```
  1                    R. Feilbogen

  2      you said you would communicate, as I recall,

  3      with the CFO, with Mr. Latz.

  4           A.    Because you said accounting matters,

  5      so I'm clearly not an accountant.  He is a CPA

  6      and he's an accountant.

  7                 I think that my participation was

  8      with respect to the business, and he was the

  9      expert on what the accounting rules were and

 10      sort of how he would report it.  That's what it

 11      is.

 12           Q.    Who was the CFO in 1998 when you

 13      became chief of staff?

 14           A.    Brian Morrissey.  I would also like

 15      to clarify.  I'll say CFO, Brian was the CFO.

 16      I'm not sure of the exact date he became the

 17      CFO.  So he may have been the controller at that

 18      time.  I'm less clear about that.

 19           Q.    Functionally, what did you consider

 20      him?

 21           A.    I functionally considered him as the

 22      CFO.

 23           Q.    Did Mr. Morrissey report to you in

 24      1998?

 25           A.    Yes.
```

```
 1                    R. Feilbogen
 2        Q.    Paragraph 8 of your complaint states
 3   that in 1999, you became the chief operating
 4   officer of AIG Trading.
 5              Prior to 1999, had there been a chief
 6   operating officer of AIG Trading?
 7        A.    Yes.
 8        Q.    Who was that?
 9        A.    Steven Prince was the chief operating
10   officer up until our energy business was sold to
11   Sempra Energy Trading, and I don't believe
12   anybody filled the chief operating officer role
13   from the time he left AIG to the time that I was
14   named chief operating officer.
15        Q.    Do you recall when it was that
16   Mr. Prince left?
17        A.    The exact date, no; time period, the
18   end of 1997, early 1998.
19        Q.    During the time that you were chief
20   of staff of AIG Trading, was there a chief
21   operating officer at AIG Trading?
22        A.    No.
23        Q.    In paragraph 8, the second sentence
24   states that your responsibilities as chief
25   operating officer expanded to include systems
```

1                     R. Feilbogen

2       and operations.

3                     Is it correct that you continued to

4       be responsible for risk management and

5       accounting as chief operating officer?

6            A.    Yes.

7            Q.    Could you describe what the roles of

8       systems and operations are -- let me withdraw

9       that.

10                    Could you describe what the

11      functions, systems and operations were within

12      AIG Trading in 1999 when you became chief

13      operating officer?

14           A.    When you say "the functions," meaning

15      my function with respect to --

16           Q.    No.  The areas, what do they do?

17           A.    Systems included both systems

18      development --

19           Q.    By "systems," do you mean computer

20      systems?

21           A.    -- computer systems development,

22      software development, maintenance of software;

23      it included hardware, communications, market

24      data; it included disaster recovery.  I'm not

25      sure we had disaster recovery in 1999, but that

1                        R. Feilbogen

2        would have been part of it.  I imagine that

3        pretty much covers it.

4                        With respect to operations,

5        operations meant the processing of the

6        transactions that were done by the front office,

7        traders, marketers, meaning everything from

8        confirmations to if invoicing was necessary,

9        accounts payable and receivable, as that would

10       flow to accounting, any sort of reconciliation.

11                       There was a Chinese wall for a

12       certain portion of our business.  So operations

13       had a subgroup for what we called our clearing

14       business, which was a group of people who would

15       interact with the customers directly and perform

16       some of these back office or operations tasks on

17       behalf of the customers.  I think that more or

18       less covers it, at least a broad definition.

19            Q.    Then paragraph 8 goes on to say that

20       in December 2000 you were promoted to executive

21       vice president and served on AIG Trading's

22       Executive Management Committee.

23                       What effect on your responsibilities

24       on a day-to-day basis did those changes in your

25       position entail?

```
 1                    R. Feilbogen
 2             MS. VLADECK:  Objection to form.
 3        A.    In December of 2000, we became a
 4   wholly-owned subsidiary and we had a new CEO,
 5   Brad Klein.  I'm not sure that my
 6   responsibilities changed all that dramatically,
 7   other than I think that the intention was for
 8   Brad and one or two or three others, other
 9   senior members of AIG, let's say, were acting a
10   little bit more as a team in terms of how we
11   expected the management of the company to work
12   going forward.
13        Q.    You used the term "front office" a
14   couple of minutes ago.  Who falls within front
15   office personnel?
16        A.    Traders, marketers, or more broadly,
17   revenue-producing individuals.
18        Q.    Is there a phrase for personnel such
19   as you as head of operations?
20        A.    That was the administrative staff or
21   the back office in a very broad term.
22        Q.    At the time that you became executive
23   vice president of AIG Trading, can you recall
24   who the other executive vice presidents were?
25             MS. VLADECK:  Objection to form.
```

```
 1                    R. Feilbogen

 2          A.    I believe that included Jonas

 3    Littman, I believe that included Andy Kaplan, I

 4    believe that included Mike Fields.  I feel like

 5    I might be missing somebody, but I think that

 6    covers it.

 7          Q.    Do you recall when Mr. Davis left AIG

 8    Trading?

 9          A.    He left in December of 2000.

10          Q.    Were there a variety of changes in

11    function at the same time that you became -- let

12    me withdraw that.

13              Were there a variety of changes and

14    titles and positions at the same time you became

15    vice president?

16          A.    Could you say that again.

17              MS. VLADECK:  Can I hear that again.

18              MR. ROGERS:  Let me withdraw the word

19          "variety."

20          Q.    Were there other changes of positions

21    within the executive branch at AIG Trading at or

22    about the time you became executive vice

23    president?

24          A.    Yes.

25          Q.    Could you describe them?
```

1                       R. Feilbogen

2          A.    Brad Klein became the CEO.  Prior to

3     Gary Davis leaving, there was some form of -- I

4     will use the word very loosely -- "partnership,"

5     which implied -- it was more of a profit-sharing

6     agreement more than anything else, but it also

7     implied certain stature that people had in the

8     company.  Not all of those people elevated to

9     this.  It's more like an Executive Committee or

10    elevating to an executive vice president.

11          There were new people that we tried

12    to elevate, people like Sheldon Pang, Jeffrey

13    Gladstein, Bernard Connolly.  I can't remember

14    the entire list.  I believe it's in one of the

15    documents that -- it might be in one of the

16    documents that you probably have in that binder.

17          So some people elevated and some

18    people's jobs were -- some people elevated.

19          Q.    In addition to Mr. Davis, were there

20    other executives who left AIG Trading at or

21    about the time he did?

22          A.    Yes.

23          Q.    Who else left?

24          A.    Bob Rubin and Barry Klein.

25          Q.    What had their roles been right

25

                        R. Feilbogen

1

2    before they left?

3        A.   While Gary Davis was the CEO, the

4    three combined ran the company.

5        Q.   Where did Mr. Davis, Mr. Rubin and

6    Barry Klein go professionally?

7            MS. VLADECK:  Objection to form.

8            MR. ROGERS:  Let me withdraw that.

9        Q.   Did Mr. Davis, Barry Klein -- I have

10   to keep using his first name so we don't get him

11   confused with Brad Klein -- and Mr. Rubin leave

12   the firm together and pursue some employment

13   together?

14       A.   Yes.  As part of their transaction

15   leaving AIG, they purchased the Asset Management

16   Group that was a part of AIG Trading Group that

17   was renamed DKR Capital.  That's where they are.

18       Q.   In the wake of their departure, Brad

19   Klein became CEO?

20       A.   Correct.

21       Q.   Thereafter, John Finigan was hired by

22   AIG Trading to become head of AIG Trading, was

23   he not?

24       A.   To become?  I'm sorry?

25       Q.   What was Mr. Finigan, John Finigan,

```
 1                    R. Feilbogen

 2      hired to do at AIG Trading?

 3                    MS. VLADECK:  Objection to form.

 4            A.    As I understand it, his job was to be

 5      CEO and president of the company.

 6            Q.    Do you recall when he joined the

 7      company?

 8            A.    I believe it was around April of

 9      2001.

10            Q.    Was it your understanding from

11      Mr. Klein or otherwise that -- let me withdraw

12      that.

13                    Was it your understanding either from

14      Brad Klein or from others that Brad Klein's role

15      as CEO was intended to be an interim role?

16            A.    I never understood that to be the

17      case.

18            Q.    When Mr. Finigan came on as CEO, what

19      position did Brad Klein then take?

20            A.    Brad Klein became the -- again, I'm

21      not sure of the exact title, but functionally,

22      it was the head of commodities.

23            Q.    From the time you described that you

24      became executive vice president and a member of

25      the Management Committee through to the end of
```

```
 1                    R. Feilbogen
 2       2002, did your title at AIG Trading change?  Let
 3       me withdraw it.
 4                    You remained an executive vice
 5       president and a member of the Management
 6       Committee of AIG Trading through 2002, did you
 7       not?
 8            A.    Yes.
 9            Q.    I am going to show you a document
10       which I am going to ask to be marked as
11       Defendants' Deposition Exhibit 1.
12                    MR. ROGERS:  Let's go off the record.
13                    (Discussion off the record.)
14                    (Defendants' Exhibit 1, AIG Trading
15               Group, Inc.'s organizational chart as of
16               12/31/02, Bates stamped D 000177-000179,
17               marked for identification, as of this
18               date.)
19            Q.    Mr. Feilbogen, you've been handed a
20       document that has been marked Defendants'
21       Deposition Exhibit 1, which is a document that
22       bears production numbers D 178 through D 179.
23                    MS. VLADECK:  Our starts with 177.
24                    MR. ROGERS:  I'm sorry, you're
25               absolutely right, so does mine.  That's a
```

```
 1                      R. Feilbogen

 2              three-page document.  It starts D 177 and

 3              it goes through D 179.

 4              Q.    Mr. Feilbogen, Defendants' Deposition

 5      Exhibit 1 appears to be an organizational chart

 6      of AIG Trading Group as of 12/31/02.  Could you

 7      look through it.

 8                  Does it appear to be an accurate

 9      summation of the organizational makeup of the

10      AIG Trading Group as of 12/31/02?

11              A.    I don't think it's entirely accurate.

12              Q.    What about it is not entirely

13      accurate?

14              A.    By December 31, 2002, I would

15      describe my position as somewhat in limbo,

16      meaning that by that point in time, I had

17      already been asked and was functioning as a --

18      again, I'll use the term very loosely --

19      "partner," or working with Tony Gordon on the

20      development of the energy business, and this

21      organizational chart does not really take that

22      into consideration.

23              Q.    Let me ask you about the time before

24      you started taking on some transitional

25      responsibilities in the Energy Group:  Does this
```

```
 1                    R. Feilbogen
 2      organizational chart accurately reflect the
 3      organization before that time in 2002?
 4           A.    No.
 5           Q.    Why not?
 6           A.    Well --
 7           Q.    I should say in what respect does it
 8      not?
 9           A.    On document 179 -- I'm sorry, could
10      you repeat the question.
11           Q.    Let me ask it a different way:   In
12      2002, you had responsibilities -- let me
13      withdraw that.
14                 In 2002, you were chief operating
15      officer of AIG Trading, were you not?
16           A.    Yes.
17           Q.    Could you look at the third page of
18      Defendants' Deposition Exhibit 1.  This is an
19      organization chart headed "Administration."
20                 Does this chart accurately reflect
21      the organizational makeup of the administration
22      side of AIG Trading during the time you were
23      chief operating officer in 2002?
24           A.    My hesitation in sort of -- again,
25      the question is slightly unclear, because I
```

```
 1                    R. Feilbogen
 2     don't recall exactly at what point in time Megan
 3     Daley became responsible for systems, as we
 4     described it before, and operations.
 5               So depending at the point in time
 6     you're talking about, if we assume that David
 7     Frankel, who was the head of operations, and if
 8     we assume that Neil Ferraiuolo, who was our CIO,
 9     were both reporting to Megan Daley, then I
10     believe that it's fairly accurate.
11          Q.    In 2002, in your role as chief
12     operating --
13          A.    I just want to add that I can't vouch
14     for the numbers that are on the page.
15          Q.    You mean the numerals --
16          A.    Describing the number of people.
17          Q.    Understood.  Let me just ask you
18     functionally:  As chief operating officer of AIG
19     Trading in 2002, did Beth Cutler, director of
20     corporate marketing, report to you?
21          A.    Yes.
22          Q.    During that same time period, did
23     Mark Balfan, market risk management, report to
24     you?
25          A.    Yes.
```

```
 1                    R. Feilbogen
 2         Q.    And in 2002, did Brian Morrissey,
 3    chief financial officer, report to you?
 4         A.    Yes.
 5         Q.    If you look at the first page now of
 6    Defendants' Deposition Exhibit 1, in 2002 during
 7    the time that you were chief operating officer
 8    of AIG Trading, did you report to John Finigan?
 9         A.    Yes.
10         Q.    Had you seen this document,
11    Defendants' Deposition Exhibit 1, prior to the
12    time it was produced in discovery in this
13    litigation?
14         A.    I've seen many variations of this
15    document.  So whether or not I have seen it in
16    this exact form is unclear.  It's a working
17    document.
18         Q.    Do you know who was responsible for
19    creating organizational charts of the sort that
20    you saw?
21              MS. VLADECK:  Objection to form.
22         A.    The initial one was created by Jane
23    Severo, my assistant, when John Finigan first
24    arrived in the company; and then I believe over
25    time that Jane and Florence, I can't pronounce
```

```
 1                    R. Feilbogen
 2    her last name, John Finigan's assistant, between
 3    the two of them, would maintain it for John.
 4         Q.    And Ms. Severo reported to you?
 5         A.    Yes.
 6              MR. ROGERS:  Let me now ask that the
 7         following document be marked as Defendants'
 8         Deposition Exhibit 2.  It is a document
 9         bearing production numbers D 180 through D
10         182, and I will hand a copy to counsel for
11         plaintiff.
12              (Defendants' Exhibit 2, AIG Trading
13         Group, Inc.'s organizational chart as of
14         1/31/03, Bates stamped D 000180-000182,
15         marked for identification, as of this
16         date.)
17         Q.    Mr. Feilbogen, Defendants' Deposition
18    Exhibit 2 appears to be an organizational chart
19    of AIG Trading as of January 31, 2003.
20              As of January 31, 2003, did you still
21    retain responsibilities as chief operating
22    officer of AIG Trading?
23         A.    Again, as I've answered before, that
24    was the period of time where my responsibilities
25    were in the process of transferring, as I was
```

```
 1                    R. Feilbogen

 2    becoming more involved in the energy business.

 3    But I retained the title of chief operating

 4    officer.

 5              MR. ROGERS:  I am now going to ask

 6         that a document bearing production numbers

 7         D 183 through 185 be marked as Defendants'

 8         Deposition Exhibit 3, and I am handing a

 9         copy to counsel for plaintiff.

10              (Defendants' Exhibit 3, AIG Trading

11         Group, Inc.'s organizational chart as of

12         2/28/03, Bates stamped D 000183-000185,

13         marked for identification, as of this

14         date.)

15         Q.   Mr. Feilbogen, Defendants' Deposition

16    Exhibit 3 appears to be an organizational chart

17    for AIG Trading Group, Inc. as of February 28,

18    2003.

19              This chart shows you with

20    responsibilities in the energy area, does it

21    not?

22         A.   It does.

23         Q.   It lists on the first page you as

24    being responsible for the energy area with Tony

25    Gordon, and it describes both of you as
```

1                        R. Feilbogen

2       executive VPs.  Do you see that?

3            A.    Yes.

4            Q.    Could you turn to the second page.

5            A.    Yes.

6            Q.    The second page is a sheet that shows

7       the Energy organization.

8                 Is this sheet an accurate reflection

9       of the organization within the Energy department

10      when you formally began your responsibilities in

11      that area?

12           A.    Well, it doesn't describe in any way

13      what the responsibilities are for most of the

14      people on the sheet here.  Again, I assume that

15      this is the full list of -- we had been hiring a

16      lot of people and talking to a lot of people, so

17      I assume that as of this date the information

18      here is correct.

19                I didn't create this sheet, so I

20      can't say with certainty.

21           Q.    When you formally undertook

22      responsibilities in the energy area, was Tony

23      Gordon the global head of Energy?

24           A.    Yes.

25           Q.    At the time you undertook formal

```
 1                     R. Feilbogen

 2     responsibilities in the energy area, were you

 3     and Mr. Gordon the only executive vice

 4     presidents of AIG Trading in the area?

 5               MS. VLADECK:  In the energy area?

 6               MR. ROGERS:  Correct.

 7          A.    We were the only executive vice

 8     presidents.

 9          Q.    In the energy area?

10          A.    In the energy area.  However, just to

11     clarify, you said when I formally took

12     responsibility for the Energy Group.  This chart

13     here dated February 28, '03 I don't believe

14     correlates to the memo written by John Finigan,

15     determining that my responsibility was now

16     solely for the Energy Group.

17          Q.    Do you recall when that memo was

18     created or sent?

19          A.    There were many versions of creation

20     of that memo.  That began probably sometime in

21     the month of February.  I don't believe that

22     memo was sent until sometime in the month of

23     March.

24          Q.    But at least --

25          A.    As a matter of fact, if you look at
```

1                     R. Feilbogen

2         the next page, page 185, you'll see that as of

3         February 28th that this sheet here describes

4         Andy Kaplan as being responsible for Brian

5         Morrissey, Mark Balfan, Beth Cutler and Megan

6         Daley, as well as being responsible for the

7         legal department, credit and treasurer.

8                     As of February 28th, this was a topic

9         that was being discussed between a number of us

10        on the Executive Committee, and I don't believe

11        that this document accurately describes the

12        state of the organization at that time.

13             Q.    So at that point, namely, February

14        28, '03, you believe you still retained

15        responsibilities in administration?

16             A.    I believe that John Finigan was

17        taking responsibility for -- I believe John

18        Finigan was filling in this box where my name

19        had been, where Andy Kaplan's name is on Exhibit

20        185, the top box.  I believe that he was acting

21        in that role more so than Andy was and more so

22        than I was at that point in time.

23             Q.    If you could look at the second page

24        of Exhibit 3 for a second.  At the list of

25        people underneath the two letters "CT," which I

```
 1                    R. Feilbogen
 2      assume means Connecticut, just quickly, what
 3      were the roles of these various individuals in
 4      early '03?  I don't want to get bogged down on
 5      whether it was February 28th or March or the
 6      like.
 7                    Donna Salvatore, what was her role?
 8           A.     Donna's experience was as a marketer
 9      in the Energy Group.  Neither Tony nor I were
10      responsible for hiring Donna, and her role,
11      therefore, at that point in time was somewhat
12      unclear, but her experience was as a marketer.
13           Q.     What was Ted Rodomer's role?
14           A.     Ted Rodomer was -- again, not hired
15      by Tony nor myself -- hired to act as a clerk or
16      junior on the trading desk.
17           Q.     What was Dawn Wetzel's role in the
18      Energy Group?
19           A.     Dawn was hired to help us write our
20      business plan, and the intention was for her to
21      become part of a structural group, a front
22      office role.
23           Q.     Ying Soong, what was her role?
24           A.     Ying was hired to help us develop the
25      Energy business plan and was to provide support
```

```
 1                    R. Feilbogen
 2      to whatever front office types of people needed
 3      the support.
 4             Q.    What was Phil Kassin's role?
 5             A.    Phil Kassin's role, he was
 6      essentially hired as a consultant to help us
 7      develop the Energy business plan, and then
 8      joined us to help us develop a structuring
 9      business.
10             Q.    What was Sanjiv Khosla's role?
11             A.    Sanjiv Khosla's role was to be our
12      head oil trader, petroleum trader, and to help
13      us develop the systems accordingly.
14             Q.    What was Akil Hollis's role?
15             A.    Akil Hollis, much like Ying Soong,
16      was there to support the activities of the more
17      senior front office staff.
18             Q.    What was Steve Pike's role?
19             A.    Steve Pike's role was to help us
20      develop a business, to acquire and restructure
21      qualified facilities, which are certain types of
22      PowerPoints.
23             Q.    What was Arie Dahan's role?
24             A.    Arie Dahan's role, Arie was initially
25      hired into the Energy Group to act as a project
```

```
 1                      R. Feilbogen
 2      manager for the implementation of systems, and
 3      eventually evolved into support or structuring
 4      work, to work with the structures.
 5          Q.    During the time in 2002 and perhaps
 6      into 2003, I am not going to quibble on dates
 7      here, within that time frame that Mr. Morrissey
 8      and his accounting function reported to you, who
 9      else worked with Mr. Morrissey in his group?
10          A.    Paul Gentile, Steve Hauerlick -- it
11      has been a long time, you quickly can forget
12      names -- Myron, Kapner I believe was his last
13      name.
14              Do I need to list everybody in the
15      entire group?
16          Q.    No.  Was Mr. Garzon in that group, or
17      was he someplace else?
18          A.    Yes, James Garzon worked in that
19      group.
20          Q.    What was Paul Gentile's role?
21          A.    Again, putting the title aside, but
22      Paul functionally acted as the assistant
23      controller.
24          Q.    Did he functionally act as
25      Mr. Morrissey's number 2 in the area?
```

1                      R. Feilbogen

2          A.    For certain activities, yes.  Steve

3     Hauerlick and Paul Gentile were, I think, both

4     considered to be his number 2.

5          Q.    By "his," you mean Mr. Morrissey?

6          A.    Yes.

7          Q.    Did you work directly with Paul

8     Gentile?

9          A.    We would have direct conversations,

10     but to be clear, Brian Morrissey ultimately made

11     the decisions.

12          Q.    And Brian Morrissey reported to you?

13          A.    At one point, yes.

14          Q.    I want to turn a little bit now to

15     matters related to your compensation.

16                In 2000, do you recall that you had a

17     salary of $200,000 a year?

18          A.    Yes.

19          Q.    Were you aware of what approvals were

20     needed for increases in salary at AIG Trading at

21     the time?

22                MS. VLADECK:  Objection to form.

23          A.    There was a process of forms to be

24     filled out, I guess the signature of the CEO, in

25     my case, I assume the signature of the CEO, or

```
 1                    R. Feilbogen

 2     for the people who worked for me, I would sign

 3     those forms; those forms, I believe, were then

 4     sent to human resources or some group within the

 5     parent company for processing.

 6          Q.    Were you aware that salary increases

 7     were sent -- let me withdraw that.

 8                 Were you aware that proposed salary

 9     changes were sent to the parent company for

10     approval?

11                 MS. VLADECK:  Objection to form.

12          A.    Yes.

13          Q.    Whose approval at the parent company

14     were proposed salary increases sent to for?

15                 MS. VLADECK:  Objection to form.

16          A.    Depending on what point in time we're

17     talking about, either Ed Matthews or Bill

18     Dooley.

19          Q.    I am just going to show you before

20     marking it a document to ask you if you ever saw

21     it before, it being produced in this litigation.

22     If you haven't, we don't have to waste time with

23     it.

24                 Let me show you a document that bears

25     production numbers D 00053 through 57.
```

```
 1                       R. Feilbogen
 2          A.    Could you ask the question again.
 3          Q.    You have in your hands a document
 4    that has production numbers D 53 through 57.  I
 5    am asking you if you have ever seen that
 6    document before it was produced in discovery in
 7    this litigation.
 8          A.    This note from Nina Mongan --
 9          Q.    That's the cover page?
10          A.    That's the cover page -- I don't
11    believe I have seen before.  And the other
12    documents here in the form that they're in with
13    Ed Matthews' signature at the bottom, I've also
14    prior to this litigation had not seen it in that
15    form.
16          Q.    You had I take it from your answer
17    seen the form of spreadsheet that is part of
18    this document.
19          A.    Yes.
20          Q.    What area of AIG Trading created this
21    spreadsheet?
22               MS. VLADECK:  Objection to form.
23          A.    In the year 2000, which I believe
24    that's dated, I would have created that
25    spreadsheet or something quite similar to it.
```

```
 1                    R. Feilbogen
 2        Q.    What role in the year 2000 did you
 3    have in maintaining the records of compensation
 4    for AIG Trading personnel?
 5             MS. VLADECK:  Objection to form.
 6        A.    I think you need to be a little more
 7    explicit about what you mean by "records."  I
 8    was responsible for creating and holding onto
 9    the tracking of bonuses to be paid to
10    individuals; once those numbers were approved by
11    the senior management within AIG Trading Group,
12    then a copy of that spreadsheet, either
13    electronic or paper, would go to human resources
14    in AIG Trading Group; and paper would be
15    processed from there and coordinated with
16    various parts of the HR group at the parent
17    company, getting Ed Matthews' approval, that
18    sort of thing.
19        Q.    You received a bonus for the year
20    2000 of $600,000, did you not?
21        A.    That's not correct, no.
22        Q.    Let me rephrase it or see whether I
23    can clear this up.
24             What's your recollection of what your
25    bonus was for the year 2000?
```

```
 1                    R. Feilbogen
 2          A.    $720,000.
 3          Q.    Do you know what approvals were
 4     obtained and by whom for the payment to you of a
 5     $720,000 bonus for the year 2000?
 6               MS. VLADECK:  Objection to form.
 7          A.    Again, that would have been
 8     ultimately Ed Matthews.
 9          Q.    Were you aware that in early January
10     2001 Brad Klein sent to Mr. Matthews for his
11     approval a list of proposed bonus payments?
12               MS. VLADECK:  Objection to form.
13          A.    In, I'm sorry, when?
14          Q.    In early January 2001.
15          A.    I wasn't aware he sent it, but it
16     makes sense that he sent it.
17          Q.    Did you have any involvement in the
18     creation of the documents that Mr. Klein sent to
19     Mr. Matthews concerning approvals for certain
20     bonuses?
21               MS. VLADECK:  Objection to form.
22          A.    I don't remember specifically.  As I
23     said, I was the keeper of the numbers, meaning
24     the calculation -- based on the profits of the
25     company, what the calculation was of the bonus
```

```
 1                    R. Feilbogen

 2      pool, what the calculation was of the other

 3      bonuses to be paid.

 4              I am sure I supplied that to Brad,

 5      but I don't know exactly what form that note was

 6      in and whether or not I had involvement in that

 7      specific piece of paper.

 8          Q.    You had described that in late 2000

 9      Mr. Davis, Barry Klein and Mr. Rubin left AIG

10      Trading, Brad Klein became CEO.

11              You are aware, are you not, that in

12      or about the same time certain agreements were

13      made by Mr. Matthews concerning guaranteed

14      compensation for AIG Trading personnel for 2001

15      and 2002?

16              MS. VLADECK:   Objection to form.

17          A.    I'm sorry, could you just repeat the

18      question one more time.

19              MR. ROGERS:  Can you read it back.

20              (Record read.)

21              THE COURT REPORTER:  "QUESTION:  You

22          had described that in late 2000 Mr. Davis,

23          Barry Klein and Mr. Rubin left AIG Trading,

24          Brad Klein became CEO.

25              You are aware, are you not, that in
```

```
 1                    R. Feilbogen

 2            or about the same time certain agreements

 3            were made by Mr. Matthews concerning

 4            guaranteed compensation for AIG Trading

 5            personnel for 2001 and 2002?"

 6            A.    Yes.

 7            Q.    When did you become aware of those

 8       guarantees for 2001 and 2002?

 9            A.    I don't recall the specific time.

10                 MR. ROGERS:  I would like to have

11            marked as Defendants' Deposition Exhibit 4

12            a document which bears plaintiff's

13            production numbers 11 through 13.

14                 (Defendants' Exhibit 4, December 6,

15            2000 memorandum and attached spreadsheet,

16            Bates stamped 000011-000013, marked for

17            identification, as of this date.)

18            Q.    Mr. Feilbogen, Defendants' Deposition

19       Exhibit 4 is a document that your counsel

20       produced in this litigation on your behalf.

21                 Do you recall when you first saw a

22       copy of this document?

23            A.    Specifically, no.

24            Q.    Do you recall that you first saw a

25       copy of this document in December 2000?
```

```
 1                    R. Feilbogen

 2          A.    More or less, yes.

 3          Q.    Who gave the document to you?

 4          A.    I believe Gary Davis gave it to me.

 5          Q.    What do you recall Mr. Davis saying

 6     to you at the time he gave it to you?

 7          A.    Just to be clear, you asked me before

 8     when I saw the document.  The last page here

 9     that lists all the names and the guarantees,

10     this is a spreadsheet that I created under the

11     instruction of Gary, and then at the very end, I

12     guess sometime close to December 6, 2000 is when

13     he put the number in for me.

14               What did he say to me?  He told me

15     that this group of us, as it says in point

16     number 3 here, Brad Klein, Jonas, Michael

17     Fields, Andrew Kaplan and myself, would be

18     responsible for the management of the company.

19     He told me that he had decided that Brad would

20     be the CEO, or I guess collectively the parent

21     company decided he would be the CEO.

22               I knew at the time that they had been

23     contemplating cutting the pool to a 30 percent

24     pool, which it says at point number 2, "The

25     traders' bonus pool will be 30 percent."
```

1                          R. Feilbogen

2                 When he handed me this document, he

3       told me that Brad and I should organize some

4       method to let people know -- let the people who

5       are described on the third page of this document

6       know about their guarantees, and that he would

7       coordinate that somehow with the parent company.

8                 As I said, since I had created this

9       spreadsheet, he had already informed me prior to

10      handing me -- prior to handing me this final

11      version of the document, he had already informed

12      me of my guarantee, as it's described on the

13      sheet here.  He told me that -- that pretty much

14      covers it.  We had a lot of conversations at

15      that time, so it's hard to recall exactly what

16      was said.

17           Q.    The purpose of communicating to the

18      people on this list that they had been given

19      guarantees for 2001 and 2002 was to help

20      encourage them to remain at AIG Trading in the

21      wake of the changes in the organization, was it

22      not?

23                 MS. VLADECK:   Objection to form.

24           A.    I believe that was the intent, yes.

25           Q.    Have you met Ed Matthews?

1                    R. Feilbogen

2          A.    Yes, I have.   Just one other point.

3    I don't believe that the third page here, just

4    to be clear, is the original document that went

5    with this memo.   The left-hand side, Schedule A,

6    where it says "original guarantees" I believe

7    was the -- probably more accurately depicts what

8    was referred to in the memo.

9                This particular spreadsheet here, I

10   believe the numbers on the right-hand side were

11   after some conversations with Ed Matthews and

12   Bill Dooley.   There are a few numbers that

13   changed.

14         Q.    Let me ask you what you can recall in

15   the creation of the document.

16                Do you know whether Mr. Davis created

17   this cover memo and then sent it to Mr. Matthews

18   for his review and signature?

19                MS. VLADECK:   Objection to form.

20         A.    You are saying did Gary Davis create

21   this memo?

22         Q.    I'm asking whether you recall that.

23         A.    I don't know that.

24         Q.    Then lets turn to the schedule at the

25   end of it, Schedule A.

```
 1                    R. Feilbogen
 2               You created that document at
 3     Mr. Davis's request?
 4          A.    Yes.
 5          Q.    Is what you are saying that the
 6     original document you created may have just had
 7     the names and the figures that are on the
 8     left-hand side under the title "original
 9     guarantees"?
10          A.    Yes.  When Gary Davis handed me this
11     memo, and it had a document similar to this
12     attached to it, I believe it was only the
13     left-hand side.
14          Q.    How was it that the document that we
15     see here as the third page of Deposition Exhibit
16     4 created?
17               MS. VLADECK:   Objection to form.
18          A.    There was discussion about the
19     guarantees between Brad Klein and some
20     combination, I guess, of Ed Matthews and Bill
21     Dooley, where Brad had asked if he could, before
22     he communicated the numbers, make some
23     adjustments to the numbers, so long as he kept
24     the number in its aggregate at or below the
25     total amount, because again, Brad had no input
```

```
 1                    R. Feilbogen

 2      on the original list.

 3           Q.    If I understand you correctly, you

 4      said Brad Klein after he saw the original list

 5      asked to be able to make some revisions?

 6           A.    Yes.

 7           Q.    He asked to do that before the

 8      numbers were communicated to the individuals on

 9      the list?

10           A.    Yes.

11           Q.    Your numbers on this list didn't

12      change between the original and the actual, did

13      they?

14           A.    Correct.

15           Q.    Ultimately, after the schedule was

16      created that we now see as the third page of

17      Deposition Exhibit 4, was that schedule then

18      attached to the memorandum from Mr. Matthews?

19           A.    Was it then attached to it?

20           Q.    Yes.  Did it become the operative

21      Schedule A for purposes of these guarantees?

22           A.    Yes.

23           Q.    Did you create the page that is

24      actually appended to Defendants' Deposition

25      Exhibit 4?
```

```
 1                         R. Feilbogen
 2          A.    I was the keeper of this spreadsheet.
 3          Q.    Did you delegate that to either
 4     Mr. Morrissey or Mr. Gentile, the actual typing
 5     of the schedule, or did you do it yourself?
 6          A.    No, I did it myself.
 7          Q.    Why is that?
 8          A.    Because the compensation numbers --
 9     the maintenance of the spreadsheets relating to
10     the deal, meaning the sale of the equity in AIG
11     Trading Group back to the parent company, was
12     kept by myself primarily in the interest of
13     keeping the fewest number of people possible in
14     the 'know' with respect to the deal.
15          Q.    Even after the deal that you were
16     just referring to took place, who had access to
17     compensation data with respect to executives at
18     AIG?
19               MS. VLADECK:  Objection to form.
20               Can I just hear the beginning part of
21          the question, please.
22               MR. ROGERS:  Let me withdraw that.
23          Q.    Leaving aside the deal that you just
24     referred to and focusing on the period from
25     December 2000 on after Brad Klein became CEO,
```

```
 1                    R. Feilbogen
 2   who had access to the database of compensation
 3   of AIG executives?
 4        A.    The parent company, our human
 5   resources department at AIG Trading Group, I
 6   did, the CEO, and Brian Morrissey did on an
 7   after-the-fact basis, meaning after the
 8   communication took place when he had to process
 9   the booking of the numbers themselves as they
10   were getting paid out, then he had access to
11   that data.
12        Q.    Just as a point of clarification, you
13   mean after a particular executive was told what
14   he was going to be paid, then Morrissey would
15   have access to that number to use it in the
16   accounting process?
17        A.    So it would fall into the proper
18   profit center and he would allocate it
19   accordingly.
20        Q.    For purposes also of clarification,
21   was it the case at AIG Trading that a bonus for
22   a particular performance year would ordinarily
23   be paid in the next year?
24        A.    Repeat the question.
25        Q.    For example, was your bonus for your
```

```
 1                    R. Feilbogen
 2    work in the year 2000 paid in the year 2001?
 3         A.    A portion of it was paid in 2000 and
 4    a portion of it was paid in 2001.
 5         Q.    I will try to be distinct, but when I
 6    am talking about a bonus for 2000, I mean the
 7    total amount of your work paid in 2000 as
 8    opposed to that portion that might have been
 9    paid in that calendar year.
10         A.    For the work that I had done for the
11    year 2000, I received some money, most money, in
12    December of 2000, and then I received the
13    remainder of my bonus in 2001.
14         Q.    For your work in 2001, what payment
15    of bonus did you receive regardless of what year
16    it may have been paid?
17         A.    For my 2001 work, I received a
18    $800,000 bonus.
19         Q.    The $800,000 that you received was --
20    let me withdraw that.
21               What was your salary in 2001?  Do you
22    recall?
23         A.    In 2001, my salary was $200,000.
24         Q.    Do you remember when you received the
25    $800,000 bonus?
```

```
 1                    R. Feilbogen

 2         A.    I'm guessing it was around February

 3    of 2002.

 4              MR. ROGERS:  I am going to ask to

 5         have marked as Defendants' Deposition

 6         Exhibit 5 a document that bears plaintiff's

 7         production numbers 14 through 20.

 8              (Defendants' Exhibit 5, January 16,

 9         2001 memorandum and attached schedules,

10         Bates stamped 000014-000020, marked for

11         identification, as of this date.)

12         Q.    Mr. Feilbogen, Defendants' Deposition

13    Exhibit 5 is a document that was also produced

14    by your counsel on your behalf.  Can you tell me

15    what it is?

16         A.    It's a summary of conversations that

17    Brad Klein had with Ed Matthews and Bill Dooley.

18         Q.    Mr. Klein cc'd you on this memorandum

19    summarizing his conversations, did he not?

20         A.    Along with the other executive VPs,

21    yes.  Almost all of us, yes.  He left one off.

22         Q.    Who is left off?

23         A.    Michael -- Mike Fields.

24         Q.    What was Mr. Fields' function at the

25    time?
```

```
 1                    R. Feilbogen

 2        A.    Mike was running the foreign exchange

 3   business.

 4        Q.    Were you present at the London

 5   meeting that is referred to in this memorandum?

 6        A.    No.

 7        Q.    Were you partied to the subsequent

 8   phone conversations that are referred to in the

 9   subject line of the memorandum?

10           MS. VLADECK:  I'm sorry, could I hear

11           that one back.

12           MR. ROGERS:  Let me try to cut

13           through it.

14        Q.    The first sentence of the document

15   states, "I thought it might be helpful to

16   summarize some of the issues raised by our

17   recent meeting and subsequent telephone

18   conversations," and the memo from Mr. Klein is

19   to Mr. Matthews and Dooley.

20           So my question really is:  Were you

21   present or did you participate in the meeting or

22   the telephone conversations that Mr. Klein is

23   referring to?

24        A.    I was not in London for the meeting;

25   I don't recall whether or not I participated in
```

1                        R. Feilbogen

2       the telephone conversations.

3            Q.    There are a number of schedules here

4       attached to this document.

5                  Did you have any role in the creation

6       of them?  I should say the first one says

7       "Original schedule per EM memo," and to the

8       extent that it is similar to the last page of

9       Deposition Exhibit 4, I assume that you did have

10      some role in the creation of that document.

11           A.    Yes.

12           Q.    Look at the later schedules and I ask

13      you if you had any role in the creation of those

14      documents.

15           A.    Yes.

16           Q.    Yes, what?

17           A.    Yes, I created the documents.

18           Q.    Who asked you to create the

19      documents?

20           A.    I don't remember if it was directly

21      Brad Klein or if it was -- it could have been

22      asked of me by any number of people at the

23      parent company.  I don't recall.

24           Q.    Did Mr. Klein ever discuss with you

25      his desire to memorialize the guarantee

```
 1                     R. Feilbogen

 2    agreements?

 3         A.    Yes.

 4         Q.    What did he say to you?

 5         A.    We talked about wanting to get it in

 6    writing, wanting to get contracts for the people

 7    who are referred to on -- for the people who are

 8    on Schedule A-1; we talked about getting them in

 9    writing and the feasibility, since there are so

10    many names on the list, of coming up with some

11    way of doing that efficiently.

12         Q.    What did you come up with as a way to

13    do it efficiently?

14         A.    We thought that we would just create

15    one standard letter or suggest that we create

16    one standard letter, and basically just drop the

17    names and the amounts into the same letter that

18    had the same language.

19         Q.    Did you ever do that?

20         A.    No, we did not, under the instruction

21    of Bill Dooley, Ed Matthews and others at AIG.

22         Q.    What did Mr. Dooley and Mr. Matthews

23    say to you in that regard?

24              MS. VLADECK:   Objection to form.

25         A.    They said, whether it was directly
```

1                    R. Feilbogen

2       through them or possibly through Dennis

3       Zampella, who was the human resource person

4       reporting to both of them, we were told that

5       they would prefer to keep the communication of

6       the guarantees to a verbal communication.  They

7       thought that was simple.

8            Q.    The people on Schedule A-1, which in

9       this document has your production number 16, had

10      already been told of their guarantees for 2001

11      and 2002, had they not?

12           A.    I'm sorry?

13           Q.    Let me withdraw that.

14                 You testified earlier when we were

15      talking about the memo that Mr. Matthews signed

16      confirming guarantees for those on Schedule A

17      appended to Deposition Exhibit 4 that those

18      individuals on that schedule were informed of

19      their guarantees for 2001 and 2002.

20           A.    At some point in time, yes, but not

21      on December 6, 2002.

22           Q.    Defendants' Deposition Exhibit 5 was

23      dated January 16, 2001.

24                 Do you know whether by that time

25      these individuals on that schedule were informed

```
 1                    R. Feilbogen

 2     of their guarantees?

 3          A.    I don't recall the exact timing of

 4     the communication that took place with the

 5     employees.

 6          Q.    The first page of Deposition Exhibit

 7     5 under point 3 states, "As you know, we have

 8     posted certain senior employees that their

 9     compensation for 2001 and 2002 will be

10     guaranteed."  Do you see that?

11          A.    Okay, then I guess it happened before

12     January 16th.  As I said, I don't recall the

13     exact timing.

14          Q.    It goes on to say, "As discussed in

15     London, we would like to memorialize the

16     agreement.  There have been a few changes,

17     although the total amount of guarantees remains

18     the same.  We have attached a separate memo."

19                What's the separate memo; is it the

20     schedule to show the figures?

21                MS. VLADECK:  Objection to form.

22          A.    I don't know.  I don't know.

23          Q.    Is the document that you're holding

24     in your hand in the form that Mr. Klein sent it

25     to you?
```

```
 1                    R. Feilbogen
 2         A.    I don't recall.  He had given me a
 3    copy of the two-page memo, and I have a file in
 4    my office where I put various documents, and I
 5    have put copies of these other pages into that
 6    same folder.  So I don't remember whether or not
 7    this was all together as one unit.
 8         Q.    Have you produced to us all of the
 9    documents that were in the file that you were
10    just referring to?
11         A.    I have given you whatever I have,
12    yes.
13         Q.    Let me refer you to the top of
14    Deposition Exhibit 5.  There is a fax machine
15    record at the top page, it doesn't show what
16    date, but it does appear that it shows you were
17    faxing this document at some point.
18         A.    Yes.
19         Q.    And it has got page numbers
20    sequentially, this one starts with page 5 and it
21    goes 6, 7, 8, 9, 10, 11.
22              When did you fax those pages?
23         A.    I faxed them to my attorney at some
24    point.  I don't remember exactly when.
25         Q.    So that represents a fax sent at the
```

```
 1                    R. Feilbogen
 2    time -- let me withdraw that.  Your answer is
 3    understandable.
 4              What direct conversations did you
 5    have with Mr. Dooley concerning the guarantees
 6    that were given by AIG Trading to employees for
 7    the years 2001 and 2002?
 8       A.    I recall a meeting in Greenwich
 9    shortly after Brad was named CEO, the exact
10    timing is unclear, Ed Matthews was at that
11    meeting, where we talked about --
12       Q.    I'm sorry, I think I asked about
13    Dooley.  Was Dooley there?
14       A.    Yes.  Bill Dooley and Ed Matthews
15    were at the meeting.  That was the first time, I
16    think, we had brought up to them how we were
17    going to communicate the guarantees, or maybe
18    the guarantees at that point had already been
19    communicated, but just what we were going to do
20    about memorializing it.  We had talked about
21    other issues at that meeting as well, concerns
22    that we had with respect to this memo that you
23    have called Exhibit number 4.
24              There may have been a second
25    conversation face to face that I may have --
```

1                    R. Feilbogen

2      Bill had been spending a fair amount of time

3      coming back and forth, so it's unclear to me.

4      We may have had a second meeting where the topic

5      came up.  I can't recall anything else.

6          Q.    What do you recall Mr. Dooley saying

7      at the meeting in Greenwich that you just

8      referred to about the topic of 2001 and 2002

9      guarantees?

10         A.    At that specific meeting, I don't

11     recall exactly what his response was.  I don't

12     know if it was at that meeting where Bill

13     specifically or Ed and Bill had suggested that

14     it would be easier to just leave the

15     communication as a verbal communication, or

16     whether at that point in time they said that

17     they wanted to think about it and come back to

18     us.  I don't remember.

19         Q.    Sitting here today, you can't testify

20     with certainty whether Mr. Dooley or

21     Mr. Matthews said anything at the meeting in

22     Greenwich concerning whether or not a separate

23     writing would be created confirming 2001 and

24     2002 guarantees for executives?

25         A.    At that meeting, I cannot recall

```
 1                    R. Feilbogen
 2    whether or not they definitively decided that we
 3    would leave it as a verbal communication or
 4    whether or not they wanted some more time to
 5    think about it.  I don't remember the exact
 6    timing of when they made that determination.
 7         Q.    Do you recall ever having heard
 8    directly from Dooley or Matthews of the
 9    determination that you say they made?
10         A.    I have a vague recollection of a
11    meeting we had with Bill Dooley when he said to
12    me that we were going to be leaving the
13    guarantees as a verbal communication at one of
14    his trips to Connecticut.
15         Q.    At the time of the Greenwich meeting,
16    had Mr. Matthews already signed his approval to
17    the guarantees, as set forth on Deposition
18    Exhibit 4?
19         A.    Yes, as the meeting took place after
20    December 6th.
21         Q.    At the time of the conversation that
22    you just said you vaguely recall, had
23    Mr. Matthews already signed Deposition Exhibit
24    4?
25         A.    Yes.
```

```
 1                  R. Feilbogen
 2          Q.   So whether or not there was a
 3    decision made to inform the executives
 4    separately by writing, there already was a
 5    writing in existence signed by AIG confirming
 6    the guarantees for 2001 and 2002, is that not
 7    correct?
 8              MS. VLADECK:  Objection to form.
 9          A.   Could you just repeat the question
10    again.
11              MR. ROGERS:  Can you repeat it.
12              THE COURT REPORTER:   "QUESTION:  So
13          whether or not there was a decision made to
14          inform the executives separately by
15          writing, there already was a writing in
16          existence signed by AIG confirming the
17          guarantees for 2001 and 2002, is that not
18          correct?"
19              MS. VLADECK:  Note my objection.
20          A.   I don't think that's accurate.  This
21    memo here --
22          Q.   You are referring to Exhibit 4?
23          A.   Exhibit 4.  This memo signed by Ed
24    Matthews refers to a schedule that at some point
25    in time had been revised.  I do not know that
```

```
 1                    R. Feilbogen

 2    that revision -- I do not know that we have

 3    record of that revision being signed by Ed

 4    Matthews.

 5         Q.    Let's talk about you, Mr. Feilbogen.

 6    Mr. Matthews signed Deposition Exhibit 4, and

 7    attached to it was a schedule which had numbers

 8    on it which are the same as the numbers set

 9    forth on the third page of Deposition Exhibit 4,

10    did he not?

11         A.    Yes.

12         Q.    There was a time in 2002, was there

13    not, when you spoke to Mr. Finigan about a job

14    offer that you may have received?

15         A.    It was sometime towards the end of

16    2001, early 2002 that I told him that I had --

17    that I was beginning to understand what my

18    market value was.

19         Q.    What do you recall you spoke to

20    Mr. Finigan about concerning alternative job

21    possibilities in 2002?

22              MS. VLADECK:   Objection to form.

23         Asked and answered.   You can answer.

24         A.    Could you just repeat it one more

25    time.
```

```
 1                    R. Feilbogen
 2         Q.    What did you tell Mr. Finigan?
 3         A.    I told Mr. Finigan that I was
 4    beginning to understand what my market value was
 5    and I had some concerns about the direction that
 6    the company was going.
 7         Q.    At the time you spoke to Mr. Finigan,
 8    you had a guarantee for 2002 of $800,000; is
 9    that right?
10         A.    No, that's not right.
11         Q.    Excuse me, it is not right.  At the
12    time that you spoke to Mr. Finigan, you had a
13    guarantee for 2002 of $600,000?
14         A.    Yes.
15         Q.    Tell me what you told Mr. Finigan
16    about your belief concerning your market value.
17         A.    I said that I understood that I could
18    find a job outside of AIG Trading Group that
19    would compensate me in the million and a half
20    dollar range; that I had concerns about the
21    financial stability of AIG Trading Group and
22    some of the things that we were doing; and was
23    concerned about the direction the company was
24    going, but at the same time felt a very strong
25    emotional connection to the company.
```

```
 1                     R. Feilbogen
 2          Q.    At the time you spoke to Mr. Finigan,
 3     did you have a job offer from another employer?
 4          A.    No, I did not.
 5          Q.    At the time you spoke to Mr. Finigan,
 6     had you spoken to other potential employers
 7     about the possibility of working for them?
 8          A.    No, I did not.
 9          Q.    What was your understanding of your
10     market value based on?
11          A.    I had received calls from some
12     recruiters and had the conversation with John
13     Finigan; because again, I had a very deep
14     emotional attachment to the company, and before
15     I started pursuing other opportunities, I wanted
16     to see whether or not I could get comfortable
17     with staying at AIG.
18          Q.    What did Mr. Finigan say in response
19     when you mentioned these things to him?
20          A.    He told me that it was important for
21     me to be on the same page with him with respect
22     to the rebuilding of the foreign exchange
23     business; he told me that he believed in John
24     Wareham, who had been his recent hire, to
25     rebuild the foreign exchange business; he told
```

```
 1                    R. Feilbogen

 2      me how important he thought I was to the

 3      company; he felt that he had made a lot of

 4      progress stabilizing the company, but felt that

 5      or implied that he needed me to remain in the

 6      role I'm in in order to help them continue

 7      building the company; and that he would give

 8      some thought to my compensation to help me get

 9      comfortable with staying.

10          Q.    What did he do after that?

11              MS. VLADECK:  Objection to form.

12          A.    I don't know.  What do you mean "what

13      did he do after that"?  I guess he gave it a

14      thought.  I don't know.

15          Q.    What knowledge do you have of what

16      next took place with respect to your

17      compensation after you mentioned it to

18      Mr. Finigan?

19          A.    He came back to me -- exactly how

20      much longer after that, I don't remember, it

21      wasn't the same week, it was maybe a week, two

22      weeks later -- and told me that he would like to

23      offer me an increase in my guarantee from

24      $600,000 to a million-three, and that I would

25      see an increase in my salary to $250,000 as of
```

```
 1                    R. Feilbogen
 2    sometime midyear.
 3         Q.    Was the $1.3 million guarantee that
 4    he mentioned to you inclusive of salary?
 5         A.    No, bonus guarantee.
 6         Q.    Did you discuss this topic then with
 7    anyone else at AIG?
 8         A.    Yes.
 9         Q.    I used the word "then" and I didn't
10    mean to.
11              Did you discuss this topic with
12    anyone else at AIG Trading?
13         A.    Yes.
14         Q.    Who else?
15         A.    Dennis Zampella.
16         Q.    What do you recall he said to you and
17    you said to him?
18         A.    I recall Dennis telling me -- after
19    the first conversation I had with John, I recall
20    at some point thereafter Dennis coming to me and
21    telling me that I had a great future at AIG and
22    said a lot of very nice things about me; that he
23    was going to help John try to figure out some
24    way to encourage me to stay.
25         Q.    Did Zampella tell you that --
```

```
 1                    R. Feilbogen
 2              MS. VLADECK:  Were you finished with
 3         your answer?
 4              THE WITNESS:  I was not finished.
 5         A.    The other communication we had is
 6    after John Finigan had the conversation with me
 7    about the increase in my guarantee, I then went
 8    to Dennis's office, I asked him if he knew -- I
 9    guess I didn't ask him if he knew, I knew he
10    knew already.  I just thanked him and asked him
11    if I should call Bill Dooley and thank him.  He
12    told me not to, to just let it all lie and just
13    be happy.
14              In between that, I guess just before
15    John Finigan had spoken to me and offered me the
16    increase, Dennis had stopped by my office, made
17    a little joke, because I was expecting a baby
18    any day, he said something like you should name
19    your child after me or your next child after me,
20    because I did you a favor.
21         Q.    This is Dennis speaking?
22         A.    Yes.
23         Q.    You mentioned a moment ago that you
24    suggested to Zampella that you might call Dooley
25    to thank him.
```

```
 1                    R. Feilbogen

 2              Did you understand that Bill Dooley

 3    had approved the increase in your compensation

 4    for 2002?

 5         A.    I was guessing that he must have

 6    played a role, but I didn't know with certainty.

 7         Q.    Did Mr. Finigan tell you that

 8    Mr. Dooley had approved the increase when

 9    Mr. Finigan told you about the increase?

10         A.    I don't recall him mentioning that.

11         Q.    The increase in your salary rate to

12    $250,000, do you know when that took place, when

13    that was effective?

14         A.    Specifically, no.  I believe it was

15    the end of June or early July 2002.

16         Q.    Do you recall when it was that you

17    first approached Mr. Finigan?  And I apologize,

18    I know you gave a date and I just can't

19    remember.

20              When do you think it is that you

21    first approached Mr. Finigan about your market

22    value?

23         A.    It was sometime either towards the

24    end of 2001 or early 2002.  I don't recall

25    exactly.
```

1                     R. Feilbogen

2          Q.    Was there anyone else at AIG Trading

3     who you discussed your compensation with between

4     the time that you first raised it with

5     Mr. Finigan and the time that Mr. Finigan told

6     you that your compensation for 2002 would be

7     increased?

8          A.    I don't recall.

9          Q.    I am going to show you but not yet

10    mark a document which was produced by us in this

11    litigation.  It's marked D 71.

12               Have you ever seen that document

13    before?

14          A.    Prior to the exchange of documents

15    that we have for this litigation, no.

16          Q.    Have you seen it since we produced

17    the document?

18          A.    Yes.  I looked at all the documents

19    you gave us.

20          Q.    Do you know what McLagan Partners'

21    compensation information is?

22          A.    I have an understanding of what their

23    service is.

24          Q.    Could you describe that?

25          A.    I believe they provide market surveys

1                          R. Feilbogen

2        of results of samplings they do for compensation

3        for different job types.

4             Q.    On this document, D 71, which is an

5        e-mail from Dennis Zampella to William Dooley

6        and John Finigan dated February 21, 2002, there

7        is a reference to McLagan data, and then it says

8        at the end, "To request special/true competitive

9        info... i.e. Sempra would be too high for AIG."

10                  What is Sempra?

11            A.    What is Sempra?

12            Q.    Yes.

13            A.    Sempra is a California utility.

14            Q.    Sempra is currently your employer; is

15       that right?

16            A.    I work at Sempra Energy Trading, yes.

17            Q.    I am going to show you now a document

18       that was produced by us and bears production D

19       70.

20                  Prior to our production of documents

21       in this litigation, had you ever seen that?

22            A.    No.

23            Q.    That's an e-mail from Mr. Zampella to

24       Mr. Dooley with a cc to John Finigan dated

25       February 21, '02, setting forth certain

```
 1                    R. Feilbogen
 2      recommendations, and under the comment section,
 3      the first point says, "He does have an
 4      opportunity at a hedge fund for $1.5 million."
 5                 Did you ever tell Mr. Zampella that
 6      you had an opportunity at a hedge fund for $1.5
 7      million?
 8           A.    That I specifically had an
 9      opportunity at a hedge fund, at a specific hedge
10      fund?  No.
11                 To clarify what I said earlier, I had
12      told him that when I understood the market
13      value, that market value was coming from
14      recruiters, telling me what a hedge fund would
15      pay for this position.
16                 MR. ROGERS:  I am told by the
17            videographer we have five minutes left on
18            the tape, so why don't we take a break.
19                 THE VIDEOGRAPHER:  The time is 11:54
20            a.m.  We're going off the record.
21                 (Recess taken.)
22                 (Defendants' Exhibit 6, September 11,
23            2002 e-mail, Bates stamped D 000074, marked
24            for identification, as of this date.)
25                 (Defendants' Exhibit 7, September 11,
```

1                    R. Feilbogen

2              2002 letter, Bates stamped D 000186, marked

3              for identification, as of this date.)

4                    THE VIDEOGRAPHER:   The time is 12:06

5              p.m. on March 16, 2004.  This marks the

6              beginning of tape number 2 of the

7              videotaped deposition of Mr. Robert

8              Feilbogen.

9         Q.    Mr. Feilbogen, I am going to hand you

10    what has been marked during the break as

11    Defendants' Deposition Exhibits 6 and 7, and I

12    will hand copies to your counsel, with apologies

13    for the handwriting on the lower right that I

14    put in there for my own purposes in marking the

15    exhibit.

16                    MS. VLADECK:   Which one is which?

17                    MR. ROGERS:   6 bears production

18              number D 74, and Exhibit 7 bears production

19              number D 186.

20         Q.    Turning first to Deposition Exhibit

21    6, Mr. Feilbogen, this is what looks like a copy

22    of an e-mail from you dated September 11, '02 to

23    Mr. Zampella.

24                    Did you send this e-mail to

25    Mr. Zampella?

```
 1                    R. Feilbogen
 2         A.    Yes.
 3         Q.    You in this e-mail are asking
 4    Mr. Zampella to type up a letter concerning your
 5    guarantee payment; is that correct?
 6         A.    Yes.
 7         Q.    Is Deposition Exhibit 7 a copy of the
 8    letter that Mr. Zampella created that you had
 9    requested?
10         A.    Yes, it is, yes.  I hadn't seen this
11    before we exchanged documents.
12         Q.    Mr. Zampella didn't send this to you?
13         A.    No, he did not.
14         Q.    What was your purpose in asking for a
15    letter of this sort?
16         A.    I was -- I needed a home equity line
17    to bridge the gap that I might have had in
18    looking to move and to sell my house and
19    purchase another house, and before I put my
20    house on the market, I needed to get a home
21    equity line just in case I needed to handle some
22    cash flow issues.
23         Q.    After you sent the e-mail to
24    Mr. Zampella, what communications did he have
25    with you about your request?
```

1                      R. Feilbogen

2          A.    I don't know if we communicated

3     directly.  I may have communicated through

4     Sandra Marr, who worked for Dennis, giving her

5     the fax number or information for the mortgage

6     broker, and I was told it was done.  That's it.

7          Q.    So you were told by Mr. Zampella's

8     office that he had sent some information to the

9     mortgage broker?

10         A.    Right.  Either by Dennis or by

11    somebody who worked for Dennis that the letter

12    had been written and sent out.

13         Q.    To your knowledge, did a letter get

14    transmitted to --

15         A.    My mortgage broker told me it was all

16    okay.

17         Q.    You stated that your best

18    recollection is that you raised the topic with

19    Mr. Finigan of your market value in early 2002.

20              MS. VLADECK:  Objection to form.

21         Q.    And you also testified that your

22    recollection is that your salary was adjusted

23    around June to July 2002.

24              Do you have a recollection as to when

25    it was that Mr. Finigan told you that your

```
 1                    R. Feilbogen
 2      compensation would be increased to $1.3 million?
 3              MS. VLADECK:  Objection to form.
 4          A.    Is the question do I have a
 5      recollection when John Finigan told me my
 6      compensation would be increased to a
 7      million-three?
 8          Q.    That is the question.
 9          A.    The specific date, no.  It was
10      again -- it was January, February, March of '02,
11      sometime in that time frame, but the specifics,
12      I can't remember.
13          Q.    But it was sometime, to your
14      recollection, in the first quarter of 2002?
15          A.    Yes, that seems reasonable.
16              MR. ROGERS:  I am going to have a
17          document marked as Defendants' Deposition
18          Exhibit 8, which bears production numbers D
19          187 through D 189, and I will hand a copy
20          to plaintiff's counsel.
21              (Defendants' Exhibit 8, Spreadsheets,
22          Bates stamped D 000187-000189, marked for
23          identification, as of this date.)
24          Q.    Mr. Feilbogen, I am now handing you a
25      copy of the marked exhibit, Defendants'
```

```
 1                    R. Feilbogen

 2      Deposition Exhibit 8.  Mr. Feilbogen, this is

 3      a document which was produced by us in the

 4      litigation, there are markings that say

 5      "material redacted" which were created by us.

 6                 Looking at the form of the document,

 7      is this a document that was prepared by your

 8      area within AIG Trading?

 9           A.    By my area?

10           Q.    Let me ask you it a different way:

11      Do you know who prepared this document?

12           A.    No.  Specifically, no.

13           Q.    Had you seen this document before it

14      was produced in this litigation?

15           A.    I don't really know.

16           Q.    The format of the document, is this a

17      format of a type of spreadsheet that you are

18      familiar with from your work at AIG Trading?

19                 MS. VLADECK:  Objection to form.

20           A.    Is it a format?  If you are going to

21      have a list of names, amounts -- if you're going

22      to keep track of information relating to a

23      specific individual -- yes, it looks like a

24      format that is similar to things I have created,

25      similar to things that lots of people in the
```

```
 1                    R. Feilbogen

 2     company could have created.  So was it "in my

 3     area," I don't know.

 4          Q.    Look at the names of the people who

 5     are listed as having guarantees.

 6               These are all individuals at AIG

 7     Trading, are they not?

 8          A.    Yes.

 9          Q.    Just assume with me for a second,

10     because I am going to ask you essentially to

11     give me some best estimates, not a strict

12     statement of fact.

13               Assuming for a second that the

14     amounts here are amounts that have not yet been

15     communicated to the employee, who would have

16     access to the data in order to create a chart

17     like this?

18          A.    John Finigan, Dennis, anyone at the

19     parent company -- not anyone, but I guess those

20     who are close to AIG Trading Group at the parent

21     company.  Depending on when this document was

22     created, it's possible that Brian Morrissey may

23     have had that conversation if it took place

24     during this gray area I've described as my job

25     responsibilities were transferring.
```

1                    R. Feilbogen

2              That probably pretty much summarizes

3         it.  I could have had access to it.  Well, it

4         has John's name on it, so I probably wouldn't

5         have had access to it.

6              Q.   Because it has --

7              A.   Finigan's name on it.  I was not

8         aware of what his compensation was.  So I

9         probably would not have had access to it unless

10        it was left blank.

11             Q.   Is it your testimony that you have

12        never seen this document before, or you just

13        don't recall seeing the document before?

14             MS. VLADECK:   Objection to form.

15             A.   I can't tell.  With all the material

16        redacted, I don't know.

17             Q.   I am going to show you a document

18        that bears production numbers D 240 through 41

19        and ask you if you ever saw that document before

20        this litigation started.

21             A.   I may have, I may have.

22             Q.   Do you know who prepared it?  It may

23        be two documents, I should say.  Do you know who

24        prepared the two pages?

25             A.   Specifically, no.

```
 1                    R. Feilbogen
 2              MR. ROGERS:  I am going to ask that
 3         this document be marked Defendants' Exhibit
 4         9.  It's a one-page document bearing
 5         production number D 77, and I am handing a
 6         copy to plaintiff's counsel.
 7              (Defendants' Exhibit 9, November 17,
 8         2002 e-mail, Bates stamped D 000077, marked
 9         for identification, as of this date.)
10         Q.    Is Defendants' Deposition Exhibit 9 a
11    copy of an e-mail that you sent on November 17,
12    2002?
13         A.    Yes.
14         Q.    The body of the e-mail says,
15    "Remember that the expense forecasts were not
16    inclusive of GTY's -- which I assume means
17    guarantees -- for front office people (salaries
18    only.)  For b/o and support (including quants),
19    we included bonuses in our guesstimates."
20              What does that mean?
21         A.    This e-mail was written during the
22    time of creating the various many models to put
23    a business plan together for the Energy Group.
24    It actually look like I wrote this e-mail for
25    myself and copied these people as a reminder for
```

```
 1                    R. Feilbogen
 2      myself.
 3                You will notice the time is 1 o'clock
 4      in the morning.  I probably had been working
 5      from home on my laptop and just e-mailed myself
 6      so that in the morning I would remember what I
 7      had done at this current stage.
 8           Q.   The subject says "Base case pro
 9      formas."
10                Did this e-mail relate to some pro
11      formas that you were creating for the Energy
12      Group?
13           A.   Yes.  We created a lot of different
14      pro formas in the process of putting the
15      business plan together and lots of different
16      cases in trying to make different assumptions in
17      trying to figure out what it is we want to put
18      on paper.
19           Q.   In this e-mail, you are saying that
20      your expense forecasts did not include
21      guarantees for front office people, but for back
22      office and support, including quants, you
23      included bonuses in your guesstimates; is that
24      right?
25           A.   Yes.  That's what it says.
```

1                    R. Feilbogen

2          Q.    What does the "(salaries)" mean after

3     the words "front office people"; does it mean

4     that you were putting in the expense forecasts,

5     their salaries, but not any guarantees?

6          A.    It means what it says.  It means that

7     if I was trying to forecast expenses at this

8     stage during the planning process, that in my

9     assumptions, I had assumed a salary level, but I

10    had assumed that we were not going to be

11    expensing our front office people.

12         Q.    On bonuses?

13         A.    Yes.  That's what it says.

14         Q.    You eventually created a large

15    business plan for the Energy Group, did you not?

16         A.    Yes.

17              MR. ROGERS:  I am going to mark as

18         Defendants' Exhibit 10 a document that

19         bears production numbers D 407 through 458,

20         and I will hand a copy to your counsel.

21              (Defendants' Exhibit 10, February 7,

22         2003 e-mail and attached AIG Energy

23         Business Plan Discussion document dated

24         December 6, 2002, Bates stamped D

25         000407-000458, marked for identification,

1                    R. Feilbogen

2          as of this date.)

3          Q.    Mr. Feilbogen, Defendants' Deposition

4     Exhibit 10 is a cover e-mail and then a long

5     document described as AIG Energy Business Plan

6     Discussion, the long document has a date on the

7     cover of December 6, 2002.

8               Is this the business plan you were

9     referring to that was put together for AIG

10    Energy?

11         A.    This is what I think we were calling

12    the abridged version.  There is a significantly

13    larger document, significantly larger, with the

14    details that supports this.

15         Q.    But this is a business plan document

16    that was created with your input and

17    supervision?

18         A.    Yes.

19         Q.    If you look to page 39 of the

20    business plan, there is a page saying "Preferred

21    Model:  Proposed Organization Phase 1," and that

22    lists you as having essentially all functions of

23    the Energy Group reporting to you and then you

24    reporting to Mr. Gordon; is that correct?

25         A.    That's one interpretation of what you

1                    R. Feilbogen

2        see on the page.

3            Q.    Why don't you tell me what your

4        interpretation is.

5            A.    We physically couldn't fit the boxes,

6        Tony's box and my box, next to each other to

7        still make the page print out the right way.  So

8        we stuck my box under his box.

9                 This was intended to sort of be a

10       very high-level concept of distinguishing

11       various project teams of people on the left-hand

12       side that were not necessarily directly -- in

13       some cases directly, in other cases not

14       directly -- part of the Energy Group that were

15       going to do various support functions; and on

16       the right-hand side, these boxes where it says

17       "Asset Acquisition Optimization," "Origination,"

18       "Credit," "Legal," "Market Risk," were, again,

19       just a different project team.

20                This was not really meant to be an

21       organizational chart, but just project teams as

22       to how we were going to roll out the business

23       plan and implement it.

24           Q.    The administration of the group, was

25       it to report to you under the business plan?

```
 1                     R. Feilbogen

 2          A.    That was intended to be an assistant,

 3     and it was to report to Tony and I.

 4          Q.    Could you look a few pages before,

 5     it's page 35.

 6          A.    Yes.

 7          Q.    There is a reference to "Pro Forma

 8     Business Models."

 9          A.    Where do you see that?

10          Q.    At the top of the page.  Then there

11     are three vertical boxes:  One is headed

12     "Classic Bank Model," one is "Slow Build Model,"

13     and one is "Preferred Model."

14                What do those three different

15     designations mean?

16          A.    As part of the business plan and

17     laying out various ways in which we could go

18     about building the energy business, we felt that

19     we ought to lay out what we called here the

20     "Classic Bank Model," which was Tony's and some

21     of the other people who had a lot of tenure in

22     the energy business, laying out specifics of how

23     they thought many of the banks in the energy

24     trading business modeled their business; and

25     then we came up with, again, depending upon how
```

```
1                    R. Feilbogen

2      quickly we wanted to get into the business, a

3      slower approach implying less cash usage

4      upfront; and then a preferred model, which we

5      thought as a group, given some of the parameters

6      that John Finigan and others laid out for us,

7      was the best way to go.

8           Q.    What did you use this document for?

9           A.    This particular document is probably

10     the document that was used for the presentation

11     that we made to Bill Dooley, Ron Latz and

12     others.  I can't remember who else was in the

13     room that day.  They were the most important

14     part of the audience, to explain what our

15     thinking was and lay out the choices.

16          Q.    Do you remember when that meeting

17     took place?

18               MS. VLADECK:  Objection to form.

19          A.    I don't remember the specific date,

20     but I guess there is a date on the front of this

21     presentation here.  It says December 6th.  It

22     was in the month of December, that I do

23     remember.  The specific date I don't remember.

24          Q.    Let me just show you this, and this

25     is all in the nature of trying to refresh your
```

```
 1                      R. Feilbogen

 2       recollection about dates.  I am going to show

 3       you a document that bears production number D

 4       95.  This is an e-mail from John Finigan to you

 5       dated February 28, '03 referring to people being

 6       eager to hear about the Energy plan.

 7                      With that in front of you, can you

 8       give me your best recollection of what

 9       discussions you had concerning the Energy

10       business plan and when?

11            A.    Discussing the Energy business plan

12       with whom?

13            Q.    Who is "London"?

14            A.    I believe John is referring here to a

15       trip he took to the London office, where

16       people -- where the employees of AIG Trading

17       Group who were not directly involved in the

18       energy business were asking him questions about

19       what's the plan.

20            Q.    So the sort of presentation being

21       referred to by Mr. Finigan there would have been

22       a presentation internally to AIG Trading people?

23                  MS. VLADECK:  Objection to form.

24            When you say "there," you're talking about

25            the e-mail?
```

```
 1                    R. Feilbogen
 2              MR. ROGERS:  Yes.
 3              MS. VLADECK:  Objection to form.
 4         A.    I just wanted to read it.  Could you
 5    just repeat the question now.
 6         Q.    Sure.  Let me just step back.  You
 7    said it's your recollection that sometime in
 8    December a business plan for AIG Energy was
 9    discussed with AIG executives.
10         A.    Yes.
11         Q.    Thereafter, were there presentations
12    to others within AIG or AIG Trading or AIG
13    affiliate organizations concerning AIG Energy.
14         A.    Yes.  We talked to groups within the
15    organization of AIG Trading Group at a very high
16    level about what the plan was.
17         Q.    When do you recall was Mr. Gordon
18    hired?
19         A.    I don't know exactly when the deal
20    was consummated, because I was not part of those
21    discussions.  So his specific hire date I don't
22    recall exactly.  But sometime in August or early
23    September, around Labor Day, was probably the
24    time he had officially been hired.
25         Q.    This is the year 2002?
```

```
1                    R. Feilbogen

2          A.    Yes, the year 2002.

3          Q.    Were you already planning to become

4     involved in the energy operation prior to

5     Mr. Gordon's hire?

6                MS. VLADECK:  Objection to form.

7          A.    John Finigan asked me to participate

8     in the development of the energy business prior

9     to his being hired, Tony Gordon being hired.

10         Q.    Where was Mr. Gordon hired from?

11    Where was he working before?

12         A.    He was an employee of Goldman Sachs.

13         Q.    Did you interview Mr. Gordon prior to

14    the time he was hired?

15         A.    Yes.

16         Q.    At the time you interviewed

17    Mr. Gordon, had you already discussed with John

18    Finigan your taking a role in the operation?

19         A.    He certainly introduced the topic at

20    that point.  At what stage our discussions were

21    at, they went on for sometime, so I don't

22    recall.

23         Q.    The complaint is still in front of

24    you, I think.  If you look at page 3, paragraph

25    14, it starts by saying, "In August 2002,
```

                    R. Feilbogen

Finigan and Zampella requested that Feilbogen

work with AIG Trading's Energy Group to help

build the energy business."

          Was there an energy group at AIG

Trading at the time?

     A.    Yes.

     Q.    Who was in that group?

     A.    At what point in time?

     Q.    August 2002.

     A.    At some point in August 2002, I had

been technically transferred into the entity AIG

Energy, Inc. I believe.  I don't recall exactly

who sat in that entity, and that entity was in

existence sometime prior to August 2002.

     Q.    Tell me where the conversation took

place that is being referred to in the first

paragraph of paragraph 14 of the complaint.

     A.    I don't think it was just one

conversation.

     Q.    Tell me what conversations there

were.

     A.    Dating back to sometime in that first

quarter when we were having discussions about

the business and my concerns about the business

```
 1                    R. Feilbogen

 2       and at the time when John had increased my

 3       guarantee, part of his pitch, while he was not

 4       specific, he talked about our opportunity for

 5       the company to get back into the energy

 6       business, that evolved over time, probably into

 7       the second quarter; he talked about his interest

 8       and Dennis having conversations with me, having

 9       me involved in helping identify the candidate;

10       John during this period of time -- we'll call it

11       sometime during the first half of 2002 or

12       thereabouts -- had asked me to do some research

13       to help him write a memo, whether it was to Ed

14       Matthews or Bill or Greenberg, whoever it was,

15       to state the case as to why we ought to be in

16       the energy business.

17               Those conversations evolved to John

18       telling me that regardless of who we hire from

19       the outside, this is a very important thing for

20       the company, and that he wanted to have somebody

21       he trusted on the inside making sure that the

22       business was being developed according to plan

23       and executed the way in which AIG Trading Group,

24       or AIG, Inc., would like to see their businesses

25       grow and be developed, having been there for
```

1                       R. Feilbogen

2      such a long time.

3                  We talked to various candidates, and

4      I didn't talk to all of the candidates, and the

5      decision was to settle in on Tony, and the

6      conversations continued about wanting me to be

7      full time engaged in the business.  That is when

8      we started -- "we" meaning specifically John

9      Finigan and I -- specifically talking about my

10     concerns about how I would be compensated in the

11     energy business.

12                 And then we worked through those

13     concerns, and then John and Dennis, I guess,

14     sometime in August must have processed my

15     movement from one profit center to another

16     inside of AIG Trading Group.  So I believe I

17     became an employee of AIG Energy, Inc. sometime

18     in that time frame, around the time in which

19     Tony Gordon was hired.

20        Q.    Tell me what conversations you had

21     with Mr. Finigan about your compensation before

22     you undertook to join the Energy Group.

23        A.    I asked John -- we probably started

24     these conversations sometime around the June

25     2002 time frame, it could have been a little bit

```
 1                    R. Feilbogen
 2      earlier, where I talked to him about my concern.
 3      I wanted to understand -- I wanted to be clear
 4      about how it was, if I was going to move from
 5      being the chief operating officer into the
 6      energy business on a full-time basis, that I was
 7      going to get compensated.
 8             I expressed my concerns that if we
 9      built this business as we had been discussing,
10      that we wouldn't see revenue for quite sometime.
11      It was unclear when we would see a net profit.
12      I was always much more conservative than others
13      in terms of when I thought we would actually see
14      a real profit.
15             Given those set of circumstances, I
16      had big concerns about how I would get paid.
17      Q.    What did Mr. Finigan say in response
18      to the concerns you stated to him?
19      A.    He told me that -- another concern I
20      also expressed to him on a personal note, I was
21      looking to move for some personal reasons.
22      Q.    Moving your residence?
23      A.    Move my residence.  I was thinking
24      about moving to an area where he lived.  I had
25      spent some time talking about that, and I was
```

```
 1                    R. Feilbogen

 2      very concerned about the increased cost of

 3      living and the increased cost of housing in that

 4      area, which is why I needed to make some

 5      decisions and understand how I was going to be

 6      compensated so that I could make good personal

 7      decisions.

 8                    Sorry, you asked a second question.

 9           Q.    The second question is:  What did

10      Mr. Finigan say in response to you when you

11      stated these initial concerns?

12           A.    His initial response was that he

13      wanted to think about it.  We had several

14      conversations after I talked to him about my

15      initial concerns; he then came back to me and

16      said to me that he understood my concerns and

17      that I should expect to be kept 'whole,' I think

18      were the words he used, for 2003.

19                    I asked him what that meant.  He

20      said, well, I will pay you the same amount of

21      money -- the same bonus for 2003 as for 2002.  I

22      joked around, and I said, are we talking about

23      the old guarantee or the new guarantee, meaning

24      the $600,000 or the $1.3 million?  And he said

25      no, no, the new number, $1.3 million.  I thanked
```

```
 1                    R. Feilbogen
 2      him.  I said I really appreciate it, it
 3      alleviates a lot of my concerns and I look
 4      forward to getting the business up and going.
 5               He made it quite clear in that
 6      conversation that this wasn't something that he
 7      was going to try to do, he made it quite clear
 8      to me that this was something that he was going
 9      to do, that he was promising me under no
10      uncertain terms that he was going to pay me a
11      million-three for the year 2003 for developing
12      the energy business.
13           Q.    Who was present when he made the
14      statements you've just referred to?
15           A.    Just John and I.
16           Q.    Where were you?
17           A.    In John's office.
18           Q.    When was it?
19           A.    That specific conversation, I don't
20      recall the exact date.  It was over the
21      summertime, it was before Tony was hired.  I
22      don't recall the specifics.
23           Q.    Did you ever see a copy of the
24      contract that Mr. Gordon signed?
25           A.    I don't remember whether or not I saw
```

```
 1                    R. Feilbogen
 2      an actual copy of it prior to this, to the
 3      exchanging of the documents, although Dennis
 4      had -- I don't remember if it was Dennis or
 5      John, but I had a pretty good flavor from these
 6      guys as to what that document contained in terms
 7      of his compensation.
 8           Q.    So you knew that he, Mr. Gordon, had
 9      signed an employment agreement of some sort?
10           A.    Of some sort, yes.
11           Q.    And you knew that it had a guarantee
12      in it for his compensation?
13           A.    I understood that they were
14      guaranteeing him for the year 2003 as well,
15      which I knew that prior to Tony coming on board;
16      because part of what John and I talked about
17      was, look, you're bringing in this guy from the
18      outside and you're guaranteeing him for 2003,
19      2002, whatever it was, but you're offering him
20      some kind of guarantee, and you're asking me to
21      really change the course of my career.  I am not
22      saying it's not a good opportunity, but you're
23      asking me to make a change, and I, too, want
24      some reassurances, especially in light of the
25      fact that AIG had already had a false start in
```

```
 1                    R. Feilbogen

 2     the energy business and there were a lot of

 3     issues getting back into the energy business.

 4          Q.    In connection with your request for

 5     assurance, did you ask Mr. Finigan for a written

 6     confirmation of what he told you about what your

 7     compensation would be in 2003?

 8          A.    No.

 9          Q.    Who else at AIG Trading did you

10     discuss your 2003 compensation with?

11          A.    Dennis.

12          Q.    When did you discuss your

13     compensation with Dennis?

14          A.    Dennis and I had talked about my

15     overall concerns while these discussions that

16     I've described to you were going on with John.

17     And then after we had -- after I had, I guess,

18     the last conversation, I don't recall the exact

19     date, with John, I then went to Dennis at some

20     point soon thereafter, I don't recall exactly

21     when it was, but it was before Tony had started,

22     and said, you know, this is what John said to

23     me.  And he said yes, I know, John told me.  I

24     said, now I feel a lot better, I'll figure out

25     what I'm going to do on my personal front in
```

```
 1                  R. Feilbogen
 2     terms of housing, and I feel a lot better about
 3     getting into the energy business now with a
 4     clear mind, and I was excited about it.
 5          Q.    To be more specific about the
 6     conversation you just testified about, did you
 7     directly tell Mr. Zampella that Mr. Finigan had
 8     assured you an exact amount for your
 9     compensation for 2003?
10          A.    I can't recall with certainty whether
11     we used an exact number, whether I referred to
12     it as keeping me 'whole' with the prior year.  I
13     may not have mentioned it at all.  I don't
14     recall exactly how the conversation went.  He
15     just said to me yes, I had the conversation with
16     John and now you should feel better.  I felt
17     like, okay, I should feel better.
18          Q.    When do you think that conversation
19     with Mr. Zampella took place?
20          A.    It was sometime in August.
21          Q.    Of 2002?
22          A.    Of 2002.  It was around the time that
23     I think Dennis had taken a couple of days off or
24     something.  So that's why I think it wasn't
25     immediately after the conversation I had with
```

1                    R. Feilbogen

2       Finigan.

3           Q.    But it was within --

4           A.    Within the two, three-week time

5       frame.

6           Q.    When was your next conversation with

7       Mr. Finigan about your 2003 compensation?

8           A.    He brought it up sometime in the

9       first quarter of 2003.

10          Q.    Tell me what you recall he said to

11      you and you said to him.

12          A.    We were having a series of meetings

13      and discussions about how to properly account

14      for all of the compensation for all of the

15      people that are being hired for the energy

16      business.  During those conversations, when we

17      were discussing different methods and different

18      ideas and different ways of doing that, he

19      brought up that -- at one point, he said to

20      Brian Morrissey that the only guarantees that he

21      wants to accrue for as an expense item were for

22      Tony Gordon and for myself.  Could he have

23      mentioned my guarantee in some other

24      conversation just prior to that?  Maybe, but

25      that's more or less the timing.

1                      R. Feilbogen

2          Q.    So you were present at a meeting in

3    Mr. Finigan's office?

4          A.    Yes.

5          Q.    Brian Morrissey was present?

6          A.    He had called Brian in towards the

7    end of that conversation.

8          Q.    The subject was accruals for

9    compensation, among other things?

10         A.    Among other expense items.

11         Q.    Your recollection is that Mr. Finigan

12    used the word "guarantee" in connection with

13    accruing bonuses for you and Gordon?

14         A.    That's my recollection.

15         Q.    It's correct, is it not, that AIG

16    Trading would accrue for expected bonuses even

17    if they were not guaranteed?

18              MS. VLADECK:   Objection to form.

19         A.    I think you need to define what

20    bonuses you're talking about.

21         Q.    I'll get there.

22              Was Mr. Zampella present when

23    Mr. Finigan and you and Mr. Morrissey had the

24    conversation you just testified to?

25         A.    I don't think so, but he could have

```
 1                    R. Feilbogen

 2     been.  I don't think he was.  There was a period

 3     of time a few consecutive days where we were

 4     talking about the expenses, and we were talking

 5     about how we were going to account for other

 6     types of expenses relating to a lot of these new

 7     employees, and Dennis was in some of those

 8     conversations and not in all of them.  So that's

 9     unclear.

10          Q.   If you look at paragraph 14 of the

11     complaint, the second sentence says, "Feilbogen

12     agreed to do so -- and the reference is to the

13     statement in the first sentence about working

14     with AIG Trading Energy -- on the condition that

15     his guaranteed bonus for 2003 would match

16     $1,300,000 he was guaranteed for 2002.  Finigan

17     and Zampella agreed that Feilbogen would be

18     guaranteed a bonus of $1,300,000 for 2003."

19               Other than the conversations you've

20     just testified to, what other statements of

21     agreement by Finigan and Zampella did they ever

22     make to you on that subject?

23          A.   Sometime towards the end of June

24     2003, Dennis and I had a conversation in his

25     office, where I told him that I understood that
```

```
 1                    R. Feilbogen
 2      AIG Financial Products would be creating some
 3      employment letters; that while I hadn't seen the
 4      letter, I had heard from another employee that
 5      had received the letter -- and I don't remember
 6      if it was directly from him or through his
 7      colleague -- that by signing the letter, you
 8      essentially were going to forego any written or
 9      verbal guarantees, or that's what the essence of
10      it was.
11              I said to Dennis, Dennis, do you
12      think that John has talked to the guys at FP
13      about my guarantee?  I said, they requested that
14      I give them all the written deals, written
15      contracts, for the employees of the energy
16      business, and I gave that to them and that I had
17      not brought up my own compensation, given the
18      role I had in the company; I wanted to be seen
19      as a team player and not focus on myself.  I
20      said, you know, what do you think has happened?
21      What do you think my letter is going to say?
22              He said to me that if he had to bet,
23      he would bet, given that Finigan is only worried
24      about covering his own "butt," that Finigan
25      probably hadn't mentioned it.
```

                        R. Feilbogen

1
2              So we talked about that, and I asked

3       whether or not he thought I should call Cassano

4       or one of the other senior guys at FP and

5       whether or not I should just tell them about it

6       or what he thought the best course of action

7       would be.

8              His suggestion was that I should talk

9       to Finigan about it, and that it would be better

10      for me if Finigan made that phone call or passed

11      that information on and not me.

12             I said, okay.  And somewhere in that

13      conversation, Dennis reiterated that he was a

14      witness -- I guess "witness" is the wrong word.

15      In fact, he is a witness for me, and that he

16      knows that I have this agreement and that I

17      should just relax, and I was a little panicked.

18             So I tried calling John, and since I

19      couldn't get him, he was out of the office, I

20      sent him an e-mail about it.  I think that

21      summarizes at least most of the conversations

22      that we have had about the guarantee.

23        Q.    So up until the time of late June,

24      let's date it as of the last conversation you

25      just testified to, which is late June, your

```
 1                    R. Feilbogen
 2     conversation with Mr. Zampella, you had never
 3     spoken to anyone at AIG FP to say that you had a
 4     guarantee for 2003; is that correct?
 5          A.    Correct.
 6          Q.    Did Mr. Finigan when he spoke to you
 7     in August 2002 about your 2003 compensation ever
 8     say that he had spoken to Mr. Dooley or anyone
 9     at AIG about your 2003 compensation?
10               MS. VLADECK:  Objection to form.
11          A.    Could you just say that again.
12          Q.    Let me withdraw that and I will start
13     with a predicate.
14               You testified earlier that you raised
15     with Mr. Finigan in considering joining the
16     Energy Group questions about compensation, and
17     that Mr. Finigan at one point said he would
18     think about it, and then you testified at some
19     point in August 2002 Mr. Finigan made statements
20     to you about your 2003 compensation.
21               MS. VLADECK:  That's incorrect.
22          Objection to form.
23               THE WITNESS:  Should I clarify?
24               MS. VLADECK:  I think it's up to him
25          to clarify.
```

```
 1                    R. Feilbogen
 2        Q.    I haven't gotten the question out,
 3   because I was interrupted by counsel.  As I
 4   said, I was laying a predicate to this.
 5             MS. VLADECK:  The predicate is
 6        inaccurate.
 7        Q.    My question is whether Mr. Finigan in
 8   the conversation that he had with you about your
 9   2003 conversation told you whether or not he had
10   spoken with Mr. Dooley or anyone else at AIG on
11   that subject.
12             MS. VLADECK:  To the extent the
13        question includes an inaccurate predicate,
14        I object.
15        Q.    You may answer.
16        A.    Sorry, that was just very confusing.
17             THE WITNESS:  Could you just repeat
18        the question.
19        Q.    I'll do it.  There is no need to get
20   testy here.
21             You testified that you had a
22   conversation with Mr. Finigan in 2002 where he
23   made certain statements to you about what your
24   2003 compensation would be, correct?
25        A.    Correct.
```

1                    R. Feilbogen

2          Q.    When he spoke to you about that

3    subject, did he tell you whether he had spoken

4    with anyone at AIG, including Mr. Dooley?

5          A.    He had not made mention -- I don't

6    recall.  I don't recall.  I don't believe he

7    made mention of that.

8          Q.    What is your best recollection of the

9    month in which you had your conversation with

10   Mr. Finigan during which he made statements to

11   you concerning your 2003 compensation about what

12   it would be?

13         A.    It was during that period from the

14   end of June through August of 2002.

15         Q.    At any time after Mr. Finigan spoke

16   to you about your 2003 compensation, did he tell

17   you that he had spoken with anyone at AIG,

18   including Mr. Dooley, about what you would be

19   paid?

20         A.    Could you just repeat that one more

21   time.

22         Q.    At any time after --

23               MR. ROGERS:  Let's have him read it.

24               (Record read.)

25               THE COURT REPORTER:  "QUESTION:  At

```
 1                    R. Feilbogen

 2          any time after Mr. Finigan spoke to you

 3          about your 2003 compensation, did he tell

 4          you that he had spoken with anyone at AIG,

 5          including Mr. Dooley, about what you would

 6          be paid?"

 7          A.    I don't recall.

 8          Q.    Did you ever speak with --

 9              MS. VLADECK:  Can we take a break.

10              MR. ROGERS:  The witness said he

11          wants to speak with counsel, so we'll take

12          a break.

13              THE VIDEOGRAPHER:  The time is 1

14          o'clock p.m.  We're going off the record.

15              (Discussion off the record.)

16              THE VIDEOGRAPHER:  The time is 1:03

17          p.m.  We're back on the record.

18          Q.    Did you, Mr. Feilbogen, ever speak to

19     Ed Matthews about what your 2003 compensation

20     would be?

21          A.    No.

22          Q.    Did you ever speak directly with

23     Mr. Dooley about what your 2003 compensation

24     would be?

25          A.    No.  I actually believe that -- no.
```

```
 1                    R. Feilbogen
 2     The answer is no, I did not.
 3          Q.    Did you speak with -- let me withdraw
 4     that.
 5                Who is Martin Wayne, Marty Wayne I
 6     should say?
 7          A.    Marty Wayne is an employee of AIG
 8     Financial Products.
 9          Q.    When did you start working with Marty
10     Wayne in connection with your work in the Energy
11     Group?
12          A.    The specific date I don't know, but
13     it was I guess in the April, May time frame,
14     maybe early June it could have even been.  That
15     whole time period is fuzzy in terms of when we
16     found out about the merger, the merging of the
17     groups.  When I was actually introduced to him
18     and when I actually found out I would be
19     reporting to him is all within a couple of week
20     span.
21          Q.    That's April, May of 2003 you're
22     talking about?
23          A.    Yes.
24          Q.    Did your dealings with Mr. Wayne
25     start with the plan to move the Energy Group
```

1                    R. Feilbogen

2     essentially from AIG Trading to AIG FP?

3          A.    Did my dealings with him relate to

4     that?  I suppose.

5          Q.    Had you worked with him or dealt with

6     him before working with him on the transaction

7     whereby trading would go over to FP with respect

8     to the energy business?

9          A.    I had no idea who Marty Wayne was

10    until I found out in a public meeting from Joe

11    Cassano that I would be reporting to him.

12         Q.    When was it that Tony Gordon left AIG

13    Trading?

14         A.    I don't know the date of the

15    Separation Agreement, but my recollection is

16    that it was sometime before I learned about --

17    or at least I learned that he would be leaving

18    AIG Trading Group sometime, I think, before I

19    learned that we would be going to AIG Financial

20    Products.

21         Q.    I believe you had said earlier in the

22    proceeding that you recall an announcement went

23    out internally about your joining the Energy

24    Group roughly around the February 2003 time

25    frame.

1                    R. Feilbogen

2              MS. VLADECK:  Objection to the form.

3         A.   I don't think I said February.  But

4    yes, I do agree that there was an announcement

5    that went out at some point.

6         Q.   How long after that would you

7    estimate was it that -- let me withdraw that.

8    Let me ask you a different question.

9              How long did you work with Mr. Gordon

10   before he left?

11        A.   Well, he started sometime in that

12   August, September 2002 time frame, and I guess

13   we worked together until roughly the March of

14   2003, April 2003 time frame.

15        Q.   Why did he leave?

16             MS. VLADECK:  Objection to form.

17        A.   I think there were a series of

18   complex issues that were surrounding Tony's

19   employment at AIG.  In broad strokes, he had

20   issues with certain employees, behavioral

21   issues, he had issues with other senior people

22   in the AIG organization.  In my view, I think he

23   exercised some bad judgment that was interpreted

24   to be qualities that we wouldn't want in

25   somebody who was leading a business.  I think

1                    R. Feilbogen

2      that summarizes it.

3           Q.     Were you consulted by management at

4      AIG Trading concerning the potential departure

5      of Mr. Gordon before that decision was made?

6           A.     Yes.

7           Q.     Who did you discuss that with?

8           A.     I discussed that with Dennis

9      Zampella, Andy Kaplan, John Finigan.  There may

10     have been a few others.  I think that summarizes

11     it.

12                 MR. ROGERS:  This will be Defendants'

13             Deposition Exhibit 11.  It's a one-page

14             document with the production number D 319,

15             and I am handing a copy to counsel.

16                 (Defendants' Exhibit 11, March 26,

17             2003 letter, Bates stamped D 000319, marked

18             for identification, as of this date.)

19           Q.     Defendants' Deposition Exhibit 11 or

20     at least the typed portion of it represents an

21     announcement of your assumption of

22     responsibility with respect to the energy area

23     in AIG Trading, does it not?

24           A.     Yes.

25           Q.     Is this a copy of the announcement

```
 1                    R. Feilbogen
 2    that went out about your change in role?
 3         A.    I believe so.
 4         Q.    The handwriting on the document, is
 5    that handwriting yours, or do you recognize it?
 6         A.    No.
 7         Q.    This announcement went out on March
 8    26, 2003, did it not?
 9         A.    Yes.  That's what it says.  This
10    document, I saw several forms of it, so I don't
11    know if the exact one here I am looking at is
12    exactly what was distributed.  I have certainly
13    seen this version of it.
14              MR. ROGERS:  We'll take a break now
15         for lunch, and we'll work it out off the
16         record as to how long a break it will be.
17         Thank you.
18              THE VIDEOGRAPHER:  The time is 1:12
19         p.m.  We're going off the record.
20              (30-minute luncheon break taken.)
21         A F T E R N O O N     S E S S I O N
22              (Time noted: 1:46 p.m.)
23              THE VIDEOGRAPHER:  The time is 1:46
24         p.m.  We're back on the record.
25    R O B E R T     F E I L B O G E N, resumed
```

```
 1                    R. Feilbogen

 2         and testified as follows:

 3    EXAMINATION BY (Cont'd.)

 4    MR. ROGERS:

 5         Q.    Mr. Feilbogen, turning back to the

 6    time in 2002 when you were told by Mr. Finigan

 7    that your compensation would go up to $1.3

 8    million from the $600,000 that it had been

 9    guaranteed, at any time in connection with that

10    decision, did Mr. Zampella tell you that he had

11    communicated with Mr. Dooley to get approval?

12              MS. VLADECK:  Objection to form.

13         A.    Did Dennis tell me that he had

14    communicated with Bill?  It may have been

15    implied.  He may have said it directly or it may

16    have been implied when I had asked him if I

17    should call Bill to thank him or mention

18    something.  I think that's the best I can

19    remember about it.

20         Q.    It was your understanding that

21    Mr. Dooley had been informed of that increase

22    and approved of it?

23              MS. VLADECK:  Objection to form.

24         A.    Again, I think I answered earlier on,

25    both when you asked me if I knew that Finigan
```

1                    R. Feilbogen

2       had talked to Dooley or just now if Dennis

3       talked to Dooley, that it was unclear to me, or

4       I don't recall the specifics.

5           Q.    But you asked the question, should I

6       thank Mr. Dooley, so at the time, you knew that

7       Mr. Dooley knew of this and approved it?

8               MS. VLADECK:   Objection to form.

9           A.    Yes.

10          Q.    Your base salary in late 2002 and

11      2003 was $250,000, was it not?

12          A.    In late 2002 and 2003, yes.

13              MR. ROGERS:   I would like to have

14              marked as Defendants' Deposition Exhibit 12

15              a document bearing production numbers D 495

16              through 499, and I am handing a copy to

17              plaintiff's counsel.

18              (Defendants' Exhibit 12, December 4,

19              2002 e-mail and attached spreadsheets,

20              Bates stamped D 000495-000499, marked for

21              identification, as of this date.)

22          Q.    Mr. Feilbogen, could you take a look

23      through Defendants' Deposition Exhibit 12, and

24      when you are ready, let me know what it is.

25          A.    D 496?

```
 1                     R. Feilbogen

 2          Q.    Right, the second page of the

 3     document.

 4          A.    The first page, I guess I e-mailed

 5     this --

 6                MS. VLADECK:  Can we just take one

 7          second.  I have a phone call.

 8                MR. ROGERS:  Certainly.

 9                THE VIDEOGRAPHER:  The time is 1:50

10          p.m.  We're going off the record.

11                (Discussion off the record.)

12                THE VIDEOGRAPHER:  The time is 1:55

13          p.m.  We're back on the record.

14          Q.    Mr. Feilbogen, before the brief

15     break, I was asking you what Defendants'

16     Deposition Exhibit 12 is.  It starts with a

17     cover e-mail, as you noted, and then there are

18     various sheets of financial data.

19                Can you tell me what this document

20     is?

21          A.    It looks like some versions of some

22     of the pages laying out the different business

23     models from both a revenue and expense

24     standpoint that we were going to include in the

25     business plan.  It's unclear from the document
```

1                          R. Feilbogen

2          as to whether it was the final version or just a

3          draft version.

4                    Q.     The cover e-mail is dated December 4,

5          2002.

6                    A.     Right.

7                    Q.     You'll recall that Exhibit 10, which

8          was what you referred to as an abridged version

9          of the business plan, has on it December 6, '02.

10                   A.     Right.

11                   Q.     Was December 4, '02 fairly late in

12         the process of putting together your financial

13         plans for the Energy Group?

14                   MS. VLADECK:   Objection to form.

15                   A.     We were still trying to figure out

16         what the right numbers ought to look like.  At

17         what point it was completely final, I don't

18         recall.

19                   Q.     Could you look at the second page of

20         the exhibit, which is the first page of the

21         financial sheets.

22                          Is this page, which is the one that's

23         marked D 496 -- withdraw that.

24                          How does this page, D 496, relate to

25         the pages after it in this document, if at all?

1                    R. Feilbogen

2           A.    It appears that 496 is a spreadsheet

3      that we were using to estimate the revenues

4      based on head count and that sort of thing; the

5      other pages appear to be expense-related pages.

6                 It's possible that document 496 on

7      the right-hand side where it mentions a line

8      called "expense without guarantees" could be

9      linked to these other pages.  I'm not really

10     sure.  I had a lot of spreadsheets going at one

11     time while developing the business plan.

12          Q.    Looking at the three columns on D 496

13     on the sort of left three-quarters of the page,

14     there are headings "Classic Bank Model,"

15     "Physical/Financial Slow Build," and "Preferred

16     Model."  You had testified earlier about the

17     three types of models in your planning.

18          A.    Right.

19          Q.    That's what these three columns refer

20     to, do they not?

21          A.    It seems that way, yes.

22          Q.    And then this first page, as you've

23     described, refers to revenues.  If you look at

24     the next three pages, is it correct that each

25     one of the next three pages sets out expected

1                      R. Feilbogen

2      costs under each of the three models?  If you

3      look on the lower left hand of D 497, for

4      example, it says "Classic Bank Model," D 498

5      "Slow Model," D 499 "Preferred Model."  Do you

6      see that?

7            A.    Yes.

8            Q.    And is that right?

9            A.    Yes, it seems that way.

10           Q.    Under the classic model set forth on

11     both pages D 496 and 497, for 2003, you've got a

12     number under "guarantees" of $9,150,000.  Do you

13     not?

14           A.    Yes, I see that.

15           Q.    Did you create this, or was this

16     created under your supervision?

17                 MS. VLADECK:  Objection to form.

18           A.    Did I create this, meaning these

19     documents?

20           Q.    Yes.

21           A.    I believe these spreadsheets resided

22     on my laptop.  Certainly, with respect to the

23     projections of some of the numbers on -- I

24     didn't create them alone.  But yes, I probably

25     was the one sitting in front of the laptop

```
 1                    R. Feilbogen
 2     typing the numbers.
 3          Q.    You testified that your salary in
 4     late 2002, early 2003 was $250,000.
 5                MS. VLADECK:  Asked and answered.
 6          Q.    Mr. Gordon's salary was $300,000, was
 7     it not?
 8          A.    Yes, it was.
 9                MR. ROGERS:  Let me have marked as
10                Defendants' Deposition Exhibit 13 a
11                one-page document that bears production
12                number D 96, and I am handing a copy to
13                counsel.
14                (Defendants' Exhibit 13, March 11,
15                2003 e-mail, Bates stamped D 000096, marked
16                for identification, as of this date.)
17          Q.    What is this document?
18          A.    This is an e-mail I wrote to Paul
19     Gentile and James Garzon.  What I was showing
20     them in this was -- from the business plan that
21     Dooley approved, I was showing what the pro
22     forma, or projections, were in the business plan
23     for the costs and allocated costs.
24                As I had mentioned earlier, as I
25     think I responded to an earlier question, there
```

1                         R. Feilbogen

2      was a lot of discussion taking place between

3      myself, Tony Gordon, Brian Morrissey and John

4      Finigan with respect to how to account for the

5      expenses that we were incurring post, let's say,

6      January of 2003 once the business plan had been

7      approved.  That was an ongoing discussion.

8              So I think I was e-mailing this here,

9      as I probably lifted this from the business

10     plan, showing roughly how many people in the

11     final column here we had actually hired, what

12     our January expenses were, what I was estimating

13     them to look like, and looking to get the exact

14     numbers from them so I could see more or less

15     how we were doing.

16        Q.    Why did you send this to Paul Gentile

17     and James Garzon; were they working with you?

18              MS. VLADECK:   Objection to form.

19        A.    Were they working with me?  They were

20     part of the accounting group and had

21     responsibilities that included monitoring the

22     expenses or booking the expenses in the company.

23        Q.    Did Mr. Morrissey and Mr. Gentile and

24     Mr. Garzon continue to provide accounting

25     services for Energy Group in 2003?

```
 1                    R. Feilbogen
 2        A.    They provided the services to all the
 3   businesses in AIG Trading Group.
 4        Q.    You refer in the body of the text in
 5   your e-mail to the biz plan which Dooley
 6   approved.
 7              Were you present when Mr. Dooley
 8   approved your business plan?
 9        A.    Yes.  After we had our big meeting
10   and big presentation, we then went offline into
11   a separate conference room with Finigan, Dennis,
12   I think Ron Latz was there, Tony obviously and
13   myself, we got some feedback from Bill.  We
14   asked him at that meeting how we should proceed,
15   and he said that we should proceed with the
16   preferred model; but he also made it quite clear
17   to Finigan that he was going to have to figure
18   out a way to fund the expense that would be
19   incurred to build the business.
20              At that same meeting, I asked Bill
21   Dooley how we were going to handle the potential
22   guarantees that were going to be written for the
23   front office people, because I was very
24   concerned about the large expense that we would
25   be incurring and what the process would be for
```

```
 1                      R. Feilbogen
 2     that.  I was particularly sensitive to that
 3     because of some precedent that had been set in
 4     the past.
 5                      He just reiterated at that point to
 6     John that he was going to have to work out some
 7     way to fund it.
 8          Q.    When did that meeting take place, to
 9     your recollection?
10          A.    Sometime in December, the day that we
11     did the presentation for the business plan.
12          Q.    The last sentence in Exhibit 13 --
13          A.    I'm sorry, I just want to mention one
14     other thing, which is that I also recall at that
15     meeting I was not present for the entire
16     meeting, I was present for part of that meeting,
17     then Tony and I left, and I don't remember what
18     happened after that.  Tony and I left the
19     meeting, and there might have been some
20     additional discussions about it.
21          Q.    Looking back at Exhibit 13 and the
22     section above the numbers, the last sentence
23     says, "If people do not have guarantees, then
24     ask me for a bonus estimate so we can accrue for
25     that as well.  Thanks."
```

```
 1                    R. Feilbogen

 2              It is correct, isn't it, that you did

 3      accrue for expected or anticipated bonuses even

 4      if they weren't the subject of an actual

 5      guarantee?

 6              MS. VLADECK:  Objection to form.

 7         A.    I think, as I mentioned earlier, we

 8      need to clarify bonus and we need to clarify

 9      what we're talking about.

10         Q.    What does that sentence mean to you?

11         A.    What it means to me is that --

12              MS. VLADECK:  Objection to form.

13              What sentence?

14         Q.    You may answer the question.

15              MS. VLADECK:  Which sentence?

16         Q.    The sentence I have read to you.

17         A.    I am assuming we are talking about

18      the last sentence.  What I am referring to in

19      the last sentence in this document is that if we

20      are hiring people who are part of the

21      administrative side of the business, people who

22      would not fall into the front office, who are

23      not revenue procedures, who would typically be

24      paid out of something called the gen fund, the

25      general fund, that that was a number that was
```

```
 1                    R. Feilbogen
 2    typically accrued for over the course of the
 3    year for AIG Trading Group, because clearly,
 4    we're adding new head count.  If we continue to
 5    accrue at the rate that they had been accruing,
 6    we would be grossly underaccrued.  Maybe not
 7    grossly, depends on how many people we hired,
 8    but we would be underaccrued because we had this
 9    new head count.
10            In these discussions that I referred
11    to earlier with a variety of people, including
12    John Finigan, we talked about how we were going
13    to account for the business; we were talking
14    about whether or not we need to increase the
15    accrual for the gen fund for those who did not
16    have guarantees who were new hires specifically
17    for the energy business.
18        Q.    For people who were hired who did not
19    have guarantees, you were accruing for a
20    potential bonus at the end of the year?
21        A.    An expected potential bonus.
22            MR. ROGERS:  I am going to ask that
23        this be marked Defendants' Exhibit 14.  The
24        document is Bates stamped D 489 through
25        494.
```

1                    R. Feilbogen

2              It may be that we don't have an extra

3         copy for counsel.  Counsel is sitting next

4         to the witness.  Obviously, I have no

5         objection if you take some extra time to

6         look over his shoulder.

7              (Defendants' Exhibit 14, March 20,

8         2003 e-mail and attached spreadsheets,

9         Bates stamped D 000489-000494, marked for

10         identification, as of this date.)

11         Q.   Could you take a look at Defendants'

12    Deposition Exhibit 14 and tell me what it is.

13         A.   It's an e-mail that I was probably

14    e-mailing to myself, which was something I would

15    do just to get a document from my desktop to my

16    laptop.  It's sometimes easier, since I don't

17    use floppy disks.

18              This looks like copies of various

19    portions of a fairly complicated spreadsheet I

20    had put together that was developed in the

21    process of putting the business plan together.

22         Q.   The cover e-mail shows that you had

23    e-mailed this to yourself on March 20th.

24         A.   Right.

25         Q.   I am going to show you, but not mark

```
 1                    R. Feilbogen
 2    unless we have to, a document that bears
 3    production number D 98, which appears to be a
 4    March 17th e-mail from you to Paul Gentile and
 5    James Garzon saying that Mr. Dooley was coming
 6    in that week.
 7              Did you create the documents that are
 8    within Deposition Exhibit 14 in connection with
 9    Mr. Dooley's visit?
10         A.   I don't recall.  These spreadsheets
11    here existed as part of the development of the
12    Energy business plan.  It was sort of an ongoing
13    living, breathing thing.
14         Q.   Do you remember whether you discussed
15    with Mr. Dooley when he visited during the week
16    of March 17th the financial figures that are in
17    Deposition Exhibit 14?
18         A.   I actually don't even recall at this
19    point whether or not that meeting ever occurred.
20    It may have, but I don't remember.
21         Q.   Whether Mr. Dooley came or not, did
22    he communicate with you about monthly expenses
23    for the budget for the Energy Group?
24              MS. VLADECK:  Objection to form.
25         A.   We did have, I'll say, more than one
```

```
1                    R. Feilbogen
2      meeting -- I can't remember how many meetings,
3      "we" meaning Tony and I -- with Bill to talk
4      about the status of the Energy Group.
5               There are actually presentations that
6      were put together for that purpose which are not
7      here, and I don't remember at the end of the day
8      what level of detail we provided him.  John
9      Finigan would -- before I gave anything to Bill
10     Dooley, John Finigan usually looked it over
11     beforehand.  So I can't remember whether or not
12     we were including those types of things or not.
13     Obviously, that would have been a little
14     sensitive, since John worked directly for Bill.
15          Q.   In your March 17th e-mail, you say to
16     Gentile and Garzon, "How are you doing with
17     this?  Dooley is coming this week, so I need to
18     nail down January and February as soon as
19     possible.  Thanks."
20               Did you discuss with Dooley the
21     January and February expenses?
22               MS. VLADECK:  Is that the whole
23          e-mail?
24               MR. ROGERS:  That's the whole e-mail.
25          We'll mark it.
```

```
 1                  R. Feilbogen

 2          MS. VLADECK:  It doesn't matter.

 3      A.    The essence of what I was trying to

 4 say in this e-mail is in preparing this

 5 particular presentation, or the little

 6 PowerPoint I had put together at least in

 7 anticipation of that, I felt that I wanted to

 8 know where we stood with our January and

 9 February expenses.

10      Q.    Turning back to Deposition Exhibit

11 14, are the financial statements -- let me

12 withdraw that.

13          Turning back to Exhibit 14, are the

14 spreadsheets that are attached to it

15 spreadsheets that you created on your laptop and

16 then mailed to yourself?

17      A.    As I said, it's a working document.

18 Yes, they are spreadsheets that I created.

19      Q.    Look at the second page of this

20 exhibit.  There is a box on the left side, it

21 says "personnel."  Do you see that?

22      A.    I do.

23      Q.    Under that, there are two EVPs, are

24 there not?

25      A.    Yes.
```

```
 1                    R. Feilbogen
 2         Q.    And there were two EVPs in Energy in
 3    March of 2003?
 4         A.    Correct.
 5         Q.    If you look across on salaries for
 6    2003, there is one EVP that has a $300,000
 7    salary, that would be Mr. Gordon, would it not?
 8         A.    Correct.
 9         Q.    And there is one EVP that has a
10    salary of $250,000 for 2003, and that would be
11    you?
12         A.    Correct.
13         Q.    And if you look over under
14    "guarantees" for 2003, there is a listing of a
15    $2 million guarantee for Mr. Gordon, is there
16    not?
17         A.    Yes.
18         Q.    And there is no listing for a
19    guarantee for you, is there?
20         A.    No.
21         Q.    Did there come a time that
22    Mr. Cassano asked you to provide some
23    information for him about the expenses at the
24    Energy Group in connection with the decision to
25    transition the Energy Group over to AIG FP?
```

```
 1                    R. Feilbogen

 2         A.    I think he specifically asked me to

 3    provide him with the written contracts for the

 4    employees of the AIG Energy Group.

 5         Q.    Did he tell you why he wanted them?

 6         A.    No.  He just asked me for it and I

 7    gave it to him.  Actually, I did not give it to

 8    him, I organized through HR to give it to him.

 9         Q.    Did you assume that he would ask for

10    that because he wanted to see what the expenses

11    were for personnel in the group he was taking

12    over?

13              MS. VLADECK:  Objection to form.

14         Q.    You may answer.

15         A.    I don't think that we could conclude

16    whether or not it has anything to do with

17    expenses.  I think he wanted to understand what

18    obligations AIG had in writing to the AIG Energy

19    employees.

20         Q.    When did you first meet Mr. Cassano;

21    was it substantially before this transition

22    period?

23         A.    I think I was introduced to him for

24    the first time at a conference we held, which I

25    think was sometime in February '03, but I don't
```

```
 1                    R. Feilbogen

 2   recall exactly when the conference was.  I met

 3   him briefly.  That answers the question.

 4        Q.    How were you first informed of the

 5   possibility that your group was going to be

 6   transferred to AIG FP?

 7        A.    I wasn't informed that it would

 8   possibly happen, I was informed that it would

 9   happen, and I was informed by John Finigan in

10   his office.

11        Q.    Tell me what you recall he said about

12   that matter.

13        A.    He told me he had -- I don't know

14   what the exact words were -- to the effect some

15   shocking news; he explained that this was an

16   entire merger between all of AIG Trading Groups

17   and AIG Financial Products; he told me it caught

18   him by surprise, he had no idea it was going to

19   happen; he told me that he thought that what we

20   were trying to do in the energy business is what

21   peaked their interest in AIG Trading Group; and

22   he basically -- he just told me that he really

23   had no idea how it was all going to sort of pan

24   out and that I was to get on an airplane to go

25   see Cassano myself.
```

```
 1                    R. Feilbogen
 2         Q.    To go to London?
 3         A.    Yes.  Joe works out of London, and to
 4    go to meet him and have a face-to-face
 5    conversation with him directly.
 6         Q.    Did Mr. Finigan tell you that all of
 7    AIG Trading was going to be folded into AIG FP,
 8    or that Energy was going to go in some other
 9    subset of AIG Trading?
10         A.    He told me that he didn't know at the
11    end of the day how it was all going to play
12    itself out, but that AIG Financial Products --
13    you can call it a merger, but he implied the
14    takeover of AIG Trading Group and all of the
15    businesses that represented AIG Trading Group.
16         Q.    Did you go to London?
17         A.    Yes.
18         Q.    Do you recall when that was?
19         A.    Again, it was in this March, April
20    time frame.  Probably April I would guess, but I
21    don't remember.
22         Q.    March, April time frame of 2003?
23         A.    I'm sorry, of 2003.
24         Q.    How long were you in London?
25         A.    I took a flight, I may have stayed in
```

```
 1                    R. Feilbogen
 2      a hotel for a night, but it was very quick.
 3           Q.    It was a quick trip?
 4           A.    Yes.
 5                MR. ROGERS:  I would like to mark as
 6           Defendants' Exhibit 15 a one-page document
 7           that has production number D 101.
 8                I apologize.  I don't have an extra
 9           copy, but it's a short document.
10                (Defendants' Exhibit 15, April 1,
11           2003 e-mail, Bates stamped D 000101, marked
12           for identification, as of this date.)
13           Q.    Mr. Feilbogen, Deposition Exhibit 15
14      contains an e-mail from you to John Finigan
15      dated April 1, then up above is an indication
16      that Mr. Finigan forwarded it to Dennis
17      Zampella.  My questions are going to be about
18      the e-mail from you to Mr. Finigan.
19                That is an e-mail that you sent to
20      Mr. Finigan on April 1?
21           A.    That's what it says.
22           Q.    The subject is referred to as "points
23      to discuss," and then you start, before you go
24      into a number of points, with the words "Just a
25      few of my thoughts."
```

```
 1                    R. Feilbogen
 2              What was the purpose of this; was it
 3    essentially just an update on progress?
 4              MS. VLADECK:  Objection to form.
 5         A.    A lot of times when John had to give
 6    any kind of report of information of any type to
 7    just about anyone, whether it was people who
 8    worked for him or people he worked for, a lot of
 9    times he would ask either myself or from time to
10    time Andy Kaplan or even Dennis Zampella to in
11    some cases go as far as actually writing the
12    document that he would put his name on and in
13    other cases to outline for him the salient
14    points that he ought to be making.
15              I can't remember why we were putting
16    together this list of sort of what the status
17    was.  I don't remember what the purpose was.
18         Q.    This e-mail is dated April 1, 2003.
19              Is it correct then that at least as
20    of then you had not been told that the Energy
21    Group was going to be folded into AIG FP?
22         A.    To be honest, I just don't remember.
23         Q.    The last point, point 6 on your
24    e-mail, says, "Ed and Bill are pleased with the
25    progress to date.  They view the development of
```

```
 1                    R. Feilbogen
 2    the energy business as a key activity for AIG.
 3    They are already recognizing the added value we
 4    can provide to AIG IC and have high hopes and
 5    expectations for the group."
 6             Ed and Bill is a reference to Ed
 7    Matthews and Bill Dooley, is it not?
 8         A.    Correct.
 9         Q.    Where did you get the information
10    that is contained in that section of the e-mail?
11         A.    I really don't recall.  Sometimes
12    when we did these exercises -- it was maybe
13    after a conversation that I may have verbally
14    had with Finigan and verbally jotted down some
15    notes.  This could be part of that.  I don't
16    remember.
17         Q.    Do you recall speaking directly with
18    either Ed Matthews or Bill Dooley in which they
19    expressed the sentiments you attribute to them
20    in point 6 of this e-mail?
21         A.    I guess in a way.  I guess in some
22    ways, yes.
23         Q.    Are the statements you make here in
24    this e-mail accurate?
25         A.    I think point number 6, just to
```

```
 1                      R. Feilbogen

 2      clarify my interpretation of Ed and Bill being

 3      pleased, stems from comments they made about the

 4      seminar, the meeting that we had assembled for

 5      potential Energy customers sometime in that

 6      February time zone, where they had commented on

 7      their -- they were impressed with how many

 8      potential customers we were able to get into the

 9      room.

10               With respect to these other things,

11      their view of the development of the energy

12      business as a key activity for AIG, I think as a

13      whole, that's probably a true statement.

14               I think that paragraph 6 is probably

15      more of an extrapolation sort of my

16      interpretation of their reactions to certain

17      kinds of things than being absolute fact.

18          Q.    Looking up at paragraph 1, you said

19      that you were, "Pleased with the way in which

20      the infrastructure platform was coming together,

21      i.e. systems, credit, legal, accounting, market

22      risk, and operations doing a great job."

23               Was that true at the time?

24          A.    Yes.

25          Q.    We were talking a couple of minutes
```

```
 1                    R. Feilbogen
 2      ago about Mr. Cassano's request for some
 3      information.
 4                    First of all, when you went to
 5      London, what do you recall you discussed with
 6      Mr. Cassano?
 7           A.    I had put a small PowerPoint together
 8      to give him an update on where we stood with the
 9      infrastructure.  The infrastructure was
10      something the parent company was hammering home
11      is the most important thing to get a good
12      platform together.
13                    So I talked to him about where we
14      stood with respect to the development of that.
15           Q.    What do you mean by "infrastructure"?
16           A.    An IT system to warehouse potential
17      transactions, whatever needed to be done on the
18      legal side in terms of setting up entities,
19      certain kinds of documentation, filings, things
20      like that, putting some operational processes in
21      place, thinking through what some of the issues
22      would be, all those kinds of things of that
23      nature.
24                    We talked about that and sort of what
25      my view is of the state of that; we talked about
```

1                       R. Feilbogen

2       what I thought the vision was in terms of the

3       business and sort of where I saw the energy

4       business going and why I thought -- or how I

5       thought we were going to make money; we talked

6       about some of my other experiences.

7                 He talked to me a lot about Financial

8       Products.  I didn't know a lot about the

9       organization.  The initial meeting was very

10      encouraging and upbeat.

11          Q.    Why didn't Mr. Gordon go with you;

12      was it already thought that he would be leaving?

13                MS. VLADECK:  Objection to form.

14          A.    I don't recall the exact state of

15      where he was in terms of the Separation

16      Agreement at that time.  It was certainly in

17      process, and I don't know exactly where we stood

18      at that time.

19          Q.    His departure was in process?

20          A.    There was some type of investigation

21      that they retained outside counsel for; there

22      was then some negotiation discussion about what

23      the settlement would be, not settlement, but

24      what the terms would be of his departure.  And

25      where along that process we were at that point

```
 1                      R. Feilbogen
 2      in time, I don't recall.
 3           Q.    It's correct, isn't it, that the
 4      reason why you went to London without Mr. Gordon
 5      and were talking to Mr. Cassano about these
 6      things is that it was understood between
 7      Mr. Cassano and you that you would be leaving
 8      Energy Group without Mr. Gordon?
 9                MS. VLADECK:   Objection to form.
10           A.    No.
11           Q.    That's not correct?
12           A.    That's not correct.
13           Q.    What's not correct about that?
14           A.    There was not an understanding about
15      I would be leaving the Energy Group, I think is
16      what you said.
17           Q.    What was your understanding when you
18      went to London to see Mr. Cassano as to what
19      your role would be in the Energy Group?
20                MS. VLADECK:   Objection to form.
21           A.    I don't believe that he ever said to
22      me exactly what my role was going to be.
23           Q.    I appreciate the clarification.
24      Sometimes we ask leading questions just to try
25      to move things along, and obviously, I was
```

```
 1                    R. Feilbogen
 2      trying to move things along too quickly.
 3              At the time that you went to London,
 4      though, it was your understanding that
 5      Mr. Gordon would not be continuing?
 6              MS. VLADECK:   Asked and answered.
 7          Objection to form.
 8          A.    I said I understood that there was a
 9      process in place, and when I went to London,
10      where we were in that process, I don't recall.
11      Obviously, Tony left the company.  I don't
12      remember exactly what I thought.
13          Q.    Did Mr. Cassano when you met with him
14      in London talk to you about any of the terms of
15      your employment going forward?
16          A.    Specific to me?
17          Q.    Yes.
18          A.    No.
19          Q.    When you came back from your trip to
20      see Mr. Cassano, did you discuss your
21      conversation with Mr. Cassano with anyone?
22          A.    Yes.
23          Q.    Who did you discuss it with?
24          A.    I discussed it with Andy Kaplan after
25      our meeting.  He had a meeting either before or
```

```
 1                    R. Feilbogen

 2    after me, I don't remember, and we flew back

 3    together.  When I got back into the office, we

 4    actually went straight to the office from the

 5    airport, we called the Energy Group together,

 6    those who had some affiliation and were working

 7    on this infrastructure project, and relayed

 8    portions of our discussion and my interpretation

 9    of it.

10         Q.    When you called the Energy Group

11    together to talk to them, was that the first

12    word that they had that they were going to be

13    transferring to AIG FP, or had that been told to

14    them before?

15              MS. VLADECK:  Objection to form.

16         A.    Both Andy and I had received several

17    phone calls on our cell phones and had voice

18    messages while I was actually in the meeting

19    with Joe.  Some rumors of some sort had leaked

20    out.  When I walked into the office, it was a

21    bit of disarray.  So people were all talking

22    about something going on with FP.

23              Part of the purpose of having that

24    meeting was to at least kind of set it straight

25    for that group of people that I was immediately
```

```
 1                   R. Feilbogen

 2    responsible for at the time or felt responsible

 3    for.

 4         Q.    So it's your understanding when you

 5    spoke to the group after you came back from your

 6    meeting with Mr. Cassano that that was the first

 7    official word they had of the change?

 8         A.    I don't know if it was the first

 9    official word.

10              MS. VLADECK:  Objection to form.

11         Q.    You don't know if it was the first

12    official word?

13         A.    I don't know how or what had been

14    told to them while I was in London.  Something

15    clearly had been told to a lot of people.

16         Q.    You had mentioned something about

17    infrastructure and AIG's view about

18    infrastructure.

19              MR. ROGERS:  I would like to have

20              marked as Defendants' Deposition Exhibit 16

21              a document that bears production numbers D

22              78 and 79, and I'll give a copy to your

23              counsel.

24         A.    Since there is five minutes left and

25    you are going to mark that, could I run to the
```

```
 1                    R. Feilbogen
 2    bathroom quickly.
 3         Q.    We'll do this fast, this is discrete,
 4    and then we'll go from there.
 5              (Defendants' Exhibit 16, Series of
 6              e-mails dated December 12 and 13, 2002,
 7              Bates stamped D 000078-000079, marked for
 8              identification, as of this date.)
 9         Q.    Exhibit 16 consists of three e-mail
10    messages.  Reading from the bottom up on the
11    first page, at the bottom, Mr. Latz is writing
12    to you and Mr. Morrissey, then you write to
13    Mr. Finigan, cc Morrissey, and Finigan responds
14    to you, all of this happens on December 12 and
15    13, 2002.
16              Do you recall that at that time there
17    was a direction that expenses had to be cut by
18    approximately 7.5 percent?
19         A.    I'm sorry, I was reading the document
20    as you were talking.  Say it again.
21         Q.    Do you remember in December of 2002
22    there was a direction to cut costs by 7.5
23    percent?
24              MS. VLADECK:  Objection to form.
25         A.    I remember this flow of e-mails, that
```

1                   R. Feilbogen

2       there was this mandate, yes.

3           Q.      Did you reduce head count, as you

4       said in your e-mail to Mr. Finigan in the middle

5       of the page was the only way to achieve the

6       reductions?

7           A.      To be perfectly honest, I don't

8       remember any more if we even cut the 7 and a

9       half percent.  Sorry.

10          Q.      Do you recall speaking with

11      Mr. Matthews or Dooley or Latz about the cutting

12      of expenses?

13          A.      I do remember talking to John

14      Finigan, I may have spoken to Ron.  Ron and I

15      would talk often.  I may have talked to him

16      about that.  I don't remember if I talked to

17      Bill Dooley about it.  Yes, I was involved in

18      some discussions about it.

19          Q.      Who made the decision that there

20      should be a 7.5 percent cut in expenses?

21          A.      It sounds like it came directly from

22      Greenberg.

23          Q.      You are looking at the original

24      message where Mr. Latz is writing, "I just came

25      back from a meeting with Howie Smith.  He passed

```
 1                    R. Feilbogen
 2      along the message to all parts of the company
 3      that MRG is mandating a 7 and a half percent
 4      cut"?
 5           A.    Yes.
 6                MR. ROGERS:  I think we can take a
 7           break now.
 8                THE VIDEOGRAPHER:  The time is 2:42
 9           p.m. on July 16, 2004, and this completes
10           tape number 2 of the videotaped deposition
11           of Mr. Robert Feilbogen.
12                (Recess taken.)
13                (Defendants' Exhibit 17, May 8, 2003
14           e-mail and attached documents, Bates
15           stamped D 000106-000118, marked for
16           identification, as of this date.)
17                THE VIDEOGRAPHER:  The time is 2:53
18           p.m. on March 16, 2004, and this marks the
19           beginning of tape number 3 of the
20           videotaped deposition of Mr. Robert
21           Feilbogen.
22           Q.    Mr. Feilbogen, we discussed a few
23      minutes ago that Mr. Cassano at some point asked
24      for some information concerning employee
25      expenses and related matters.
```

1                    R. Feilbogen

2              What do you recall of what he asked

3    you for?

4         A.    I believe he asked me to provide him

5    with written contracts for those people who had

6    written contracts in the Energy Group; he also

7    asked me about how much we had spent on systems;

8    he had inquired about other aspects of the

9    expenses.

10         Q.    Did it strike you as unusual that he

11   would be interested in that information if his

12   organization is going to be taken over, the

13   group?

14              MS. VLADECK:   Objection to form.

15         A.    Would it strike me as unusual?   No.

16   It's his company.   He is entitled to whatever

17   information he asks for.

18         Q.    Do you remember whether he asked you

19   for that information in person when you were

20   meeting with him or by telephone or by some

21   other means?

22         A.    I don't recall.

23         Q.    I am going to show you what has been

24   marked as Defendants' Deposition Exhibit 17.

25   It's a document that bears production numbers D

```
1                     R. Feilbogen

2       106 through 118, and I am handing a copy to your

3       counsel as well.

4                The first two pages of this exhibit

5       are different versions of what looks like the

6       same e-mail, but the first of the two pages are

7       a little bit more legible.

8                Is the --

9                MS. VLADECK:  Can you give him a

10           chance to look at it.

11               MR. ROGERS:  Sure.

12        A.    Okay.

13        Q.    Let's start first with the cover

14      e-mail that is the same on both pages 106 and

15      107.

16               This is an e-mail from you to

17      Mr. Cassano dated May 8, '03, is it not?

18        A.    Yes.

19        Q.    In the e-mail, you are telling him

20      you are including certain information he has

21      asked for, correct?

22        A.    Yes.

23        Q.    Let's look at the sheets now that

24      start with D 108 and go to D 115.  What are

25      these?
```

1                    R. Feilbogen

2         A.    D 108 appears to be a list of the

3    people who sat inside of the entity called AIG

4    Energy, Inc., and I guess it has start dates,

5    salaries, et cetera.

6         Q.    And then looking at pages 109 to 115,

7    what are they?

8         A.    These were spreadsheets kept by human

9    resources to track specifically those who we

10   were interviewing and new hires specifically for

11   the energy business.

12        Q.    Did you collect these sheets in order

13   to send them on to Mr. Cassano?

14             MS. VLADECK:   Objection to form.

15        A.    I remember asking someone in HR to

16   assemble it all.  I don't remember whether --

17   once it was assembled whether I put the package

18   together or my assistant put it together.

19        Q.    Who in HR did you ask?

20        A.    It could have been Dennis, it could

21   have been Sandra Marr, it could have been

22   someone named Luddy, L-U-D-D-Y.  I don't

23   remember her last name.  It says I'm asking here

24   in the e-mail.

25        Q.    The way this is put together, if you

1                    R. Feilbogen

2      look at the pages that are marked D 116 and 117,

3      they are an e-mail string starting from the

4      bottom up, the bottom e-mail is your e-mail to

5      Mr. Cassano, which is identical to the e-mail

6      that's the first page of the exhibit, and then

7      up above is Mr. Cassano's response and then your

8      reply.

9                    Does this refresh your recollection

10     that you first provided certain data to

11     Mr. Cassano and then Mr. Cassano asked you for

12     documents, contracts?

13         A.    Yes.  That's what this string of

14     e-mails here represent, and yes, it refreshes my

15     memory.

16         Q.    And then you sent the inquiry on to

17     Mr. Zampella, asking for all employee contracts

18     and offer letters.  Do you see that?

19         A.    Yes.

20         Q.    What was your understanding as to why

21     Mr. Cassano wanted to see those documents?

22                MS. VLADECK:   Objection to form.

23         A.    My understanding of why he wanted to

24     see the documents was, as he said here, he

25     wanted to see the employment contracts or

1                    R. Feilbogen

2    acceptance letters.  I understood that to mean

3    he would like to see whatever written agreements

4    we have entered into for the new hires,

5    specifically for the energy business.

6        Q.    On his e-mail asking for documents,

7    he doesn't limit it to new hires, does he?  It

8    says, "I am guessing that there are employment

9    contracts or at a minimum offer letters for the

10   members of the team."

11       A.    My interpretation of what he asked

12   for was for the new hires we had hired for the

13   Energy Group.

14       Q.    In your e-mail to Mr. Zampella

15   passing on Mr. Cassano's request, you say, "Can

16   you make me copies of all Energy employee

17   contracts/offer letters."  You didn't limit it

18   to new hires, did you?

19       A.    That's what the words say.

20       Q.    What is OpenLink?  Mr. Cassano in his

21   e-mail to you on D 116 says he would also like

22   to see whatever contracts you have with

23   OpenLink.

24       A.    It's a software provider.  They

25   provide software to run an energy business as

```
 1                     R. Feilbogen
 2    well as other kinds of businesses.
 3         Q.    Was the expense of OpenLink a
 4    significant expense for the Energy Group?
 5         A.    Yes.
 6         Q.    If you look at the last page of the
 7    exhibit, Exhibit 17, there is a page which has
 8    the number D 118.
 9              Is this a document that was
10    transmitted by you to Mr. Cassano on May 8th
11    along with the salary and other information?
12         A.    Not that I recall.
13              MS. VLADECK:  On your copy, can you
14         see what the heading is.  It seems to be
15         cut off.
16              MR. ROGERS:  "Additional incentive"
17         something I think is what it says.  We may
18         be able to find another copy to find out.
19         Q.    At the moment, I'm asking what
20    recollection you have as to your -- let me ask
21    the question.
22              Did you create this document that's
23    at page D 118?
24         A.    I don't believe I did.  It doesn't
25    look familiar to me.
```

```
 1                    R. Feilbogen
 2        Q.    Do you know who created it?
 3        A.    No.
 4        Q.    Here in Exhibit 17, we've got
 5   evidence that in early May 2003 Mr. Cassano is
 6   communicating with you about various matters
 7   relating to personnel.
 8             There came a time when Mr. Wayne also
 9   asked you for information, did there not?
10             MS. VLADECK:  Objection to form.
11        A.    He may have.  He asked me questions
12   about the energy business.  I don't recall
13   specifically what he asked me.
14        Q.    When you were introduced to
15   Mr. Wayne -- and I apologize if this is
16   repetitive, because you did say something about
17   being introduced to Mr. Wayne, I just can't
18   remember -- what was told to you about what his
19   role would be in the energy area?
20        A.    It was announced at that meeting at
21   their offices in Wilton that Marty Wayne -- I
22   don't remember his specific words, but something
23   to the effect that he would be running the
24   energy business, or something like everybody in
25   the room would be reporting to Marty Wayne with
```

```
 1                   R. Feilbogen
 2    respect to the energy business.
 3        Q.    As of the time of that announcement,
 4    had you met with Mr. Wayne and spoken to him
 5    separately?
 6        A.    I think we did meet at an earlier
 7    meeting that was held.  We must have met once
 8    before, because I do recall prior to going to
 9    this meeting where it was announced that
10    everybody would be reporting to him that he
11    called me on my cell phone and asked me when we
12    do come up to Wilton if I could stay for a
13    little while afterwards.
14        Q.    Did you stay for a little while
15    afterwards and meet with him?
16        A.    Yes.
17        Q.    What did you discuss when you met
18    with Mr. Wayne?
19        A.    I asked him what my role would be.
20        Q.    What did he say?
21        A.    He had no idea.
22        Q.    Is that all he said?
23        A.    He told me he had no idea what I do,
24    he had no idea what my skill set was.  He didn't
25    have any answers.
```

```
 1                    R. Feilbogen
 2        Q.    What was Mr. Wayne's role at AIG FP?
 3        A.     Quite frankly, I have no idea.   I
 4    understood him to have the title of managing
 5    director, but I don't think I have a good
 6    understanding of what his role was.
 7              MR. ROGERS:  I would like to have
 8         this marked as Exhibit 18, please.
 9              (Defendants' Exhibit 18, May 5, 2003
10         e-mail, Bates stamped D 000104-000105,
11         marked for identification, as of this
12         date.)
13              MR. ROGERS:  Defendants' Deposition
14         Exhibit 18 is a document bearing production
15         numbers D 104 and 105.
16        Q.    I'll hand it to you, I've already
17    given your counsel a copy.  This exhibit shows
18    at the bottom of the first page and carrying
19    over to the second briefly an e-mail from Brian
20    Morrissey to you with the subject
21    "second-quarter cost" and then your response.
22              What's your recollection as to
23    what -- let me withdraw that.
24              What was Mr. Morrissey asking you for
25    here?
```

```
 1                    R. Feilbogen

 2              MS. VLADECK:  Objection to form.

 3         A.    It says here that he was asking me

 4    for what I thought the second-quarter expense

 5    would be for the Energy Group.

 6         Q.    And he was asking you for that

 7    information because you were the acting head of

 8    the Energy Group at the time?

 9              MS. VLADECK:  Objection to form.

10         A.    He was asking me that question

11    because I was the businessperson involved in

12    hiring some people and developing systems and

13    that sort of thing.  So I would have been a

14    little bit closer to the updated numbers than he

15    would have been.

16         Q.    Was it your responsibility at that

17    time to make the estimates that he --

18         A.    Was it my --

19         Q.    He says, "What do you estimate that

20    your second-quarter cost will be?"

21              MS. VLADECK:  I think both the

22              reporter and the witness asked for you to

23              repeat the question.

24         Q.    You didn't understand the question?

25         A.    I would like you to ask the question
```

```
  1                    R. Feilbogen

  2    again.

  3         Q.    Was it your responsibility to report

  4    to Mr. Morrissey costs of the Energy Group that

  5    he then booked as the accountant?

  6              MS. VLADECK:  Objection to form.

  7         A.    No, that wasn't my responsibility.

  8         Q.    Then why is he asking you for these

  9    figures?

 10              MS. VLADECK:  Objection to form.

 11         Q.    You can answer.

 12         A.    He's asking me a question, because

 13    again, as the businessperson that was closest to

 14    hiring new people, closest to the expenses we

 15    were incurring with respect to the systems and

 16    that sort of thing, he was looking for a 'read,'

 17    I suppose, to understand whether or not relying

 18    on past months' monthly data seemed like a fair

 19    assumption.

 20         Q.    What sort of a fiscal year did Energy

 21    run on at the time; was it a calendar fiscal

 22    year?

 23         A.    The company operated, I guess, on --

 24    yes.

 25         Q.    So the first quarter is January,
```

```
 1                    R. Feilbogen

 2    February, March?

 3         A.    Yes, correct.

 4         Q.    You responded to Mr. Morrissey by

 5    sending the e-mail that's here on the first page

 6    of Deposition Exhibit 18.  Where did you get the

 7    figures that you put into that e-mail?

 8         A.    I can't say with complete certainty,

 9    but I would say for the months -- at least for

10    the first-quarter months, I probably was

11    regurgitating information that I had received

12    from the accounting group through whatever the

13    reports are that were generated, and with the

14    April and May numbers, again, they could have

15    been my estimates.  I don't really recall.

16         Q.    At the time you did this, you were

17    the only active executive vice president at the

18    Energy Group, were you not?

19         A.    Again, I don't recall the exact time

20    at which Tony exited the company.  It's probably

21    a fair assumption, but I don't recall the exact

22    date that he left.  Assuming that he had left?

23         Q.    Yes.

24         A.    Then yes, I was -- well, by this

25    time, we already, I guess, were in the process
```

```
 1                      R. Feilbogen
 2     of merging with the guys at FP.  So I guess the
 3     answer to that question actually is no.
 4                  Somewhere in this time period, and
 5     the dates are not clear in my mind, Joe and
 6     Marty clearly were the senior people running the
 7     energy business, but that was all fairly new to
 8     them.
 9         Q.    And you didn't copy Joe or Marty on
10     this e-mail to Brian Morrissey, did you?
11         A.    No.
12         Q.    What do you remember about the
13     information that Mr. Wayne asked you for about
14     Energy personnel and personnel costs within the
15     Energy Group?
16         A.    He asked me for a list of people, he
17     may have asked me what some of those people do.
18     I don't recall specifically.
19                  The questions that he would ask came
20     a lot one at a time; I would take a phone call,
21     he would ask a specific question, I would hang
22     up the phone.  That was it.  I don't recall.
23         Q.    We saw in the deposition exhibit that
24     described Mr. Cassano's request for information
25     and your response that you would forward
```

```
 1                    R. Feilbogen
 2       Mr. Cassano's request for documents to
 3       Mr. Zampella.
 4                    Did Mr. Zampella copy you on his
 5       response, or did he give you contracts and
 6       documents, which you then transferred to
 7       Mr. Cassano?
 8                    MS. VLADECK:  Objection to form.
 9            A.    Are you asking specifically about the
10       contracts in the e-mail earlier?
11            Q.    Yes.  If we go back to page D 116 of
12       Exhibit 17 --
13            A.    When I asked him to make me the
14       copies?
15            Q.    Yes.  You forwarded to Zampella
16       Cassano's e-mail, and you say, "Can you make me
17       copies of all contracts/offer letters"; then it
18       says, "I will take that and package it up with
19       the rest of the information Joe requested."
20                    Do you know how the information Joe
21       requested was transmitted to him?
22            A.    I don't.
23            Q.    You don't remember whether you took
24       it to him or whether it was sent some other way?
25            A.    I don't remember.
```

```
 1                    R. Feilbogen
 2              MR. ROGERS:  I would like to have
 3         this document marked as Defendants'
 4         Deposition Exhibit 19.  It bears production
 5         numbers D 467 through 472.
 6              (Defendants' Exhibit 19, June 16,
 7         2003 e-mail with attached December 17, 2002
 8         consultant contract, Bates stamped D
 9         000467-000472, marked for identification,
10         as of this date.)
11              MR. ROGERS:  I am handing a copy of
12         Defendants' Exhibit 19 to your counsel.
13         Q.    Deposition Exhibit 19 at the top of
14    the first page shows an e-mail from you to
15    Martin Wayne with a cc to Andy Kaplan, dated
16    June 16, 2003 in which you appear to be
17    forwarding to Mr. Wayne a copy of a current
18    contract with some employee.
19         A.    Yes.  I don't know that he was an
20    employee.
21         Q.    Tell me what you recall.  What is
22    this?
23         A.    The attached document is a
24    Consultancy Agreement.
25         Q.    Between AIG Trading and the
```

```
 1                   R. Feilbogen

 2   consultant?

 3        A.    AIG I guess it is and the consultant,

 4   yes.

 5        Q.    And it was dated December 17, 2002,

 6   the consultant contract was, right?

 7        A.    Yes.

 8        Q.    And you forwarded this to Mr. Wayne,

 9   did you not?

10        A.    Yes.

11        Q.    Why did you do that?

12        A.    Probably because he asked me to.

13        Q.    What did he say when he asked you to?

14        A.    I don't know.  He probably just asked

15   me for the contract.

16        Q.    It is correct, is it not, that

17   Mr. Wayne was trying to get information on the

18   Energy Group's current commitments to pay costs

19   for personnel and for consultants?

20             MS. VLADECK:  Objection to form.

21        A.    Could you repeat that again.

22             MR. ROGERS:  Could you reread it,

23        please.

24             (Record read.)

25             THE COURT REPORTER:  "QUESITON:  It
```

```
 1                    R. Feilbogen

 2          is correct, is it not, that Mr. Wayne was

 3          trying to get information on the Energy

 4          Group's current commitments to pay costs

 5          for personnel and for consultants?"

 6          A.    It might have been.

 7                MR. ROGERS:  I am going to have

 8          marked as Defendants' Deposition Exhibit 20

 9          a document that bears production numbers D

10          281 and 282.  It's a two-page document.

11                (Defendants' Exhibit 20, AIG employee

12          transfers as of 6/16/03, Bates stamped D

13          000281-000282, marked for identification,

14          as of this date.)

15                MR. ROGERS:  I am handing a copy of

16          the deposition exhibit to your counsel.

17          Q.    Had you seen Deposition Exhibit 20

18     prior to the beginning of this litigation?

19          A.    It doesn't look familiar.

20          Q.    The draft line on the upper

21     right-hand corner says it's a draft of June 16,

22     '03, your e-mail to Mr. Wayne containing the

23     Consultancy Agreement that we just referred to

24     on Deposition Exhibit 19 is also dated June 16,

25     2003.
```

```
 1                    R. Feilbogen
 2              Do you recall Mr. Wayne describing to
 3      you that there was an effort underway to
 4      quantify financial information with respect to
 5      AIG TG employee transfers?
 6         A.    Not that I recall.
 7              MR. ROGERS:  I am going to have
 8         marked as Defendants' Deposition Exhibit 21
 9         a document bearing production number D 521,
10         and I will hand a copy to your counsel.
11              (Defendants' Exhibit 21, June 17,
12         2003 e-mail, Bates stamped D 000521, marked
13         for identification, as of this date.)
14         Q.    Defendants' Deposition Exhibit 21 is
15      an e-mail that you sent to a Steve Sitver at AIG
16      FP, isn't it?
17         A.    Yes.
18         Q.    And you cc'd Marty Wayne?
19         A.    Yes.
20         Q.    At the time, what were Mr. Sitver's
21      responsibilities?  And I should say "at the
22      time," it's a June 17, 2003 e-mail.
23         A.    I understood him to be the COO of AIG
24      Financial Products.
25         Q.    In the first line of the e-mail, you
```

```
 1                    R. Feilbogen

 2      say to Mr. Sitver, "I spoke with Marty and

 3      understand the plan to begin the integration for

 4      Energy."

 5                    As of this point, what did Mr. Wayne

 6      tell you about the plan to begin the integration

 7      for Energy?

 8                    MS. VLADECK:  Objection.  I am going

 9            to withdraw the objection.

10            A.    What did I understand the plan to be?

11            Q.    Yes.

12            A.    I understood the plan, as I speak

13      about it in the e-mail, to relate to the

14      personnel plan.  Marty had given me a list of

15      individuals that were going to stay as they

16      transferred to AIG Financial Products, and

17      basically, those who were not on the list I

18      assume would be laid off.

19            Q.    As of June 17th, had Mr. Wayne

20      discussed with you what your role would be?

21            A.    He did not make that clear, no.  The

22      only thing he made clear was that my name was on

23      the list of those staying or being asked to

24      stay.

25            Q.    What communications had you had with
```

```
 1                    R. Feilbogen
 2    Steve Sitver as of June 17th concerning your
 3    role at AIG FP?
 4               MS. VLADECK:  Objection to form.
 5         A.    I'm not sure I had much communication
 6    with him with respect to me.
 7         Q.    So why did you send him an e-mail on
 8    June 17th?
 9         A.    I don't recall exactly why.  It was
10    probably under the instruction of Marty Wayne.
11         Q.    Do you know why Mr. Wayne might have
12    instructed you to write to Mr. Sitver?
13               MS. VLADECK:  Objection to form.
14         A.    No.
15         Q.    So it's your testimony on June 17th
16    you had no idea what your role at AIG FP would
17    be?
18         A.    I only understood that I would be
19    part of the Energy Group.
20         Q.    It's your testimony here that when
21    you referred on June 17th to "understanding the
22    plan to begin the integration for Energy," all
23    you were referring to was head count?
24         A.    Yes.
25         Q.    We talked a little bit about accruals
```

```
 1                    R. Feilbogen

 2      for people without guarantees.  I am going to

 3      show you two more documents.  Could you pull out

 4      Exhibit 13.

 5              MR. ROGERS:  I am going to ask that

 6          this document be marked as Defendants'

 7          Deposition Exhibit 22.  It's a one-page

 8          document bearing production number D 97.

 9              (Defendants' Exhibit 22, March 15,

10          2003 e-mail, Bates stamped D 000097, marked

11          for identification, as of this date.)

12              MR. ROGERS:  I'll hand a copy to your

13          counsel.

14          Q.    Do you have Deposition Exhibit 22 in

15      front of you?

16          A.    Yes.

17          Q.    This is an e-mail from you to

18      Mr. Finigan with a cc to Zampella and Gordon

19      dated March 15, 2003, is it not?

20          A.    Yes.

21          Q.    The e-mail starts with you saying,

22      "As we hire people into the group without

23      guarantees, I would like to provide Brian with

24      an estimate of bonus for these employees so we

25      can accrue over the year."
```

```
 1                    R. Feilbogen
 2                    Do you see that?
 3          A.    Yes.
 4          Q.    Did you end up providing Brian
 5    Morrissey with an estimate of bonus for certain
 6    employees so that they could be accrued even
 7    though the bonuses weren't guaranteed?
 8                    MS. VLADECK:  Objection to form.
 9          A.    At some point, Brian and I may have
10    had discussions, and maybe even possibly e-mail,
11    on certain individuals on possibly how much I
12    expected to pay them in terms of total
13    compensation.  That's possible.  To be very
14    clear, though, I'm talking about the nonfront
15    office staff.
16                    MR. ROGERS:  I am going to have
17            marked as Defendants' Exhibit 23 a one-page
18            document bearing production number D 162.
19                    (Defendants' Exhibit 23, Energy
20            Group, Inc.'s 2003 guarantees, Bates
21            stamped D 000162, marked for
22            identification, as of this date.)
23                    MR. ROGERS:  I'll hand a copy to
24            plaintiff's counsel.
25          Q.    Who created Defendants' Deposition
```

```
 1                    R. Feilbogen
 2    Exhibit 23?
 3              MS. VLADECK:  Objection to form.
 4         A.    I'm not sure.
 5         Q.    Did you see Defendants' Deposition
 6    Exhibit 23 prior to the document production in
 7    this lawsuit?
 8         A.    I don't think so.
 9         Q.    Who was in charge of managing the
10    accrual process for AIG Trading in 2003?
11              MS. VLADECK:  Objection to form.
12         A.    Who was responsible for managing the
13    accrual process?  Ultimately, John Finigan.
14         Q.    Below John Finigan, who else worked
15    with him in managing the accrual process?
16              MS. VLADECK:  Objection to form.
17         A.    He would have the accounting
18    department execute what he wished to do, but
19    John Finigan was responsible for the accruals at
20    AIG Trading Group.
21         Q.    If you look at Defendants' Deposition
22    Exhibit 23, there is a line at the bottom saying
23    "Operations" with numbers for every month for
24    2003 with a total at the right.
25              What guarantees of bonus compensation
```

```
 1                    R. Feilbogen

 2      existed for people in operations in the Energy

 3      Group in 2003?

 4                    MS. VLADECK:  Objection to the form

 5           again.

 6           A.    Sorry, I don't understand the

 7      connection to what you started with and then the

 8      question.

 9           Q.    Were there, to your knowledge, any

10      guarantees of bonus compensation from AIG

11      Trading to employees in operations in the energy

12      area in 2003?

13           A.    I'm sorry, I don't mean to be

14      difficult, but one -- people had contracts with

15      different entities inside of AIG Trading Group.

16      So who had the contracts with whom I can't

17      recall.

18                    Yes, there were people in operations

19      who had some written guarantees, if that answers

20      the question.

21           Q.    In 2003 in the energy area at AIG

22      Trading, which individuals fell within the

23      category operations?

24           A.    At what point in time?  It's a very

25      broad question.
```

```
 1                    R. Feilbogen
 2         Q.    Let's pick February 2003.
 3         A.    We would probably have to refer back
 4    to the organizational charts.  Clearly, Carl
 5    Peterson was an energy operations person who had
 6    already been on board, and there were several
 7    other operations people that Carl had hired.
 8    Whether they were employees by that time or not,
 9    I just can't recall.
10         Q.    Are you aware of any bonus guarantees
11    that Mr. Peterson or any of the other operations
12    employees had in 2003?
13         A.    Yes.  I was made aware at the time.
14         Q.    What specific guarantees can you
15    recall existed for operations people in 2003?
16         A.    I recall that Carl Peterson's total
17    compensation was guaranteed to be $400,000.  I
18    don't recall how long that contract was for and
19    when that contract started.  The specifics of
20    the guarantees that other operations people may
21    have had, I can't recall.
22         Q.    In your complaint at paragraph 21,
23    and I'll let you page to it, it's page 4.  Are
24    you there?
25         A.    Yes.
```

```
 1                    R. Feilbogen
 2         Q.    The second sentence of paragraph 21
 3   of the complaint alleges that, "Finigan
 4   instructed AIG Trading's accountants to stop
 5   accruing Feilbogen's bonus because the unused
 6   money accrued for Gordon's bonus could be
 7   applied to pay Feilbogen's guaranteed minimum
 8   bonus."
 9              What is your basis for that
10   allegation?
11         A.    I don't recall whether I heard that
12   directly from John Finigan or whether I heard
13   that from Brian Morrissey, but one of those two
14   people were my source of that.
15         Q.    Tell me, to the best of your
16   recollection, what you recall Mr. Finigan may
17   have said to you on the subject of stopping
18   accruals.
19         A.    I remember having conversations.
20   Whether they were specifically with John or
21   whether they were with Brian, I can't recall.
22              What was expressed to me was that --
23   what was implied was that because John was
24   managing the overall expense of the entire
25   company -- and he obviously had to manage to his
```

```
 1                  R. Feilbogen
 2    own budget -- that he had instructed to stop
 3    accruing for Tony's bonus, given in effect at
 4    that point in time that there had been an
 5    overaccrual, because we were going to have to
 6    pay all that money to Tony.
 7          Q.    I understand you said you're not
 8    quite sure whether it was Finigan or Morrissey,
 9    but do you recall anything else that was said?
10          A.    I don't think so, no.
11          MR. ROGERS:  Let me mark as
12          Defendants' Exhibit 24 a document that
13          plaintiff produced that bears plaintiff's
14          production numbers 6 and 7.  I hand a copy
15          to counsel.
16          (Defendants' Exhibit 24, AIG Trading
17          Group, Inc.'s trading summary for the month
18          ended May 31, 2003, Bates stamped
19          000006-000007, marked for identification,
20          as of this date.)
21          Q.    What is Defendants' Deposition
22    Exhibit 24?
23          A.    It looks like one of the standard
24    reports written out of the accounting system
25    used by AIG Trading.
```

```
 1                    R. Feilbogen

 2        Q.    How did you get it?

 3        A.    It was given to me by Paul Gentile.

 4        Q.    Did you ask Paul Gentile for it?

 5        A.    Yes, I did.

 6        Q.    There is date stamped on the upper

 7   left-hand side of the first page, it looks like,

 8   "July 2, '03 10:54 a.m."

 9             Is that consistent with your

10   recollection of when you asked Mr. Gentile for

11   this document, namely July 2 or so?

12        A.    No.

13        Q.    When did you ask Mr. Gentile for this

14   document?

15        A.    Sometime towards the end of June.

16        Q.    Why did you ask Mr. Gentile for this

17   document?

18        A.    After I had a very disturbing

19   conversation with John Finigan in response to an

20   e-mail I wrote him, asking him whether or not he

21   had conveyed the guarantee that he had made me

22   to AIG Financial Products and he told me during

23   that conversation that he had not made me that

24   promise and told me that under no circumstances

25   should I tell anybody at AIG Financial Products
```

```
 1                    R. Feilbogen

 2     that that promise had been made to me, I was

 3     very alarmed.

 4                    It wasn't immediately after we had

 5     that conversation, but within a day of that

 6     conversation, I asked Paul if he had any records

 7     of my guarantee, and he provided me with a few

 8     documents.

 9          Q.    Do you remember where Mr. Gentile was

10     when he gave you those documents?

11          A.    I believe he, and I can't remember if

12     Brian was there or not, gave me those documents

13     in the parking lot outside of Greenwich Plaza in

14     Greenwich, Connecticut.

15          Q.    So you called and asked Mr. Gentile

16     for the documents and asked him to come down and

17     give them to you at the parking lot?

18          A.    Yes.

19                    MR. ROGERS:  I am going to mark this

20               document, which bears plaintiff's

21               production number 10, as Defendants'

22               Deposition Exhibit 25.

23                    (Defendants' Exhibit 25, Maccola

24               report, Bates stamped 000010, marked for

25               identification, as of this date.)
```

```
 1                      R. Feilbogen

 2          Q.    Is Defendants' Deposition Exhibit 25

 3     also a document that Mr. Gentile gave you in the

 4     parking lot along with Deposition Exhibit 24?

 5          A.    Yes.

 6          Q.    Is the handwriting on the document

 7     Mr. Gentile's?

 8          A.    I don't know if it's his.

 9          Q.    He gave you these documents at your

10     request?

11          A.    Actually, I had never seen this

12     document until he gave it to me.

13          Q.    But you asked him for documents

14     relating to accruals?

15          A.    I asked him specifically if he could

16     print out for me a Maccola report.

17          Q.    I'm sorry?

18          A.    Maccola was the name of the

19     accounting system that we used, and I asked him

20     specifically if he could print out a Maccola

21     report that provided some kind of detail of the

22     expenses.

23          Q.    Is the Maccola report what we see in

24     Defendants' Deposition Exhibit 24?

25          A.    Yes.
```

```
 1                    R. Feilbogen

 2         Q.    Defendants' Deposition Exhibit 24 on

 3   the second page shows a third line "guarantees."

 4   Do you see that?

 5         A.    Yes.

 6         Q.    After April, there is no number, is

 7   there, it's a zero?

 8         A.    Correct.

 9         Q.    Who was responsible for filling out

10   the Maccola report?  And by that, I mean

11   actually keeping it, not necessarily making the

12   decisions that go into it.  Who was in charge of

13   the Maccola report?

14         A.    I believe that virtually all of the

15   accountants in the accounting department had

16   access to the system or some level of access to

17   the system.

18         Q.    But it was within the accounting

19   department headed by Mr. Morrissey?

20         A.    Mr. Morrissey, yes.

21         MR. ROGERS:  I would like to have

22         marked as Defendants' Exhibit 26 a document

23         marked D 119.

24             (Defendants' Exhibit 26, June 25,

25         2003 e-mail, Bates stamped D 000119, marked
```

```
 1                    R. Feilbogen

 2          for identification, as of this date.)

 3          Q.    You testified before lunch concerning

 4     a meeting --

 5          A.    I'm sorry, I just want to go back to

 6     one thing.

 7          Q.    There is no question pending.  I want

 8     to go forward and get as much as I can out of

 9     this day.

10               You testified before lunch that you

11     were present when Mr. Finigan and Mr. Morrissey

12     were in Mr. Finigan's office and there was a

13     discussion about accruals.

14          A.    Yes.

15          Q.    You testified as to your recollection

16     about what Mr. Finigan said concerning accrual

17     for a bonus for you in 2003.

18               MS. VLADECK:  Objection to form.

19          Q.    Let me ask you what your recollection

20     is as to the specific words Mr. Finigan uttered

21     concerning accruals.

22               MS. VLADECK:  Objection to form.

23          A.    I can't quote him specifically.  I

24     can't quote him specifically.

25          Q.    Is it your testimony here that he
```

```
  1                    R. Feilbogen
  2   specifically used the word "guarantee" as
  3   opposed to referring to accruals for bonuses?
  4             MS. VLADECK:  Objection to form.
  5        A.    Is it my testimony -- can you repeat
  6   it again.
  7        Q.    Yes.  In the meeting that you earlier
  8   testified about -- let me take it back another
  9   way, because it has been awhile since you
 10   testified to it.
 11             What do you recall was said about
 12   accruals in May or June of 2003 in the
 13   conversation you previously testified you were
 14   present for?
 15             MS. VLADECK:  Objection to form.
 16        A.    The conversation that we were talking
 17   about didn't occur in May or June.  We talked
 18   about a conversation that occurred earlier than
 19   May or June.
 20        Q.    I will try to cut through this,
 21   because we've got a record, and I don't want to
 22   waste anybody's time.
 23             You discussed that in '02, in July or
 24   August, that time frame -- and the record
 25   reflects what it is, I am not asking you to
```

```
 1                    R. Feilbogen

 2      agree with the date now -- there was a

 3      conversation where Mr. Finigan, you say, made

 4      certain commitments to you about your '03

 5      compensation.

 6           A.    Yes.

 7           Q.    That's not what I'm referring to.

 8           A.    Okay.

 9           Q.    You then later said, when I asked you

10      about any other conversations with Mr. Finigan,

11      that you were present when Mr. Finigan,

12      Mr. Morrissey and you were together when the

13      subject of accrual for bonuses came up.

14           A.    Yes.

15           Q.    What do you remember as to the date

16      of that conversation and exactly what was said?

17           A.    There were a series of conversations

18      that were taking place from February onward

19      where we talked about accruals for a number of

20      different types of expenses.

21                 The people you mentioned, we were

22      sometimes all together, not always all together.

23      In those meetings, we talked about whether or

24      not we should be accruing -- whether or not we

25      should be increasing the overall general fund
```

```
 1                    R. Feilbogen

 2      accrual for new nonproduction people that we

 3      were hiring into the company, because our run

 4      rate vis-a-vis 2002 may not be adequate; we

 5      talked about how we were going to handle the

 6      guarantees that were written for all of the new

 7      employees that were being hired that were front

 8      office type of people; and discussed whether or

 9      not we would be accruing for that as an expense

10      item, as had been done -- not that it had been

11      done, but there were some similar types of

12      issues in the foreign exchange department in the

13      previous year.

14              So there was question and

15      conversation regarding how those guarantees

16      would be handled, those types of guarantees,

17      would they be expense or would we deal with them

18      at the end of the year; and there was a

19      discussion about how he was going to handle Tony

20      and how he was going to handle myself in terms

21      of how we were getting paid.

22          Q.    What discussion do you recall

23      regarding the topic of accrual regarding Gordon

24      and yourself?

25          A.    I do remember John saying that he
```

```
 1                    R. Feilbogen

 2    only wanted to accrue our guarantees, meaning

 3    Tony and myself, as an expense item for the time

 4    being, and that we would address the other

 5    guarantees at another time.

 6         Q.   What other guarantees?

 7         A.   The other written guarantees for the

 8    new front office energy employees that had been

 9    hired.

10         Q.   When was the conversation that you

11    just described with Mr. Finigan where he is

12    talking about accruing yours and Gordon's?

13         A.   That was probably sometime towards

14    the -- sometimes, let's say, in the mid-March to

15    mid-April time frame.

16         Q.   When that conversation took place, is

17    it your testimony that Mr. Finigan used the word

18    "guarantee" with respect to your compensation?

19         A.   That is my recollection.

20         Q.   If Mr. Finigan were to testify that

21    he never used the word "guarantee," but rather

22    did discuss accrual for bonuses generally, would

23    you say that's a lie?

24              MS. VLADECK:  Objection to form.

25         A.   Could you just repeat that.
```

1                    R. Feilbogen

2              MR. ROGERS:  Could you repeat it.

3              THE COURT REPORTER:  "QUESTION:  If

4         Mr. Finigan were to testify that he never

5         used the word "guarantee," but rather did

6         discuss accrual for bonuses generally,

7         would you say that's a lie?"

8         A.    I don't mean to be difficult, but I

9    think we need to be more specific than that.  If

10   he used the word "guarantee" in what context?

11        Q.    Mr. Feilbogen, I don't want to fence

12   with you, but you just described a conversation

13   you had with Mr. Finigan, you even dated it into

14   March I believe, concerning accrual with respect

15   to Mr. Gordon and you.  That's the conversation

16   I'm talking about.

17        A.    I understand that.

18        Q.    I asked you if you recalled whether

19   he used specifically the word "guarantee," and

20   you said that's your recollection, and I

21   followed up with a fairly simple question.

22              MS. VLADECK:  Objection to form,

23         objection to predicate.

24              MR. ROGERS:  And if you would like, I

25         will ask it again.

```
 1                     R. Feilbogen
 2        Q.    That is the context.
 3             MS. VLADECK:  Objection.  I don't
 4        think it's a proper question, so objection
 5        to form.
 6             MR. ROGERS:  Could you read the
 7        question again.
 8             (Record read.)
 9             THE COURT REPORTER:  "QUESTION:  If
10        Mr. Finigan were to testify that he never
11        used the word "guarantee," but rather did
12        discuss accrual for bonuses generally,
13        would you say that's a lie?"
14        A.    He used the word "guarantee" in that
15   conversation, but in the context of which you're
16   asking it, I don't know with certainty I could
17   say that was a lie.
18        Q.    Mr. Gordon did have a written
19   guarantee, did he not?
20        A.    As far as I knew, yes.
21        Q.    I would like to hand you what has
22   been marked as Defendants' Deposition Exhibit
23   26.  This is an e-mail from you to Mr. Finigan
24   on June 25, 2003.
25             You referred before lunch to an
```

```
 1                    R. Feilbogen
 2      e-mail you sent to Mr. Finigan referring to
 3      prior conversations with him about your
 4      compensation.
 5              Is this the e-mail you were referring
 6      to?
 7          A.   Yes.
 8          Q.   In the beginning of the e-mail, you
 9      say that Mr. Wayne had called you that day and
10      told you that they -- by "they" -- let me
11      withdraw that.
12              Earlier that day, Mr. Wayne had told
13      you that agreements of some sort were going to
14      be presented to the Energy Group employees who
15      were going to become FP employees?
16          A.   Yes.
17          Q.   What did Mr. Wayne tell you about
18      that?
19          A.   That was it.  He just told me that I
20      will be coming up on Friday and I'm going to
21      have letters of employment.
22          Q.   Did he also tell you that the letters
23      would reflect guarantees or deals in place?
24          A.   No.
25          Q.   Where did you get that from then when
```

```
 1                    R. Feilbogen

 2      you said in the next sentence, "These letters

 3      will apparently reflect any guarantees or deals

 4      in place"?

 5                MS. VLADECK:  Objection to form.

 6           A.    As I said earlier, I had understood

 7      through Adam DeChiera and others, and I don't

 8      remember directly who told me, that the letter,

 9      at least that Adam had received, had this

10      paragraph that alluded to -- it sort of

11      cancelled out any written or verbal guarantees

12      or agreements.  And that's what precipitated my

13      conversation with Dennis, which we talked about

14      earlier.

15           Q.    Then you say in the e-mail, "I just

16      don't want to find myself in the awkward

17      position of asking about it or informing them

18      for the first time about it on Friday."

19                Do you see that?

20           A.    Yes.

21           Q.    So it was the case that as of June

22      25th, you had never informed anybody at FP that

23      you thought you had a guarantee for your 2003

24      compensation?

25                MS. VLADECK:  Objection to form.
```

```
 1                      R. Feilbogen
 2          A.    As of June 25th, I had not talked to
 3     anyone at FP about my own economic terms with
 4     the company.
 5          Q.    Including whether or not you had a
 6     guarantee for 2003 compensation?
 7          A.    I did not talk about the economics at
 8     all.
 9          Q.    After you sent this e-mail to
10     Mr. Finigan, I believe you said he spoke to you.
11          A.    He called me.
12          Q.    Was it on the same day that you sent
13     the e-mail?  Do you recall?
14          A.    I don't recall if it was on the same
15     day or if it was the next day.
16          Q.    This was sent at 3:46 p.m.  I don't
17     know whether that helps refresh your
18     recollection whether it was that day or the next
19     day.
20          A.    I had sent this because he wasn't in
21     the office that day, but he may have come back
22     later that day.  I can't remember when he
23     responded.
24          Q.    What again did Mr. Finigan say when
25     he spoke to you?
```

```
 1                    R. Feilbogen
 2              MS. VLADECK:  Asked and answered.
 3              MR. ROGERS:  It hasn't been asked, it
 4         has been answered in an answer that might
 5         be in connection with another question.  So
 6         I want to have a question and answer here.
 7         Q.    What did Mr. Finigan say to you about
 8    the subject of the e-mail that you sent to him
 9    that's marked as Deposition Exhibit 26?
10         A.    He told me that -- he said that -- he
11    said something like I don't know what you're
12    talking about, I told you I would keep you
13    'whole,' of course I didn't tell anyone at FP
14    about it, I don't recommend you do, it's not
15    going to be good for you, they don't like deals,
16    they certainly don't like verbal deals, and I
17    strongly urge you to just forget about this and
18    move on, something to that effect.
19         Q.    Did you talk to Mr. Zampella after
20    your e-mail to Mr. Finigan?
21         A.    Yes.
22         Q.    What do you recall of that
23    conversation?
24         A.    Right after I had this conversation,
25    I called Dennis in his office, I asked him if he
```

```
 1                    R. Feilbogen

 2    was in the room when John called me, because he

 3    was on speaker box.  He said yes.  I said,

 4    Dennis, he's lying to me, you know I had a deal,

 5    you know I had a guarantee, and I just don't

 6    understand the behavior here.

 7              And he said to me, I know, I agree,

 8    just calm down, leave it to me and just relax, I

 9    will help you deal with it, something along

10    those lines.

11        Q.    What was your next conversation with

12    anyone concerning your compensation?

13        A.    The next day, I think it was the next

14    day or within a day or two of that conversation

15    I had with Dennis, he stopped by my office and

16    he popped his head in, and he said to me

17    something like I might have to name another kid

18    after him, referring back to the comment he had

19    made to me after he had played whatever role he

20    had played in the guarantee for 2002.

21        Q.    What did you understand him to mean

22    by the comment he made in June 2002 to you?

23        A.    I thought maybe he spoke to Bill

24    Dooley or maybe he spoke to someone at FP on my

25    behalf.  I tried to push a little bit, but he
```

1                    R. Feilbogen

2    just said I can't talk about it, it's just going

3    to be okay.  I said okay.  That was obviously

4    before I saw the letter.

5         Q.    When was it that you called

6    Mr. Gentile and asked for the Maccola report?

7         A.    It was around this time.  I can't

8    remember the specifics.  I'm sorry, I don't

9    remember the exact date.

10        Q.    When Mr. Gentile met you in the

11   parking lot and gave you the documents you had

12   asked him to give to you, do you recall saying

13   anything to him about your personal situation?

14   And by "personal situation," I mean your issues

15   with trading.

16        A.    I may have.

17        Q.    Do you have any recollection of what

18   you said?

19        A.    I may have said that Finigan is

20   trying to renege on the deal that he had made me

21   or I may have said he's trying to renege on the

22   guarantee.  I don't remember the exact words I

23   used, but I sort of summarized the issue.

24             MR. ROGERS:  I would like to have

25        marked as Defendants' Deposition Exhibit 27

1                    R. Feilbogen

2          a document that bears plaintiff's

3          production number 1.

4                    (Defendants' Exhibit 27, June 27,

5          2003 letter, Bates stamped 000001, marked

6          for identification, as of this date.)

7          Q.    Defendants' Deposition Exhibit 27 is

8     a copy of a letter to you from Steven Sitver

9     dated June 27, 2003.

10              Is this the letter I think you were

11    referring to a minute ago as the letter

12    constituting AIG FP's offer to you?

13         A.    Yes.

14         Q.    How did you get this; was it handed

15    to you, sent to you?

16         A.    Handed to me by Marty Wayne.

17         Q.    Where were you; in Wilton or

18    Greenwich?

19         A.    Greenwich.

20         Q.    Wayne had come down to see -- let me

21    withdraw that.

22              Had Wayne come down to give letters

23    of this sort to the various employees who were

24    going to FP?

25         A.    Yes.

```
 1                    R. Feilbogen

 2               MS. VLADECK:  Objection to form.

 3          Q.    When you met with Wayne, what do you

 4     recall him saying to you?

 5          A.    He handed me the letter, he handed me

 6     a pen, I read the letter, and I told him I

 7     couldn't sign it.

 8          Q.    Did he describe to you, either before

 9     or after the communication you just described,

10     anything about what your employment would be at

11     AIG FP?

12          A.    I think he briefly summarized the

13     first two paragraphs, saying that I would find

14     in the letter that my title would be managing

15     director, and that I would find that my base

16     salary was the same as it is at AIG Trading

17     Group, $250,000.  It wasn't a very long

18     conversation.

19          Q.    Did he discuss the level of

20     discretionary incentive compensation, namely

21     bonus, that you might reasonably expect?

22               MS. VLADECK:  Objection to form.

23          A.    No.

24          Q.    Did he say anything about potential

25     bonuses at AIG FP?
```

```
 1                    R. Feilbogen
 2        A.    Not that I recall, no.
 3        Q.    Do you recall Mr. Zampella saying to
 4   you that if you went to AIG FP, you could expect
 5   substantial bonuses or words to that effect?
 6        A.    Yes.
 7        Q.    What do you remember about what
 8   Mr. Zampella said to you?
 9        A.    Just that the organization there is
10   very small, and that they make a huge amount of
11   money, and that the pool available to pay out is
12   so substantial that most of the people there
13   make an awful lot of money.
14        Q.    After you told Mr. Wayne when he gave
15   you this letter that you were not going to sign
16   it at that time, what then happened?
17        A.    I explained to him why I wouldn't
18   sign it, and I asked him whether or not he was
19   aware or if anyone at AIG FP was aware that I
20   had a guarantee that had been conveyed to me
21   verbally by John Finigan.
22        Q.    What did he say in response to that?
23        A.    He told me no, it was the first he
24   was hearing it.  And I said, well, based on that
25   and based on what this last paragraph says here,
```

```
 1                    R. Feilbogen
 2    I don't think I can sign the letter, but I
 3    really need to think about it.  So I took the
 4    letter and I left.
 5         Q.   Did he say anything more about your
 6    decision?
 7         A.   No, he looked stunned.
 8         Q.   What was your next conversation or
 9    communication that you can recall about your
10    employment?
11         A.   I think, if I recall correctly, the
12    27th of June was a Friday, and I think we were
13    supposed to report to Wilton that Monday, so I
14    went.  I may have the dates wrong, but that's
15    more or less correct.
16         Q.   When you got to Wilton, were you
17    asked to fill out various new hire or new
18    employee-type documentation?  Let's just show
19    you the document.
20              MR. ROGERS:  Mark as Defendants' --
21         you asked for a break.  We'll mark this --
22              THE WITNESS:  Let's do this set of
23         documents and then take a break.
24              MR. ROGERS:  We are going to mark D
25         122 through D 129 as Defendants' Exhibit
```

```
 1                    R. Feilbogen
 2          28, and I will hand a copy to counsel.
 3                  (Defendants' Exhibit 28, AIG
 4          Financial Products Corp. company documents,
 5          Bates stamped D 000122-000129, marked for
 6          identification, as of this date.)
 7          Q.      Defendants' Deposition Exhibit 28 is
 8      a collection of documents.  I assume you have
 9      seen these, since we produced them and you said
10      you looked at all the produced documents.
11                  Is the handwriting on the first page
12      of the exhibit yours?
13          A.      Yes.
14          Q.      And then, if you turn to the third
15      page of the document, you signed a policy there
16      on D 124 and dated it July 1, '03.  Do you see
17      that?
18          A.      Yes.
19          Q.      Similarly, on page D 125, is that
20      your signature with the date July 1, '03?
21          A.      Yes.
22          Q.      On D 126, the acknowledgment of the
23      AIG Code of Conduct, is that your signature?
24          A.      Yes.
25          Q.      And is the other handwriting on
```

```
 1                    R. Feilbogen
 2    there, including the date of July 1, yours?
 3         A.    Yes.
 4         Q.    On D 127 toward the top, is that your
 5    signature?
 6         A.    Yes.
 7         Q.    There is other information above that
 8    with your name and address and the like.  Did
 9    you fill that out?
10         A.    Yes.
11         Q.    This actually has the date June 30,
12    2003 on it, and I am looking at D 129, which is
13    another document that has July 1.
14         A.    Yes.
15         Q.    It looks like about four out of the
16    five signatures are dated July 1, one is dated
17    June 30.
18              On or about July 1, you were in
19    Wilton and you signed these documents; is that
20    right?
21         A.    Yes.
22         Q.    What else took place on July 1?
23              MS. VLADECK:  Objection to form.
24              MR. ROGERS:  Let me withdraw that.
25         Let's take a break and I'll figure out
```

```
 1                    R. Feilbogen
 2          which day of the week it is.
 3                  THE VIDEOGRAPHER:  The time is 4:12
 4          p.m.  We're going off the record.
 5                  (Recess taken.)
 6                  THE VIDEOGRAPHER:  The time is 4:22
 7          p.m.  We're back on the record.
 8          Q.    During the break, Mr. Feilbogen, we
 9     checked a calendar and found out that June 30,
10     2003 was a Monday, July 1, 2003 was a Tuesday.
11     We've been talking about Defendants' Deposition
12     Exhibit 28, which has a variety of signatures of
13     yours, most of them dated July 1, but one of
14     which is dated June 30.
15                  Can you recall what you did at AIG FP
16     on either June 30 or July 1?
17          A.    With respect to these documents?
18          Q.    Let's start with that.
19          A.    I don't recall either which day we
20     actually -- "we" meaning the group of us who
21     came from AIG Trading Group to Financial
22     Products as a group, the Energy Group.  We all
23     went into a conference room and we were
24     presented with forms, new hire forms, all sorts
25     of information.
```

1                     R. Feilbogen

2              I asked Marty Wayne, who was present

3       at least at the beginning of that meeting, what

4       I should do, should I fill out the forms, should

5       I not fill out the forms, because there was this

6       outstanding issue that I had not signed the

7       letter.

8              He said to me why don't I fill out

9       the forms, since we had some people from FP in

10      the room who were going to explain all the

11      documents and everything, why don't you sit

12      down, fill out the forms, and we'll deal with

13      the processing at a later time.

14          Q.    Where was it that the meetings that

15      you just described took place?

16          A.    In a conference room in Wilton.

17          Q.    In Wilton?

18          A.    Yes.

19          Q.    Did the Energy Group start working in

20      Wilton the day that you all showed up and there

21      were the meetings with respect to these forms?

22          A.     Given your reference to the calendar,

23      I think we were told that the official transfer

24      date would be July 1, but everybody had showed

25      up that Monday, June 30.  So I guess there was a

1                    R. Feilbogen

2       technical thing there.

3                    Does that answer the question?

4              Q.    Yes.  Were the files and computers

5       and office paraphernalia moved from Greenwich to

6       Wilton over the weekend before?

7              A.    Computers were not moved at all.  AIG

8       FP made their own arrangement to set up desks

9       for us with phones and computers.  Some people

10      had brought some stuff over.  I don't recall how

11      the files and whatever it was got to Wilton.  I

12      know the files from my office had not been moved

13      over in preparation for going to Wilton.

14                   I had begun boxing up what I thought

15      I might want to have with me in Wilton and

16      dividing up my files to leave behind for those

17      who were staying in the trading group.

18             Q.    Who was staying in the trading group

19      that you dealt with to the extent that you had

20      files that they would need?

21             A.    I had documents relating to systems

22      development and that kind of thing that I had

23      accumulated over the years that I had left for

24      the head of systems; I had documents relating

25      to -- I think I had some documents even relating

1                         R. Feilbogen

2     to Gary Davis in the time that he was there that

3     I had set aside for Andy Kaplan; I had documents

4     relating to recruiters and I guess some rTsumTs

5     and things like that that I had aggregated over

6     time that I had put aside for Dennis, things of

7     that nature; I had a lot of filing cabinets, a

8     lot of papers.

9         Q.    Did you have files that you gave to

10    Mr. Morrissey in connection with accounting,

11    CFO-type issues?

12        A.    Yes.  I had some that were set aside

13    in a box for Brian.

14        Q.    Tell me what else you did on June 30

15    and July 1 and thereafter during that week at

16    AIG FP.

17        A.    Again, assigning dates to each

18    individual conversation and things is a little

19    difficult to recall.  But on June 30th, at some

20    point during the day, and I don't remember at

21    what time during the day, Doug Poling said he

22    wanted to have some sort of conversation with

23    me.

24              At some point during the day, I asked

25    him if he thought that was going to occur that

```
 1                     R. Feilbogen

 2      day, I specifically remember that because it

 3      happened to be my daughter's birthday, and he

 4      said he didn't think that was going to happen.

 5      So I said if it was okay with him, I would leave

 6      early that day.

 7               I came back the next day, and I

 8      believe on Tuesday mornings they hold a fairly

 9      large morning meeting, I asked what I should do,

10      I was told to sit in a conference room.

11               At some point early that week, I had

12      a video conference with Joe Cassano, and then at

13      some other point, either later that week or

14      early the next week, there was I believe a

15      second video conference.  I think that for the

16      most part sums it up.  There were times in there

17      where I was told or it was left open as to

18      whether or not I should be coming into the

19      office.

20          Q.    First of all, you said that on June

21      30 Doug Poling asked to speak with you and it

22      couldn't get done that day.

23               Had you met Doug Poling before June

24      30?

25          A.    Yes.
```

1                   R. Feilbogen

2        Q.    What meetings had you had with

3   Mr. Poling before June 30th?

4        A.    Sometime after the announcement of

5   the merger and after some meetings with Joe

6   Cassano and Steve Sitver, at some stage, we were

7   asked on more than one occasion to come to

8   Wilton for different types of meetings, and

9   that's where I had met him.

10       Q.    At those meetings, were there

11   discussions about what the Energy Group would do

12   going forward and what your role would be in it?

13       A.    At those meetings what the Energy

14   Group would do?  Not in specific terms, no.

15       Q.    What was the purpose of the meeting?

16            MS. VLADECK:   Objection to form.

17       A.    There was one meeting that was an

18   introduction to AIG FP, that was the meeting

19   where we were told in that public forum that we

20   would be reporting to Marty Wayne; there was a

21   meeting where we talked about -- "we" meaning --

22   Joe had given me a specific list of individuals

23   that should come to a meeting to talk about the

24   types of business those individuals thought they

25   might be able to do within the Energy arena or

```
 1                        R. Feilbogen

 2      had intended to do.  I think I came to one of

 3      these morning meetings prior to actually being

 4      up there on the June 30th date.  I think that

 5      probably covers it.

 6           Q.    You said that you had two video

 7      conferences with Joe Cassano.

 8           A.    It might have been more than that.

 9      I'm pretty sure it was just two.

10           Q.    Tell me what you recall of the first

11      of them.

12           A.    The first conversation on the video

13      box was in response to, I think, an e-mail that

14      I had written, where he said to me that -- I

15      think the tone of it was he was sort of

16      disappointed that I had reacted maybe in the way

17      in which I did, where he said to me that -- he

18      reiterated to me that those at AIG Financial

19      Products work on a discretionary bonus basis; he

20      talked about wanting me on the team; that

21      signing the letter and the state that it was in

22      were the terms under which -- were the only

23      terms under which I could become an employee.

24           Q.    What did you do after that

25      conversation?
```

```
 1                    R. Feilbogen
 2          A.    Well, what did I do right after that?
 3     I went home.
 4          Q.    With respect to your --
 5          A.    How did I respond?
 6          Q.    Yes.
 7          A.    I told him that I very much wanted to
 8     be a part of AIG Financial Products; I told him
 9     that the issue at hand here, in my view, is a
10     matter of principle; that John Finigan had made
11     me a promise and that AIG had made me a promise;
12     that while I understand what he's saying and I
13     would take that under consideration, I felt that
14     by signing the letter in the current form it was
15     in, I was foregoing something that I wasn't
16     prepared to forego; but yet I had been at AIG
17     for a very long time, I was very emotionally
18     attached to the company.
19               I listened very carefully to what he
20     had to say to me and tried very hard to see if I
21     could go over those issues and told him I needed
22     some time to think about it.
23          Q.    Did you meet with Doug Poling on July
24     1 as you had discussed possibly doing so on June
25     30th?
```

```
1                 R. Feilbogen

2         A.    I may have.  Honestly, I don't

3    recall.

4              MR. ROGERS:  I am going to mark three

5         documents as one exhibit to try to save

6         time.  The first page of it bears

7         plaintiff's production number 21, the

8         second bears plaintiff's production number

9         5, and the third is D 153.

10             MS. VLADECK:  And this is all

11        Defendants' Exhibit 29?

12             MR. ROGERS:  Correct.  And I am

13        handing a copy to counsel.

14             (Defendants' Exhibit 29, July 3, 2003

15        e-mail, July 9, 2003 letter and July 9,

16        2003 e-mail, Bates stamped 000021, 000005

17        and D 000153, marked for identification, as

18        of this date.)

19        Q.    Is the first page of Defendants'

20   Exhibit 29 an e-mail that you sent on July 3 to

21   Joe Cassano with cc's to Doug Poling and Marty

22   Wayne?

23        A.    Yes.

24        Q.    If you look at the second paragraph,

25   second sentence, it says, "Based on the
```

1                    R. Feilbogen

2    conversation we had on Tuesday, July 1."

3                    Was your video conference with

4    Mr. Cassano on July 1?

5         A.    It must have been.

6         Q.    Then you wrote this e-mail, which is

7    the first page of Defendants' Deposition Exhibit

8    29, on July 3 to Mr. Cassano, correct?

9         A.    Correct.

10        Q.    July 4th at least was a holiday, that

11   would have been Friday.

12        A.    Friday.

13        Q.    Looking at the second page of Exhibit

14   29, this is a letter that you got from

15   Mr. Cassano dated July 9 in response to your

16   e-mail; is that correct?

17        A.    Yes.

18        Q.    Then the third page of the exhibit is

19   an e-mail from you to Mr. Cassano, also dated

20   July 9 at 2:11 p.m., referring to a video

21   conference that day.

22                   Can you tell me what took place

23   during the video conference on July 9 with

24   Mr. Cassano and whether there was anyone else

25   participating in it?

```
 1                    R. Feilbogen

 2          A.    Doug Poling and Marty Wayne, I

 3     believe, were in the room.

 4          Q.    Mr. Cassano would have been in

 5     London?

 6          A.    Yes.  He was on the video box.  You

 7     want me to tell you about --

 8          Q.    First of all, did you come to AIG FP

 9     on Monday, July 7 and Tuesday July 8?

10          A.    I think I did, I think I did.  I

11     don't know if I came both of those days.  I

12     don't recall exactly.

13          Q.    What do you recall about what was

14     said in the video conference on July 9th with

15     Mr. Cassano?

16          A.    He said to me that -- he expressed

17     some level of dismay that I had responded to our

18     last video conference in writing; he said as a

19     result of that, he was forced to respond to me

20     in writing, which I suppose is the second page

21     of this document here.

22                I don't think I remember the

23     specifics of the conversation other than it

24     wasn't a very good tone, and he pretty much said

25     to me that -- I believe it was in this
```

```
 1                     R. Feilbogen

 2     conversation where -- no, I don't remember.

 3     Sorry.

 4          Q.    At the end of the e-mail that you

 5     sent on July 9 at 2:11, you say, "I will not be

 6     in and can be reached through my attorney.

 7     Please advise who my attorney should contact."

 8                    When did you first take on

 9     representation with respect to this matter?

10                    MS. VLADECK:  Objection to form.

11          A.    I don't think I know the technical

12     answer to that.

13          Q.    I am asking for a date as to when you

14     first consulted counsel concerning your claimed

15     compensation from AIG.  Let me withdraw that.

16                    When did you first consult counsel

17     concerning the disagreements you had with AIG

18     Trading and FP concerning the 2003 compensation?

19                    MS. VLADECK:  Objection to form.

20          A.    I don't recall the exact date.

21          Q.    Had you consulted with counsel as of

22     July 3 when you wrote the e-mail that's the

23     first page of Deposition Exhibit 29?

24          A.    Yes.

25          Q.    Had you consulted with counsel by
```

```
 1                    R. Feilbogen
 2    June 25 when you wrote your e-mail to John
 3    Finigan that has been marked as Deposition
 4    Exhibit 26?
 5         A.    No, I don't think so.
 6         Q.    So it was sometime between June 25
 7    and July 3 that you consulted with counsel?
 8              MS. VLADECK:  Objection to form.
 9         A.    I guess that's the date range based
10    on what you said.
11         Q.    I think you testified a little bit
12    about this, at least on the edges of this
13    subject.
14              Do you recall discussing with
15    Mr. Wayne what arrangements might be made for
16    employees who were in the Energy Group who would
17    not be transferred over to work at AIG FP?
18         A.    Could you just repeat it.
19         Q.    This is a different subject.
20         A.    It's switching gears?
21         Q.    It's switching gears.
22              Back in June, you discussed with
23    Mr. Wayne the situation of certain employees
24    whose employment was not going to continue as a
25    result of the transfer of Energy to AIG FP, did
```

1                    R. Feilbogen

2        you not?

3            A.    Yes.  He posted me on those who would

4        not be going.

5            Q.    You recall we marked an exhibit of a

6        communication you had with Mr. Sitver in that

7        regard?  It's Exhibit 21.

8            A.    Yes.

9            Q.    In Exhibit 21, which was dated June

10       17, you were suggesting that someone at FP might

11       want to interview a couple of assistants who

12       might otherwise not be retained; is that right?

13           A.    Yes.

14           Q.    Do you recall also communicating with

15       Mr. Wayne right at that same time period, namely

16       June 17 and June 18th, concerning the severance

17       arrangement that would be offered to those whose

18       employment would not continue?

19           A.    I'm sorry, did I talk to Marty Wayne

20       about the severance?

21           Q.    Yes, or communicate to him.

22           A.    Around that time, yes, we had some

23       communication about that.

24           Q.    What's your recollection of those

25       communications?

```
 1                    R. Feilbogen
 2        A.    There had been some discussion, some
 3   of which I picked up on through Dennis Zampella
 4   and Andy Kaplan, as to what was being
 5   contemplated in terms of severance for the
 6   Energy Group and for other groups, for that
 7   matter.
 8            I took the opportunity -- I took it
 9   upon myself to place a call to Marty Wayne to
10   talk to him about some thoughts I had on that
11   subject.
12        Q.    The severance arrangements you're
13   talking about is the severance for those people
14   whose employment would be lost as a result of
15   the integration of Trading with FP?
16        A.    That specific conversation was
17   specific to those individuals.
18        Q.    Did Mr. Zampella or someone else
19   inform you of what was being contemplated to
20   offer individuals whose employment was lost as a
21   result of the integration of Trading into FP?
22        A.    Dennis talked about what the practice
23   had been at AIG Trading Group and hoping that we
24   would be able to continue that practice for
25   these individuals.
```

```
 1                    R. Feilbogen
 2          Q.    What did Dennis say that the practice
 3   was that he hoped would be continued?
 4          A.    One month for each year of service.
 5               MR. ROGERS:  I am going to ask that
 6          this be marked as Defendants' Deposition
 7          Exhibit 30.  The document that's being
 8          marked bears production numbers D 500
 9          through 501.  I am handing a copy to
10          counsel.
11               (Defendants' Exhibit 30, June 17 and
12          18, 2003 e-mails, Bates stamped D
13          000500-000501, marked for identification,
14          as of this date.)
15          Q.    You have in front of you Deposition
16   Exhibit 30, do you not?
17          A.    Yes.
18          Q.    This is a combined exhibit that has
19   two e-mails that you sent separately to
20   Mr. Wayne, the one on the top on June 17, the
21   one on the 2nd on June 18, correct?
22          A.    He is cc'd on the one on the 18th.
23          Q.    You are absolutely right, sorry.
24               In the first e-mail on the first page
25   of Deposition Exhibit 30, you were discussing
```

```
 1                    R. Feilbogen
 2      the situation of two individuals whose
 3      employment was expected to be lost and then
 4      talked about other people who have been asked to
 5      relocate.
 6                    Do you see that?
 7           A.    Yes.
 8           Q.    What was the purpose of sending this
 9      e-mail?
10           A.    The purpose was I felt that somebody
11      should at least ask the question as to whether
12      or not -- to describe the context under which
13      the people had been hired, that somebody should
14      at least raise the question as to whether or not
15      the severance policy that was being contemplated
16      for this group of people was really fair.
17           Q.    The second page which you correctly
18      pointed out is your e-mail to Mr. Poling with a
19      cc to Marty Wayne describes that Marty had
20      suggested you write to Doug about that.
21           A.    Yes.
22           Q.    In both of these e-mails, you used
23      the words "severance policy," but you put the
24      word "policy" in quotes.  Why is that?
25           A.    I'm not sure I can properly
```

```
 1                    R. Feilbogen

 2       distinguish between "policy" and "practice."

 3            Q.    So it was your understanding that

 4       this is what was being contemplated with respect

 5       to the individuals who were being let go as part

 6       of the integration of FP, but otherwise did not

 7       have an understanding as to whether it was a

 8       policy or a practice?

 9                 MS. VLADECK:  Objection to form.

10            A.    No.   What I mean is that I was not

11       aware of a written policy that AIG Trading Group

12       had with respect to severance, and there was a

13       practice of paying this one month per year.

14                 So from my perspective, the intent

15       and purpose was -- to me, it effectively was a

16       policy, which is why I put it in quotes.

17                 MR. ROGERS:  I would like to have

18            this document marked as Deposition Exhibit

19            31 for defendants.  It bears production

20            numbers D 1 through 33, and I am giving a

21            copy to counsel.

22                 (Defendants' Exhibit 31, AIG Trading

23            Group Companies policy manual as of April

24            2, 1997, Bates stamped D 000001-000033,

25            marked for identification, as of this
```

```
 1                    R. Feilbogen

 2          date.)

 3          Q.    This is the AIG Trading Group policy

 4     manual, the cover page is dated April 2, 1997.

 5     Could you look to the back page of the exhibit.

 6          A.    The final page?

 7          Q.    Yes, the final page.

 8               Is this a copy of page 29 of the

 9     policy that bears your signature?

10          A.    Yes.

11               MS. VLADECK:  I am just going to

12          object.  It's not stapled.  I don't know if

13          that's the signature and that's the policy.

14          Unless you went through every page, I'm not

15          sure that's a fair question.

16               MR. ROGERS:  Let's straighten it out,

17          because I think it's pretty easily

18          straightened out.

19          Q.    Before we get to your signature page,

20     look at page 29 of the policy manual.  Are you

21     there?

22          A.    Yes.

23          Q.    That's a page that on the bottom left

24     says "Policy '97."  Do you see that?

25          A.    Yes.
```

```
  1                    R. Feilbogen

  2        Q.   It has got the page number 29 and

  3   it's blank, it doesn't have a signature.  Do you

  4   see that?

  5        A.   Yes.

  6        Q.   If you go to the last page of the

  7   document which bears production number D 33,

  8   that page is also numbered page 29, is it not?

  9        A.   Yes.

 10        Q.   And it also has "Policy '97" in the

 11   lower left-hand corner?

 12        A.   Correct.

 13        Q.   It describes at the top, "I have read

 14   the policy manual of the AIG Trading Group

 15   Companies dated April 2, 1997, which, among

 16   other things," and then it goes on, and then

 17   your signature is on this page, is it not?

 18        A.   Yes.

 19        Q.   When you signed the page that is

 20   shown as D 33 in this exhibit, did you have the

 21   policy manual that is otherwise marked as

 22   Defendants' Deposition Exhibit 31?

 23        A.   What is D 33?

 24             MS. VLADECK:  It's 29 of the

 25        document.
```

```
 1                    R. Feilbogen

 2          A.    You threw me for a loop.  Can you ask

 3     me one more time.

 4          Q.    This is a pretty simple point.  We've

 5     got here your signature page, we've got also a

 6     full copy of the policy manual.  It is correct,

 7     is it not, that you signed page 29 of the policy

 8     manual at a time when you had the rest of the

 9     policy manual in front of you?

10          A.    Yes.

11          Q.    And you had an opportunity to read it

12     before you signed page 29 of the policy manual,

13     did you not?

14          A.    Yes.

15          Q.    You mentioned that you are currently

16     employed by Sempra Energy Trading.  When did you

17     begin your employment with Sempra?

18          A.    Early September of 2003 shortly after

19     the Labor Day weekend.

20          Q.    You left FP on or about July 9th,

21     correct, AIG FP?  Let me put it this way:  If

22     you look at Exhibit 29, which is two exhibits

23     ago, on the last page of that exhibit, which

24     bears production number D 153, you say toward

25     the end of this July 9 e-mail, "I will not be in
```

```
 1                    R. Feilbogen
 2      and can be reached through my attorney."
 3                    Were you ever at AIG FP's offices on
 4      July 9, 2003?
 5           A.    No.
 6           Q.    From July 10, 2003 until you started
 7      your employment after the Labor Day weekend with
 8      Sempra, what activities were you engaged in
 9      professionally?
10           A.    Looking for a job.
11           Q.    What firms did you look for a job
12      with?
13                 MS. VLADECK:  Objection to form.
14           A.    I had a conversation with Gary Davis,
15      I had a conversation with Steve Prince and David
16      Messer.
17           Q.    Who are they?
18           A.    The chairman and president of Sempra.
19           Q.    Are you related to anybody at Sempra?
20           A.    Yes.
21           Q.    Who?
22           A.    Steve Prince.
23           Q.    What's your relationship with
24      Mr. Prince?
25           A.    He is my uncle.
```

```
 1                    R. Feilbogen
 2          Q.    What other firms did you talk to?
 3          A.    I tried touching base with several
 4     recruiters.  I think that pretty much summarizes
 5     it.
 6               MR. ROGERS:  Let's take a break.
 7               THE VIDEOGRAPHER:  The time is 4:59
 8          p.m. on July 16, 2004, and this completes
 9          tape number 3 of the videotaped deposition
10          of Mr. Robert Feilbogen.
11               (Recess taken.)
12               THE VIDEOGRAPHER:  The time is 5:07
13          p.m. on March 16, 2004.  This marks the
14          beginning of tape number 4 of the
15          videotaped deposition of Mr. Robert
16          Feilbogen.
17               MR. ROGERS:  Could you read the last
18          question and answer so I could remember
19          where we were.
20               (Record read.)
21               THE COURT REPORTER:  "QUESTION:  What
22          other firms did you talk to?
23               "ANSWER:  I tried touching base with
24          several recruiters.  I think that pretty
25          much summarizes it."
```

1                    R. Feilbogen

2        Q.    Which recruiters did you try touching

3    base with?

4        A.    I tried getting in touch with a woman

5    named Rachel Fedder, I don't know the name of

6    the firm she's with, but she's with a large

7    firm; I contacted Cromwell Partners; I guess on

8    an informal basis a guy that I know that is a

9    recruiter.  He knew that I was looking, but we

10   didn't have any serious conversations.

11       Q.    Prior to July 2003, had you ever

12   discussed with anyone at Sempra Energy Trading

13   the possibility of you working there?

14       A.    Prior to July 2003?  Yes.

15       Q.    When?

16       A.    Specifically, I can't remember, but

17   around the time that Gary Davis was preparing to

18   leave, we didn't have any specific discussions,

19   if you feel like you would like to explore some

20   opportunities here, let's sit down and talk.

21       Q.    Did you --

22             MS. VLADECK:  He is not finished.

23       A.    That was sort of an outstanding

24   offer, in the sense that if you would like to

25   open up a discussion with us, we would like to

```
 1                  R. Feilbogen
 2   spend some time talking to you about it.
 3        Q.    The statement you just referred to
 4   was essentially the substance of what Sempra was
 5   telling you?
 6        A.    Yes.
 7        Q.    What essentially is the business of
 8   Sempra Energy Trading?
 9        A.    They are in the wholesale energy
10   trading business.
11        Q.    Did you contact Sempra after July 9,
12   2003, or did someone from Sempra contact you?
13             MS. VLADECK:   Objection to form.
14        A.    I would characterize it as I
15   initiated the serious discussion.
16        Q.    Who did you have the serious
17   discussion with that resulted in your becoming
18   employed by Sempra?
19        A.    Both Steve Prince and David Messer.
20        Q.    Are Messrs. Prince and Messer located
21   at Sempra Energy's office in Connecticut?
22        A.    Yes.
23        Q.    When did you start discussing with
24   Sempra seriously the possibility of joining them
25   after July 10, 2003?
```

```
 1                    R. Feilbogen

 2              MS. VLADECK:  Objection to form.

 3         A.    I don't remember the exact date where

 4    I asked whether or not we could explore an

 5    opportunity.

 6         Q.    In July or August, did you go away on

 7    vacation?

 8         A.    Yes.

 9         Q.    For how long?

10         A.    I think I was away for approximately

11    a week in August.

12         Q.    When did you finalize an agreement to

13    go to work for Sempra?

14              MS. VLADECK:  Objection to form.

15              MR. ROGERS:  Fair enough.  Let me

16         withdraw that and start again.

17         Q.    When did you receive an offer from

18    Sempra to join that firm?

19         A.    Sometime before I went on vacation.

20         Q.    Do you recall when in August you went

21    on vacation?

22         A.    I believe we were gone the week

23    before Labor Day.  I don't recall the exact

24    dates, but I do recall being home a few days

25    prior to Labor Day with my kids before they
```

```
 1                    R. Feilbogen

 2      started school.

 3           Q.    Did Sempra give you an offer letter

 4      describing the terms of your employment?

 5           A.    No.

 6           Q.    Did Sempra give you any documentation

 7      between the time you received an offer and the

 8      time you accepted it confirming the offer?

 9           A.    No.

10           Q.    What were the terms of your

11      employment that you accepted when you went to

12      Sempra?

13           A.    Meaning the economics, or meaning

14      the --

15           Q.    I will start with the economics and

16      then the title.  Start with the economics.

17           A.    The economics was that I would come

18      on with a base salary of $240,000; that I

19      would -- my guarantee for the balance of 2003

20      was $250,000; and that the minimum guarantee for

21      2004 would be $500,000 bonus.

22           Q.    Is the actual amount of your bonus

23      for 2004 driven by a formula concerning

24      revenues, or is it more discretionary?

25                 MS. VLADECK:  Objection to form.
```

```
1                        R. Feilbogen
2         A.    I am subject to a discretionary
3    bonus.
4         Q.    The guarantee for the balance of '03
5    that you described and minimum guarantee for
6    '04, do you have any writing that reflects those
7    guarantees?
8         A.    I do not have any writing, no.
9         Q.    Your counsel produced to us a
10   document that contains production number 23 from
11   plaintiff.  It's a November 21 to whom it may
12   concern letter.
13              What were the circumstances under
14   which that was produced; did you ask for that?
15        A.    Similar to a letter that Dennis wrote
16   for me, I was trying to put together the
17   financing for the house for the move that we had
18   talked about earlier.  So I needed to have the
19   letter in order to secure the financing.
20        Q.    Are you aware of any document signed
21   on behalf of Sempra, other than the document we
22   just talked about, that was created for the
23   purposes you described, that reflects any
24   guaranteed compensation for you?
25        A.    Other than that letter, that is the
```

```
 1                    R. Feilbogen

 2      only document I have seen that refers to or

 3      describes the compensation agreement I have.

 4           Q.    Who did you make the agreement with

 5      orally?

 6           A.    David Messer.

 7           Q.    What is Mr. Messer's position?

 8           A.    He is president of the company.

 9           Q.    What is your title and role at the

10      company?

11           A.    I understand my title to be the chief

12      operating officer; however, that is not a title

13      that has been made public to the employees of

14      Sempra as of today.

15           Q.    What are your functions at Sempra?

16           A.    I am responsible for the technology

17      department, which includes system development,

18      hardware, communications and alike, similar to

19      what I was responsible for at AIG; I am

20      responsible for operations; I am responsible for

21      what they call the middle office and for risk

22      infrastructure, which the parallel to that at

23      AIG would have been the risk management group.

24      I think that pretty much summarizes it.

25           Q.    Approximately how many employees are
```

```
 1                    R. Feilbogen

 2      employed by Sempra Energy Trading?

 3           A.    Approximately 650.

 4           Q.    Are they all based in Connecticut?

 5           A.    No.

 6           Q.    In your office, when you describe the

 7      technology and the operations work that you do,

 8      approximately how many employees are you

 9      responsible for?

10                 MS. VLADECK:   Objection to form.

11           A.    To put it in the right zone, I would

12      say the number is probably 175ish people.

13           Q.    By comparison, when you were doing

14      the COO job at AIG Trading, how many people were

15      at AIG Trading in Connecticut that were involved

16      in the same sort of role?

17           A.    I'm sorry, let's back up.  When I

18      said 175 people, I don't know if you intended

19      that to be Connecticut.  I intended that number

20      to be globally.

21           Q.    Okay.

22                 MR. ROGERS:  Let's take a break.

23                 THE VIDEOGRAPHER:  The time is 5:20

24           p.m.  We're going off the record.

25                 (Discussion off the record.)
```

```
 1                    R. Feilbogen
 2              THE VIDEOGRAPHER:  The time is 5:20
 3    p.m.  We're back on the record.
 4         Q.    Let me rephrase, unless you wanted to
 5    go on.  I'm just trying to get a picture of the
 6    size of the operations that you are dealing with
 7    now at Sempra compared to the size of the
 8    operations you were dealing with at AIG Trading
 9    when you were a COO.
10         A.    The total number of employees at AIG
11    Trading Group was 350, which is comparable to
12    the 650 or approximately 650 at Sempra; the
13    number of people that I was responsible for was
14    a bit larger number at AIG than it currently is
15    at Sempra.
16         Q.    Did you have any e-mail
17    communications with Sempra concerning your
18    employment while you were negotiating your
19    employment with them?
20         A.    I don't think so.
21         Q.    Were your communications with them
22    concerning the terms of your employment by
23    telephone or in person?
24         A.    Both.
25         Q.    Who did you deal with in negotiating
```

```
 1                    R. Feilbogen
 2    the terms of your employment?
 3         A.    The terms of the employment were
 4    presented to me by David Messer.
 5         Q.    Was there anyone else at Sempra
 6    who discussed with you the terms of your
 7    employment?
 8         A.    When I got there, Denise Freda was
 9    the head of human resources.  So when we filed
10    the paperwork, she obviously knew what the
11    compensation was.
12         Q.    Did you sign various
13    employment-related documents when you joined
14    Sempra?
15         A.    Yes.
16         Q.    Did you sign an acknowledgment of an
17    employee manual?
18         A.    They had a policy manual, I'm sure
19    they had other documents that I signed.
20         Q.    Do you keep a calendar of any sort,
21    either on your BlackBerry or computer or by old
22    technology, paper, that describes meetings and
23    communications you have with people?
24         A.    While I was an employee at AIG, I was
25    completely dependent on the calendar system that
```

1                      R. Feilbogen

2    was part of the e-mail system; and now as an

3    employee of Sempra, I am, again, completely

4    dependent on the calendar system as part of my

5    e-mail.

6        Q.    During the time period between

7    essentially July 10, 2003 and when you joined

8    Sempra, did you keep a calendar or other record

9    of your communications or appointments with

10   people?

11       A.    No.

12       Q.    If you could look at the complaint

13   which is in front of you and turn to paragraph

14   48, which is on page 8.  There is an allegation

15   that the reasonable bonus value of your work

16   services and labor rendered to AIG Trading from

17   January through June 2003 was $650,000.

18            What do you base that allegation on?

19       A.    The time period of January through

20   2003 represents half the year.  So $650,000 is

21   half the $1.3 million guarantee that Finigan

22   gave me.

23       Q.    Since July 9, 2003, have you had any

24   communications by telephone, in person, by

25   electronic means or paper or any other means

```
  1                    R. Feilbogen
  2     with Brad Klein?
  3          A.    Yes.
  4          Q.    Can you tell me what communications
  5     you've had with him?
  6          A.    Telephone and I guess in brief
  7     e-mail.
  8          Q.    What have you discussed or in the
  9     case of e-mails communicated with Mr. Klein
 10     about?
 11          A.    If I recall correctly, I think most
 12     of the e-mails were in response to I tried
 13     calling you back, but you weren't there kind of
 14     thing.  Phone conversations had to do with
 15     personal stuff.  I asked him how his new
 16     business is going.  He has inquired and had come
 17     in contact with some people that I had done some
 18     business with in the past in his new role, so he
 19     called me about some background on that.
 20          Q.    Where is he?
 21          A.    At Jeffries.  I don't know the proper
 22     name for the institution, but it's Jeffries.
 23          Q.    Have you discussed with Mr. Klein
 24     your dispute with AIG Trading and AIG FP?
 25          A.    Aside from the sort of courteous how
```

```
 1                    R. Feilbogen
 2    is the lawsuit going and the sort of one-line
 3    answer of slowly, that's not a topic that we've
 4    really spent anytime talking about.
 5         Q.    Have you discussed with Mr. Klein the
 6    possibility of his testifying on your behalf in
 7    your lawsuit?
 8         A.    I don't recall asking him that.
 9         Q.    To your knowledge, has any
10    representative of yours spoken with Mr. Klein or
11    any representative of Mr. Klein's?
12              MS. VLADECK:  I am going to direct
13         you not to answer to the extent that it
14         calls for information you got from me or
15         Karen, counsel.
16              MR. ROGERS:  I just want to clarify.
17         I'm not asking for the substance of any
18         communications.  I'm asking for the fact of
19         whether there have been any communications.
20              MS. VLADECK:  I think your question
21         has some of the substance in it, and
22         therefore, my direction stands.
23              MR. ROGERS:  I just want to be clear:
24         You are directing this witness not to
25         answer a question as to whether any
```

```
 1                    R. Feilbogen
 2          representative of his has spoken to
 3          Mr. Klein or a representative of Mr. Klein
 4          about the subject matter of this lawsuit?
 5               MS. VLADECK:  Correct, if he knows it
 6          from his lawyers.
 7          Q.    Do you accept your counsel's
 8     instructions?
 9               MS. VLADECK:  Oh, please, Ted.
10          That's not a proper question.
11          A.    Yes.
12               MR. ROGERS:  I won't debate with you.
13          It is a proper question, though.
14          Q.    Just to parse out what's left of the
15     question, since your counsel has blocked it,
16     have you spoken to any representative of
17     Mr. Klein?
18          A.    No.
19          Q.    Of your knowledge, outside of what
20     your counsel has told you, namely, for example,
21     if Mr. Klein has told you, are you aware whether
22     your representatives have spoken to any
23     representatives of Mr. Klein's or Mr. Klein
24     himself?
25          A.    I am a little confused.  I need you
```

1                    R. Feilbogen

2      to repeat that.

3            Q.     Sure.

4                 (Record read.)

5                 THE COURT REPORTER:  "QUESTION:  Of

6            your knowledge, outside of what your

7            counsel has told you, namely, for example,

8            if Mr. Klein has told you, are you aware

9            whether your representatives have spoken to

10           any representatives of Mr. Klein's or

11           Mr. Klein himself?"

12                 MR. ROGERS:  It doesn't sound very

13           good.  Let me try it again.

14           Q.     As I understand your counsel's

15      instructions, she has instructed you not to

16      answer my overall question, which is knowledge

17      you have concerning whether there have been

18      communications between your representatives and

19      Mr. Klein or his representatives, to the extent

20      that you know such information because of

21      something your counsel has told you.

22           A.     Okay.

23           Q.     Outside of that context, are you

24      aware of any communications between your

25      representatives and Mr. Klein or his

```
 1                    R. Feilbogen
 2    representatives; for example, has Mr. Klein told
 3    you that?
 4          A.    As far as I can recall, the answer is
 5    no.
 6          Q.    Has any lawyer for Mr. Klein spoken
 7    to you?
 8          A.    No.
 9          Q.    Has Mr. Klein spoken to you about the
10    lawsuit that he has pending against AIG Trading
11    and AIG Financial Products?
12          A.    Not other than I know he has a
13    lawsuit pending.  That's it.
14          Q.    Has Mr. Klein asked you whether you
15    would testify on his behalf in his lawsuit?
16          A.    I don't recall him asking me that
17    specific question.
18          Q.    Have you spoken to any person other
19    than Mr. Klein since July 9, 2003 who was
20    employed at AIG Trading, AIG FP or AIG at any
21    time during your employment with AIG Trading or
22    AIG FP?
23                MS. VLADECK:  Wait a second.  Can you
24          hear it back.  I don't think that's what
25          you want.
```

```
 1                    R. Feilbogen
 2              MR. ROGERS:  Let's hear it back.
 3         Q.    Let me try to simplify it, although I
 4    might need that question for the record.
 5              What I'm looking for, to try to save
 6    time, is a broad brush to ask since July 9th
 7    whether you have spoken to anybody who was
 8    employed by those three entities during the
 9    time that you were employed by either Trading or
10    FP.
11         A.    You are asking me if after July 9
12    have I spoken to anybody who is currently
13    employed by these three entities?
14         Q.    No.  Who has ever been at any time
15    employed by any of these entities, meaning
16    former employees or current employees.
17         A.    After July 9, have I spoken to
18    anybody who has ever been an employee of AIG
19    Trading Group, FP --
20         Q.    Or AIG.
21         A.    Yes.
22         Q.    By "ever," I mean ever during the
23    time --
24         A.    Yes.
25         Q.    Who have you spoken with?
```

```
 1                    R. Feilbogen
 2        A.    Lou Amato.
 3        Q.    Who is Lou Amato?
 4        A.    Lou Amato, I'm not sure of his title,
 5   functionally is the CIO for the financial
 6   services group at AIG.
 7        Q.    What did you speak to him about while
 8   at Sempra?
 9        A.    I had received a rTsumT of somebody
10   who had been employed by Lou's former employer,
11   so I was calling for a reference.
12        Q.    Did the subject of your current
13   lawsuit or dispute with AIG Trading and FP come
14   up?
15        A.    No.
16        Q.    I think we now got the question in
17   mind.  I would like to be clear.  Although I
18   said have you spoken to people, I would include
19   within "people" e-mails and letters if you had
20   any communication.
21              Who else have you communicated with
22   since July 9th?
23        A.    I have spoken with Vasant Shanbhogue.
24   Vasant and I spoke about, again, some of his
25   ex-colleagues in the context of my searching for
```

1                     R. Feilbogen

2       certain types of people and looking for

3       recommendations, looking for an opinion.

4            Q.    What role does Vasant Shanbhogue have

5       at AIG or did he have at AIG Trading?

6            A.    At AIG Trading or AIG Energy, he was

7       hired as our senior quantitative analyst.

8            Q.    Who else have you spoken to since

9       July 9th among the categories I've outlined?

10           A.    Phil Kassin.

11           Q.    What did you speak with Mr. Kassin

12      about?

13           A.    A personal friendly hello.  It turned

14      out he was on vacation at the same resort that I

15      was at this past February.

16           Q.    So you ran into him?

17           A.    Ran into him.  I have talked to --

18      let's put it this way:  There is somebody that

19      we had hired -- David Allen is the guy's name.

20      David Allen was an employee for OpenLink, which

21      was the system that we had purchased.

22                 Again, I spoke to David about a job I

23      had been trying to fill at Sempra, and thought

24      perhaps one or two of his former colleagues from

25      OpenLink might fit the bill.  So he helped me

```
 1                    R. Feilbogen

 2      with that.

 3                 It might make the list a lot shorter

 4      if I said I haven't talked about the lawsuit

 5      with any of these people, and there are other

 6      people that I have spoken to that I have had

 7      personal conversations with.

 8           Q.    Let me see if you can quickly run

 9      down who else you have spoken to.

10           A.    I spoke with David Frankel.

11           Q.    What role did he have?

12           A.    David was the head of operations.  I

13      spoke with, very shortly after July 9th, Andy

14      Kaplan.  We had some very brief conversations,

15      and we had a very quick hello on the phone

16      recently.

17           Q.    But there was no discussion about

18      this lawsuit or the facts underlying this

19      lawsuit, I take it.

20           A.    No.  I have spoken with Neil

21      Ferraiuolo, who is the head of systems; I have

22      spoken with Peter Galbraith.

23           Q.    What was his role?

24           A.    Peter was our head of credit.  I have

25      spoken with Daniel Greenwald; I have spoken with
```

```
 1                    R. Feilbogen

 2     people in the systems department; Sandra Marr

 3     and I had some verbal conversation and,

 4     certainly, some e-mail with respect to an

 5     inventory of document or things that I had

 6     turned back over to AIG post July 9th.  I am

 7     sure I am forgetting some names.

 8          Q.    I am just asking for your present

 9     recollection, and I appreciate that it's late.

10     I understand.

11              Other than the conversations you had

12     with Mr. Klein where you said that the subject

13     of this dispute had come up, have you discussed

14     your dispute with AIG Trading and AIG FP with

15     any current or former employee of AIG Trading or

16     AIG FP or AIG?

17          A.    Various people on this list of people

18     that we've just talked about -- I'm sorry, there

19     is another name you could add to the list, Arie

20     Dahan.

21              Quite a few of those people, one of

22     the first questions they'll ask me is how is it

23     going, but I'll just give a one-line response,

24     it's fine and not engage the conversation.

25          Q.    Have you asked any current or former
```

1                       R. Feilbogen

2      employee of AIG Trading, AIG FP or AIG to assist

3      you in any way in connection with this lawsuit,

4      to testify on your behalf or to communicate with

5      your counsel?

6               MS. VLADECK:  Objection to form.

7          A.    Clearly, my phone call to Paul

8      Gentile to ask for those documents towards

9      the end of -- I'm sorry, that wasn't the

10     lawsuit.

11         Q.    Other than your call with

12     Mr. Gentile.  I think at some point in this

13     questioning I talked about your dispute, so it's

14     appropriate you had raised that.  Other than

15     that.

16         A.    Other than that, I think the answer

17     is no.

18         Q.    I take it that you took very few

19     documents with you from AIG Trading or AIG

20     FP.

21         A.    Yes.

22         Q.    Have you produced to us every

23     document that you took with you from AIG Trading

24     or AIG FP?

25              MS. VLADECK:  Asked and answered.

1                    R. Feilbogen

2          Objection to form.

3          A.    I have given everything that I have

4     had back to AIG.

5          Q.    You mentioned that you had some

6     e-mails with Mr. Klein.  I would ask that

7     you take steps to preserve e-mails, to the

8     extent that you have them, and we'll

9     communicate with your counsel as to whether

10    there are any.

11              Do you have a W-2 from Sempra

12    now?

13         A.    Yes.

14         Q.    We'll ask for that.  I won't waste

15    your time.  I will communicate that with your

16    counsel.

17              Are you aware of any audiotapes or

18    videotapes, for that matter, or answering

19    machine tapes of people who are making

20    statements in any way related to the facts

21    underlying this lawsuit?

22         A.    Am I aware of any?

23         Q.    Yes.

24         A.    No.

25              MR. ROGERS:  Why don't we take a

```
 1                    R. Feilbogen

 2          two-minute break.  I'll consult with my

 3          colleagues.  I think we're done.

 4                  THE VIDEOGRAPHER:  The time is 5:44

 5          p.m.  We're going off the record.

 6                  (Recess taken.)

 7                  THE VIDEOGRAPHER:  The time is 5:50

 8          p.m.  We're back on the record.

 9          Q.    Mr. Feilbogen, do you keep your

10     telephone records, your telephone bills?

11          A.    No.

12          Q.    You throw them out?

13          A.    Yes.

14          Q.    Turning to your bonus arrangements at

15     Sempra now.  You've testified that for 2004

16     you've got a minimum guaranteed bonus at

17     Sempra.

18                  What is your understanding of the

19     factors that will go into the determination of

20     what bonus you actually will receive at Sempra

21     for 2004?

22          A.    It's discretionary, as I mentioned

23     earlier.  That's up to David Messer to evaluate

24     my performance and my contributions.

25                  MR. ROGERS:  I have no further
```

245

```
 1                R. Feilbogen

 2          questions.  Thank you for your time on a

 3          snowy day.

 4               MS. VLADECK:   Thank you.

 5               THE VIDEOGRAPHER:   The time is 5:51

 6          p.m. on March 16, 2004.  This completes the

 7          videotaped deposition of Mr. Robert

 8          Feilbogen.

 9               (Time noted: 5:51 p.m.)

10                    _____

11                    ROBERT FEILBOGEN

12

13

14     Subscribed and sworn to before me

15     this ____ day of _____,2004.

16

17     _____

18

19

20

21

22

23

24

25
```

```
 1
 2                    C E R T I F I C A T E
 3      STATE OF NEW YORK    )
 4                           : ss.
 5      COUNTY OF NASSAU     )
 6
 7              I, OTIS DAVIS, a Notary Public
 8         within and for the State of New York, do
 9         hereby certify:
10              That ROBERT FEILBOGEN, the witness
11         whose deposition is hereinbefore set
12         forth, was duly sworn by me and that such
13         deposition is a true record of the
14         testimony given by the witness.
15              I further certify that I am not
16         related to any of the parties to this
17         action by blood or marriage, and that I
18         am in no way interested in the outcome of
19         this matter.
20              IN WITNESS WHEREOF, I have hereunto
21         set my hand this 22nd day of March 2004.
22
23
24                         _____
25                              OTIS DAVIS
```

247

```
 1
 2     -------------------I N D E X-------------------
 3     WITNESS              EXAMINATION BY         PAGE
 4     R. FEILBOGEN         MR. ROGERS               5
 5
 6                  INFORMATION REQUESTS
 7     REQUEST:                               243
 8     DIRECTION:                             233
 9
10                      E X H I B I T S
11     Defendants' Exhibit 1, AIG Trading     27
12     Group, Inc.'s organizational chart as
13     of 12/31/02, Bates stamped D
14     000177-000179
15     Defendants' Exhibit 2, AIG Trading     32
16     Group, Inc.'s organizational chart as
17     of 1/31/03, Bates stamped D
18     000180-000182
19     Defendants' Exhibit 3, AIG Trading     33
20     Group, Inc.'s organizational chart as
21     of 2/28/03, Bates stamped D
22     000183-000185
23     Defendants' Exhibit 4, December 6,     46
24     2000 memorandum and attached
25     spreadsheet, Bates stamped 000011-000013
```

248

1

2          EXHIBITS (CONT'D)

3          Defendants' Exhibit 5, January 16,      55

4          2001 memorandum and attached

5          schedules, Bates stamped

6          000014-000020

7          Defendants' Exhibit 6, September 11,     75

8          2002 e-mail, Bates stamped D 000074

9          Defendants' Exhibit 7, September 11,     75

10         2002 letter, Bates stamped D 000186

11         Defendants' Exhibit 8, Spreadsheets,     79

12         Bates stamped D 000187-000189

13         Defendants' Exhibit 9, November 17,      83

14         2002 e-mail, Bates stamped D 000077

15         Defendants' Exhibit 10, February 7,      85

16         2003 e-mail and attached AIG Energy

17         Business Plan Discussion document

18         dated December 6, 2002, Bates stamped

19         D 000407-000458

20         Defendants' Exhibit 11, March 26,        114

21         2003 letter, Bates stamped D 000319

22         Defendants' Exhibit 12, December 4,      117

23         2002 e-mail and attached

24         spreadsheets, Bates stamped D

25         000495-000499

1

2          EXHIBITS (CONT'D)

3          Defendants' Exhibit 13, March 11,      122

4          2003 e-mail, Bates stamped D 000096

5          Defendants' Exhibit 14, March 20,      128

6          2003 e-mail and attached

7          spreadsheets, Bates stamped D

8          000489-000494

9          Defendants' Exhibit 15, April 1, 2003  136

10         e-mail, Bates stamped D 000101

11         Defendants' Exhibit 16, Series of      146

12         e-mails dated December 12 and 13,

13         2002, Bates stamped D 000078-000079

14         Defendants' Exhibit 17, May 8, 2003    148

15         e-mail and attached documents, Bates

16         stamped D 000106-000118

17         Defendants' Exhibit 18, May 5, 2003    157

18         e-mail, Bates stamped D 000104-000105

19         Defendants' Exhibit 19, June 16, 2003  163

20         e-mail with attached December 17,

21         2002 consultant contract, Bates

22         stamped D 000467-000472

23         Defendants' Exhibit 20, AIG employee   165

24         transfers as of 6/16/03, Bates

25         stamped D 000281-000282

25

250

1

2        EXHIBITS (CONT'D)

3        Defendants' Exhibit 21, June 17, 2003   166

4        e-mail, Bates stamped D 000521

5        Defendants' Exhibit 22, March 15,        169

6        2003 e-mail, Bates stamped D 000097

7        Defendants' Exhibit 23, Energy Group,    170

8        Inc.'s 2003 guarantees, Bates stamped

9        D 000162

10       Defendants' Exhibit 24, AIG Trading      175

11       Group, Inc.'s trading summary for the

12       month ended May 31, 2003, Bates

13       stamped 000006-000007

14       Defendants' Exhibit 25, Maccola          177

15       report, Bates stamped 000010

16       Defendants' Exhibit 26, June 25, 2003   179

17       e-mail, Bates stamped D 000119

18       Defendants' Exhibit 27, June 27, 2003   193

19       letter, Bates stamped 000001

20       Defendants' Exhibit 28, AIG Financial   197

21       Products Corp. Company documents,

22       Bates stamped D 000122-000129

23       Defendants' Exhibit 29, July 3, 2003    207

24       e-mail, July 9, 2003 letter and July

24       9, 2003 e-mail, Bates stamped 000021,

25       000005 and D 000153

251

```
 1
 2        EXHIBITS (CONT'D.)
 3        Defendants' Exhibit 30, June 17 and      214
 4        18, 2003 e-mails, Bates stamped D
 5        000500-000501
 6        Defendants' Exhibit 31, AIG Trading      216
 7        Group Companies policy manual as of
 8        April 2, 1997, Bates stamped D
 9        000001-000033
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```