UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT FEILBOGEN,

                 Plaintiff,                    3:03 Civ. 1624 (CFD)

        - against -

                                    September 10, 2004

AIG TRADING GROUP, INC. and AIG
FINANCIAL PRODUCTS CORP.,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Anne C. Vladeck (ct25285)
Karen Cacace (ct25286)
VLADECK, WALDMAN, ELIAS
 & ENGELHARD, P.C.
Attorneys for Plaintiff
1501 Broadway, Suite 800
New York, New York 10036
(212) 403-7300

Dan Young (ct17188)
WOFSEY, ROSEN, KWESKIN
 & KURIANSKY, LLP
600 Summer Street
Stamford, Connecticut
(203) 327-2300

**Oral Argument Requested**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

    A.    Feilbogen's Early Employment with AIG Trading ..................................... 2

    B.    Feilbogen's Employment as Chief Operating Officer
        of AIG Trading ....................................................................................... 3

    C.    Feilbogen's Original Guaranteed Compensation for
        2001 and 2002 ......................................................................................... 4

    D.    Feilbogen's Increased Guaranteed Compensation for 2002 ..................... 5

    E.    Feilbogen's Move to the Energy Group and His Guaranteed
        Compensation for 2003 ............................................................................ 7

    F.    Accrual of Feilbogen's 2003 Guaranteed Compensation ........................ 10

    G.    The AIG Trading and AIG-FP Merger ..................................................... 12

    H.    Feilbogen's Constructive Discharge ......................................................... 14

    I.    The Energy Group After Feilbogen's Departure ..................................... 19

    J.    AIG Trading's Severance Policy .............................................................. 20

    K.    Feilbogen's Subsequent Employment ...................................................... 20

ARGUMENT ....................................................................................................... 21

    II.    STANDARD FOR SUMMARY JUDGMENT ....................................... 21

    III.    SUMMARY JUDGMENT SHOULD BE DENIED ON
         PLAINTIFF'S BREACH OF CONTRACT CLAIM ............................... 22

    A.    Plaintiff's Breach of Contract Claim is Not Barred by
        the Statute of Frauds ............................................................................... 22

    B.    Finigan Had Authority to Bind AIG-Trading and AIG-FP
        to a Contract ........................................................................................... 26

IV.   SUMMARY JUDGMENT SHOULD BE DENIED ON
      PLAINTIFF'S WAGE CLAIM BECAUSE THE GUARANTEED
      BONUS CONSTITUTES WAGES ...................................................... 29

V.    SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S
      PROMISSORY ESTOPPEL CLAIM .................................................... 31

VI.   SUMMARY JUDGMENT SHOULD BE  DENIED ON PLAINTIFF'S
      QUANTUM  MERUIT AND UNJUST ENRICHMENT CLAIMS .................... 34

VII.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S
      CONSTRUCTIVE DISCHARGE CLAIM ......................................... 36

      A.    There Are Factual Disputes as to Whether Defendants
            Created Intolerable Working Conditions That Forced
            Plaintiff to Resign ..................................................................... 36

      B.    There Are Factual Issues as to Whether Plaintiff Is Entitled
            to Severance if He Was Constructively Discharged ................................. 39

CONCLUSION ....................................................................................... 40

## TABLE OF AUTHORITIES

### CASES

ABC Office Equip. v. Royal Consumer Bus. Prods.,
   721 F. Supp. 1557 (D.Conn. 1989) ................................................................31

Allen v. Bridgestone/Firestone, Inc.,
   81 F.3d 793 (8th Cir. 1996) ........................................................................38

Ametex Fabrics, Inc. v. Just in Materials, Inc.,
   140 F.3d 101 (2d Cir. 1998)........................................................................21

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)..................................................................................21

Belcher v. Goodway Printing & Graphics, Inc.,
   No. CV 960155524, 1997 WL. 435840 (Conn.Super. July 23, 1997)..............34

Blakeslee v. Board of Water Comm'rs of City of Hartford,
   121 Conn. 163 (1936) ................................................................................27

Brittell v. Dep't. of Correction,
   247 Conn. 148 (1998) ................................................................................38

Burkle v. Superflow Mfg. Co.,
   137 Conn. 488 (Conn. 1951)...................................................................24, 26

Butler v. Cadbury,
   No. 3:97-CV-2241, 1999 WL. 464527 (D.Conn. June 30, 1999)..............29, 30

C.R. Klewin, Inc. v. Flagship Properties, Inc.,
   220 Conn. 569 (1991) ............................................................................25, 26

C.R. Klewin, Inc.  v. Flagship Properties, Inc.,
   955 F.2d 5 (2d Cir. 1992) ...........................................................................35

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)..................................................................................21

Chertkova v. Connecticut General Life Ins., Co.,
   92 F.3d 81 (2d Cir. 1986) ...........................................................................38

Croslan v. Hous. Auth. for New Britain,
   974 F. Supp. 161 (D. Conn. 1997).................................................................33

Curry v. Burns,
   225 Conn. 782 (1993) ................................................................................24

Cweklinsky v. Mobil Chemical Co.,
    364 F.3d 68 (2d Cir. 2004)...........................................................................31

Detroit Institute of Arts Founders Society v. Rose,
    127 F. Supp. 2d 117 (D.Conn. 2001)........................................................23, 24

Diana v. Schlosser,
    20 F. Supp. 2d 348 (D.Conn. 1998)..............................................................21

Dunn v. Actmedia, Inc., No. CV 980163913,
    1998 WL. 892729 (Conn.Super. Dec. 14, 1998) ..........................................34

Finley v. Aetna Life and Casualty Co.,
    202 Conn. 190 (1987), rev'd on other grounds ............................................24

Fitzgerald v. Henderson,
    251 F.3d 345 (2d Cir. 2001)........................................................................36

Gerner v. Applied Industrial Materials Corp.,
    No. X08CV020192069, 2004 WL. 504369 (Conn.Super. Feb. 26, 2004) ......26

Howley v. Town of Stratford,
    217 F.3d 141 (2d Cir. 2000)........................................................................22

Lee v. Jenkins Bros.,
    156 F. Supp. 858 (D.Conn. 1957), aff'd 268 F.2d 357 (2d Cir. 1959).............24

Leson v. Ari of Connecticut, Inc.,
    51 F. Supp. 2d 135 (D.Conn. 1999)..............................................................38

Linker v. Kock Investments, Inc.,
    62 F. Supp. 2d 611 (D.Conn. 1999)..............................................................36

McGowan v. Admin.,
    153 Conn. 691 (1996) .................................................................................31

McKenna v. Woods,
    21 Conn. App. 528 (1990) ..........................................................................27

North Shore Bottling Co. v. C. Schmidt and Sons, Inc.,
    292 N.Y.S.2d 86 (1968)...........................................................................23, 24

Panzino v. Scott Paper Co.,
    685 F. Supp. 458 (D.N.J. 1988) ...................................................................33

Pennsylvania State Police v. Suders,
    124 S. Ct. 2342 (2004)...........................................................................36, 39

Pelton v. Olin Corp.,
    No. CV 88 0092063S, 1991 WL 14950, at *3 (Conn.Super. July 30, 1991)....31

Raskin v. Wyatt,
No. 94 CIV. 2314 (WK), 1996 WL. 175087 (S.D.N.Y. April 15, 1996), aff'd, 125
F.3d 55 (2d Cir. 1997)..................................................................................................37

Reeves v. Sanderson Plumbing Prods., Inc.,
530 U.S. 133 (2000)......................................................................................................21

Rodal v. Anesthesia Group of Onondaga, P.C.,
369 F.3d 113 (2d Cir. 2004)..........................................................................................21

Rosick v. Equipment Maintenance and Service, Inc.,
632 A.2d 1134 (Conn.App. 1993) .................................................................................34

Sadowski v. Dell Computer Corp.,
268 F. Supp. 2d 129 (D.Conn. 2003).............................................................................21

Scandura v. City of Middletown,
No. CV-01-0094798-S, 2003 LEXIS 545 (Conn.Super. Feb. 27, 2003)..........................35

Sheltry v. Unum Life Ins.  Co.,
247 F. Supp. 2d 169 (D.Conn. 2003).............................................................................28

Skold v. American Int'l Group, Inc.,
No. 96 Civ. 7137, 1999 WL. 405539 (S.D.N.Y. June 18, 1999), aff'd mem., 205
F.3d 1324 (2d Cir. 2000) ..............................................................................................36

Somerville v. Epps,
419 A.2d 909 (Conn.Super. 1980) ................................................................................35

Spence v. Maryland Casualty Co.,
995 F.2d 1147 (2d Cir. 1993).........................................................................................38

Stetson v. NYNEX Serv. Co.,
995 F.2d 355 (2d Cir. 1993)...........................................................................................38

Stewart v. Cendant Mobility Services Corp.,
267 Conn. 96 (2003) ........................................................................................32, 33, 34

Strang v. Witkowski,
138 Conn. 94 (1951) .....................................................................................................25

Taylor v. Blaylock & Partners, L.P.,
659 N.Y.S.2d 257 (1st Dep't 1997).................................................................................27

Tolbert v. Queens College,
242 F.3d 58 (2d Cir. 2001).............................................................................................21

United Coastal Industries, Inc. v. Clearheart Construction Co.,
    802 A.2d 901 (Conn.App. 2002) ...................................................................34

Weiss v. Engelhard Minerals & Chems. Corp.,
    571 F.2d 117 (2d Cir. 1978)..................................................................24, 25

Wuerth v. Schott Electronics, Inc.,
    No. CV91 036406S, 1992 WL. 65351 (Conn.Super. March 13, 1992)............31

Zaitsev v. Salomon Brothers, Inc.,
    60 F.3d 1001 (2d Cir. 1995)............................................................................25

Ziotas v. Reardon Law Firm, P.C.,
    No. 550776, 2000 WL. 170848 (Conn.Super. Oct. 23, 2000) ...........................30

## STATUTES

Conn. Gen. Stat. § 31-71a(3) (2003)...................................................................29

Conn. Gen. Stat. § 31-71(c)(2003).....................................................................29

Fed. R. Civ. P. 56(c) ..........................................................................................21

PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, plaintiff Robert Feilbogen ("plaintiff" or "Feilbogen") respectfully submits this memorandum of law in opposition to the motion for summary of judgment of defendants AIG Trading Group, Inc. ("AIG Trading") and AIG Financial Products Corp. ("AIG-FP") (collectively "defendants").

Plaintiff alleges that defendants breached a contract to pay him a guaranteed bonus for 2003, violated Connecticut Labor Law, and constructively discharged him.  In the alternative, plaintiff claims he is entitled to compensation under the theories of promissory estoppel, unjust enrichment or quantum meruit.  Defendants' motion for summary judgment must be denied as there are genuine issues of material fact with respect to each of plaintiff's claims.

Indeed, this case presents a quintessential fact issue.  Feilbogen claims that he and John Finigan ("Finigan"), the Chief Executive Officer and President of AIG Trading, entered into an oral contract guaranteeing that AIG Trading would pay Feilbogen a bonus of $1,300,000 for 2003.  Finigan admits to such a conversation, but disagrees on some of its content. Defendants, ignoring plaintiff's testimony, claim that Finigan did not enter into a contract. Whether or not a contract exists can not be decided on summary judgment and must be determined by a jury.

Similarly, Feilbogen's claim that defendants constructively discharged him turns on a factual issue.  Defendants demanded that mid-way through 2003 Feilbogen sign an agreement disavowing even his right to claim that he had been guaranteed compensation for 2003.  Whether defendants' demand created intolerable working conditions is an issue of fact that must be determined by a jury.

Rather than acknowledge that factual issues predominate in this case, defendants have moved for summary judgment, baselessly claiming that there are legal bars to each of plaintiff's claims.  None of the arguments advanced by defendants are meritorious.  Therefore, defendants' motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS[1]

A.    Feilbogen's Early Employment with AIG Trading

Feilbogen graduated from New York University in December 1989 with a Bachelor of Science in finance and international business.  (Pl. Dep. 6)  Soon after his graduation, he started working full-time for Drexel Burnham Lambert ("Drexel"), a financial services firm, in a clerical role.  (Pl. Dep. 7-8)  When Drexel dissolved in February 1990, Feilbogen went to work for AIG Trading Corp., which later became AIG Trading Group, Inc., another financial services firm.  (Pl. Dep. 8-9)  His first job at AIG Trading was a risk management position in which he aggregated market risk and presented his findings to AIG Trading's trading desk and parent company.  (Pl. Dep. 9)  In late 1990, Feilbogen began working on AIG Trading's foreign exchange desk.  (Pl. Dep. 9-10)  He initially traded Canadian dollars and then moved to the foreign exchange forwards desk as a junior trader.  (Pl. Dep. 9-10, 14)

---

[1]    Excerpts of plaintiff's deposition are referred to as "Pl. Dep. __."  Excerpts of the depositions of all other witnesses are referred to with the person's name, followed by "Dep. ___."  The complete transcripts of the depositions of plaintiff, Dennis Zampella, Brian Morrissey, Joseph Cassano, John Finigan, Paul Gentile, William Dooley, Steven Prince and David Messer are attached to the Affidavit of Michael Gifford ("Gifford Aff.") submitted with the Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem.").  The complete transcripts of the depositions of Steven Pike and Timothy Sullivan are attached to the Affidavit of Anne C. Vladeck ("Vladeck Aff.) submitted with this opposition.  The complete transcripts of the depositions of Joseph Cassano, William Dooley, and Doug Poling taken in AIG Financial Products v. Alan Chandler and Robert Feilbogen, 04 Civ. 4264 (S.D.N.Y.), are also attached to the Vladeck Aff., and are referred to as the person's name followed by "NY Dep. __."  Exhibits are cited to as either "Vladeck Aff. Ex. ___" or "Gifford Aff.  Ex. __."  The Affidavits of Robert Feilbogen ("Pl. Aff.") and Bradford Klein ("Klein Aff.") are submitted separately.

During the next few years Feilbogen's responsibilities on the trading desk increased.  (Pl. Dep. 14)  As of 1992, Feilbogen's responsibilities included quoting foreign exchange forwards, floating rate agreements, and interest rate swaps and options to AIG Trading Corp.'s customer base.  (Pl. Dep. 14)  Feilbogen remained a trader on the foreign exchange forwards desk through 1997.  (Pl. Dep. 10)

B.    Feilbogen's Employment as Chief Operating Officer of AIG Trading

In 1998, Feilbogen became the Chief of Staff for Gary Davis ("Davis"), the Chief Executive Officer of AIG Trading.  (Pl. Dep. 10)  In that position he worked with Davis on all matters related to AIG Trading.  (Pl. Dep. 14-15)  He was also responsible for the Risk Management and Accounting Groups.  (Pl. Dep. 15)  He managed these groups by overseeing the day-to-day functions of the groups, advising the groups of new transactions that were being contemplated, and coordinating the groups' efforts with American International Group, Inc. ("AIG"), the parent company of AIG Trading.  (Pl. Dep. 15-17)  In addition, Feilbogen was responsible for ensuring that the risk reports being produced by the Risk Management Group were accurate.  (Pl. Dep. 16)  He was also the spokesperson for the senior partners in the company if they wanted a transaction to be accounted for in a particular way.  (Pl. Dep. 17)  In addition, Feilbogen oversaw the process in which the daily profit and loss estimate produced by the Risk Management Group was reconciled at the end of each month by the Accounting Group. (Pl. Dep. 16-17)

In 1999, Feilbogen became the Chief Operating Officer of AIG Trading.  (Pl. Dep. 19)  Feilbogen maintained his responsibilities with respect to the Risk Management and Accounting Groups.  (Pl. Dep. 20)  He also became responsible for the Systems and Operations Groups.  (Pl. Dep. 19-20)  The functions of the Systems Group included computer systems

development, software development, maintenance of software and hardware, communications, and disaster recovery.  (Pl. Dep. 20-21)  The functions of the Operations Group included processing the transactions completed by the traders and marketers.  (Pl. Dep. 21)  This involved confirmations, invoices, and reconciliation.  (Pl. Dep. 21)  The Operations Group also included a subgroup that handled the clearing business and dealt directly with customers.  (Pl. Dep. 21)

Feilbogen's compensation for 2000 consisted of a salary of $200,000 and a bonus of $720,000.  (Pl. Dep. 40, 43-44)

C.    Feilbogen's Original Guaranteed Compensation for 2001 and 2002

In December 2000, Davis and two other senior executives left AIG Trading, and AIG Trading became a wholly-owned subsidiary of AIG.  (Pl. Dep. 22-25)  Prior to leaving AIG Trading, Davis told Feilbogen that Brad Klein ("Klein") would become the Chief Executive Officer of AIG Trading, and that Klein, Feilbogen, and three other senior executives would be responsible for managing the company.  (Pl. Dep. 47)  Feilbogen was promoted to Executive Vice President and began serving on AIG Trading's Executive Management Committee.  (Pl. Dep. 21-22)

Davis asked Feilbogen to create a spreadsheet that listed guaranteed compensation for AIG Trading employees for 2001 and 2002.  (Pl. Dep. 47)  In December 2000, Davis told Feilbogen that he would be guaranteed bonus compensation of $800,000 for 2001 and $600,000 for 2002.  (Pl. Dep. 48; Gifford Aff. Ex. 17)  Feilbogen created the spreadsheet requested by Davis, and this spreadsheet was later attached to a memorandum from Edward Matthews ("Matthews"), Senior Vice Chairman of AIG.  (Pl. Dep. 47-50)  Klein and Feilbogen discussed memorializing the guarantees in writing for each employee, but they did not do this because they were told that Matthews and William Dooley ("Dooley"), Senior Vice President of Financial

Services for AIG, preferred to keep the guarantees verbal.  (Pl. Dep. 58-59, 62-64)  None of the employees that were guaranteed compensation for 2001 and 2002 were guaranteed employment; their employment remained at-will, but if they were fired without cause during a year in which their compensation was guaranteed, they would receive the full amount of the guarantee.  (Pl. Aff. ¶ 4)

Dennis Zampella ("Zampella"), the senior manager for AIG responsible for human resources at AIG Trading, confirmed that AIG Trading did not give employees with guarantees for 2001 or 2002 anything in writing concerning their guarantees.  (Zampella Dep. 32, 75-76)  Zampella also testified that even though the employees did not have anything in writing concerning their 2001 and 2002 bonuses, he believed AIG Trading was obligated to pay the bonuses.  (Zampella Dep. 77)

In April 2001, John Finigan was hired to be the Chief Executive Officer and President of AIG Trading, and Klein became the Head of the Commodities Group.  (Pl. Dep. 25-26)  During 2001, Feilbogen worked as the Chief Operating Officer and Executive Vice President of AIG Trading reporting to Finigan.  (Pl. Aff. ¶ 5)  Feilbogen received a bonus of $800,000 in accordance with his verbal guarantee.  (Pl. Dep. 54-55)

D.    Feilbogen's Increased Guaranteed Compensation for 2002

In early 2002, Feilbogen discussed his compensation with Finigan.  (Pl. Dep. 66-67)  After having some discussions with recruiters, Feilbogen told Finigan that he understood that he could find a job outside of AIG Trading that would compensate him in the million and a half dollar range.  (Pl. Dep. 67-68)  Feilbogen also told Finigan that he had concerns about the direction AIG Trading was heading in, but that he had a strong emotional attachment to the company because he had worked there for such a long time.  (Pl. Dep. 67)  Finigan told

Feilbogen that Feilbogen was important to the company, that he needed his help to continue building the company, and that he would consider his compensation.  (Pl. Dep. 68-69)  Within a few weeks of that conversation, Finigan told Feilbogen that he would increase Feilbogen's salary for 2002 from $200,000 to $250,000 and increase his guaranteed bonus for 2002 from $600,000 to $1,300,000.   (Pl. Dep. 69-70, 78-79; Finigan Dep. 48-49)   Feilbogen understood that according to company policy, his employment could still be terminated during 2002, but if it was terminated without cause he would receive the $1,300,000 that had been guaranteed.  (Pl. Aff. ¶ 7)

Feilbogen also discussed the increase in his compensation with Zampella.  (Pl. Dep. 70-71)   Before Feilbogen learned that Finigan was going to increase his guarantee, Zampella told Feilbogen that he had a great future at the company and that Zampella was going to help Finigan figure out a way to encourage him to stay at the company.  (Pl. Dep. 70, 157) Zampella then recommended to Finigan and Dooley that Feilbogen's compensation be increased. (Zampella Dep. 83; Gifford Aff. Exs. 12, 13)  Dooley agreed with Zampella's recommendation because he had a strong belief in Feilbogen's abilities.  (Zampella Dep. 98-99, 157; Dooley Dep. 13-14)

After Finigan told Feilbogen about the increase in his guarantee for 2002, Zampella stopped by Feilbogen's office and said to Feilbogen something to the effect that "you should name your child after me because I did you a favor."  (Pl. Dep. 71; Zampella Dep. 84) Feilbogen asked Zampella if he should thank Dooley because he assumed that Dooley had played a role in the decision to give him an increase.  (Pl. Dep. 71-72)  Zampella told him that was not necessary.  (Pl. Dep. 71)

Neither Zampella nor Finigan put Feilbogen's increased guaranteed compensation for 2002 in writing.  (Zampella Dep. 87, 158; Finigan Dep. 51)  Despite the fact that the 2002 increase was not in writing, Zampella believed that Feilbogen had a right to rely on the promise that he would be paid a bonus of $1,300,000 for 2002.  (Zampella Dep. 87)  Feilbogen was paid the increase in salary for 2002 as of June or July of 2002.  (Pl. Dep. 72, 117; Zampella Dep. 87)  He was also paid the increased guarantee bonus of $1,300,000 bonus for 2002.  (Zampella Dep. 87, 159; Finigan Dep. 51)

E.      Feilbogen's Move to the Energy Group and His Guaranteed Compensation for 2003

When Finigan told Feilbogen that he would increase Feilbogen's guarantee for 2002, he also told Feilbogen that the company had an opportunity to re-enter the energy business.  (Pl. Dep. 94)  Over the next several months Finigan and Feilbogen discussed AIG Trading's potential re-entry into the energy business.  (Pl. Dep. 94)  Finigan asked Feilbogen to do some research and help him draft a memorandum explaining this possibility.  (Pl. Dep. 94)  Finigan and Feilbogen also discussed hiring someone from outside of AIG Trading to help run the energy business.  (Pl. Dep. 94-95)  Feilbogen knew that the person being hired would be guaranteed compensation for 2003.  (Pl. Dep. 99)

During the summer of 2002, Finigan and Feilbogen discussed Finigan's wish that Feilbogen work with the new energy business full time.  (Pl. Dep. 95, 109)[2]  Feilbogen told Finigan that he did not think that the energy group would produce revenue for some time, and that he was therefore very concerned about how he would get paid if he joined the energy group.

_____

[2]      Both Finigan and Dooley wanted Feilbogen to join the energy group because he had been at AIG Trading for a long time and he would be able to help the energy group organize its business.  (Dooley Dep. 21-22, 89)

(Pl. Dep. 96)  Feilbogen presented several reasons why his compensation for 2003 should be guaranteed.  Feilbogen told Finigan that Finigan was asking him to change the course of his career.  (Pl. Dep. 99)  In addition, Feilbogen said that he knew the person being hired from the outside was going to be guaranteed compensation.  (Pl. Dep. 99)  Feilbogen also told Finigan that there were a lot of issues concerning the energy business because AIG Trading had previously had a "false start" in the energy business.  (Pl. Dep. 99-100).  In addition, Feilbogen told Finigan that he needed to be sure what his compensation would be for 2003 because he was planning to buy a house in Finigan's neighborhood, and the houses were very expensive in that area.  (Pl. Dep. 96-97)  Feilbogen told Finigan that he wanted to be clear about how he was going to be compensated if he left his position as Chief Operating Officer and joined the energy group. (Pl. Dep. 95-96)

When Feilbogen initially expressed his concerns about his compensation for 2003, Finigan told Feilbogen that he would have to think about it.  (Pl. Dep. 97)  After several conversations, Finigan told Feilbogen that he understood Feilbogen's concerns and that Feilbogen would be kept "whole" for 2003.  (Pl. Dep. 97)  Feilbogen asked Finigan what he meant by being kept "whole," and Finigan responded that he would pay Feilbogen the same bonus for 2003 that he was going to get for 2002.  (Pl. Dep. 97)  Feilbogen asked Finigan if he was talking about his old guarantee of $600,000 or his new guarantee of $1,300,000, and Finigan said that he was referring to the new number, $1,300,000.  (Pl. Dep. 97)  Finigan was clear that he was promising, under no uncertain terms, to pay Feilbogen a $1,300,000 bonus for 2003 for

developing the energy business plan.  (Pl. Dep. 97)[3]  Feilbogen understood that according to company policy, his employment could still be terminated during 2003, but if it was terminated without cause he would receive the $1,300,000 that he had been guaranteed.  (Pl. Aff. ¶ 8)  After their conversation, Feilbogen thanked Finigan and said that he was looking forward to getting the business up and running.  (Pl. Dep. 97-98)

Feilbogen also discussed his 2003 compensation with Zampella.  (Pl. Dep. 100-01)  In August 2002, Feilbogen told Zampella what he and Finigan had agreed to regarding his compensation for 2003.  (Pl. Dep. 100-01)  Zampella said he already knew because Finigan had told him.  (Pl. Dep. 100-01)  Feilbogen said that he felt a lot better, that he would be comfortable buying a new house, and that he could get into the energy business with a clear mind.  (Pl. Dep. 100-01)  Zampella told him that he should feel better.  (Pl. Dep. 101)

Zampella and Finigan both admitted that a conversation between Finigan and Feilbogen concerning Feilbogen's 2003 compensation occurred.  (Zampella Dep. 14-17; Finigan Dep. 33-34)  They both confirmed that Feilbogen was concerned about how he would get paid in 2003 if he joined the energy business and that he requested a guarantee.  (Zampella Dep. 14-15, 19-20, 128; Finigan Dep. 34-36)  Zampella testified that he did not believe Feilbogen would have joined the energy group if he did not have the "ability to make good money."  (Zampella Dep. 128)  Zampella also testified that he did not believe that Feilbogen accepted the position in the energy group on the condition that he would only get paid if there was money at the end of the year.  (Zampella Dep. 137-38)  Finigan admitted that he did not expect that the energy group

---

[3]     Defendants have admitted that Finigan was the principal individual responsible for setting Feilbogen's compensation for 2003.  (Vladeck Aff. Ex. 8, Response to Interrogatory No. 1)

would yield a profit in 2003.  (Finigan Dep. 40)  Both Finigan and Zampella testified that they thought that Feilbogen was an extremely valuable member of the company.  (Zampella Dep. 18; Finigan Dep. 317)

The only difference between Zampella's and Finigan's version of the substance of this conversation and Feilbogen's is that Zampella and Finigan testified that Finigan told Feilbogen that he "would try to make him whole."  (Zampella Dep. 17; Finigan Dep. 33, 310) Finigan and Zampella both understood "make whole" to mean the same level of bonus compensation that Feilbogen received in the prior year, $1,300,000.  (Zampella Dep. 17; Finigan Dep. 33, 312)

In August or September 2002, after Finigan and Feilbogen's conversations regarding Feilbogen's 2003 compensation, AIG Trading hired Tony Gordon ("Gordon") to help run the energy business.  (Pl. Dep. 91, 95, 98)  Feilbogen and Gordon, along with other AIG Trading employees, created a business plan for the energy group.  (Dooley Dep. 19-20; Vladeck Aff. Ex. 16; Finigan Dep. 348-49)  This business plan was used for a presentation made to Dooley and others in December 2002.  (Pl. Dep. 86-89)  Dooley approved the business plan.  (Pl. Dep. 124)  Dooley also made it clear that Finigan would have to figure out how to fund the expenses, including any guaranteed compensation, that would be incurred as they built the business.  (Pl. Dep. 124-25)

F.    Accrual of Feilbogen's 2003 Guaranteed Compensation

At some point during the first quarter of 2003, Finigan and Feilbogen had several discussions concerning how to properly account for employees' compensation in the energy group.  (Pl. Dep. 102, 182-84)  They discussed whether to accrue for the compensation of the new employees being hired into the energy group and how to account for Gordon's and

Feilbogen's compensation.  (Pl. Dep. 102, 182-84)  Finigan was responsible for the accruals at AIG Trading.  (Pl. Dep. 171)  Finigan decided that the only guarantees that he wanted to accrue for as expense items were Feilbogen's and Gordon's guarantees.  (Pl. Dep. 102, 183-84)  Finigan called Brian Morrissey ("Morrissey"), Chief Financial Officer of AIG Trading, in at the end of one of these conversations and told him to accrue money to pay Feilbogen's and Gordon's guarantees for 2003.  (Pl. Dep. 102-03; Morrissey Dep. 28)

Finigan told Morrissey that AIG Trading would need $3,000,000 to pay Feilbogen's and Gordon's 2003 bonuses.  (Morrissey Dep. 39)  Morrissey understood that $1,700,000 was to pay Gordon and $1,300,00 was to pay Feilbogen.  (Morrissey Dep. 41-42) From January through April, Morrissey accrued on average $250,000 per month to pay Feilbogen's and Gordon's bonus.  (Morrissey Dep. 38-39, 57; Gifford Aff. Ex. 14; Vladeck Aff. Ex. 6)[4]  This accrual was made in a line entitled "guarantee" in AIG Trading's FRX Report, which is an extraction of information from AIG Trading's general ledger.  (Morrissey Dep. 35, 38; Gifford Aff. Ex. 14)  This accrual was also recorded in an accounting document entitled "Energy Inc. Guarantees 2003."  (Vladeck Aff. Ex. 6)  The Energy Inc. Guarantees 2003 schedule lists accruals by month of $141,666 for "Management 1" and $108,334 for "Management 2."  (Vladeck Aff. Ex. 6)  Management 1 represented Gordon and Management 2 represented Feilbogen.  (Morrissey Dep. 43)

In early 2003, due to various issues, including Gordon's interactions with other employees, he was asked to resign.  (Zampella Dep. 105; Dooley Dep. 48; Finigan Dep. 164-65,

---

[4]     Finigan did not tell Morrissey to accrue for Feilbogen's or Gordon's 2003 bonuses until February 2003.  Because Morrissey had not accrued anything for Feilbogen's or Gordon's bonuses in January 2003, he accrued $500,000 in February 2003.  (Morrissey Dep. 38-39; Gifford Aff. Ex. 14)

332)  Gordon left AIG Trading in March or April 2003.  (Pl. Dep. 113)  In May 2003, Finigan

told Morrissey to stop accruing for Feilbogen's and Gordon's 2003 bonuses.  (Morrissey Dep. 40)

Finigan told Morrissey that he could stop accruing because "we have enough."  (Morrissey Dep.

40)  At that time, AIG Trading had accrued $1,000,000 for Feilbogen's and Gordon's bonuses.

This accrual is reflected in the "guarantee" lines in AIG Trading's FRX Reports and in AIG

Trading's general ledger.  (Gifford Aff. Exs. 14, 16; Vladeck Aff. Ex. 6)

       The accounting group prepared spreadsheets that summarized the profit and loss

of the company for Finigan.  (Gentile Dep. 14)  The information contained in the spreadsheets

prepared for Finigan came from AIG Trading's general ledger.  (Gentile Dep. 15)  Finigan

reviewed accounting results, including expense accruals, on a monthly basis with Morrissey.

(Morrissey Dep. 16, 30)

G.    The AIG Trading and AIG-FP Merger

       In late 2002 or early 2003, Joseph Cassano ("Cassano"), Chief Executive Officer

of AIG-FP, Dooley, and other AIG executives began discussing integrating AIG Trading and

AIG-FP.  (Cassano Dep. 28, 37; Dooley Dep. 53-55)  In April 2003, Cassano, Dooley and M.R.

("Hank") Greenberg, Chairman and Chief Executive Officer of AIG, met with Finigan and told

him that they wanted to integrate AIG Trading and AIG-FP.  (Cassano Dep. 43-44; Vladeck Aff.

Ex. 12)  Finigan informed Feilbogen of the planned merger by telling him that he had "shocking

news."  (Pl. Dep. 134-135)  Finigan said that he had not had any idea that this was going to

happen and that he was not sure how it would all work out.  (Pl. Dep. 134-35)  He said he

thought that the energy business had peaked interest in AIG Trading.  (Pl. Dep. 134)  He also

implied that AIG-FP was going to take over AIG Trading.  (Pl. Dep. 134)

Finigan told Feilbogen that he should go to London to meet with Cassano.  (Pl. Dep. 134-35)  Feilbogen went to London and discussed AIG Trading's infrastructure with Cassano.  (Pl. Dep. 140-41)  Cassano also told Feilbogen about AIG-FP.  (Pl. Dep. 141)  They did not discuss the terms of Feilbogen's employment.  (Pl. Dep. 143)

Once he knew that AIG Trading and AIG-FP were going to merge, Finigan became concerned about his job.  (Dooley Dep. 62, 156)  Finigan wanted to remain employed with the company.  (Finigan Dep. 64)  Finigan asked Dooley if there would be a long-term position for him.  (Dooley Dep. 196)  Dooley told Finigan that Cassano would determine if there was a spot for him.  (Dooley Dep. 196-97)  Eventually Cassano determined that there would not be a position for Finigan, and Dooley and Cassano terminated Finigan's employment.  (Dooley Dep. 193-94)  They told Finigan that his employment was terminated on November 14, 2003, and he was paid a salary through May 2004.  (Finigan Dep. 6-8)

In May 2003, Cassano asked Feilbogen to provide him with the written contracts for the employees in the energy group.  (Pl. Dep. 132-33, 148-49)  Feilbogen asked the Human Resources Department to compile the contracts.  (Pl. Dep. 133, 150-51)  Feilbogen believed that Cassano was looking for information about written employment contracts given to newly hired employees in the energy group.  (Pl. Dep. 152-53)

Finigan also sent information about employee contracts to Cassano.  (Finigan Dep. 186; Vladeck Aff. Ex. 13)  The information that Finigan provided to Cassano included a document entitled "Additional Incentive Compensation."  (Vladeck Aff. Ex. 13, D001256)  This document listed compensation agreements for certain employees.  (Vladeck Aff. Ex. 13, D001256)  A different version of this document stated which of the compensation agreements were "verbal deals."  (Vladeck Aff. Ex. 14)  The document that Finigan ultimately provided to

Cassano did not indicate that any of the compensation agreements were verbal deals.  (Vladeck Aff. Ex. 13, D001256)  Finigan, and Dooley, were aware of the fact that Cassano did not like "deals" with employees at all, particularly not "verbal deals."  (Finigan Dep. 396; Dooley NY Dep. 29-32, 35)

As AIG-FP was the successor company to AIG Trading, AIG-FP had an obligation to pay any obligations that AIG Trading had assumed prior to the merger.  (Dooley Dep. 199)

H.     Feilbogen's Constructive Discharge

Feilbogen was informed at a meeting that Marty Wayne, an AIG-FP employee, would be the head of the energy group.  (Pl. Dep. 155-56)  Feilbogen asked Wayne what Feilbogen's role would be in the energy group.  (Pl. Dep. 156)  Wayne said that he had no idea. (Pl. Dep. 156, 167-68)

On June 25, 2003, Wayne told Feilbogen that AIG-FP was going to be giving employment letters to the AIG Trading employees that were transferring to AIG-FP.  (Pl. Dep. 187)  After Feilbogen learned from AIG Trading employees that the AIG-FP employment letters required employees to forego their guaranteed compensation, Feilbogen called Zampella.  (Pl. Dep. 104-05, 188)  Feilbogen asked Zampella if he thought that Finigan had told AIG-FP about Feilbogen's 2003 guarantee.  (Pl. Dep. 105)  Zampella said that he thought that Finigan was only worried about himself, and that Finigan probably had not told AIG-FP about Feilbogen's guarantee.  (Pl. Dep. 105)  Zampella said that he was aware of Feilbogen's guarantee and that Feilbogen should relax.  (Pl. Dep. 106)  Zampella suggested that Feilbogen call Finigan and talk

to him about it because it would be better if Finigan informed AIG-FP of Feilbogen's guarantee than if Feilbogen did.  (Pl. Dep. 106) [5]

Feilbogen told Zampella that AIG-FP had requested copies of all the written contracts for employees in the energy group and that Feilbogen had provided the written contracts but had not mentioned his verbal guarantee.  (Pl. Dep. 105)  Feilbogen explained to Zampella that he had not brought up his own guarantee because he did not want to appear that he was focused on himself, but rather wanted to be seen as a team player.  (Pl. Dep. 105)

Feilbogen was unable to reach Finigan by telephone so he sent an email asking if Finigan had informed AIG-FP about Feilbogen's guarantee.  (Pl. Dep. 106, 186-87; Gifford Aff. Ex. 23)  After Finigan received this email, he called Doug Poling, AIG-FP's general counsel. (Finigan Dep. 364-65)  Finigan then called Feilbogen and told him that he did not promise to make Feilbogen whole for 2003.  (Pl. Dep. 176-77, 190; Finigan Dep. 360)  Finigan said that AIG-FP did not like deals, especially verbal deals.  (Pl. Dep. 190)  Finigan urged Feilbogen not to tell anyone at AIG-FP and to forget about the promise.  (Pl. Dep. 190) [6]

After this conversation with Finigan, Feilbogen called Zampella.  (Pl. Dep. 190-91)  Zampella said he had been in the room with Finigan during this conversation.  (Pl. Dep. 190-91)  Feilbogen told Zampella that Finigan had been lying and that Zampella knew it.  (Pl.

---

[5]     Zampella testified that Feilbogen told Zampella and Finigan not to forget about his guarantee.  (Zampella Dep. 113-15, 141)  Zampella thought that if Feilbogen transferred to AIG-FP, "all bets were off."  (Zampella Dep. 116, 169)

[6]     Cassano testified that the bonuses at AIG-FP were paid on a discretionary basis. (Cassano Dep. 110)  Finigan admitted that he knew that Cassano did not like deals.  (Finigan Dep. 396)

Dep. 191)  Zampella said that he agreed with Feilbogen and that he would help Feilbogen.  (Pl. Dep. 191)

Within a few days, Zampella stopped by Feilbogen's office and said that Feilbogen might have to name another child after him.  (Pl. Dep. 191)  Feilbogen thought that Zampella had talked to Dooley or someone at AIG-FP regarding Feilbogen's guarantee.  (Pl. Dep. 191)  Zampella did not provide Feilbogen any details, but he told Feilbogen it would be okay.  (Pl. Dep. 191-92)

After his conversation with Finigan, Feilbogen asked Paul Gentile ("Gentile"), the Assistant Controller for AIG Trading, if Gentile had any records of Feilbogen's guarantee.  (Pl. Dep. 177, 192)  Feilbogen asked Gentile specifically for a Maccola report that provided detail concerning expenses.  (Pl. Dep. 178)[7]  Gentile provided Feilbogen with several accounting documents.  (Pl. Dep. 175-179)

On Friday, June 27, 2004, Wayne gave Feilbogen an AIG-FP employment letter (the "AIG-FP Employment Letter").  (Pl. Dep. 193; Gifford Aff. Ex. 24)  The AIG-FP Employment Letter provided that as of July 1, 2003, Feilbogen's employment would be transferred to AIG-FP and that Feilbogen would be a Managing Director in the Energy Group reporting to Wayne.  (Gifford Aff. Ex. 24)  It also provided that Feilbogen's base salary would be $250,000 and that he would be "eligible to be considered for discretionary incentive compensation."  (Gifford Aff. Ex. 24)  In addition, the AIG-FP Employment Letter stated that, "this letter supersedes all prior discussions, agreements and understandings of any kind and

---

[7]     Maccola was the name of AIG Trading's accounting system.  (Pl. Dep. 178)

nature between you and AIG-TG or AIG-FP regarding the terms of your employment." (Gifford Aff. Ex. 24)

Feilbogen asked Wayne if anyone at AIG-FP was aware of his guarantee, which had been verbally conveyed to him by Finigan. (Pl. Dep. 195) Wayne said he was not aware that Feilbogen had a guarantee. (Pl. Dep. 195) Feilbogen told Wayne that he did not think he could sign the letter but that he would take the letter home and think about it. (Pl. Dep. 194, 196)

On Monday, June 30, Feilbogen reported to AIG-FP's offices in Wilton, Connecticut. (Pl. Dep. 195) On Tuesday, July 1, Feilbogen had a video conference with Cassano, who was in London. (Pl. Dep. 203, 205) Cassano told Feilbogen that AIG-FP employees work on a discretionary bonus basis and that Feilbogen could only work for AIG-FP if he signed the AIG-FP Employment Letter. (Pl. Dep. 205) Feilbogen told Cassano that he wanted to be part of AIG-FP, but that if he signed the letter he would be foregoing AIG Trading's promise to pay him $1,300,000 for 2003. (Pl. Dep. 206)

On July 3, 2003, Feilbogen sent an email to Cassano which stated,

You have put me in an impossible position by asking me to sign the letter of employment and forfeiting my current guarantee with nothing in exchange to ensure my 2003 compensation. My 2003 guarantee agreed to by John Finigan was to compensate me not only for the risk of assuming a new role (transitioning from COO to partnering with Tony Gordon) but for developing and executing an energy business plan. . . . My compensation agreements in the past have never been in writing and have always been honored. While I understand that things have changed midway through the year, I have honored my end of the bargain by executing the energy business plan approved by AIG as asked of me by Bill Dooley and John Finigan. I am simply looking for AIG to honor their end of the agreement.

(Gifford Aff. Ex. 25)

Cassano wrote an email to Dooley on July 4, 2003, updating him on Feilbogen's situation.  Although Cassano had told Feilbogen he wanted him to join AIG-FP, in the email to Dooley Cassano stated, "It is the case we are ourselves are (sic) not sure of [Feilbogen's] long term prospects.  He has nothing knew (sic) or different to bring to the table." (Cassano Dep. 172; Vladeck Aff. Ex. 9)

Cassano and Feilbogen had another video conference on July 9, 2003.  (Pl. Dep. 208-09)  Cassano told Feilbogen that he was dismayed that Feilbogen had responded to their last video conference in writing, and that Cassano would have to respond to Feilbogen in writing. (Pl. Dep. 209)  Cassano sent Feilbogen a letter dated July 9, 2003, which stated that "we have discussed your position with John Finigan, among others, and it is clear that, contrary to the assertions in your e-mail, you were not given a 2003 guarantee." (Gifford Aff. Ex. 25)[8]  Cassano further stated that Feilbogen could continue his employment with AIG-FP according to the terms of the AIG-FP Employment Letter or he could resign.  (Gifford Aff. Ex. 25)  Feilbogen responded to Cassano's July 9 letter by sending him an email stating that "you have made the decision to end my employment at AIG." (Gifford Aff. Ex. 25)

Cassano testified that he asked Finigan if Finigan had guaranteed Feilbogen's compensation, and that Finigan said he had not.  (Cassano Dep. 79)  Cassano testified that if Finigan had said that he had verbally guaranteed Feilbogen $1,300,000 for 2003, AIG-FP would

---

[8]     Cassano made this statement despite the facts that, prior to Feilbogen leaving the company, noone from AIG-FP asked Zampella or anyone at AIG Trading other than Finigan if Feilbogen had a guarantee for 2003 (Zampella Dep. 185-86) and that Cassano knew that AIG Trading had accrued for Feilbogen's bonus (Cassano Dep. 60, 77).

have honored the guarantee.  (Cassano Dep. 79, 168-70)[9]  Moreover, according to Cassano, if

AIG-FP let go someone with a guarantee mid-year, AIG-FP would owe that employee the entire

amount of the guarantee.  (Cassano Dep. 67)

I.     The Energy Group After Feilbogen's Departure

According to Cassano, building a business generally takes between eighteen

months and three years.  (Cassano Dep. 102)  As of May 2004, the Energy Group at AIG-FP had

completed some small transactions.  (Cassano Dep. 100)  Cassano testified that a transaction

with El Paso Corporation ("El Paso") was suggested in the business plan that Feilbogen worked

on before leaving AIG Trading.  (Cassano Dep. 100-01)  Feilbogen had also discussed a possible

transaction with El Paso in an email to Finigan on April 22, 2003.  (Finigan Dep. 358-59;

Vladeck Aff. Ex. 15)

A large transaction with El Paso was scheduled to close in June 2004.  (Cassano

Dep. 100)  Steven Pike ("Pike") and Timothy Sullivan ("Sullivan"), structured that El Paso

transaction.  (Pike Dep. 25-49; Sullivan Dep. 18, 21-36)  Feilbogen and Gordon hired Pike and

Sullivan in early 2003.  (Pike Dep. 18-19; Sullivan Dep. 11)  Feilbogen was also involved in

reviewing the initial letter of interest sent from AIG Trading to El Paso.  (Pike Dep. 29; Sullivan

Dep. 22)  Pike and Sullivan's employment was transferred to AIG-FP in July 2003.  (Pike Dep.

21; Sullivan Dep. 14)  The proposed transaction with El Paso was revised several times.  (Pike

---

[9]     Brad Klein also told Cassano that he had a verbal contract with AIG Trading, which he
had entered into with Finigan.  (Cassano Dep. 84)  As is the case here, Finigan denied entering
into Klein's contract and Cassano refused to honor the contract.  (Cassano Dep. 84)  Klein has
also sued AIG Trading and AIG-FP, and his related case is pending before this Court.  Klein v.
AIG Trading Group, Inc. and AIG Financial Products Corp, 03 Civ. 2122.

Dep. 25-49; Sullivan Dep. 21-36)  AIG-FP projected profits of twenty percent of $230,000,000,

or $46,000,000, from the transaction that was expected to close in June 2004.  (Pike Dep. 50-51)

J.      AIG Trading's Severance Policy

AIG Trading had a policy of offering employees one month of salary per year of

service as severance.  (Pl. Dep. 213-14; Zampella Dep. 175; Vladeck Aff. Ex. 10; Finigan Dep.

254)  This practice was followed for employees who lost their job as a result of the AIG Trading

and AIG-FP merger.  (Zampella Dep. 177)[10]

K.      Feilbogen's Subsequent Employment

On July 10, 2003, Feilbogen started looking for employment.  (Pl. Dep. 220)

Feilbogen talked to recruiters, to Gary Davis, and to Steve Prince ("Prince") and David Messer

("Messer").  (Pl. Dep. 220-22)  Prince, is the Chairman and Chief Executive of Sempra Energy

Trading Corp. ("Sempra"), a wholesale energy trading business.  (Prince Dep. 9; Pl. Dep. 220,

223)  Prince is also Feilbogen's uncle.  (Pl. Dep. 220)  Messer is the President of Sempra.

(Messer Dep. 11)  Beginning at the end of 2000, Feilbogen had an outstanding offer to talk to

Sempra about possible employment.  (Pl. Dep. 222-23)

Feilbogen began working for Sempra in early September 2003.  (Pl. Dep. 219)

He became the Chief Operating Officer at Sempra.  (Pl. Dep. 227)  The terms of Feilbogen's

employment with Sempra were a base salary of $240,000, a guaranteed bonus for the remainder

of 2003 of $250,000, and a guaranteed bonus of $500,000 for 2004.  (Pl. Dep. 225)  Feilbogen's

employment contract with Sempra was not in writing.  (Pl. Dep. 225-26)

---

[10]      Zampella testified that severance was conditioned on an employee signing a release
(Zampella Dep. 188), but a memorandum describing the severance practice does not mention a
release.  (Vladeck Aff. Ex. 10)

ARGUMENT

II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is inappropriate here because defendants have failed to meet their burden of establishing the absence of any material issues of fact.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004); Sadowski v. Dell Computer Corp., 268 F. Supp.2d 129, 132 (D.Conn. 2003).  In examining the record to determine whether a genuine issue has been raised, the Court is required to resolve all ambiguities and draw all permissible inferences in the light most favorable to the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Ametex Fabrics, Inc. v. Just in Materials, Inc., 140 F.3d 101, 107 (2d Cir. 1998); Sadowski., 268 F. Supp.2d at 133.  As this Court has recognized, "The duty of a court on a motion for summary judgment is to determine whether there are any genuine issues of material fact to be resolved by trial and not to decide factual issues.  In this regard, the court's task is issue identification, not issue resolution."  Diana v. Schlosser, 20 F. Supp.2d 348, 349 (D.Conn. 1998) (quotation and citation omitted).

The Supreme Court and this Circuit have consistently held that when ruling on a motion for summary judgment, a court is required to give credence to all evidence favorable to the nonmovant and "must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000); Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001) (citations omitted).  A court may not credit the movant's evidence unless it comes from disinterested witnesses and is otherwise uncontradicted and unimpeached.  See Reeves, 530 U.S. at 151.  "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the

nonmoving party, summary judgment is improper." Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000).

When the record here is examined with all inferences drawn in plaintiff's favor, a jury could reasonably determine that defendants breached their contract to pay plaintiff a guaranteed bonus of $1,300,000 for 2003; defendants violated Connecticut Labor Law; and defendants constructively discharged plaintiff.  In the alternative, a reasonable jury could determine that plaintiff should recover under either the doctrine of promissory estoppel, quantum meruit or unjust enrichment.

III.     SUMMARY JUDGMENT SHOULD BE DENIED ON
         PLAINTIFF'S BREACH OF CONTRACT CLAIM

Defendants do not -- and can not -- dispute that there is a genuine issue of material fact as to whether Finigan guaranteed Feilbogen $1,300,000 in bonus compensation for 2003.  Instead, defendants claim that there are myriad legal bars preventing plaintiff from enforcing the guarantee.  However, none of the arguments advanced by defendants are sufficient to support their motion for summary judgment.

A.     Plaintiff's Breach of Contract Claim is Not Barred by the Statute of Frauds

Defendants claim that the oral agreement between Finigan and Feilbogen is not enforceable because it is barred by the Connecticut Statute of Frauds.  (Def. Mem. 14-18) Defendants contend that the oral agreement falls within the Statute of Frauds because it could not be performed within one year of when it was made.  (Def. Mem. 14-15)  Defendants' argument is flawed because it fails to acknowledge an essential term of the contract.  Even with the guarantee, Feilbogen's employment was still at-will.  (Pl. Aff. ¶ 8)  Defendants could have, and in fact did, terminate his employment without cause within a year of the date that the agreement

was entered into.  (Pl. Aff. ¶ 8)  Because the contract could have been performed within one year from the date it was made, it is not barred by the Statute of Frauds.  See Detroit Institute of Arts Founders Society v. Rose, 127 F. Supp.2d 117, 138 (D.Conn. 2001) (finding that a contract that could have been performed within one year did not violate the Statute of Frauds).

Plaintiff's claim here is similar to that of the plaintiff in North Shore Bottling Co. v. C. Schmidt and Sons, Inc., 292 N.Y.S.2d 86 (1968).  In  North Shore Bottling Co., the plaintiff-employee alleged an oral contract to distribute beer in New York as long as the defendant-employer distributed beer in New York.  Id. at 89.  The New York Court of Appeals, applying New York's analogous Statute of Frauds, held that the oral employment contract did not fall within the Statute of Frauds because the employer could have terminated the contract within a year of the date it was made.  Id. at 89-90.  The court found that, "Although the parties may have expected the agreement to last over a year long period, they contemplated its possible termination by action -- unquestionably with the defendant's power to take at any time -- discontinuing its beer sales in the New York area."  Id. at 90.  Accordingly, the court held the Statute of Frauds did not apply to the alleged contract.  Id.

Defendants argue that plaintiff's contract is barred by the Statute of Frauds because the parties did not expect that the 2003 bonus would be paid until late 2003 or early 2004, more than a year after the contract was entered into.  (Def. Mem. 14-15)  Defendants' argument fails to account for the possibility, which was understood by the parties as part of the contract, that if AIG Trading terminated Feilbogen's employment without cause at any time in 2003, AIG Trading was obligated to pay Feilbogen the $1,300,000 guarantee.   (Pl. Aff. ¶ 8)[11]

---

[11]     Testimony from defendants' decisionmakers make it plain that guarantees did not alter the at-will nature of the employment relationship.  (Cassano NY Dep. 24, 33, 101; Poling NY

This possibility precludes application of the Statute of Frauds.  See Detroit Institute of Arts Founders Society, 127 F. Supp.2d at 138; North Shore Bottling Co., 292 N.Y.S.2d at 89-90.

 The cases cited by defendants are inapposite because the contracts at issue could not be completed by one of the parties terminating the contract within a year.  For example, in Burkle v. Superflow Mfg. Co., 137 Conn. 488, 490 (Conn. 1951), (Def. Mem. 14), the parties agreed that for an indefinite period the plaintiff would solicit orders for plumbing items and the defendant would fill the orders.  The court found that neither party could, "at its option, bring the agreement to an end."  Id. at 496.  If one of the parties did terminate the contract, the contract would be breached, not completed.  Id.  Similarly, in Lee v. Jenkins Bros., 156 F. Supp. 858 (D.Conn. 1957), aff'd 268 F.2d 357 (2d Cir. 1959), (Def. Mem. 15), the contract at issue did not allow for termination by either party within a year.  In fact, the contract at issue in Lee, in which the employer promised to pay the employee a pension if the employee remained with the company until he turned sixty, could not have been completed until thirty years after it was made.  Id. at 861.

 Defendants' contention that this case is similar to Weiss v. Engelhard Minerals & Chems. Corp., 571 F.2d 117 (2d Cir. 1978), (Def. Mem. 15), is also meritless.  In Weiss, the oral contract for employment, which was agreed to in 1975, provided that the employee would receive one bonus in 1976 and another bonus in 1977.  Id. at 188.  The contract did not provide

---

Dep. 28)  To the extent, however, that defendants now dispute that the parties contemplated AIG Trading's termination of the contract before the end of 2003, that is a genuine issue of material fact that should be decided by a jury.  See Finley v. Aetna Life and Casualty Co., 202 Conn. 190, 199 (1987) (holding that '[i]n the absence of definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact . . . [[that must] properly . . . be determined by the jury") (citations and quotation marks omitted), rev'd on other grounds, Curry v. Burns, 225 Conn. 782 (1993).

that the employee would receive either bonus if he was discharged without cause.  Id. Consequently, the court found that because the contract could not be fully performed until the second bonus was paid in 1977, more than one year after the contract was entered into, the contract fell within the Statute of Frauds.  Id. at 119.[12]

The Statute of Frauds is also inapplicable here because plaintiff fully performed under the contract.  Feilbogen completed all his obligations under the contract until his employment was terminated without cause.  See Section VII, infra.  Where a contract has been fully performed by one party, it does not fall within the Statute of Frauds.  See Strang v. Witkowski, 138 Conn. 94, 99 (1951) (holding that contracts which "had been fully performed by the plaintiff and nothing remained to be done by the defendants except to pay the commissions earned, were not within the statute [of frauds].").

Finally, enforcing Feilbogen's contract is consistent with Connecticut's policy of taking a narrow view of the one-year provision of the Statue of Frauds.  See C.R. Klewin, Inc. v. Flagship Properties, Inc., 220 Conn. 569, 577 (1991).  In C.R. Klewin, the Supreme Court of Connecticut recognized that,

> [T]he one-year provision no longer seems to serve any purpose very well, and today its only remaining effect is arbitrarily to forestall the adjudication of possibly meritorious claims.  For this reason, the courts have for many years looked on the provision with disfavor, and have sought constructions that limited its application.

---

[12]    Similarly, in Zaitsev v. Salomon Brothers, Inc., 60 F.3d 1001, 1002 (2d Cir. 1995), (Def. Mem. 15), the plaintiff alleged a contract with his employer that spanned multiple years with a bonus to be paid at the end of each year.  The plaintiff in Zaitsev did not allege that the contract provided that the employer would have to pay the bonuses if his employment was terminated without cause.  Id.  Thus, Zaitsev is inapposite.

Id. The court also stated that "the one-year provision 'is an anachronism in modern life . . . we are not disposed to expand its destructive force.'" Id. at 582 (quoting Farmer v. Arabian American Oil., 277 F.2d 46, 51 (2d Cir. 1960)).[13] The "destructive force" of the one-year provision of the Statute of Frauds should not shield defendants from their obligation to plaintiff.[14]

B.    Finigan Had Authority to Bind AIG-Trading and AIG-FP to a Contract

Defendants' argument that Finigan did not have authority to bind AIG Trading to a contract with Feilbogen (Def. Mem. 18-19) is belied by the testimony of its own witnesses. Despite the fact that the 1997 AIG Trading Group Policy Manual states that employees are not entitled to bonuses unless the agreement is in writing (Gifford Aff. Ex. 26), Cassano testified that he would have honored an oral contract between Finigan and Feilbogen if he believed one existed. (Cassano Dep. 79, 168-70) Moreover, Feilbogen's increased guarantee for 2002 was honored even though it was not in writing. (Zampella Dep. 87) Indeed, Zampella testified that he thought Feilbogen had a right to rely on the contract even though it was not in writing. (Zampella Dep. 87)[15]

---

[13]    In C.R. Klewin, the court noted that its earlier decision in Burkle v. Superflow Mfg. Co., 137 Conn. 488, "did not purport to change the well-established rule of narrow construction of the underlying one-year provision." 220 Conn. at 581.

[14]    Defendants should also be estopped from relying on the Statute of Frauds because Finigan made a promise to Feilbogen that he had reason to believe Feilbogen would rely on, and Feilbogen relied on Finigan's promise to his detriment. See Gerner v. Applied Industrial Materials Corp., No. X08CV020192069, 2004 WL 504369, at *2 (Conn.Super. Feb. 26, 2004) (estoppel may be applied to prevent use of Statute of Frauds); Section V, infra.

[15]    Brian Morrissey, AIG Trading Chief Financial Officer, testified that he had guarantees for 2001 and 2002, but he did not have any writing regarding the guarantee. (Morrissey Dep. 50) He trusted that the guarantees would be honored. (Morrissey Dep. 65) Paul Gentile, AIG Trading's Assistant Controller, testified that he had a verbal guarantee for 2001 which was

By its conduct of honoring verbal guarantees, AIG Trading waived the provision in its policy manual requiring that guarantees of bonuses be in writing.  Indeed, it is routinely found that provisions requiring written amendments to contracts have been waived by verbal agreements.  For example, in McKenna v. Woods, 21 Conn.App. 528, 533 (1990), the defendant argued that an oral modification to the terms of sale of a house was ineffective because the original written contract required amendments to be in writing.   The court rejected the defendant's argument, holding that, "It is well settled that despite the presence of such a clause in a contract, a modification by subsequent parol agreement will be given effect."  Id.  Accord Blakeslee v. Board of Water Comm'rs of City of Hartford, 121 Conn. 163, 183 (1936) (recognizing the general rule that "despite a provision in the contract that it may not be changed except in writing, a parol agreement modifying its terms will be given effect"); Taylor v. Blaylock & Partners, L.P., 659 N.Y.S.2d 257, 258-59 (1st Dep't 1997) (recognizing that "a party to a written agreement may orally waive enforcement of one of its terms despite a provision to the contrary" and that such waiver "may be demonstrated by words or conduct, including full or partial performance and equitable estoppel").  Here, AIG Trading's practice of entering into and honoring verbal agreements concerning employee compensation modifies the requirement in its policy manual that such agreements be in writing.  To the extent that there is any factual issue as to whether AIG Trading's conduct modified the policy manual, that is a question for the jury. See McKenna, 21 Conn.App. at 533 ("contract modification is a question of fact").[16]

---

honored.  (Gentile Dep. 87-88)  In addition, AIG Trading entered into and honored verbal contracts with other employees, including Adam DeChiara and John Ofori.  (Klein Aff.  ¶ 3-6)

[16]     Zampella testified that he thought information contained in a spreadsheet constituted a written guarantee.  (Zampella Dep. 81)  There is also a genuine issue of material fact as to

Defendants' argument that Feilbogen admitted that Finigan did not have authority to guarantee Feilbogen's compensation for 2003 (Def. Mem. 18-19) is disingenuous.  Feilbogen testified that he believed either Matthews or Dooley needed to approve increases in compensation for AIG Trading employees.  (Pl. Dep. 40-41)  Thus, in 2002 when AIG Trading increased Feilbogen's guaranteed bonus compensation from $600,000 to $1,300,000, Feilbogen assumed that Dooley had approved the increase.  (Pl. Dep. 71-72)  In contrast, in 2003 Finigan did not increase Feilbogen's bonus compensation; Finigan guaranteed only that Feilbogen would receive the same compensation as the year before.  (Pl. Dep. 97-98)[17]  Thus, AIG would not need to approve Finigan's promise to pay Feilbogen the same amount in 2003 as he had been paid in 2002.

Moreover, in their responses to plaintiff's interrogatories, defendants admitted that for 2003 "the principal individual with responsibility for determining Plaintiff's compensation [] was John Finigan."  (Vladeck Aff. Ex. 8, Response to Interrogatory No. 1)  Given this admission, defendants' belated attempt to claim that Finigan did not have authority to bind AIG-Trading to a contract with Feilbogen should be rejected out of hand.  At the very least, to the extent there is any question whether Finigan, the Chief Executive Officer of AIG Trading, had actual or apparent authority to enter into contracts guaranteeing AIG Trading employees' compensation, that presents an issue of fact which should be decided by a jury.  See Sheltry v. Unum Life Ins.

---

whether the information contained in AIG Trading's accounting documents (Morrissey Dep. Ex. 2; Vladeck Aff. Ex. 6) is sufficient to constitute a written guarantee.

[17]     Even Finigan acknowledged that he used the term "make whole" when discussing Feilbogen's 2003 compensation.  (Finigan Dep. 33, 310)

<u>Co.</u>, 247 F. Supp.2d 169, 175-77 (D.Conn. 2003) (finding factual issues as to whether broker had apparent authority to act for insurer precluded summary judgment).

Finally, defendants' argument that Finigan's promise did not bind AIG-FP (Def. Mem. 19-20) is absurd.  As Dooley admitted, the successor company in a merger is obligated to pay any obligations that the individual companies assumed prior to the merger.  (Dooley Dep. 199)  Thus, if a jury determines that Finigan entered into a contract on behalf of AIG Trading to guarantee Feilbogen bonus compensation of $1,300,000 for 2003, AIG-FP, as the successor company after the merger between AIG Trading and AIG-FP, is obligated to pay the guarantee.

IV.     SUMMARY JUDGMENT SHOULD BE DENIED
        ON PLAINTIFF'S WAGE CLAIM BECAUSE THE
        <u>GUARANTEED BONUS CONSTITUTES WAGES</u>

As with plaintiff's claim for breach of contract, defendants do not argue that there are no genuine issues of material fact regarding plaintiff's claim for wages under Connecticut Labor Law.  Instead, defendants contend that Feilbogen's guaranteed bonus for 2003 does not constitute wages under the Labor Law.  (Def. Mem. 21-23)  Defendants' analysis of the applicable law is incorrect.

Under Conn. Gen. Stat. § 31-71(c)(b), "whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the next business day succeeding the date of such discharge."  Wages are defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, piece, commission or other basis of calculation."  Conn. Gen. Stat. § 31-71a(3) (2003).  A bonus may constitute wages for purposes of the statute.  <u>Butler v. Cadbury</u>, No. 3:97-CV-2241, 1999 WL 464527, at *2 (D.Conn. June 30, 1999) (holding that a "bonus may constitute a wage under section 31-71a(3)").

In <u>Butler</u>, the court noted that given "the important public policy of ensuring that employees receive wages due them . . . section 31-72 must be given a liberal construction in favor of those whom the legislature intended to benefit." <u>Id.</u> at *3 (internal quotations and citations omitted).  The court recognized that when the legislators enacted the Labor Law, they did so because "the payment of earned wages is a gut-level right that should be assured by clear, strong state statutes." <u>Id.</u> (citation omitted).

In support of their argument that Feilbogen's 2003 bonus would not constitute wages under the Labor Law, defendants rely on a case that considered a bonus that was not tied to the services rendered by the employee.  In <u>Ziotas v. Reardon Law Firm, P.C.</u>, No. 550776, 2000 WL 170848, *1 (Conn.Super. Oct. 23, 2000), the plaintiff alleged that he had an agreement with his employer for a bonus that "would reflect what a successful year" it had been for the plaintiff and the firm.  The court determined that because the bonus at issue was to be determined according to the success of all the members of the firm, it was "an arbitrary figure [] with no relation to any actual services performed by the plaintiff" and thus did not fulfill the statute's requirement of "compensation for labor or services rendered." <u>Id.</u> at 3.

<u>Ziotas</u> is inapplicable here because Feilbogen's 2003 guarantee was for a sum certain of $1,300,000, and as such is wholly distinguishable from the discretionary bonus at issue in <u>Ziotas</u>.  In addition, Feilbogen's 2003 guarantee was for the services that Feilbogen would render in 2003.  (Pl. Dep. 97)  Regardless of how AIG Trading did as a firm in 2003, Feilbogen's contract entitled to him a $1,300,000 bonus.  (Pl. Dep. 97)  The amount was agreed on because both parties determined that that was the value of the work Feilbogen would perform. Defendants' argument that because Feilbogen did not expect the energy group to realize profits in 2003 his bonus was not tied to his individual efforts is unavailing.  Feilbogen requested the

guarantee specifically because it would require great individual effort on his part to create the energy business plan and get the business up and running.  (Pl. Dep. 95-99)  He wanted to be sure that he would be compensated for these efforts even if the energy group did not realize a profit in 2003.  (Pl. Dep. 95-99; Zampella Dep. 14-15)

Accordingly, Feilbogen's 2003 bonus is exactly the type of payment that falls within the statute.  See Wuerth v. Schott Electronics, Inc., No. CV91 036406S, 1992 WL 65351, at *2 (Conn.Super. March 13, 1992) (where there was a connection between the work to be performed and the bonus to be paid, bonus constituted wages for purpose of statute). Furthermore, to the extent that there is any factual issue whether Feilbogen's 2003 bonus was compensation for his services, that issue should be decided by a jury.  See Pelton v. Olin Corp., No. CV 88 0092063S, 1991 WL 14950, at *3 (Conn.Super. July 30, 1991) (holding that whether plaintiff's bonus constituted "compensation for labor or services rendered" was a genuine issue of material fact that precluded summary judgment).[18]

## V.        SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM

In the event that plaintiff is not successful on his breach of contract claim, he has alleged an alternative claim for promissory estoppel.   In order to establish his claim for promissory estoppel, Feilbogen will have to demonstrate: (1) a clear and definite promise which AIG Trading could have reasonably expected would induce reliance, and (2) actual detrimental reliance on the alleged promise.  Cweklinsky v. Mobil Chemical Co., 364 F.3d 68, 77-78 (2d Cir.

---

[18]      The other cases cited by defendants hold that severance payments do not come within the definition of wages in the Labor Law.  See ABC Office Equip. v. Royal Consumer Bus. Prods., 721 F. Supp. 1557, 1559 (D.Conn. 1989); McGowan v. Admin., 153 Conn. 691, 693 (1996). Plaintiff has not claimed that defendants' failure to pay him severance was a violation of the Labor Law.  Therefore, these cases are inapposite.

2004); Stewart v. Cendant Mobility Services Corp., 267 Conn. 96, 104-05 (2003).  Defendants do not dispute that there are genuine issues of fact as to whether Finigan made a clear and definite promise to Feilbogen.  Defendants, however, incorrectly claim that Feilbogen can not establish that he detrimentally relied on the alleged promise by proving that he did not seek other employment because he received the guarantee for 2003 from AIG Trading.  (Def. Mem. 28-29) Defendants' argument inexplicably fails to apply controlling law.

In Stewart, the Supreme Court of Connecticut sustained a jury verdict for the plaintiff on her promissory estoppel claim.  267 Conn. at 99.  The plaintiff and her husband were both employed by the defendant until the employer fired the plaintiff's husband.  Id.  When her husband was fired, plaintiff asked her supervisor if it would affect her employment if her husband took a job with one of defendant's competitors.  Id.  Her supervisor assured her that her husband's future employment would not affect her employment.  Id. at 101.  Based on this promise, plaintiff did not pursue other employment opportunities.  Id.  After plaintiff's husband obtained employment with one of defendant's competitors, defendant fired plaintiff.  Id.

The court upheld plaintiff's jury verdict on her promissory estoppel claim, finding that there was sufficient evidence of both a clear promise and plaintiff's detrimental reliance.  Id. at 102.  Regarding plaintiff's claim that she detrimentally relied on the promise that her employment would not be affected if her husband joined one of defendant's competitors, the court held that the jury could have found that plaintiff would have been able to seek a comparable position if she tried, and that she would have tried to find a different position had she not been given the assurances by her supervisor.  Id. at 114-15.  The court held that this evidence "was sufficient to warrant the jury's finding that the plaintiff reasonably relied on [her supervisor's] representations to her financial detriment."  Id. at 115.

Defendants not only fail to cite <u>Stewart</u>, they argue a position in conflict with its holding.  Defendants contend that Feilbogen's allegation that he would have sought other employment if he had not received the guarantee for 2003 is insufficient to establish detrimental reliance.  (Def. Mem. 28-29)  The cases relied on by defendants all predate <u>Stewart</u>.  Moreover, they are factually distinguishable.

For example, <u>Panzino v. Scott Paper Co.</u>, 685 F. Supp. 458, 461 (D.N.J. 1988), involved plaintiffs who could not establish that they would have been able to obtain other employment if they sought it.   In contrast to <u>Panzino</u>, the evidence here demonstrates that plaintiff would have been able to find comparable employment had he sought it earlier in 2003.  Plaintiff had a standing offer to discuss employment with Sempra.  (Pl. Dep. 222-23)  Indeed, he was hired by Sempra soon after he sought employment there.  (Pl. Dep. 219-22)  Moreover, defendants ignore the fact that Feilbogen changed jobs within AIG Trading.  Feilbogen took the position in AIG Trading's energy group because he was guaranteed compensation for 2003.  If he had not been given the guarantee, he could have stayed in his position as Chief Operating Officer of AIG Trading and he could have attempted to negotiate a guarantee for continued work in that position. [19]

Because there are genuine issues of fact as to whether Finigan promised to pay Feilbogen $1,300,000 for 2003 and whether Feilbogen detrimentally relied on Finigan's promise,

---

[19]     <u>Croslan v. Hous. Auth. for New Britain</u>, 974 F. Supp. 161 (D. Conn. 1997), involved a public agency, which is subject to a much higher standard for estoppel.  Estoppel against a public agency may be invoked "(1) only with great caution; (2) only when the action in question has been induced an agent having authority in such matters; (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency."  <u>Id.</u> at 168.

summary judgment should be denied on plaintiff's promissory estoppel claim.  See Stewart, 267 Conn. at 99.

VI.   SUMMARY JUDGMENT SHOULD BE
      DENIED ON PLAINTIFF'S QUANTUM
      MERUIT AND UNJUST ENRICHMENT CLAIMS

In the event that plaintiff is not successful on his breach of contract claim, he has alleged alternative claims for quantum meruit and unjust enrichment.  Quantum meruit applies in the absence of an express contract where the trier of fact determines that an implied contract for services existed and the plaintiff is entitled to the reasonable value of the services rendered. United Coastal Industries, Inc. v. Clearheart Construction Co., 802 A.2d 901, 906 (Conn.App. 2002).  The doctrine of unjust enrichment applies where, although no remedy is available for breach of contract, recovery is proper because the defendant benefited from the plaintiff's work, the defendant unjustly did not pay for the benefit, and the plaintiff was harmed by the defendant's failure to pay.  Id. at 905; Dunn v. Actmedia, Inc., No. CV 980163913, 1998 WL 892729, at *4 (Conn.Super. Dec. 14, 1998); Belcher v. Goodway Printing & Graphics, Inc., No. CV 960155524, 1997 WL 435840, at *3 (Conn.Super. July 23, 1997).

Defendants contend that summary judgment should be granted on plaintiff's claims for unjust enrichment and quantum meruit because the 1997 AIG Trading Policy Manual is an express contract between the parties that requires bonus contracts to be in writing.  (Def. Mem. 30-31)  This argument fails because, at the very least, there are genuine issues of fact regarding whether defendants by their conduct waived the provision in the policy manual requiring bonus contracts to be in writing.  See supra Section III.B.[20]

---

[20]      The cases cited by defendants hold that quantum meruit and unjust enrichment claims can not be successful if an express contract has been entered into.  See Rosick v. Equipment

Defendants also claim that plaintiff's quantum meruit claim must fail because at his deposition Feilbogen testified that the basis for his $650,000 in alleged damages for this claim was that he worked half of the year, and the $650,000 represented half of his guaranteed compensation for the year.   (Def. Mem. 31-32)   As Somerville v. Epps, 419 A.2d 909 (Conn.Super. 1980), a case cited by defendants, holds, a plaintiff may recover under quantum meruit for the value of the services rendered.  This amount will be proven at trial.  The fact that Feilbogen believed that the damages were calculated as a percentage of his guarantee is immaterial.

Defendants' contention that plaintiff is not entitled to any damages under the theory of unjust enrichment because the energy group was not profitable in 2003 is also inappropriate for summary judgment.  Feilbogen completed substantial work for AIG Trading in 2003 by creating the business plan and getting the group up and running.  At trial, the jury will determine the value of this work.  Moreover, despite defendants' argument to the contrary, evidence of the profitability to AIG-FP of the El Paso transaction should be relevant to the jury's determination.

In the event that plaintiff is unsuccessful on his breach of contract claim, there are genuine issues of material fact from which a reasonable jury could decide that Feilbogen is entitled to compensation for the service he provided to defendants under the theory of quantum meruit or compensation for the benefit that he provided to defendants under the theory of unjust enrichment.  Therefore, summary judgment on these claims is improper.  See C.R. Klewin, Inc.

Maintenance and Service, Inc., 632 A.2d 1134, 1141 (Conn.App. 1993); Scandura v. City of Middletown, No. CV-01-0094798-S, 2003 LEXIS 545, *17 (Conn.Super. Feb. 27, 2003). Plaintiff does not dispute this proposition and alleges these claims only as an alternative if he is unsuccessful on his breach of contract claim.

v. Flagship Properties, Inc., 955 F.2d 5, 6-7 (2d Cir. 1992) (genuine issues of fact regarding extent of services plaintiff provided to defendant precluded summary judgment on quantum meruit claim); Linker v. Kock Investments, Inc., 62 F. Supp.2d 611, 615 (D.Conn. 1999) (denying summary judgment on quantum meruit claim because "[t]he issue of whether defendants were benefited is a question of fact for the jury.").

> VII.   SUMMARY JUDGMENT SHOULD BE DENIED ON
> PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM

A.   There Are Factual Disputes as to Whether Defendants
Created Intolerable Working Conditions That Forced Plaintiff to Resign

The standard for determining whether an employee was constructively discharged is objective: "Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?"  Pennsylvania State Police v. Suders, 124 S.Ct. 2342, 2351 (2004).  Accord Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir. 2001). In determining whether a constructive discharge occurred, all of the factors leading to the employee's resignation should be considered.  See Skold v. American Int'l Group, Inc., No. 96 Civ. 7137, 1999 WL 405539, at *6 (S.D.N.Y. June 18, 1999) ("a finding of constructive discharge can be based on a totality of the circumstances"), aff'd mem., 205 F.3d 1324 (2d Cir. 2000).

Defendants contend that Feilbogen can not establish his claim for constructive discharge because he was only "speculating" that his compensation might be reduced if he signed the AIG-FP Employment Letter, and such speculation does not constitute intolerable working conditions.  (Def. Mem. 26)  Defendants ignore the fact that by signing the AIG-FP Employment Letter, Feilbogen would not only have given up his guarantee, but more importantly, any right to even claim that he had a guaranteed bonus for 2003.  (Gifford Aff. Ex. 24)  It is undisputed that

if Feilbogen signed the AIG-FP Employment Letter, AIG-FP could have decided not to pay him any bonus compensation for 2003 and plaintiff would have forfeited his right to claim that he was entitled to the $1,300,000 guarantee.  (Gifford Aff. Ex. 24)  Feilbogen was not speculating that he was forfeiting his right to claim that he had a guarantee, he was, in fact, forfeiting that right.[21]

Thus, Raskin v. Wyatt, No. 94 CIV. 2314 (WK), 1996 WL 175087 (S.D.N.Y. April 15, 1996), aff'd, 125 F.3d 55 (2d Cir. 1997), cited by defendants, is not applicable to this case.  In Raskin, the plaintiff alleged that he attempted to negotiate an employment contract with his employer concerning his future compensation and job responsibilities, but that the employer would not agree.  Id. at *2.  Because they could not reach agreement, the plaintiff resigned and claimed that he was constructively discharged.  Id. at *3.  The court held that the employer's refusal to grant the plaintiff "special requests regarding compensation and responsibilities" was insufficient to establish intolerable working conditions that caused a constructive discharge.  Id. at *6.[22]

In contrast, Feilbogen is not alleging that he could not agree on a contract with defendants.  He is alleging that he had a contract, and AIG-FP insisted not only that he disavow his contract but that he forfeit any right to claim that a contract existed.  A jury could find that defendants could have agreed with Feilbogen to defer the issue of his guarantee until year end.

---

[21]     Defendants have not disputed plaintiff's allegation that by forcing him to forfeit his right to claim he had a guarantee for 2003, defendants' violated the public policies of preventing unjust enrichment and precluding the release of claims without compensation.

[22]     Defendants did not note that Raskin was affirmed.  In its opinion, the Second Circuit did not reach the issue of whether the plaintiff "was forced to leave or simply left," because the court found that there were no issues of fact as to whether the plaintiff was subjected to any age discrimination.  125 F.3d at 68.

Instead, defendants made Feilbogen's disavowal of the guarantee a condition of continued employment.[23]

Indeed, despite the fact that Cassano knew that Feilbogen would not agree to give up his claim to his guaranteed compensation for 2003, Cassano insisted that Feilbogen sign the AIG-FP Employment Letter if he was going to work at AIG-FP.  (Gifford Aff. Ex. 25)  Cassano told Feilbogen in a letter dated July 9, 2004, "As an employee at will, you have the choice of continuing your employment in accordance with the June 27 letter, or choosing not do so and resigning your employment."  (Gifford Aff. Ex. 25)  Thus, the facts here are distinguishable from those in Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993), cited by defendants, where the employer "never either expressly or impliedly suggested that [the plaintiff's] employment would be terminated."[24]

Because there are genuine issues of fact as to whether forcing Feilbogen to give up his right to claim he had a guarantee for 2003 created intolerable working conditions sufficient to cause a constructive discharge, summary judgment on this claim is improper.  See Chertkova v. Connecticut General Life Ins., Co., 92 F.3d 81, 89-90 (2d Cir. 1986) (reversing

---

[23]   The other cases cited by defendants (Def. Mem. 25-26) are also inapposite.  None of them involve an employee being forced to forfeit a claim for a contractual right.  See Spence v. Maryland Casualty Co., 995 F.2d 1147, 1156-58 (2d Cir. 1993) (criticism of employee's work and difficult supervisor); Brittell v. Dep't. of Correction, 247 Conn. 148, 178-79 (1998) (offering to transfer employee as a remedy to sexual harassment); Leson v. Ari of Connecticut, Inc., 51 F. Supp.2d 135, 143-44 (D.Conn. 1999) (reassignment to new position).

[24]   The fact that other AIG Trading employees were given similar letters is immaterial because the other employees were not being asked to give up any claims to guaranteed compensation.  Thus, Allen v. Bridgestone/Firestone, Inc., 81 F.3d 793, 797 (8th Cir. 1996), cited by defendants, where all "employees [were] treated alike" is not applicable.

summary judgment on constructive discharge claim because issues of fact existed as to whether working conditions were so intolerable as to create a constructive discharge).

B.    There Are Factual Issues as to Whether Plaintiff
       Is Entitled to Severance if He Was Constructively Discharged

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a form discharge for remedial purposes."  Suders, 124 S.Ct. at 2351.  Thus, if Feilbogen is successful on his constructive discharge claim, he is entitled to the same benefits as other employees who were discharged. Defendants, however, contend that even if Feilbogen was constructively discharged, he is not entitled to severance because employees who were discharged were only entitled to severance if they agreed to sign a release of claims.  (Def. Mem. 24-25)  Defendants' argument ignores the factual dispute regarding whether a release was a prerequisite to receiving severance.

Zampella testified that employees were required to sign a release, but the policy memo regarding severance did not mention a release.  (Zampella Dep. 188; Vladeck Aff. Ex. 10).  Thus, there is a genuine issue of material fact as to whether plaintiff would have been entitled to severance if he was constructively discharged but did not sign a release.  Accordingly, summary judgment on this claim is improper.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be denied in its entirety.

Dated: New York, New York
        September 13, 2004

By:    _____
       Anne C. Vladeck (ct25285)
        avladeck@vladeck.com
       Karen Cacace (ct25286)
        kcacace@vladeck.com
       VLADECK, WALDMAN, ELIAS &
        ENGELHARD, P.C.
       1501 Broadway, Suite 800
       New York, New York  10036
       (212) 403-7300

       Dan Young (ct17188)
        dyoung@wrkk.com
       WOFSEY, ROSEN, KWESKIN
        & KURIANSKY, LLP
       600 Summer Street
       Stamford, Connecticut
       (203) 327-2300

       Attorneys for Plaintiff
       Robert Feilbogen