UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ROBERT FEILBOGEN,

                    Plaintiff,                          3:03 Civ. 1624 (CFD)

          - against -
                                                        September 10, 2004
AIG TRADING GROUP, INC. and AIG
FINANCIAL PRODUCTS CORP.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT[1]

          Plaintiff Robert Feilbogen ("plaintiff" or "Feilbogen"), pursuant to Local Civil Rule

56(a)2, submits this statement in response to the statement of purportedly undisputed material

facts submitted by defendants AIG Trading Group, Inc. ("AIG Trading") and AIG Financial

Products Corp. ("AIG-FP") (collectively "defendants").

          1.        Admit.  Feilbogen's sixth claim is for constructive discharge, which entitles him

to severance.  (Complaint, Sixth Cause of Action)

---

[1]        Excerpts of plaintiff's deposition are referred to as "Pl. Dep. _____."  Excerpts of the
depositions of all other witnesses are referred to with the person's name, followed by "Dep.
_____."  The complete transcripts of the depositions of plaintiff, Dennis Zampella, Brian
Morrissey, Joseph Cassano, John Finigan, Paul Gentile, William Dooley, David Messer, and
Steven Prince are attached to the Affidavit of Michael Gifford ("Gifford Aff.") submitted with
the Memorandum of Law in Support of Defendants' Motion for Summary Judgment.  The
complete transcripts of the depositions of Steven Pike and Timothy Sullivan are attached to the
Affirmation of Anne C. Vladeck ("Vladeck Aff.) submitted with this opposition.  The complete
transcripts of the depositions of Joseph Cassano, William Dooley, and Doug Poling taken in AIG
Financial Products v. Alan Chandler and Robert Feilbogen, 04 Civ. 4264 (S.D.N.Y.), are also
attached to the Vladeck Aff., and are referred to as the person's name followed by "NY Dep. __."
Exhibits are cited to as either "Vladeck Aff. Ex. __," "Gifford Aff.  Ex. _" or "Marr. Aff. Ex. __."
The Affidavits of Robert Feilbogen ("Pl. Aff.") and Bradford Klein ("Klein Aff.") are submitted
separately.

2.      Admit.  Feilbogen has recently moved.  His current address is 3 Hanover Road, Scarsdale, NY 10583.  (Pl. Aff. ¶ 2)

3.      Admit.

4.      Admit.

5.      Admit.

6.      Admit.

7.      Admit.

8.      Admit in part.  Defendants produced an AIG Trading Group Companies Policy Manual dated April 2, 1997, which is thirty pages long.  (Gifford Aff. Ex. 26)  There was no testimony regarding whether the policy manual was actually issued on April 2, 1997.

9.      Admit.

10.     Admit.

11.     Admit.

12.     Admit.

13.     Admit.

14.     Admit.

15.     Admit in part.  Dooley assumed that compensation records were kept in Human Resources.  (Dooley Dep. 68)  In addition, Feilbogen understood that forms regarding increases in salary were sent to Human Resources.  (Pl. Dep. 40-41)  However, the compensation records maintained by Human Resources were often incomplete.  (Pl. Aff. ¶ 11)  For example, the information contained in the spreadsheets attached to the affidavit of Sandra Marr does not include guarantees for Adam DeChiara ("DeChiara") or John Ofori ("Ofori").  (Marr Aff. Exs. A, B, C, D)  However, DeChiara and Ofori had verbal contracts.  (Klein Aff. ¶ ¶ 4-5; Pl. Aff. ¶ 11)

16.     Admit.

17.     Admit.

18.     Admit in part.   Feilbogen created a spreadsheet listing guarantees that were eventually approved by Edward Matthews ("Matthews").   The spreadsheet that Feilbogen created and that Matthews approved is different from the spreadsheet in Def. Dep. Ex. 4.   (Pl. Aff. ¶ 3)  There were changes to the spreadsheet after Feilbogen created it and Matthews approved it.   (Pl. Dep. 50-52; Pl. Aff. ¶ 3)   The second column of actual guarantees was added after Matthews approved the column of original guarantees.   (Pl. Aff. ¶ 3)

19.     Admit in part.   Feilbogen was not sure of the exact timing of when employees were notified of their 2001 and 2002 guarantees.   (Pl. Dep. 60)

20.     Admit.

21.     Admit.

22.     Admit in part.   Admit that Feilbogen's annual salary for 2001 was $200,000 and his guaranteed bonus was $800,000, and that he received those amounts.   See paragraph 18 regarding Def. Dep. Ex. 4.

23.     Admit in part.   Feilbogen's 2000 bonus was paid partly in December 2000 and partly in 2001.   (Pl. Dep. 54)  Feilbogen thought that his 2001 bonus was paid in February 2002. (Pl. Dep. 55)

24.     Admit.

25.     Admit.

26.     Admit in part.   Feilbogen did not "admit" he had no other job offer; he never told Finigan he had.   The correct cites to plaintiff's deposition are Pl. Dep. 66-69, 75.

27.     Admit.

28.     Admit.

29.     Admit.

30.     Admit.

31.     Admit.  The citations that support this paragraph are Zampella Dep. 87, 159 and Finigan Dep. 51.

32.     Deny.  AIG Trading employees who were guaranteed bonus compensation would be paid bonuses if they were fired without cause prior to the time that AIG Trading paid bonuses.  (Pl. Aff. ¶ 4)

33.     Admit.

34.     Admit in part.  Feilbogen spoke to Finigan about his compensation in response to the request by Finigan that Feilbogen move to the energy group full time.  (Pl. Dep. 94-95)

35.     Admit in part.  Feilbogen also asked Finigan if Finigan was talking about the same guarantee for 2003 as his original guarantee of $600,000 for 2002 or his increased guarantee of $1,300,000 for 2002.  (Pl. Dep. 97)  Finigan told Feilbogen that he meant the increased guarantee of $1,300,000.  (Pl. Dep. 97)  Finigan made it clear that he was promising to pay Feilbogen $1,300,000 for 2003 for developing the energy business.  (Pl. Dep. 98)

36.     Admit in part.  Feilbogen also provided several other reasons why he sought a guarantee.  Feilbogen told Finigan that Finigan was asking him to change the course of his career.  (Pl. Dep. 99)  In addition, Feilbogen said that he knew the person being hired from the outside was going to be guaranteed compensation.  (Pl. Dep. 99)  Feilbogen also told Finigan that there were a lot of issues concerning the energy business because AIG Trading had previously had a "false start" in the energy business.  (Pl. Dep. 99-100).  In addition, Feilbogen told Finigan that he needed to be sure what his compensation would be for 2003 because he was

planning to buy a house in Finigan's neighborhood, and the houses were very expensive in that area.  (Pl. Dep. 96-97)

37.     Admit in part.  Feilbogen testified that the conversations with Finigan regarding his 2003 compensation occurred from the end of June through August 2002.  (Pl. Dep. 109)

38.     Admit.

39.     Deny.  Dooley testified that he had conversations with Zampella concerning Feilbogen's compensation when Feilbogen became involved in AIG Trading's energy business.  (Dooley Dep. 34-36)  Dooley was unclear as to whether those conversations concerned Feilbogen's 2002 or 2003 compensation.  (Dooley Dep. 34-36)

40.     Admit in part.  The compensation records maintained by Human Resources were often incomplete.  (Pl. Aff. ¶ 11)  See paragraph 15.  Other spreadsheets do show a guaranteed bonus for Feilbogen for 2003.  (Gifford Aff. Ex. 14; Vladeck Aff. Ex. 6)

41.     Admit in part, deny in part.  Admit that Feilbogen began to participate in the development of the energy business at Trading in 2002.  Deny that Feilbogen stopped acting as Chief Operating Officer of AIG Trading on March 26, 2003.  Feilbogen continued to act as Chief Operating Officer of AIG Trading until his employment with defendants ended.  (Pl. Aff. ¶ 6)

42.     Admit.

43.     Admit in part.  Tony Gordon ("Gordon") was hired in August or September 2002.  (Pl. Dep. 91)  Feilbogen understood that Gordon had a written employment contract which guaranteed his compensation for 2003.  (Pl. Dep. 98-99)

44.     Admit.

45.     Admit.  Prior to the email, Feilbogen had verbally asked Human Resources for a letter regarding his guarantee for 2002.  Feilbogen only needed compensation information for 2002 to provide to his mortgage broker and bank.  (Pl. Aff. ¶ 9)

46.     Admit.

47.     Admit.

48.     Admit in part, deny in part.  Brian Morrissey ("Morrissey") testified that he thought he reported to Feilbogen until March 2003.  (Morrissey Dep. 9)  Morrissey then reported to Andy Kaplan, AIG Trading's General Counsel, until May 2003, when he began reporting to Kathy Furlong, and AIG-FP employee.  (Morrissey Dep. 9-10)  Paul Gentile ("Gentile") testified that he reported to Morrissey (Gentile Dep. 13), but did not testify as to who James Garzone reported to.  Deny that Feilbogen's Chief Operating Officer responsibilities ended on March 26, 2003.  See paragraph 41.

49.     Admit.

50.     Admit.

51.     Admit in part, deny in part.  Admit that AIG Trading began accruing $1,700,000 in 2003 to pay Gordon's guarantee.  Admit that AIG Trading began accruing $1,300,000 in 2003 to pay Feilbogen.  Deny that the accrual for Feilbogen was made because he earned $1,300,000 in 2002.  The 2003 accrual for Feilbogen was made because Feilbogen had a guarantee of $1,300,000 in 2003.  (Pl. Dep. 102-03, 183-84)

52.     Admit in part.  Finigan never told Morrissey that Feilbogen did not have a guarantee for 2003.  (Morrissey Dep. 64)

53.     Admit.  Gentile had discussions with Morrissey regarding accruing bonuses for the energy group in 2003.  (Gentile Dep. 22)

54.     Admit in part.  Morrissey instructed Gentile to create Def. Dep. Ex. 25, which included all the accruals for bonuses in the energy group for 2003.  (Gentile Dep. 92-94)  While Finigan testified he never saw Def. Dep. Ex. 25, he had monthly meetings at which he reviewed accounting documents, which summarized the information contained in the FRX reports.  See paragraphs 160-61.

55.     Admit.

56.     Admit in part.  While nobody "instructed" Gentile to create the entries, it was part of his job to take the information he was provided and prepare accounting documents.  (Gentile Dep. 10, 12)

57.     Admit in part.  Gentile testified that to his knowledge, Finigan had not seen an FRX report.  (Gentile Dep. 101)

58.     Admit in part, deny in part.  Feilbogen testified that he first consulted with counsel at some point between June 25 and July 3, 2003.  (Pl. Dep. 210-11)  Gentile testified that he provided Feilbogen with Def. Dep. Ex. 25 and Morrissey Dep. Ex. 2 in early July.  (Gentile Dep. 54)  It is not clear whether Gentile provided Feilbogen with the documents before or after Feilbogen retained counsel.  It is clear from the documents and testimony, however, that the information contained in the documents that Gentile provided to Feilbogen had been entered into AIG Trading's general ledger well before Feilbogen's retention of counsel.  (Gentile Dep. 71-73; Gifford Aff. Ex. 16)

59.     Admit in part, deny in part.  Deny that Def. Dep. Ex. 14 contains human resources information on compensation.  Plaintiff created this spreadsheet as part of the budgeting process for the energy group.  (Pl. Aff. ¶ 10)  Plaintiff was mostly concerned with estimating new headcount needed for the development of the energy business and potential written guarantees

for these new hires.  (Pl. Aff. ¶ 10)  Plaintiff did not include his 2003 guarantee on the spreadsheet because he was not a new hire.  (Pl. Aff. ¶ 10 )  There are many inaccuracies on this spreadsheet, including the number included for Gordon's guarantee.  (Pl. Aff. ¶ 10)

60.     Deny.  See paragraph 41.

61.     Admit.

62.     Admit.

63.     Admit.

64.     Admit.

65.     Admit.  The testimony cited by defendants does not support this paragraph. Finigan Dep. 8 provides some support for this paragraph.

66.     Admit.

67.     Admit in part.  While Gordon's resignation date was effective June 1, 2003, he left AIG Trading in March or April 2003.  (Pl. Dep. 113)

68.     Admit in part.  Feilbogen did not include information concerning his guarantee because he thought Cassano was interested in written contracts with guarantees for new hires in the energy group.  (Pl. Dep. 133, 153)  The information that Feilbogen sent Cassano included only written guarantees for new hires in the energy group.  (Gifford Aff. Ex. 22)

69.     Admit.

70.     Admit.

71.     Admit.

72.     Admit in part.  The compensation records maintained by Human Resources were often incomplete.  (Pl. Aff. ¶ 11)  See paragraph 15.  Apart from Marr's affidavit, plaintiff has no knowledge of how she created the chart.  Moreover, Marr was not identified by defendants either

in their initial disclosures or in response to plaintiff's interrogatories as someone with information concerning plaintiff's compensation. (Vladeck Aff. Ex. 7, ¶ A; Vladeck Aff. Ex. 8, Response to Interrogatory No. 3)  Thus, plaintiff was not given notice defendants were going to rely on Marr in time to take her deposition.

73.    Admit.

74.    Admit in part.  In the same phone call, Finigan also told Feilbogen that AIG-FP did not like deals, especially verbal deals.  (Pl. Dep. 190)  Finigan urged Feilbogen not to tell anyone at AIG-FP and to forget about the promise.  (Pl. Dep. 190)  At that time, Finigan was concerned about keeping his job.  (Dooley Dep. 62, 156)

75.    Admit in part.  Up until late June 2003, Feilbogen had no conversations with anyone at AIG-FP concerning his compensation at all.  (Pl. Dep. 104-05)

76.    Admit.  The letter also stated, "this letter supersedes all prior discussions, agreements and understandings of any kind and nature between you and AIG-TG or AIG-FP regarding the terms of your employment."  (Gifford Aff. Ex. 24)

77.    Admit.

78.    Deny that Cassano "hoped Feilbogen would stay with AIG-FP."  Cassano sent an email to Dooley on July 4, 2003, which stated, "It is the case we are ourselves are (sic) not sure of [Feilbogen's] long term prospects.  He has nothing knew (sic) or different to bring to the table." (Cassano Dep. 172; Vladeck Aff. Ex. 9)

79.    Admit in part.  AIG-FP pays some bonuses on a guaranteed basis as a means of giving employees an incentive.  (Cassano NY Dep. 25-28, 182-83; Poling NY Dep. 88-89) Feilbogen was guaranteed a bonus for 2003 as an incentive for him to join the Energy Group full time.  (Pl. Dep. 93-98)

80.     Admit.

81.     Admit.  The July 3, 2003 email from Feilbogen to Cassano stated,

> You have put me in an impossible position by asking me to sign
> the letter of employment and forfeiting my current guarantee with
> nothing in exchange to ensure my 2003 compensation.  My 2003
> guarantee agreed to by John Finigan was to compensate me not
> only for the risk of assuming a new role (transitioning from COO
> to partnering with Tony Gordon) but for developing and executing
> an energy business plan. . . . My compensation agreements in the
> past have never been in writing and have always been honored.
> While I understand that things have changed midway through the
> year, I have honored my end of the bargain by executing the
> energy business plan approved by AIG as asked of me by Bill
> Dooley and John Finigan.  I am simply looking for AIG to honor
> their end of the agreement.

(Gifford Aff. Ex. 25)

82.     Admit in part, deny in part.  Admit that Cassano referred to Feilbogen as "a bit of a luxury."  (Vladeck Aff. Ex. 9)  Deny that Cassano wanted Feilbogen to work for AIG-FP.  See paragraph 78.

83.     Admit.  Cassano's July 9, 2003 letter to Feilbogen further stated that Feilbogen could continue his employment with AIG-FP according to the terms of the AIG-FP Employment Letter or he could resign.  (Gifford Aff. Ex. 25)

84.     Admit.  Feilbogen responded to Cassano's July 9 letter by sending him an email stating that "you have made the decision to end my employment at AIG."  (Gifford Aff. Ex. 25)

85.     Admit in part, deny in part.  Admit that AIG-Trading had a severance practice of providing employees severance pay equivalent to one month of salary per year of service.  (Pl. Dep. 213-14; Zampella Dep. 175; Vladeck Aff. Ex. 10; Finigan Dep. 254)  Deny that payment of severance was conditioned on signing a release.  (Vladeck Aff. Ex. 10)

86.     Deny.  See paragraph 85.

87.     Admit.

88.     Admit.

89.     Admit.

90.     Admit.

91.     Admit.

92.     Admit.

93.     Admit.

94.     Admit.

95.     Admit.

96.     Admit.

97.     Admit.

98.     Admit in part.  Zampella conducted a review of such jobs and determined the range to be substantially higher.  (Gifford Aff. Ex. 12)

99.     Admit.

100.    Admit.

DISPUTED ISSUES OF MATERIAL FACT

Plaintiff, pursuant to Local Civil Rule 56(a)2, submits this statement of material issues of fact that present genuine issues to be tried in this action against defendants.

Plaintiff's Background

101.    As Chief of Staff for Gary Davis ("Davis") in 1998, Feilbogen worked with Davis on all matters related to AIG Trading.  (Pl. Dep. 14-15)

102.    Feilbogen was also responsible for the Risk Management and Accounting Groups. (Pl. Dep. 15)  He managed these groups by overseeing the day-to-day functions of the groups, advising the groups of new transactions that were being contemplated, and coordinating the groups' efforts with American International Group, Inc. ("AIG"), the parent company of AIG Trading.  (Pl. Dep. 15-17)  In addition, Feilbogen was responsible for ensuring that the risk reports being produced by the Risk Management Group were accurate.  (Pl. Dep. 16)  He was also the spokesperson for the senior partners in the company if they wanted a transaction to be accounted for in a particular way.  (Pl. Dep. 17)  In addition, Feilbogen oversaw the process in which the daily profit and loss estimate produced by the Risk Management Group was reconciled at the end of each month by the Accounting Group.  (Pl. Dep. 16-17)

2001 and 2002 Guarantees

103.    When Davis left AIG-Trading in December 2000, Davis told Feilbogen that Brad Klein ("Klein") would become the Chief Executive Officer of AIG Trading, and that Klein, Feilbogen, and three other senior executives would be responsible for managing the company. (Pl. Dep. 47)

104.    Davis asked Feilbogen to create a spreadsheet that listed guaranteed compensation for AIG Trading employees for 2001 and 2002.  (Pl. Dep. 47)  Feilbogen created the spreadsheet

requested by Davis, and this spreadsheet was later attached to a memorandum from Edward Matthews ("Matthews"), Senior Vice Chairman of AIG.  (Pl. Dep. 47-50)

105.    In December 2000, Davis told Feilbogen that he would be guaranteed bonus compensation of $800,000 for 2001 and $600,000 for 2002.  (Pl. Dep. 48; Gifford Aff. Ex. 17)

106.    Klein and Feilbogen discussed memorializing the 2001 and 2002 guarantees in writing for each employee, but they did not do so because they were told that Matthews and William Dooley ("Dooley"), Senior Vice President of Financial Services for AIG, preferred to keep the guarantees verbal.  (Pl. Dep. 58-59, 62-64)

107.    Zampella confirmed that AIG Trading did not give employees with guarantees for 2001 or 2002 anything in writing concerning their guarantees.  (Zampella Dep. 32, 75-76)

108.    Zampella testified that even though the employees did not have anything in writing concerning their 2001 and 2002 bonuses, he believed AIG Trading was obligated to pay the bonuses.  (Zampella Dep. 77)

109.    According to Zampella, the information in a spreadsheet constituted a written guarantee.  (Zampella Dep. 81)

110.    None of the employees that were guaranteed compensation for 2001 and 2002 were guaranteed employment; their employment remained at-will, but if they were fired without cause during a year in which their compensation was guaranteed, they would receive the full amount of the guarantee.  (Pl. Aff. ¶ 4)

Increase in Feilbogen's 2002 Compensation

111.    During 2001, Feilbogen worked as the Chief Operating Officer and Executive Vice President of AIG Trading reporting to Finigan.  (Pl. Aff. ¶ 5)

112.    In early 2002, Feilbogen discussed his compensation with Finigan.  (Pl. Dep. 66-67)  After having some discussions with recruiters, Feilbogen told Finigan that he understood that he could find a job outside of AIG Trading that would compensate him in the million and a half dollar range.  (Pl. Dep. 67-68)  Feilbogen also told Finigan that he had concerns about the direction AIG Trading was heading in, but that he had a strong emotional attachment to the company because he had worked there for such a long time.  (Pl. Dep. 67)

113.    Finigan told Feilbogen that Feilbogen was important to the company, that he needed his help to continue building the company, and that he would consider his compensation. (Pl. Dep. 68-69)

114.    Within a few weeks of that conversation, Finigan told Feilbogen that he would increase Feilbogen's salary for 2002 from $200,000 to $250,000 and increase his guaranteed bonus for 2002 from $600,000 to $1,300,000.  (Pl. Dep. 69-70, 78-79; Finigan Dep. 48-49)

115.    According to AIG Trading company policy Feilbogen's employment could still be terminated during 2002, but if it was terminated without cause he would receive the $1,300,000 that had been guaranteed.  (Pl. Aff. ¶ 7)

116.    Cassano has confirmed that guarantees meant that if employees "were terminated, they would get the guaranteed amount."  (Cassano NY Dep. 24)

117.    Doug Poling, General Counsel of AIG-FP, also confirmed that employees might have contracts specifying a guaranteed amount of compensation, but that they would still be employees at-will.  (Poling NY Dep. 28)

118.    Feilbogen also discussed the increase in his 2002 compensation with Zampella. (Pl. Dep. 70-71)  Before Feilbogen learned that Finigan was going to increase his guarantee,

Zampella told Feilbogen that he had a great future at the company and that Zampella was going to help Finigan figure out a way to encourage him to stay at the company.  (Pl. Dep. 70, 157)

119.   Zampella then recommended to Finigan and Dooley that Feilbogen's compensation be increased.  (Zampella Dep. 83; Gifford Aff. Exs. 12, 13)  Dooley agreed with Zampella's recommendation because he had a strong belief in Feilbogen's abilities.  (Zampella Dep. 98-99, 157; Dooley Dep. 13-14)

120.   After Finigan told Feilbogen about the increase in his guarantee for 2002, Zampella stopped by Feilbogen's office and told Feilbogen something to the effect that "you should name your child after me because I did you a favor."  (Pl. Dep. 71; Zampella Dep. 84)

121.   Neither Zampella nor Finigan put Feilbogen's increased guaranteed compensation for 2002 in writing.  (Zampella Dep. 87, 158; Finigan Dep. 51)

122.   Despite the fact that the 2002 increase was not in writing, Zampella believed that Feilbogen had a right to rely on the promise that he would be paid a bonus of $1,300,000 for 2002.  (Zampella Dep. 87)

Feilbogen's 2003 Compensation

123.   When Finigan told Feilbogen that he would increase Feilbogen's guarantee for 2002, he also told Feilbogen that the company had an opportunity to re-enter the energy business.  (Pl. Dep. 94)

124.   Over the next several months, Finigan and Feilbogen discussed AIG Trading's potential re-entry into the energy business.  (Pl. Dep. 94)

125.   During the summer of 2002, Finigan and Feilbogen discussed Finigan's wish that Feilbogen work with the new energy business full time.  (Pl. Dep. 95, 109)

126.    Both Finigan and Dooley wanted Feilbogen to join the energy group because he had been at AIG Trading for a long time and he would be able to help the energy group organize its business.  (Dooley Dep. 21-22, 89)

127.    Feilbogen explained to Finigan that he was concerned about how he would be compensated for 2003 if he worked full time on the energy business.  (Pl. Dep. 95)  Feilbogen told Finigan that he wanted to be clear about how he was going to be compensated if he left his position as Chief Operating Officer and joined the energy group.  (Pl. Dep. 95-96)

128.    When Feilbogen initially expressed his concerns about his compensation for 2003, Finigan told Feilbogen that he would have to think about it.  (Pl. Dep. 97)

129.    After several conversations, Finigan told Feilbogen that he understood Feilbogen's concerns and that Feilbogen would be kept "whole" for 2003.   (Pl. Dep. 97) Feilbogen asked Finigan what he meant by being kept "whole," and Finigan responded that he would pay Feilbogen the same bonus for 2003 that he was going to get for 2002.  (Pl. Dep. 97) Feilbogen asked Finigan if he was talking about his old guarantee of $600,000 or his new guarantee of $1,300,000, and Finigan said that he was referring to the new number, $1,300,000. (Pl. Dep. 97)   Finigan was clear that he was promising, under no uncertain terms, to pay Feilbogen a $1,300,000 bonus for 2003 for developing the energy business plan.  (Pl. Dep. 97-98)

130.    Finigan was the principal individual with responsibility for determining plaintiff's compensation for 2003.  (Vladeck Aff. Ex. 8, Response to Interrogatory No. 1)

131.    Feilbogen understood that his employment could still be terminated during 2003, but if it was terminated without cause he would receive the $1,300,000 that he had been guaranteed.  (Pl. Aff. ¶ 8)

132.    After his conversation with Finigan, Feilbogen thanked Finigan and said that he was looking forward to getting the business up and running.  (Pl. Dep. 97-98)

133.    Finigan testified that he told Feilbogen that he "would <u>try</u> to make him whole" for 2003.  (Finigan Dep. 33, 310)  Zampella testified that Finigan told him he had told Feilbogen he would "try" to make him whole.  (Zampella Dep. 17)  Finigan and Zampella both understood "make whole" to mean the same level of bonus compensation that Feilbogen received in the prior year, $1,300,000.  (Zampella Dep. 17; Finigan Dep. 33, 312)

134.    Feilbogen also discussed his 2003 compensation with Zampella.  (Pl. Dep. 100-01)  In August 2002, Feilbogen told Zampella what he and Finigan had agreed to regarding his compensation for 2003.  (Pl. Dep. 100-01)  Zampella said he already knew because Finigan had told him.  (Pl. Dep. 100-01)  Feilbogen said that he felt a lot better, that he would be comfortable buying a new house, and that he could get into the energy business with a clear mind.  (Pl. Dep. 100-01)  Zampella told him that he should feel better.  (Pl. Dep. 101)

135.    Zampella did not believe Feilbogen would have joined the energy group if he did not have the "ability to make good money."  (Zampella Dep. 128)

136.    Zampella did not believe that Feilbogen accepted the position in the energy group on the condition that he would only get paid if there was money at the end of the year.  (Zampella Dep. 137-38)

137.    Finigan did not expect that the energy group would yield a profit in 2003.  (Finigan Dep. 40)

138.    Both Finigan and Zampella thought that Feilbogen was an extremely valuable member of the company.  (Zampella Dep. 18; Finigan Dep. 317)

Other Examples of Verbal Contracts Entered Into By AIG Trading

139.     AIG Trading entered into other verbal contracts with employees regarding compensation.  (Klein Aff. ¶ ¶ 3-6; Pl. Aff. ¶ 11)

140.     For example, in 1999, AIG Trading entered into a verbal contract with John Ofori ("Ofori"), another employee in the Global Commodity Index Business.  Ofori's contract provided that he would receive 10% of the profitability resulting from the sale of warrants of Ashanti, a gold company.  When the warrants became profitable in 2003, AIG Trading honored Ofori's contract.  (Klein Aff. ¶ 5; Pl. Aff. ¶ 11)

141.     In 2001, AIG Trading entered into a verbal contract with Adam DeChiara ("DeChiara"), an AIG Trading employee in the Global Commodity Index Business, which provided that DeChiara would receive 15% of the net profitability of the Global Commodity Index Business.  AIG Trading honored this contract in 2001 and 2002.  (Klein Aff. ¶ 4; Pl. Aff. ¶ 11)

Energy Business Plan

142.     Feilbogen and Gordon, along with other AIG Trading employees, created a business plan for the energy group in 2002.  (Dooley Dep. 19-20; Vladeck Aff. Ex. 11; Finigan Dep. 348-49)

143.     This business plan was used for a presentation made to Dooley and others in December 2002.  (Pl. Dep. 86-89)

144.     Dooley approved the business plan.  (Pl. Dep. 124)

145.     Dooley also made it clear that Finigan would have to figure out how to fund the expenses, including any guaranteed compensation, that would be incurred as they built the business.  (Pl. Dep. 124-25)

2003 Bonus Accruals

146.    Finigan was responsible for determining what expenses should be accrued for at AIG Trading.  (Pl. Dep. 171)

147.    At some point during the first quarter of 2003, Finigan and Feilbogen had several discussions concerning how to properly account for employees' compensation in the energy group.  (Pl. Dep. 102, 182-84)

148.    They discussed whether to accrue for the compensation of the new employees being hired into the energy group and how to account for Gordon's and Feilbogen's compensation.  (Pl. Dep. 102, 182-84)

149.    Finigan decided that the only guarantees that he wanted to accrue for as expense items were Feilbogen's and Gordon's guarantees.  (Pl. Dep. 102, 183-84)

150.    Finigan called Morrissey in at the end of one of these conversations and told him to accrue money to pay Feilbogen's and Gordon's guarantees for 2003.  (Pl. Dep. 102-03; Morrissey Dep. 28)

151.    Finigan told Morrissey that AIG Trading would need $3,000,000 to pay Feilbogen's and Gordon's 2003 bonuses.  (Morrissey Dep. 39)  Morrissey understood that $1,700,000 was to pay Gordon and $1,300,00 was to pay Feilbogen.  (Morrissey Dep. 41-42)

152.    From January through April, Morrissey accrued on average $250,000 per month to pay Feilbogen's and Gordon's bonus.  (Morrissey Dep. 38-39, 57; Gifford Aff. Ex. 14; Vladeck Aff. Ex. 6)  Finigan did not tell Morrissey to accrue for Feilbogen's or Gordon's 2003 bonuses until February 2003.  Because Morrissey had not accrued anything for Feilbogen's or

Gordon's bonuses in January 2003, he accrued $500,000 in February 2003.  (Morrissey Dep. 38-39; Gifford Aff. Ex. 14)

153.    These accruals were made in a line entitled "guarantee" on AIG Trading's FRX Report, which is an extraction of information from AIG Trading's general ledger.  (Morrissey Dep. 35, 38; Gifford Aff. Ex. 14)

154.    These accruals were also recorded in an accounting document entitled "Energy Inc. Guarantees 2003."  (Vladeck Aff. Ex. 6)  The Energy Inc. Guarantees 2003 schedule lists accruals by month of $141,666 for "Management 1" and $108,334 for "Management 2." (Vladeck Aff. Ex. 6)   Management 1 represented Gordon and Management 2 represented Feilbogen.  (Morrissey Dep. 43)

155.    In early 2003, due to various issues, including Gordon's interactions with other employees, he was asked to resign.  (Zampella Dep. 105; Dooley Dep. 48; Finigan Dep. 164-65, 332)

156.    Gordon left AIG Trading in March or April 2003.  (Pl. Dep. 113)

157.    In May 2003, Finigan told Morrissey to stop accruing for Feilbogen's and Gordon's 2003 bonuses.  (Morrissey Dep. 40)  Finigan told Morrissey that he could stop accruing because "we have enough."  (Morrissey Dep. 40)

158.    At that time, AIG Trading had accrued $1,000,000 for Feilbogen's and Gordon's bonuses.  This accrual is reflected in the "guarantee" lines in AIG Trading's FRX Reports and in AIG Trading's general ledger.  (Gifford Aff. Exs. 14, 16; Vladeck Aff. Ex. 6)

159.    The accounting group prepared spreadsheets that summarized the profit and loss of the company for Finigan.  (Gentile Dep. 14)  The information contained in the spreadsheets prepared for Finigan came from AIG Trading's general ledger.  (Gentile Dep. 15)   Finigan

reviewed accounting results, including expense accruals, on a monthly basis with Morrissey. (Morrissey Dep. 16, 30)

### AIG Trading and AIG-FP Merger

160.     In late 2002 or early 2003, Joseph Cassano ("Cassano"), Chief Executive Officer of AIG-FP, Dooley, and other AIG executives began discussing integrating AIG Trading and AIG-FP.  (Cassano Dep. 28, 37; Dooley Dep. 53-55)

161.     In April 2003, Cassano, Dooley and M.R. ("Hank") Greenberg, Chairman and Chief Executive Officer of AIG, met with Finigan and told him that they wanted to integrate AIG Trading and AIG-FP.  (Cassano Dep. 43-44; Vladeck Aff. Ex. 12)

162.     Finigan informed Feilbogen of the planned merger by telling him that he had "shocking news."  (Pl. Dep. 134-135)  Finigan said that he had not had any idea that this was going to happen and that he was not sure how it would all work out.  (Pl. Dep. 134-35)  He said he thought that the energy business had peaked interest in AIG Trading.  (Pl. Dep. 134)  He also implied that AIG-FP was going to take-over AIG Trading.  (Pl. Dep. 134)

163.     Once he knew that AIG Trading and AIG-FP were going to merge, Finigan became concerned about his job.  (Dooley Dep. 62, 156)  Finigan wanted to remain employed with the company.  (Finigan Dep. 64)  Finigan asked Dooley if there would be a long-term position for him.  (Dooley Dep. 196)  Dooley told Finigan that Cassano would determine if there was a spot for him.  (Dooley Dep. 196-97)

164.     Finigan sent information about employee contracts at AIG Trading to Cassano. (Finigan Dep. 186; Vladeck Aff. Ex. 13)

165.     The information that Finigan provided to Cassano included a document entitled "Additional Incentive Compensation."  (Vladeck Aff. Ex. 13, D001256)  This document listed

compensation agreements for certain employees.  (Vladeck Aff. Ex. 13, D001256)  A different version of this document stated which of the compensation agreements were "verbal deals." (Vladeck Aff. Ex. 14)   The document that Finigan ultimately provided to Cassano did not indicate that any of the compensation agreements were verbal deals.  (Vladeck Aff. Ex. 13, D001256)

166.    Finigan, and Dooley, were aware of the fact that Cassano did not like "deals" with employees at all, particularly not "verbal deals."  (Finigan Dep. 396; Dooley NY Dep. 29-32, 35)

167.    Eventually Cassano determined that there would not be a position for Finigan, and Dooley and Cassano terminated Finigan's employment.  (Dooley Dep. 193-94)

168.    Cassano and Dooley told Finigan that his employment was terminated on November 14, 2003.  Finigan was paid a salary through March 2004.  (Finigan Dep. 6-8)

169.    Finigan requested additional office services, administrative support, and medical benefits, which were granted through September 2004.  (Cassano Dep. 21-22)

170.    As AIG-FP was the successor company to AIG Trading, AIG-FP had an obligation to pay any obligations that AIG Trading had assumed prior to the merger.  (Dooley Dep. 199)

171.    According to Cassano, AIG-FP honors verbal representations.  (Cassano NY Dep. 60)

Feilbogen's Constructive Discharge

172.    On June 25, 2003, Wayne told Feilbogen that AIG-FP was going to be giving employment letters to the AIG Trading employees that were transferring to AIG-FP.  (Pl. Dep. 187)

173.    After Feilbogen learned from AIG Trading employees that the AIG-FP employment letters required employees to forego their guaranteed compensation, Feilbogen called Zampella.  (Pl. Dep. 104-05, 188)  Feilbogen asked Zampella if he thought that Finigan had told AIG-FP about Feilbogen's 2003 guarantee.  (Pl. Dep. 105)  Zampella said that he thought that Finigan was only worried about himself, and that Finigan probably had not told AIG-FP about Feilbogen's guarantee.  (Pl. Dep. 105)  Zampella said that he was aware of Feilbogen's guarantee and that Feilbogen should relax.  (Pl. Dep. 106)  Zampella suggested that Feilbogen call Finigan and talk to him about it because it would be better if Finigan informed AIG-FP of Feilbogen's guarantee than if Feilbogen did.  (Pl. Dep. 106)

174.    Feilbogen told Zampella that AIG-FP had requested copies of all the written contracts for employees in the energy group and that Feilbogen had provided the written contracts but had not mentioned his verbal guarantee.  (Pl. Dep. 105)  Feilbogen explained to Zampella that he had not brought up his own guarantee because he did not want to appear that he was focused on himself, but rather wanted to be seen as a team player.  (Pl. Dep. 105)

175.    Zampella testified that Feilbogen told Zampella and Finigan not to forget about his guarantee.  (Zampella Dep. 113-15, 141)  Zampella thought that if Feilbogen transferred to AIG-FP, "all bets were off." (Zampella Dep. 116, 169)

176.    Because Feilbogen was unable to reach Finigan by telephone, he sent him an email asking if Finigan had informed AIG-FP about Feilbogen's guarantee.  (Pl. Dep. 106, 186-87; Gifford Aff. Ex. 23)

177.    After Finigan received this email, he called Doug Poling, AIG-FP's general counsel.  (Finigan Dep. 364-65)

178.    Finigan then called Feilbogen and told him that he did not promise to make Feilbogen whole for 2003.  (Pl. Dep. 176-77, 190; Finigan Dep. 360)  Finigan said that AIG-FP did not like deals, especially verbal deals.  (Pl. Dep. 190)  Finigan urged Feilbogen not to tell anyone at AIG-FP and to forget about the promise.  (Pl. Dep. 190)

179.    Finigan admitted that he knew that Cassano did not like deals.  (Finigan Dep. 396)

180.    Cassano testified that the bonuses at AIG-FP were paid on a discretionary basis. (Cassano Dep. 110)

181.    After his conversation with Finigan, Feilbogen called Zampella.  (Pl. Dep. 190-91)  Zampella said he had been in the room with Finigan during this conversation.  (Pl. Dep. 190-91)  Feilbogen told Zampella that Finigan had been lying and that Zampella knew it.  (Pl. Dep. 191)  Zampella said that he agreed with Feilbogen and that he would help Feilbogen.  (Pl. Dep. 191)

182.    Within a few days, Zampella stopped by Feilbogen's office and said that Feilbogen might have to name another child after him.  (Pl. Dep. 191)  Feilbogen thought that Zampella had talked to Dooley or someone at AIG-FP regarding Feilbogen's guarantee.  (Pl. Dep. 191)  Zampella did not provide Feilbogen any details, but he told Feilbogen it would be okay.  (Pl. Dep. 191-92)

183.    After Marty Wayne gave Feilbogen the June 27, 2003 letter, Feilbogen asked Wayne if anyone at AIG-FP was aware of his guarantee, which had been verbally conveyed to him by Finigan.  (Pl. Dep. 195)  Wayne said he was not aware that Feilbogen had a guarantee. (Pl. Dep. 195)  Feilbogen told Wayne that he did not think he could sign the letter but that he would take the letter home and think about it.  (Pl. Dep. 194, 196)

184.   In his July 9, 2003 letter to Feilbogen, Cassano stated, "we have discussed your position with John Finigan, among others, and it is clear that, contrary to the assertions in your e-mail, you were not given a 2003 guarantee."  (Gifford Aff. Ex. 25)  Cassano made this statement despite the facts that, prior to Feilbogen leaving the company, noone from AIG-FP asked Zampella or anyone at AIG Trading other than Finigan if Feilbogen had a guarantee for 2003 (Zampella Dep. 185-86) and that Cassano knew that AIG Trading had accrued for Feilbogen's bonus.  (Cassano Dep. 60, 77)

185.   Cassano testified that if Finigan had said that he had verbally guaranteed Feilbogen $1,300,000 for 2003, AIG-FP would have honored the guarantee.  (Cassano Dep. 79, 168-70)

186.   According to Cassano, if AIG-FP fired someone with a guarantee mid-year, AIG-FP would owe that employee the entire amount of the guarantee.  (Cassano Dep. 67)

187.   Brad Klein also told Cassano that he had a verbal contract with AIG Trading, which he had entered into with Finigan.  (Cassano Dep. 84)

188.   Finigan denied entering into Klein's contract and Cassano refused to honor the contract.  (Cassano Dep. 84)

189.   Klein has also sued AIG Trading and AIG-FP, and his related case is pending before this Court.  Klein v. AIG Trading Group, Inc. and AIG Financial Products Corp, 03 Civ. 2122.

The Energy Business

190.   According to Cassano, building a business generally takes between eighteen months and three years.  (Cassano Dep. 102)

191.    As of May 2004, the energy group at AIG-FP had completed some small transactions.  (Cassano Dep. 100)

192.    A transaction with El Paso Corporation ("El Paso") was suggested in the business plan that Feilbogen worked on before leaving AIG Trading.  (Cassano Dep. 100-01)

193.    Feilbogen had also discussed a possible transaction with El Paso in an email to Finigan on April 22, 2003.  (Finigan Dep. 358-59; Vladeck Aff. Ex. 15)

194.    A large transaction with El Paso was scheduled to close in June 2004.  (Cassano Dep. 100)  Steven Pike ("Pike") and Timothy Sullivan ("Sullivan"), structured that El Paso transaction.  (Pike Dep. 25-49; Sullivan Dep. 18, 21-36)

195.    Feilbogen and Gordon hired Pike and Sullivan in early 2003.  (Pike Dep. 18-19; Sullivan Dep. 11)

196.    Feilbogen was also involved in reviewing the initial letter of interest sent from AIG Trading to El Paso.  (Pike Dep. 29; Sullivan Dep. 22)

197.    Pike and Sullivan's employment was transferred to AIG-FP in July 2003.  (Pike Dep. 21; Sullivan Dep. 14)

198.    The proposed transaction with El Paso was revised several times.  (Pike Dep. 25-49; Sullivan Dep. 21-36)

199.    AIG-FP projected profits of twenty percent of $230,000,000, or $46,000,000, from the transaction that was expected to close in June 2004.  (Pike Dep. 50-51)

Zampella Affidavit

200.    Defendants produced an affidavit signed by Zampella.  (Vladeck Aff. Ex. 16)

201.    Zampella's affidavit was prepared by defendants' counsel.  (Zampella Dep. 110)

202.    At several points in this affidavit, Zampella stated that allegations made by Feilbogen are false.  (Vladeck Aff. Ex. 16)  In his deposition, Zampella testified that he had not seen Feilbogen's complaint, and was not trying to make Feilbogen look like a liar and that he did not believe that Feilbogen is a liar.  (Zampella Dep. 142-43)

203.    In his affidavit, Zampella swore that Finigan did not seek approval from Dooley for a guarantee for Feilbogen in 2003.  (Vladeck Aff. Ex. 16, ¶ 4)  In his deposition, Zampella admitted that he did not know if Finigan asked Dooley to approve a guarantee for Feilbogen in 2003. (Zampella Dep. 131-33)

204.    In his affidavit, Zampella denied that Feilbogen had a guarantee for 2003. (Vladeck Aff. Ex. 16)  Zampella did not include in his affidavit a statement that Finigan told Feilbogen he would "try to make Feilbogen whole" for 2003.  (Vladeck Aff. Ex. 16)

<u>Morrissey Affidavit</u>

205.    Defendants produced an affidavit signed by Morrissey.  (Vladeck Aff. Ex. 17)

206.    Morrissey did not draft the affidavit; it was given to him by defendants' counsel. (Morrissey Dep. 52-53)

207.    Paragraph 2 of Morrissey's affidavit states,

> I understand that Mr. Feilbogen alleges that from January 2003 to April 2003, AIGTG's Energy Group accrued $108,334 per month to pay Mr. Feilbogen an alleged guaranteed 2003 bonus of $1,300,000, as well as $141,66 per month to pay AIGTG employee Tony Gordon a guaranteed 2003 bonus of $1,700,000.  Mr. Feilbogen also alleges that when Mr. Gordon left AIGTG in May 2003, AIGTG's President and Chief Executive Officer, John J. Finigan, instructed AIGTG's accountants to stop accruing for Mr. Feilbogen's bonus because the unused money accrued for Mr. Gordon's bonus supposedly would be put toward Mr. Feilbogen's bonus.  These allegations are false.

(Vladeck Aff. Ex. 17, ¶ 2)

208.    In his deposition, Morrissey admitted that AIG Trading's Energy Group accrued $108,334 per month to pay Feilbogen and $141,660 a month to pay Gordon until April 2003. (Morrissey Dep. 56-57)

209.    In his deposition, Morrissey also admitted that after Gordon left AIG Trading, Finigan instructed him to stop accruing for bonuses because "we have enough now."  (Morrissey Dep. 59)

### Finigan Affidavit

210.    Defendants produced an affidavit signed by Finigan on November 10, 2003. (Vladeck Aff. Ex. 18)

211.    As of November 10, 2003, Finigan hoped that he could stay employed at AIG Trading.  (Finigan Dep. 64)

212.    In his affidavit, Finigan swore that he had reviewed the Complaint in this case. (Vladeck Aff. Ex. 18, ¶ 2)  In his deposition, Finigan admitted that he did not see the whole Complaint.  (Finigan Dep. 65)

213.    In his affidavit, Finigan denied guaranteeing Feilbogen's compensation for 2003.

(Vladeck Aff. Ex. 18)  Finigan did not include in his affidavit a statement that he told Feilbogen

he would "try to make him whole" for 2003, although he testified to making that statement.

(Vladeck Aff. Ex. 18; Finigan Dep. 33, 310)


Dated: New York, New York
       September 10, 2004

                              By:    _Anne Vladeck_
                                     Anne C. Vladeck (ct25285)
                                       avladeck@vladeck.com
                                     Karen Cacace (ct25286)
                                       kcacace@vladeck.com
                                     VLADECK, WALDMAN, ELIAS &
                                       ENGELHARD, P.C.
                                     1501 Broadway, Suite 800
                                     New York, New York  10036
                                     (212) 403-7300

                                     Dan Young (ct17188)
                                       dyoung@wrkk.com
                                     WOFSEY, ROSEN, KWESKIN
                                       & KURIANSKY, LLP
                                     600 Summer Street
                                     Stamford, Connecticut
                                     (203) 327-2300