**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ROBERT FEILBOGEN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 3:03CV1624(DJS)** |
| | : | |
| **AIG TRADING GROUP INC. and AIG** | : | |
| **FINANCIAL PRODUCTS CORP.,** | : | |
| | : | |
| **Defendants.** | : | |

**MEMORANDUM OF DECISION**

On September 24, 2003, plaintiff Robert Feilbogen filed this action alleging that his former employers, defendants AIG Trading Group Inc. ("Trading") and AIG Financial Products Corp. ("AIG FP") failed to pay him guaranteed compensation despite an obligation to do so.  Specifically, Feilbogen alleges the following claims: breach of contract (First Cause of Action); promissory estoppel (Second Cause of Action); violation of Sections 31-71c and 31-71e of the Connecticut General Statutes (Third Cause of Action); quantum meruit (Fourth Cause of Action); unjust enrichment (Fifth Cause of Action); and constructive discharge (Sixth Cause of Action).  On August 9, 2004, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendants filed a motion for summary judgment.  (See Dkt. # 32).  For the reasons set forth herein, defendants' motion is **GRANTED in part** and **DENIED in part.**

## I. FACTS

Defendant Trading, a subsidiary of American International Group, Inc. ("AIG"), is a financial services firm and is a corporation organized and existing pursuant to the laws of the State of Delaware.  During the time period relevant to the Complaint, its principal place of business was located at One Greenwich Plaza, Greenwich, Connecticut, 06830.  Defendant AIGFP, also a subsidiary of AIG, is a financial services firm and is a corporation organized and existing pursuant to the laws of the State of Delaware with its headquarters and principal place of business located at 50 Danbury Road, Wilton, Connecticut, 06897.

Feilbogen began working at Trading in 1990 in an entry-level position and eventually ascended to a management position. Feilbogen was a member of the foreign exchange forwards trading desk until late 1997 or early 1998, where he quoted foreign exchange forwards, floating rate agreements, interest rate swaps, and options to Trading's customer base.  In 1998, Feilbogen became Trading's Chief of Staff, where he reported to Chief Executive Officer Gary Davis.  Feilbogen's responsibilities as Chief of Staff included supervision of the risk management and accounting groups, which included advising the groups of new transactions that were being contemplated and coordinating the groups' efforts with AIG. In addition, Feilbogen ensured that the risk reports were accurate and acted as the spokesperson for the

senior partners in the company if they wanted a transaction to be accounted for in a particular way.  Feilbogen oversaw the reconciliation process for the monthly profit and loss estimate reports between the risk management group and the accounting group.  In 1999, Feilbogen became Trading's Chief Operating Officer.  In addition to his then-existing duties, Feilbogen became responsible for oversight of systems and operations.

In December 2000, as part of AIG's purchase of Trading's stock, Feilbogen became an Executive Vice-President and was appointed to Trading's Executive Management Committee.  Also in December of 2000, Davis and two other management employees left Trading.  When Davis left, Bradford Klein became the CEO.  In April 2001, John Finigan replaced Klein as CEO of Trading.  Feilbogen reported to Finigan following Klein's departure.  Dennis Zampella was a human resources manager employed by AIG who was assigned to Trading to oversee personnel issues related to the corporate transaction.

In 2000, Feilbogen's annual salary was $200,000 and he received a bonus of $720,000.  Feilbogen understood that Edward Matthews, an executive of AIG, approved his compensation.  Trading claims that changes in compensation for employees at Trading were sent to AIG for approval, and that either Matthews or William Dooley of AIG had to approve any increases.  In 2000, Feilbogen created and maintained spreadsheets that contained the

-3-

bonus figures to be paid to individuals at Trading.  Once the bonus figures were approved by senior management at Trading, a copy of the spreadsheet was forwarded to human resources at Trading.  Human resources would coordinate with AIG to obtain the necessary approvals for the bonus figures.  Feilbogen claims that he and Klein discussed memorializing the 2001 and 2002 bonus guarantees in writing for each employee, but they did not do so because they were told that Matthews and Dooley preferred to keep the guarantees verbal.

On December 6, 2000, Matthews approved proposed guaranteed bonus figures for 2001 and 2002 for Trading employees.  The Trading employees with guaranteed bonus figures in the spreadsheets approved by Matthews were informed of their 2001 and 2002 bonus guarantee figures sometime between December 6, 2000 and January 16, 2001.  In 2001, Feilbogen's annual salary was $200,000; his guaranteed bonus for 2001 was $800,000. In 2002, Feilbogen's salary was $200,000; his guaranteed bonus for 2002 was originally set at $600,000.  Matthews approved these amounts in his memorandum of December 6, 2000.

The 2001 and 2002 guarantees were adopted in December of 2000 as a means of encouraging employees to stay with the firm at a time of management turnover.  Trading paid its annual bonuses to employees no earlier than December of the bonus year, and on occasion later.  Trading claims that, in the absence of a written

contract explicitly providing otherwise, it paid annual bonuses only to persons who were employees at the time of bonus payment. Feilbogen claims that Trading paid guaranteed bonuses to employees who were terminated without cause prior to the time bonuses were scheduled to be paid. Feilbogen claims that the employees who were guaranteed compensation for 2001 and 2002 were not guaranteed employment; their employment remained at-will, but if they were fired without cause during a year in which their compensation was guaranteed, they would receive the full amount of the guarantee.

In late 2001 or early 2002, Feilbogen spoke with Finigan about his 2002 compensation. Feilbogen told Finigan that he could earn $1,500,000 at a comparable position with another firm, but that he would like to stay with Trading. Finigan told Feilbogen he would give some thought to his compensation and consulted with Zampella. On February 21, 2002, Zampella sent an email to Dooley recommending that Feilbogen's 2002 compensation be increased to $1,300,000 in bonus and $250,000 in salary. Dooley approved the increase, and Trading's human resources department noted Feilbogen's new guaranteed bonus figure of $1,300,000 on a spreadsheet of guaranteed bonuses for 2002. Shortly thereafter, Finigan told Feilbogen that his guaranteed bonus figure for 2002 had been increased from $600,000 to $1,300,000 and his salary had been increased from $200,000 to

$250,000.  After learning of his pay increase, Feilbogen spoke
with Zampella and asked Zampella if he should call to thank
Dooley.  Zampella said that it would not be necessary.
Feilbogen was paid a bonus of $1,300,000 for 2002 in February
2003.

Sometime in the first half of 2002, Finigan asked Feilbogen
to help prepare a memorandum to AIG recommending that Trading
enter the energy business.  During the summer of 2002, Finigan
and Feilbogen discussed moving Feilbogen to the new energy
business on a full-time basis.  Feilbogen testified that on or
about June of 2002, he spoke to Finigan about how he would be
compensated if he concentrated on the energy business on a
full-time basis.  Feilbogen told Finigan that he wanted to be
clear how he would be compensated, so that he could make personal
decisions, and that Finigan responded by saying, "I will pay you
the same amount of money--the same bonus for 2003 as 2002."
(Dkt. # 37 Ex. 1 at 97:20-21.)  Feilbogen claims that he asked
Finigan whether Finigan meant the original bonus amount of
$600,000 or the increased bonus amount of $1.3 million, and that
Finigan stated that he meant the $1.3 million figure.  Feilbogen
claims that he insisted upon clarification of his compensation
because he was apprehensive about working in a new venture and
that he would have to relocate to a more expensive area.
Feilbogen never spoke with Matthews or Dooley of AIG about what

-6-

his compensation would be for 2003, and human resources documents do not reflect Feilbogen's 2003 bonus figure.  Defendants vigorously dispute Feilbogen's claim to a guarantee for his 2003 bonus.

In 2002, Feilbogen began to participate in the development of the energy business at Trading, but continued to act as Trading's COO.  In September 2002, Tony Gordon was hired by Trading as the CEO of the energy group and was made an Executive Vice-President of Trading.  Gordon's salary was set at $300,000, and he had a written employment contract with Trading that included provision for a guaranteed bonus for 2003.  Feilbogen and Gordon were the only Executive Vice-Presidents of Trading who were working in the energy group in 2002.

In January 2003, Feilbogen remained the COO of Trading, but he was becoming more involved in the energy group.  Morrissey, as Chief Financial Officer of Trading, reported to Feilbogen until Feilbogen's COO responsibilities ended.  Paul Gentile and James Garzone reported to Morrissey.  Morrissey, Gentile, and Garzone provided accounting services to all the businesses in Trading, including the energy group in 2002 and 2003.

Feilbogen claims that certain accounting documents reflect the fact that he was to receive a bonus of $1.3 million in 2003. Bonuses for "back office" employees, such as Feilbogen, were accounted for in an entry called "general fund."  Morrissey

-7-

consulted with Finigan about accruals for 2003 for general fund bonuses for the energy group.  Morrissey originally proposed accruing $2 million, based on his understanding of the bonuses paid the prior year to Gordon and Feilbogen.  Finigan instructed him that the accrual should be $3 million, which represented Gordon's $1,700,000, and $1,300,000 for Feilbogen.  Around the time of Gordon's departure from Trading, Morrissey told Gentile that $1,700,000 of the $3,000,000 that was being accrued for energy management bonuses was for Gordon.  Gentile assumed the balance was an accrual for Feilbogen's bonus because Feilbogen was the other person running the energy group.  Based on his assumption, Gentile created entries titled "Management 1" and "Management 2" on a spreadsheet titled "Energy Inc. Guarantees," which he prepared for Feilbogen's use.  (See Dkt. # 44 Ex. 6.) The Energy Inc. Guarantees 2003 schedule lists accruals by month of $141,666 for "Management 1" and $108,334 for "Management 2." Management 1 represented Gordon and Management 2 represented Feilbogen.

These accruals were also reflected in an item entitled "guarantee" on Trading's FRX Report, which is an extraction of information from Trading's general ledger.  (See Dkt. # 37 Ex. 14.)  The accountants and Feilbogen saw the FRX report for the energy group in the first half of 2003.  Gentile printed out the Energy, Inc. Guarantees and the FRX reports in response to a

request from Feilbogen in early July of 2003.

In early 2003, the decision was made to integrate the operations of Trading into AIGFP.  The decision was announced to employees in April of 2003.  In March or April of 2003, Finigan told Feilbogen of the decision to integrate Trading into AIGFP. In March or April of 2003, Feilbogen traveled to London to meet with Joe Cassano, the Chief Executive Officer of AIGFP, to discuss the integration of Trading into AIGFP.  As part of the integration efforts, Cassano asked Feilbogen to provide him with copies of written contracts for employees of the energy group at Trading, and Feilbogen asked Zampella to put the package together.  Feilbogen emailed the package to Cassano on May 8, 2003.  Included in the materials Feilbogen sent to Cassano was a chart prepared by human resources personnel listing commitments and a cover memorandum referring to the fact that Gordon had a guarantee.  (See Dkt. # 37 Ex. 22.)  The materials made no mention of a bonus guarantee to Feilbogen.  Cassano responded to Feilbogen via email on May 10, 2003, and directed Feilbogen to compile copies of "all the employment contracts or offer acceptance letters that are in place for the team members." (Id.)  Feilbogen forwarded this email to Zampella, requesting that he make copies of "all energy employee contracts/offer letters."  (Id.)

At a meeting in Wilton concerning the integration process,

Feilbogen was informed by AIGFP that its energy activities would be headed by another executive, Martin Wayne.  Feilbogen testified that as time went on during the integration discussions he did not receive information satisfactory to him as to what role he would fulfill at AIGFP.  Feilbogen testified that he understood in June 2003 only that he would be part of the energy group at AIGFP.  Feilbogen and other Trading energy personnel selected to join AIGFP in Wilton were scheduled to begin work in Wilton on July 1, 2003.  AIGFP, using the compensation information provided by Feilbogen and others created a chart, dated June 16, 2003, titled "AIGTG Employee Transfers," which contains information concerning the energy personnel transferring from Trading, including base salary and whether the employee had a bonus guarantee.  The "bonus guarantee" box for Feilbogen stated "N/A."  (Dkt. # 35 Ex. E.)

On the afternoon of June 25, 2003, Feilbogen sent an email to Finigan stating the following:

> Marty Wayne called me today and told me that they will be presenting the energy group with contracts or letters on Friday indicating that we will become FP employees.  These letters will apparently reflect any guarantees or deals in place.  Have you spoken to Joe Cassano about my verbal guarantee?  I asked Dennis, and he said he knew we had agreed on my comp for 2003, but wasnt [sic] sure if you had mentioned anything.  I just don't want to find myself in the awkward position of asking about it or informing them for the first time about it on Friday.  If you havent [sic] mentioned anything, let me know how you would like to handle it.

(Dkt. # 37 Ex. 26.)  Finigan then called Feilbogen and denied

having given him a guarantee.  Feilbogen claims that Finigan
stated that AIGFP did not approve of verbal deals and urged
Feilbogen not to mention his promise to anyone at AIGFP.

On June 27, 2003, Wayne gave a letter to Feilbogen
describing AIGFP's offer of employment to Feilbogen.  The letter
stated that any bonus compensation for 2003 would be
discretionary, and that it superceded any prior discussion of
compensation. On July 1, 2003, Feilbogen had a videoconference
call with Cassano.  Feilbogen testified that Cassano told
Feilbogen that he wanted him on the team, but that employees at
AIGFP work on a discretionary bonus basis, and that the current
terms of the employment letter were the only terms under which
Feilbogen could join AIGFP.  Feilbogen testified that he told
Cassano that Finigan made him a promise and, by signing the
letter in its current form, he would be forgoing a bonus he felt
he was entitled to receive.  On July 9, 2003, Cassano sent a
letter to Feilbogen, stating as follows:

> [a]s we have previously advised you, we have discussed
> your position with John Finigan, among others, and it
> is clear that, contrary to the assertions in your
> e-mail, you were not given a 2003 guarantee.  This
> conclusion is of course consistent with Trading Group's
> Policy Manual, by which you agreed in writing to be
> bound.  The Policy Manual clearly states that, absent a
> written contract to the contrary, no employee has any
> entitlement to a bonus until it is actually received.

(Dkt. # 37 Ex. 25.)  On or about April 2, 1997, Trading issued a
Policy Manual.  The Trading Policy Manual states the following:

-11-

> [t]he Company may, but is not required to, pay
> employees a bonus based upon their performance and that
> of the Company.  However, the determination as to
> whether and in what amount to pay such bonus shall be
> made by the Company in its sole discretion and, absent
> a written contract to the contrary, no employee has any
> entitlement to a bonus until it is actually received.

(Dkt. # 37 Ex. 26 at 38.)  On April 28, 1997, Feilbogen signed an

Acknowledgment of Compliance with Policy Manual, after being

provided with an opportunity to read it.  Feilbogen sent an email

to Cassano on July 9, 2003 stating that Feilbogen's employment

had ended, and claiming that Feilbogen had been terminated.

There was no written severance policy at Trading.  There

was, however, a severance practice to offer employees, who were

not offered employment with AIGFP as a result of the integration

of Trading into AIGFP, one month of salary per year of service.

Trading claims that payment of severance was conditioned on

signing a release, and that employees who lost their job as a

result of the integration of Trading into AIGFP received an offer

of severance contingent on signing a release.

## II.  DISCUSSION

Feilbogen alleges the following claims: breach of contract

(First Cause of Action); promissory estoppel (Second Cause of

Action); violation of Sections 31-71c and 31-71e of the

Connecticut General Statutes (Third Cause of Action); quantum

meruit (Fourth Cause of Action); unjust enrichment (Fifth Cause

of Action); and constructive discharge (Sixth Cause of Action).

-12-

Defendants claim that his breach of contract cause of action is barred by Connecticut's Statute of Frauds, and that the other claims lack merit.

## A.  STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the

nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

### B.  BREACH OF CONTRACT

In his First Cause of Action, Feilbogen claims that defendants breached an oral contract to pay him a guaranteed bonus of $1.3 million in 2003.  The prima facie elements of a breach of contract action are the existence of an agreement, breach of the agreement by the defendant, and damages to the plaintiff from the breach.  Rather than dispute these prima facie elements in their motion for summary judgment,[1] defendants claim that, even if they did agree to pay Feilbogen a bonus of $1.3 million in 2003, this contract is not enforceable because it is not written, and therefore is subject to Connecticut's Statute of Frauds.  They also claim that Finigan lacked the authority to enter into a contract of this kind on behalf of Trading, and that Feilbogen was not entitled to a bonus as a matter of law based upon Trading's Policy Manual.

### 1. STATUTE OF FRAUDS

Defendants claim that Feilbogen's breach of contract claim

---

[1] Defendants vigorously dispute the existence of a contract to pay Feilbogen a guaranteed bonus of $1.3 million, but they do not seek judgment as a matter of law on this ground at this time. Any reference to a contract in this memorandum should be viewed in the spirit of performing the court's task under Rule 56 only and not as an endorsement of the strength of plaintiff's claims.

is based upon an oral agreement that cannot be performed within one year and is therefore unenforceable.  Connecticut's Statute of Frauds provides the following: "[n]o civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: . . . upon any agreement that is not to be performed within one year from the making thereof. . . ."  Conn. Gen. Stat. § 52-550(a)(5). Defendants argue that, because the oral contract regarding the amount of his 2003 bonus upon which Feilbogen relies arose during a conversation between him and Finigan in August of 2002, and bonuses were paid to employees no earlier than December of the year that the bonus was due, any agreement regarding the amount of Feilbogen's 2003 bonus could not have been performed within one year because Feilbogen would have received his guaranteed bonus in December of 2003 at the earliest.  As such, defendants claim that the oral contract upon which Feilbogen relies is subject to the bar set forth in Section 52-550(a)(5) because it could not have been performed within one year.

Feilbogen claims that the oral contract at issue could have been performed in less than one year.  Specifically, he contends that he would have received his guaranteed bonus if Trading terminated his employment in 2003 for any reason other than for cause.  Defendants dispute Feilbogen's interpretation of the oral

contract.

Interpretation is an issue of fact, and is therefore reserved for the factfinder, unless the evidence compels one conclusion only.  "Interpretation requires a determination of the intention of the parties as manifested by their words and conduct."  Heyman v. CBS, Inc., 178 Conn. 215, 227-28 (1979). "'The intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were. . . .  This determination requires a finding of mutuality of obligation.' . . .  Intention is an inference of fact. . . ."  Hydro-Hercules Corporation v. Gary Excavating, Inc., 166 Conn. 647, 652-53 (1974) (quoting Hess v. Dumouchel Paper Co., 154 Conn. 343, 347 (1966)); see Lavigne v. Lavigne, 3 Conn. App. 423, 427-28 (1985).  "In the absence of 'definitive contract language,' however, 'the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact.'"  Finley v. Aetna Life and Cas. Co., 202 Conn. 190, 213 (1987) (quoting Bead Chain Mfg. Co. v. Saxton Products, Inc., 183 Conn. 266, 274-75 (1981)), overruled on other grounds by Curry v. Burns, 225 Conn. 782 (1993); see Kakalik v. Bernardo, 184 Conn. 386, 393 (1981) (holding that the meaning of a contract is "question of the intent of the parties, to be determined, as a matter of fact, from the language of the contract, the

circumstances attending its negotiation, and the conduct of the parties in relation thereto."). "Because it is an inference of fact, determining the intent of the parties is within the province of the jury: it is the raison d'etre of the jury system." Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 533 (1999) (internal quotation marks omitted) (quoting Coelho v. Posi-Seal Intern., Inc., 208 Conn. 106, 113 (1988)).

Defendants' motion must be denied because Feilbogen has presented sufficient evidence to support his interpretation of the oral contract at issue. Feilbogen cites a "company policy" for the proposition that he would be paid his guaranteed bonus if Trading terminated his employment without cause during 2003. (See Dkt. # 43 ¶ 8.) Feilbogen's statement is not a bald assertion; he was a part of Trading's upper management for a significant period of time and was familiar with compensation issues. Although defendants dispute Feilbogen's iteration of company policy, they admit the fact that certain employees with bonus guarantees whose employment ended prior to the payment of bonuses were paid undisclosed amounts pursuant to severance agreements. (See Dkt. # 46 at 2 n.1.) The characterization of payments to departing employees with bonus guarantees is immaterial– what is significant is the source of Trading's obligation to make these payments. Therefore, it is possible that Feilbogen will be able to prove that Trading was obliged to

-17-

pay an employee a guaranteed bonus if Trading terminated the employee for any reason other than for cause during the bonus year.

Because Feilbogen may be able to prove that the oral agreement to pay him a guaranteed bonus could have been performed within one year, it is possible that this contract is not subject to Connecticut's Statute of Frauds.  Defendants' motion for summary judgment is therefore denied on this ground.

2. FINIGAN'S AUTHORITY

Defendants claim that Finigan lacked the authority to enter into an oral agreement to pay a guaranteed bonus to Feilbogen, and that Feilbogen cannot prove that he perceived Finigan to have the apparent authority to do so.  "'Apparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses.'"  Tomlinson v. Board of Educ. of City of Bristol, 226 Conn. 704, 734 (1993) (quoting Lewis v. Michigan Millers Mutual Ins. Co., 154 Conn. 660, 665 (1967)). "[A]pparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal," and is an issue of fact.  Two criteria are relevant to determining whether apparent authority existed:

> [f]irst, it must appear from the principal's conduct that "the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such

-18-

authority." [Nowak v. Capitol Motors, Inc., 158 Conn. 65, 69 (1969)]. . . . Second, the party dealing with the agent must have, "acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority" to bind the principal to the agent's action. [Id.]

Tomlinson, 226 Conn. at 734-35.

Defendants contend that any salary increase, including a bonus increase, had to have been approved by either Dooley or Matthews from AIG.  Defendants point out that Feilbogen's salary and bonus increases for 2001 and 2002 were expressly approved by Dooley and Matthews, and that Feilbogen was aware of this fact. Defendants therefore claim that there is no reasonable basis for Feilbogen to believe that Finigan had the authority to unilaterally guarantee him a bonus of $1.3 million in 2003.

Feilbogen could prove to the trier of fact that Finigan acted with apparent authority when he entered into an oral agreement to pay Feilbogen a guaranteed bonus in 2003.  In August of 2003, Finigan was the CEO of Trading.  Although Feilbogen's 2001 and 2002 bonuses were approved by AIG management, and were the subject of deliberation involving Dooley, Matthews, and Zampella, Feilbogen's request originated with Finigan, and Finigan was the person who conveyed approval of Feilbogen's request to Feilbogen.  Although approval from AIG management had been sought and obtained in the past, Feilbogen was not involved in that process, and obtained no official notification from Dooley, Matthews, or Zampella regarding his pay increases.  By

-19-

designating Finigan as the person with whom Feilbogen should negotiate regarding his compensation, Trading conveyed the impression that Finigan could enter into an agreement on its behalf.  See Edart Truck Rental Corp. v. B. Swirsky and Co., Inc., 23 Conn. App. 137, 140 (1990) ("Apparent authority may be derived from a course of dealing.").  Further, a factfinder could conclude that Feilbogen's presumption that Finigan could set his 2003 bonus in an amount equal to his 2002 bonus as well as the underlying presumption that Finigan would properly process his decision through AIG management and human resources were both reasonable under the circumstances.  Accordingly, Feilbogen may be able to prove that Finigan acted with apparent authority, and defendants' motion for summary judgment is denied on this ground.

Defendants are not entitled to judgment as a matter of law on Feilbogen's breach of contract claim.  In addition to the reasons set forth herein, the court also finds that genuine issues of material fact remain regarding whether defendants waived the provision in AIG's Policy Manual regarding the payment of bonuses, and whether AIGFP could be liable for an obligation incurred by Trading.  As such, defendants' motion is denied with respect to Feilbogen's First Cause of Action.

## C. CLAIM FOR WAGES

Feilbogen claims that defendants failed to pay him wages due in violation of Sections 31-71c and 31-71e of the Connecticut

General Statues.  In their motion for summary judgment, defendants argue that Feilbogen's 2003 bonus cannot be considered "wages" as that term is defined in Section 31-71a(3).  The term "wages" is defined as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation. . . ."  Conn. Gen. Stat. § 31-71a(3).  Courts confronting the issue of whether a bonus is properly considered wages have recognized the fact that there are many different kinds of payments to employees falling within the general term "bonus," and that the particular characteristics of each payment determine whether the bonus constitutes wages.  To be sure, the term "bonus" does imply a gratuitous payment, but experience suggests that bonuses are often simply another form of compensation paid to employees for services rendered.  When compelled to differentiate between the two extremes, courts focus on the relationship between the compensation and the employee's services rendered.  Courts that have held that a bonus payment is wages have done so when the payment is premised upon work or services the employee has performed as opposed to the general success of the company or the whim of management.  Thus, if there is some indication that the bonus payment is premised upon the individual's quantifiable performance, or otherwise based upon some kind of service rendered, the bonus may be considered wages.

Feilbogen may be able to prove that his bonus was unpaid wages because the bonus bore a sufficient relationship to services he rendered for defendants.  Feilbogen claims that, although the bonus was not premised upon some quantifiable criteria, it was given to him in recognition of the fact that he would be leaving a secure management position so that he could develop and create a new business venture on behalf of Trading. Feilbogen claims that he spent a great deal of time and effort developing a business plan and then implementing his plan for starting the energy business.  He also claims that this business plan had great value for defendants, but nevertheless that this value would not immediately be realized in financial terms. Further, Feilbogen's bonus was set at a negotiated amount prior to the start of 2003, which suggests that, in determining the amount of the bonus to be paid, defendants relied heavily upon Feilbogen's expected contribution to their business.  The fact that the bonus was guaranteed also suggests that it was related to Feilbogen's expected contributions to the company and not upon some abstract notion of success.

Im sum, the nature of the bonus payment as Feilbogen describes it could be considered wages as that term is used in Sections 31-71c and 31-71e of the Connecticut General Statutes. Specifically, the finder of fact could conclude that Feilbogen's 2003 bonus bore a sufficient relationship to the services he

rendered to the company such that the bonus would properly be considered "compensation for labor or services rendered"; the choice between what defendants consider a "retention incentive" and what Feilbogen considers a payment for services rendered is a properly reserved for the factfinder.  Therefore, defendants' motion for summary judgment is denied with respect to Feilbogen's Third Cause of Action.

### D. CONSTRUCTIVE DISCHARGE

Feilbogen claims that defendants constructively discharged him from his position by directing him to sign the June 27, 2003 letter setting forth the terms of his continued employment.  He contends that defendants "erroneously characterized [his] discharge as a voluntary resignation in order to avoid paying [Feilbogen] the severance he otherwise would have been paid," and that defendants' "actions violated the public policy of preventing overreaching by employers and the forfeiture by employees of benefits earned by the rendering of substantial service."  (Dkt. # 1, Sixth Cause of Action, ¶¶ 54-55.) Feilbogen claims that, as a result of defendants' actions, he should receive a severance benefit of $270,000.  Feilbogen, in order to succeed on his claim, must present "sufficient evidence for a jury to decide reasonably and legally that [he] had been discharged in violation of public policy." Seery v. Yale-New Haven Hosp., 17 Conn. App. 532, 539 (1989); see Sheets v. Teddy's

<u>Frosted Foods, Inc.</u>, 179 Conn. 471, 474 (1980).

Defendants argue that Feilbogen cannot prove that he was constructively discharged and that he was nevertheless not entitled to severance benefits.  With respect to the first argument, Feilbogen may be able to prove that he was constructively discharged.  "'Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.'" <u>Brittell v. Dept. of Correction</u>, 247 Conn. 148, 178 (1998) (quoting <u>Chertkova v. Connecticut General Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996)).  "'Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" <u>Brittell</u>, 247 Conn. at 178 (quoting <u>Chertkova</u>, 92 F.3d at 89).  A jury could find that compelling an employee to waive the right to receive a $1.3 million guaranteed bonus, which constituted about 84% of the employee's total compensation of $1.55 million, would have forced the employee to resign.  The fact that Feilbogen may ultimately have received a bonus comparable to, or even in excess of, $1.3 million does not alter this conclusion; according to the most favorable construction of Feilbogen's evidence, his $1.3 million bonus was guaranteed, and defendants tried to force him to waive the guarantee, making it possible that Feilbogen would

receive nothing.  The finder of fact must examine the evidence as a whole in order to determine whether a reasonable person in Feilbogen's position would have felt compelled to resign.

Defendants other arguments addressed to this claim lack merit.  The severance policy is subject to interpretation, which, as stated previously herein, is within the province of the finder of fact.  Feilbogen may be able to show that a severance benefit was available to him and that execution of a release was not a prerequisite to the right to collect severance.  As such, defendants' motion is denied with respect to this claim.

### E. PROMISSORY ESTOPPEL

Feilbogen claims that Finigan promised him a guaranteed bonus of $1.3 million for 2003, and, pursuant to the doctrine of promissory estoppel, this court should enforce this promise because Feilbogen relied upon it to his detriment.  Defendants claim that Feilbogen cannot prove that he relied upon Finigan's promise to his detriment.

"Promissory estoppel is asserted when there is an absence of consideration to support a contract."  Glazer v. Dress Barn, Inc., 274 Conn. 33, 78 (2005).  With respect to promissory estoppel, the Connecticut Supreme Court has endorsed the approach set forth in Section 90 of the Restatement (Second) of Contracts, which provides the following:

> [a] promise which the promisor should reasonably expect
> to induce action or forbearance on the part of the

> promisee or a third person and which does induce such
> action or forbearance is binding if injustice can be
> avoided only by enforcement of the promise. The remedy
> granted for breach may be limited as justice requires.

Rest. (Second) Contracts § 90 (1981).  "A fundamental element of

promissory estoppel, therefore, is the existence of a clear and

definite promise which a promisor could reasonably have expected

to induce reliance." D'Ulisse-Cupo, 202 Conn. at 214.  Further,

"[t]o succeed on a claim of promissory estoppel, the party

seeking to invoke the doctrine must have relied upon the other

party's promise." Stewart v. Cendant Mobility Services Corp.,

267 Conn. 96, 112 (2003).  "That reliance, of course, may take

the form of action or forbearance. . . .  Nevertheless, the

asserted reliance, regardless of its form, must result in a

detrimental change in the plaintiff's position" such that there

is a cost to the plaintiff of relying upon the promise.  Id. at

112-13.

     Feilbogen has presented sufficient evidence for the

factfinder to conclude that he relied upon Finigan's promise to

his detriment.  Feilbogen's offer closely resembles the

plaintiff's offer of proof in Stewart, where the Connecticut

Supreme Court affirmed the trial court's entry of judgment based

upon a jury's verdict in the plaintiff's favor on her promissory

estoppel claim.  In Stewart, the plaintiff demonstrated that her

employer promised her that her husband's working for a competitor

would not have a negative effect upon her employment.  See id. at

-26-

111.  The evidence showed that the plaintiff did not have another job offer at the time, nor did she have any definite idea of what she would do had her employer failed to address her concerns about her husband, but rather that she would enter a receptive job marketplace as a highly desirable candidate, and would likely command a substantial signing bonus.  See id. at 111-12.  Here, Feilbogen has presented evidence indicating that he had a longstanding invitation to discuss a position with Sempra Energy, and that he could command a salary of $1.5 million in the job marketplace.  Feilbogen could also prove that, because he did not receive a bonus for his work at Trading for the period of January through June of 2003, his reliance cost him the chance to earn a full bonus for the year 2003.  Therefore, defendants' motion for summary judgment is denied with respect to this claim.

### F. QUASI-CONTRACT CLAIMS

Feilbogen claims that, if no recovery is available under his contract theories, he is entitled to restitution pursuant to the quasi-contract theories of quantum meruit and unjust enrichment.  "Unjust enrichment and quantum meruit are forms of the equitable remedy of restitution by which a plaintiff may recover the benefit conferred on a defendant in situations where no express contract has been entered into by the parties."  Burns v. Koellmer, 11 Conn. App. 375, 385 (1989).

"Quantum meruit is a theory of contract recovery that does

not depend upon the existence of a contract, either express or implied in fact. . . .  Rather, quantum meruit arises out of the need to avoid unjust enrichment to a party, even in the absence of an actual agreement." Gagne v. Vaccaro, 255 Conn. 390, 401 (2001).  The doctrine of quantum meruit "strikes the appropriate balance by evaluating the equities and guaranteeing that the party who has rendered services receives a reasonable sum for those services." Id.  "The pleadings must allege facts to support the theory that the defendant, by knowingly accepting the services of the plaintiff and representing to [him] that []he would be compensated in the future, impliedly promised to pay [him] for the services []he rendered." Burns, 11 Conn. App. at 383-84.

"Unjust enrichment applies whenever 'justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.'"  Gagne, 255 Conn. at 401 (quoting 12 S. Williston, Contracts § 1479, at 272 (3d ed. 1970)).  The doctrine of unjust enrichment is "based on the postulate that it is contrary to equity and fairness for a defendant to retain a benefit at the expense of the plaintiff." Id.  "In order for the plaintiff to recover under the doctrine, it must be shown that the defendants were benefitted, that the benefit was unjust in that it was not paid for by the defendants, and that the failure of payment

-28-

operated to the detriment of the plaintiff."  Burns, 11 Conn.
App. at 383.

Defendants argue that they are entitled to judgment as a
matter of law on Feilbogen's restitution claims because the
subject matter of his claims, the unpaid $1.3 million bonus, is
subject to an express written agreement in the form of the Policy
Manual.  Defendants claim that "[w]hen an express contract exists
between the parties, no claim of quantum meruit or unjust
enrichment can lie."  (Dkt. # 33 at 31 (citing Rosick v.
Equipment Maintenance & Service, Inc., 33 Conn. App. 25, 27
(1993).)  In Rosick, the Connecticut Appellate Court affirmed the
trial court's entry of judgment as a matter of law in favor of
the defendant on the plaintiff's restitution claim where the
plaintiff sought reimbursement for extra work performed on a
project, but failed to seek reimbursement pursuant to the
procedure set forth in the written agreement between the parties
concerning the project.  Rosick, 33 Conn. App. at 38.  The court
held that "[t]he express contract provided a procedure for the
plaintiff to make a claim for extras and the road patching costs
fell within that procedure; thus, because there was an express
provision covering road patching, a quantum meruit claim to
recover this work is barred."  Id.

Here, there is an express provision governing the payment of
bonuses:

> [t]he Company may, but is not required to, pay
> employees a bonus based upon their performance and that
> of the Company.  However, the determination as to
> whether and in what amount to pay such bonus shall be
> made by the Company in its sole discretion and, absent
> a written contract to the contrary, no employee has any
> entitlement to a bonus until it is actually received.

(Dkt. # 37 Ex. 26 at 38.)  Feilbogen's claim that defendants were
unjustly enriched by receipt of the benefit of his services,
including certain special projects, without fairly compensating
him is contrary to the express language set forth in the Policy
Manual; according to the policy manual, Feilbogen expressly
agreed to the possibility that he would not receive a bonus in
any given year.  Even though the court has held that the
factfinder must decide whether defendants waived this provision
in one particular instance, thus permitting an oral modification
of the Policy Manual guaranteeing Feilbogen a $1.3 million bonus
for 2003, there is no evidence that defendants disavowed the
Policy Manual altogether.  Whether defendants are bound by a
promise or contractual undertaking to pay a bonus, or whether the
bonus itself meets the statutory definition of wages is a much
different question than whether justice requires that the court
order defendants to remunerate Feilbogen beyond the amount of his
salary despite an express agreement to the contrary.  As such,
defendants' motion for summary judgment is granted with respect
to the Fourth and Fifth Causes of Action.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (dkt. # 32) is **GRANTED in part** and **DENIED in part**. Judgment as a matter of law shall enter in favor of defendants on the Fourth and Fifth Causes of Action set forth in the complaint. The parties shall file a joint trial memorandum on or before September 8, 2006.

So ordered this 15th day of May, 2006.

**/s/DJS**

**_____**
       **DOMINIC J. SQUATRITO**
    **UNITED STATES DISTRICT JUDGE**